UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
IN RE ADELPHIA COMMUNICATIONS        :
CORPORATION SECURITIES AND DERIVATIVE :
LITIGATION                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- X
THIS MEMORANDUM AND ORDER APPLIES TO   :
No. 03 Civ. 5755, The Adelphia Business Solutions   :        03 MD 1529 (LMM)
Actions                              :        <u>MEMORANDUM</u>
                                     :        <u>AND ORDER</u>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

McKENNA, D.J.,


## I.  Background

     This action is part of a multi-district securities litigation pending before this

Court.  <u>In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.</u>, No. 03 MDL 1529.

     In the instant case, the Wellsville Group has brought a securities fraud class action

on behalf of itself and all stockholders of Adelphia Business Solutions, Inc. who

purchased their securities between January 6, 2000 and March 27, 2002 (collectively

"plaintiffs").[1]  (Compl. ¶¶ 1, 12-20.)  In their Consolidated Amended Class Action

Complaint ("Complaint"), plaintiffs have named as defendants John J. Rigas, Michael J.

Rigas, Timothy J. Rigas, and James P. Rigas (collectively "the Rigases" or "defendants"),

all of whom were directors and/or senior officers of Adelphia Business Solutions

("ABIZ") between 2000 and 2002.  (Id. ¶¶ 21-23.)  ABIZ was a telecommunications

company providing local phone service, long distance service, high-speed data

---

[1] In an Order dated December 5, 2003, this Court appointed the Wellsville Group as lead plaintiff in this
action.  The members of the Wellsville Group include:  Rance Baxter, Richard Bokman, John Dewaileebe,
Jeffrey Hyslip, John Hyslip, Joseph Hyslip, Norman Preston, and Larry Walsh.  (Compl. ¶¶ 12-20.)

transmission, and internet connectivity to business, government, and educational customers.  (Id. ¶ 2.)  Plaintiffs have not named ABIZ in this action, as it has filed for Chapter 11 bankruptcy.  (Id. ¶ 7.)[2]

Plaintiffs claim violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; 15 U.S.C. § 78t(a).  (See also Compl. ¶¶ 1, 90-99.) Plaintiffs contend that from January 2000 to January 2002 ABIZ engaged in various fraudulent schemes in order to artificially inflate the price of ABIZ securities by including misrepresentations and fraudulent statements in various publicly filed documents and press releases.  (Compl. ¶¶ 4-6, 23-26, 35-37.)  These schemes include: falsely reporting statistics relating to new customers; falsely reporting corporate overhead expenses; and failing to disclose debt for which it and its parent corporation, Adelphia Communications Corp. ("ACC"), were liable.  (Id. ¶¶ 38-62.)  Plaintiffs allege they would not have purchased or acquired ABIZ at these artificially inflated prices if they had known of defendants' misrepresentations.  (Id. ¶¶ 81-83, 94.)  In March 2002, it was revealed that ACC owed $2.3 billion in debt, for which it and ABIZ were jointly obligated and which was not reported on their balance sheets.  (Id. ¶¶ 65, 66.)  ABIZ also announced that it would default on $15.3 million in secured notes.  (Id. ¶ 64.)  Plaintiffs allege that, as a result, ABIZ filed for bankruptcy.  (Id. ¶¶ 6, 63-68.)  ABIZ, now renamed Telcove, is undergoing a reorganization that would allegedly leave plaintiffs with no value for their shares of ABIZ stock.  (Id. ¶ 69.)[3]  Plaintiffs allege that they have lost the

---

[2] Prior to January 11, 2002, ABIZ was a majority (79%) owned subsidiary of Adelphia Communications Corp. ("ACC").  On January 11, 2002, ACC distributed all of its shares of ABIZ stock to the shareholders of ACC as a stock dividend.  (Id. ¶3.)

[3] Telcove's proposed reorganization plan calls for a reduction in debt from $1.42 billion to $68.4 million by converting a majority of creditors' claims to equity and/or cash. (Id.)

total value of their investments in ABIZ, resulting in a collective injury of $3,308,608. (Id. ¶¶ 6, 12.)

Defendants have filed a Motion to Dismiss both the 10(b) and 20(a) claims that are alleged in plaintiffs' Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons set forth below, the motion is granted in part and denied in part. Plaintiffs, however, will be given limited leave to amend their Complaint.

## II. Section 10(b) Claim

### A. Particularity

Under Federal Rule of Civil Procedure 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6). A court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pled factual allegations. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). A court should dismiss a complaint only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant: "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied;

and (5) that plaintiff's reliance was the proximate cause of their injury."  In re IBM Corp. Sec. Litig., 163 F. 3d 102, 106 (2d Cir. 1998).[4]

An allegation of securities fraud under Section 10(b) and Rule 10b-5 is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[5]  Rule 9(b) requires a complaint alleging fraud to:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Mills, 12 F.3d at 1175.  In examining a complaint for compliance with Rule 9(b), a court must "read the complaint generously, and draw all inferences in favor of the pleader."  Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., 794 F. Supp. 1265, 1280

---

[4] Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j,  reads in relevant portion:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange —
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10-b, 17 C.F.R. § 240.10b-5, reads in relevant portion:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> . . .
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[5] Rule 9(b) states:  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

(S.D.N.Y. 1992) (citation and quotations omitted).  The purposes of Rule 9(b) are: "(1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits."  In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 213 (S.D.N.Y. 1999) (citing DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)).

An allegation of a 10(b) violation is also subject to the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  The PSLRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Further, the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. at § 78u-4(b)(2).  "Under the heightened pleading requirements of Rule 9(b) and the PLSRA, plaintiffs must allege the first two elements of a securities fraud claim – fraudulent acts and scienter – with particularity."  Gabriel Capital, L.P. v. NatWest Fin., Inc., 94 F. Supp. 2d 491, 500 (S.D.N.Y. 2000).

Defendants argue that plaintiffs have not met any of the four requirements of 9(b) or the PSLRA.  The court will first address the second prong – whether plaintiffs have adequately identified the speaker of the alleged fraudulent or misleading statements. (Defs.' Mem. at 3-7; Defs.' Reply at 1-6.)  The court will then address the remaining

three prongs together as they all relate to the particularity of the statements themselves. Third, the court will address the issue of causation.

### 1. Identification of Speaker

Defendants argue that under Rule 9(b) and the PSLRA, plaintiffs are required to specifically identify the role of each defendant in the alleged fraud, and cannot simply "lump the Rigas defendants together without specifying their roles in the alleged fraud." (Defs.' Mem. at 4; Defs.' Reply at 4-6.)  However, the group pleading doctrine is an exception to the requirement that a complaint identify each defendant's fraudulent acts. Under this doctrine, plaintiffs may "'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective works of those individuals with direct involvement in the everyday business of the company.'"  In re Emex Corp. Sec. Litig., No. 01 Civ. 4886, 2002 WL 31093612, at *7 (S.D.N.Y. Sept. 18, 2002) (quoting In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999)).  Here, plaintiffs can rely on the group pleading exception because the Rigas defendants are identified as holding positions that qualify them as "corporate insiders with active daily roles," Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000), or as members of the Board of Directors with equity interests in ABIZ and access to information concerning the company's day-to-day business.[6]  See In re Oxford Health, 187 F.R.D. at 142-43.  (See also Compl. ¶¶ 21-23, 97-98.)

---

[6] In their Reply, defendants concede the applicability of the group pleading doctrine to the identification of the speaker requirement.  (See Defs.' Reply at 5-6.)  Defendants then argue that the group pleading doctrine does not apply to the scienter requirement and that plaintiffs must allege scienter with specificity as to each individual defendant.  (Id.)  Defendants, however, do not raise the issue of scienter in their opening papers. "Reply papers are not the proper place for new arguments or requests for relief."  Irish Lesbian and Gay Org. v. Giuliani, 918 F. Supp. 728, 731 (S.D.N.Y. 1996).  As plaintiffs have not had the opportunity to

## 2. Particularity as to Each Misstatement or Fraudulent Statement

Defendants also argue that plaintiffs have not specified which statements are false or misleading, when and where the statements were made, and why the statements are misleading or fraudulent. (Defs.' Mem. at 4-7; Defs.' Reply at 1-4.)

Plaintiff's allegations fall into three general categories. Plaintiffs allege that defendants made false or misleading statements regarding ABIZ's: (a) line counts (Compl. ¶¶ 38-53); (b) corporate overhead expenses (id. ¶¶ 54-58); and (c) exposure to off-balance sheet liabilities of its parent corporation, ACC (id. ¶¶ 59-62). Plaintiffs allege that due to these false statements, investors were lured into purchasing stock in a company that appeared to be growing, which therefore artificially inflated the stock price. In March 2002, when the public finally became aware of the past misleading statements and ABIZ filed for bankruptcy, investors were left holding worthless stock. (Id. ¶¶ 63-69.)

### a) Defendants Overstated Line Counts (Compl. ¶¶ 38-53)

ABIZ was a competing local exchange carrier ("CLEC") trying to break into pre-existing local telephone markets. Plaintiffs allege that the Rigases falsely portrayed ABIZ as a successful CLEC, when it was actually failing, by overstating its "line counts," which lured investors into purchasing ABIZ stock and caused the price of ABIZ stock to rise. This resulted in plaintiffs purchasing ABIZ stock at inflated prices. (Compl. ¶¶ 2, 33-35, 52.)

respond to this later pled argument, the Court declines to address the issue of whether scienter has been properly pled with particularity.

Additionally, based on this Court's analysis below with respect to plaintiffs' 20(a) claim, infra, this Court finds the group pleading doctrine applicable to defendant John Rigas.

### *(1) Which statements were misleading and when and where the statements were made.*

"Line counts" are the number of new customers that a company assigns to its available access lines (lines assigned to specific phone numbers) in its various regions of service; line counts are an indicator of growth in the CLEC market. The number of customers retaining their lines is an indicator in calculating a net line count (new lines minus disconnected lines) for ABIZ. (Id. ¶ 38.) Plaintiffs allege defendants issued press releases and filed financial statements with the Securities and Exchange Commission that misrepresented ABIZ's customer base by systematically inflating line counts.

Specifically, plaintiffs allege that defendants included artificially inflated line count statistics in ABIZ's January 6, 2000 press release (Compl. ¶ 39); March 1, 2000 press release (id. ¶ 41); Form 10-K filed with the SEC on March 30, 2000 (id. ¶ 43); Form 10-Q filed with the SEC on May 15, 2000 (id. ¶ 44); Form 10-Q filed with the SEC on August 14, 2000 (id. ¶ 45); and Form 10-Q filed with the SEC on November 14, 2000 (id. ¶ 46).

The court finds that these allegations sufficiently specify which statements were misleading and when and where these statements were made.

### *(2) Why the statements were misleading.*

Plaintiffs allege defendants sought to create the perception that ABIZ was a growing company by publicly reporting inflated line count statistics in order to ensure that the company stayed in business and to lure investors into purchasing stock. Plaintiffs allege defendants knew or were deliberately reckless in disregarding the actual level of line counts when publicly reporting these statistics. (Id. ¶ 47). Plaintiffs allege that

defendants inflated line counts through the entire class period by using or approving certain practices. (Id. ¶¶ 39-53.) Specifically, plaintiffs allege that ABIZ engaged in the practice of "cramming" by adding hundreds of lines to existing customers who never ordered them and then disconnecting the lines within the same month without reporting the disconnections. Plaintiffs allege that affected customers were not aware of the additional lines in most cases and that this practice artificially inflated line counts. (Id.) Plaintiffs also allege that ABIZ engaged in the practice of "slamming" by entering "new" customer names into its systems although the customers had never signed up for service with ABIZ or had poor credit and could not afford new service and then disconnected the lines in the same month without reporting the disconnections. (Id.) Additionally, plaintiffs allege that ABIZ entered businesses with poor credit as "new" lines although they had not ordered new service or could not afford new service, and ABIZ retained these customers in its systems although they had disconnected their lines. (Id.) Plaintiffs allege that ABIZ did not disclose any of these false and deceptive sales practices or their effect on the company's financial position. (Id. ¶¶ 47, 52-53.) Plaintiffs also allege the inflation of line counts violates generally accepted accounting principles ("GAAP"), which must be followed when filing any documents with the Securities and Exchange Commission. Specifically, plaintiffs allege that the inflation of line counts violates Financial Accounting Standard No. 5 and Statement of Financial Accounting Concept No. 6, which prohibit improper recognition of fictitious revenues. (Id. ¶¶ 70-72.)

Plaintiffs make many specific allegations regarding the inflation of line counts. For example, plaintiffs allege that ABIZ's "Louisville and Philadelphia offices were particularly aggressive in reporting line counts." (Id. ¶ 48.) Plaintiffs also point to two

specific incidents when the inflation came to light.  Plaintiffs allege that in November 2000 personnel in the operations unit notified the corporate accounting department and top ABIZ executives that "the line counts being reported to the public . . . were grossly overstated and inaccurate."  Plaintiffs allege the executives told the operations unit personnel "not to speak about the issue to anyone" and that they "would take care of this."  (Id. ¶ 51.)  Plaintiffs also allege that in April 2001 ABIZ's Philadelphia office could not fill a legitimate large line order because its system reported an insufficient number of available lines; the seemingly occupied lines, however, were actually available and were improperly reported as active.  (Id. ¶50.)

Defendants argue that plaintiffs have not alleged by how much defendants inflated the line counts.  (Defs.' Mem. at 5-6; Defs.' Reply at 2-3.)  The PSLRA, however, "does not require that plaintiffs plead with particularity every single fact" when plaintiffs plead "on information and belief."  Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000).  As plaintiffs' allegations regarding inflation of line counts are very specific in other respects, the Court finds plaintiffs' allegations sufficiently particular despite plaintiffs' failure to allege by how much the line counts were inflated.

### b)  Defendants Falsely Reported Corporate Overhead Expenses (Compl. ¶¶ 54-58)

Plaintiffs allege that ABIZ entered into agreements with its parent company, ACC, under which ABIZ was obligated to share corporate overhead services and other business expenses with ACC and other companies owned by the Rigases.  Plaintiffs allege defendants arbitrarily decided how to allocate expenses and payment obligations among the various Adelphia companies based, not on any actual expenses incurred by the

companies, but rather on the financial needs of the individual companies. Plaintiffs also allege that defendants concealed this arbitrary allocation. (Compl. ¶ 54.)

### *(1) Which statements were misleading and when and where the statements were made.*

Plaintiffs allege that defendants concealed the arbitrary allocation of overhead expenses. Specifically, plaintiffs point to ABIZ's July 7, 2000 proxy statement, which states that ABIZ paid ACC for shared corporate overhead expenses in 1999 and that the amount ABIZ paid was calculated "based on allocation of Adelphia Communications' incremental costs incurred [to provide ABIZ with] these services." (Id. ¶ 55-56.) Plaintiffs allege this statement misrepresented to investors that the amount ABIZ paid ACC for overhead expenses was related to the costs incurred by ACC to provide the services to ABIZ, when in fact the amount was calculated arbitrarily. Plaintiffs also complain that defendants reported false and misleading "corporate overhead" expense figures in Adelphia Communication's 10-Qs dated May 15, 2000, August 14, 2000, November 14, 2000, May 15, 2001, and August 14, 2001. (Id. ¶ 57.)

The court finds these facts sufficient to allege which statements were false and misleading and when and where the statements were made.

### *(2) Why the statements were misleading.*

Defendants argue that plaintiffs do not explain why and how the agreements between ACC and ABIZ and the treatment of expenses was improper or misallocated. (Defs.' Mem. at 6; Defs.' Reply at 3.)

Plaintiffs allege the corporate overhead statistics reported in ABIZ's proxy statement and ACC's 10-Qs were misleading because they did not reflect the actual usage

of services between the various companies. Plaintiffs specifically complain that defendants misallocated and improperly treated corporate overhead expenses by: 1) failing to properly document labor (including part-time employees of ABIZ), operating, equipment, circuit network, and other costs to ABIZ or ACC based on which company actually used these services; 2) allowing ABIZ to use Remedy, Microsoft Veritas, and Oracle software applications licensed only to ACC with no or inadequate accounting or documentation; 3) allowing ABIZ to use and route the hardware and network circuits of ACC with no or inadequate accounting or documentation; 4) allowing ABIZ to use or share office space of ACC with no or inadequate accounting or documentation; and 5) allowing ABIZ to share powerlink network sales, support, accounting, and provisioning services of ACC with no or inadequate accounting or documentation. (Compl. ¶ 58.) Plaintiffs also allege that because ABIZ included these inaccurate overhead expense amounts in its SEC filings, defendants also violated basic tenets of GAAP, including the principles that financial reporting be "accurate," "reliable," and "complete." (Compl. ¶ 73.)

Plaintiffs, however, do not go beyond general allegations that the allocation of overhead costs were "handled in an arbitrary manner" or with "inadequate documentation." (See Compl. ¶¶ 54-58.) Although plaintiffs explain to which costs they are referring, e.g. labor, hardware, software licenses, plaintiffs do not explain how the overhead costs were allocated nor do they describe any practices used by defendants that amount to improper allocation of these costs. Such general allegations are insufficient to comply with Rule 9(b).

Defendants also argue that plaintiffs have not identified the corporate overhead sharing agreements between ABIZ and ACC to which they refer (Defs.' Mem. at 6; Defs.' Reply at 3.) "Fraud allegations may be based on information and belief as to facts peculiarly within the opposing party's knowledge." Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1310-11 (S.D.N.Y. 1996). "Moreover, in cases of corporate fraud, the requirements of Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge . . . . This is particularly the case where, as here, discovery has not yet commenced." Id.

Plaintiffs have pled on "information and belief as to all other matters [not within their personal knowledge]." (Compl. ¶ 1.) The existence of overhead sharing agreements is not within plaintiffs' personal knowledge. The source of plaintiffs' "information and belief" as to the existence of one or more of these agreements appears to be ABIZ's July 7, 2000 proxy statement. That statement refers to a "Management Services Agreement between [ABIZ] and Adelphia Communications dated April 10, 1998, with respect to shared corporate overhead expenses." (Compl. ¶ 56.) Since one or more of defendants allegedly authored this statement and defendants were ABIZ directors and/or officers who had access to and control over ABIZ documents and business activities (Compl. ¶¶ 21-23, 97-98), the content of these agreements, and the agreements themselves, should be "peculiarly within [defendants'] knowledge" and possession. See Degulis, 928 F. Supp. at 1310-11. Courts have allowed complaints alleging fraud to survive motions to dismiss when such facts are within defendants' knowledge. See, e.g., Vento & Co. of New York v. Metromedia Fiber Newtork, Inc., No. 97 Civ. 7751, 1999 WL 147732, at *13 (S.D.N.Y. Mar. 18, 1999).

Additionally, plaintiffs have pointed to a specific proxy statement, allegedly authored by defendants, that refers to the existence of an overhead sharing agreement. Defendants should presumably know to which agreement they themselves were referring when they wrote that statement. The Court finds this allegation sufficient "to provide a defendant with fair notice of the claims against it." See In re Livent, 78 F. Supp. 2d at 213.

Thus, the Court finds plaintiffs need not explain the details of the provisions of the overhead expenses agreements, but the Court finds plaintiffs have not pled with sufficient particularity how defendants improperly allocated overhead costs.

### c) Defendants Concealed ABIZ's Exposure to ACC Off-Balance Sheet Debt (Compl. ¶¶ 59-62.)

Plaintiffs allege that ABIZ received loans from ACC and was obligated to advance funds on demand to ACC, and that the two companies were jointly obligated (along with other Rigas owned entities) under certain credit facilities. Because of these joint financial obligations, plaintiffs allege that ABIZ was required to disclose in its financial statements any material adverse information about ACC's financial position. Plaintiffs allege that ACC materially understated its debt, for which ABIZ was jointly liable. (Compl. ¶¶ 59-60.) In March 2002, ACC issued a press release revealing it owed $2.3 billion in debt, for which both it and ABIZ were jointly liable and which had not been disclosed on their balance sheets. That same day, ABIZ filed for bankruptcy. (Compl. ¶¶ 65-68.)

#### *(1) Which statements were misleading and when and where the statements were made.*

Plaintiffs allege ABIZ's July 6, 2001 proxy statement was false and misleading because, although it disclosed the existence of the credit facilities, it did not disclose ACC's off-balance sheet liabilities.  (Id. ¶ 61.)  Plaintiffs then go on to allege that "Defendant's 10-Q's and 10K's filed during the Class period" were also false and misleading.  (Id.)

Plaintiffs do not, however, allege to which specific 10-Qs and 10-Ks they are referring and which statements within those 10-Qs and 10-Ks were false and misleading.  Even if plaintiffs are referring to the absence of statements, plaintiffs should be able to point to which forms and which statements within those forms should have disclosed the existence of jointly obligated debts.  Cf. Runes v. Gridcomm, Inc., No. B-86-473-TFGD, 1990 WL 483735, at *2 (D. Conn. Jan. 3, 1990).  The Court finds that plaintiffs have adequately alleged that the July 2001 proxy statement was fraudulent but have not adequately alleged which other statements were fraudulent.

### (2) Why the statements were misleading.

Plaintiffs allege that ACC and other Rigas-owned entities, including ABIZ, entered into agreements under which ACC and the other entities were jointly liable for debts in excess $2 billion.  Plaintiffs allege the Rigases failed to disclose these material off-balance sheet liabilities in ACC's financials, thereby materially understating ACC's debt.  This information was not disclosed until March 2002, and plaintiffs allege it should have been disclosed earlier to ABIZ's investors because of ABIZ's "interconnection" with and "dependen[cy] on the solvency" of ACC resulting from the joint credit facilities.  (Compl. ¶¶ 60-61.)  Plaintiffs also allege that because ABIZ failed to include ACC's debt amounts in its SEC filings, defendants also violated basic tenets of GAAP, including the

principles that financial reporting be "accurate," "reliable," and "complete." (Compl. ¶ 73.)

Defendants argue that Plaintiffs have not identified the credit facilities to which they refer. (Defs.' Mem. at 6; Defs.' Reply at 4.) As explained above, the existence of these credit facilities may be pled on information and belief as to facts peculiarly within defendants' knowledge, and the requirements of Rule 9(b) are relaxed as to matters particularly within the opposing party's knowledge. See Degulis, 928 F. Supp. at 1310-11. The source of plaintiffs' information on the existence of the credit facilities appears to be ABIZ's July 6, 2001 proxy statement, which states "[ABIZ] and certain of Adelphia Communications' other subsidiaries and affiliates are parties to a joint bank credit facility" (Compl. ¶ 61), and ACC's December 31, 2000 press release, which again refers to these "credit facilities" (Compl. ¶ 65 ).[7] Since one or more of defendants allegedly authored these statements, the content of these agreements and the agreements themselves should be "peculiarly within [defendants'] knowledge" and possession. See Degulis, 928 F. Supp. at 1310-11. "Plaintiffs have pleaded sufficient facts at this stage to survive a motion to dismiss . . . . Whether these allegations can be proven after discovery is completed is another question." Vento & Co., 1999 WL 147732, at *13.

Defendants also argue that plaintiffs do not adequately explain how ABIZ would be "materially impacted" by ACC's debt. (Defs.' Mem. at 6; Defs.' Reply at 4.) Plaintiffs argue that ABIZ, ACC, and other Adelphia subsidiaries were jointly obligated to repay debts under the joint credit facility agreement; that is, if ACC was responsible for certain debts, ABIZ would also be responsible for those debts. Therefore, the debts of

_____

[7] Plaintiffs do not allege that ABIZ's December 31, 2000 press release was a misleading statement regarding off-balance sheet debt; rather, they allege this statement disclosed the existence of past misleading statements. (Compl. ¶¶ 63-68.)

ACC should have been disclosed to ABIZ investors so that ABIZ investors would be aware of any debts that ABIZ may potentially have to repay. (Compl. ¶¶ 59-60.) The Complaint could be clearer with respect to this argument, as well as other allegations, but as the Court must "read the complaint generously, and draw all inferences in favor of the pleader," <u>Pompano-Windy City</u>, 794 F. Supp. at 1280, the Court finds these allegations sufficient to plead how ABIZ would be impacted by ACC's debts.

In sum, the Court finds: (a) the allegations regarding line counts are pled with sufficient particularity; (b) the allegations regarding corporate overhead expenses are not pled with particularity because plaintiffs do not explain how the expenses were improperly allocated; and (c) the allegations regarding off-balance sheet debt are not pled with particularity as to which statements, besides the July 2001 proxy statement, were fraudulent. The Court will allow plaintiffs leave to amend their Complaint to cure these defects regarding particularity.

3. **Causation**

In federal securities fraud actions, plaintiffs must prove both "(1) transaction causation (but for the fraudulent statement or omission the plaintiff would not have entered into the transaction); and 2) loss causation (the subject of the fraudulent statement or omission was the cause of the actual loss suffered)." <u>Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.</u>, No. 02 CIV. 1230, 2002 WL 31027550, at *8 (S.D.N.Y. Sept. 10, 2002). <u>See also</u> <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 172 (2d Cir. 2005).

Defendants argue that plaintiffs have not adequately pled transaction causation, also termed reliance. Particularly, defendants argue that plaintiffs have adequately alleged neither how the alleged fraudulent acts affected the price of ABIZ securities,

(Defs.' Mem. at 5-7; Defs.' Reply at 2-4), nor which purchases or sales plaintiffs made in connection with the alleged misstatements, (Defs.' Mem. at 4). However, since plaintiffs have invoked the "fraud on the market theory," (Compl. ¶¶ 81-86; Pls.' Opp. at 13-14), they are not required to allege any additional reliance.

The fraud on the market theory holds that "'in an open and developed securities market, the price of a company's stock is determined by the available information regarding the company and its business [and that m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.'" In re Livent, 78 F. Supp. 2d at 213 n. 4 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988)). There is a presumption of reliance. In re Emex, 2002 WL 31093612, at *8.

Under this theory, it is presumed that defendants' misstatements caused the price of ABIZ securities to fluctuate, and plaintiffs need not show they made certain securities purchases in reliance on specific misstatements.[8] Plaintiffs are not required to plead any particulars of reliance as the fraud on the market theory satisfactorily pleads transaction causation.

Defendants also argue that plaintiffs have not adequately alleged how they were harmed by the allegedly misleading statements. (Defs.' Mem. at 5-7; Defs.' Reply at 2-4.) This is essentially a loss causation argument.

Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell, 396 F.3d at 172 (citation

---

[8] In addition to relying on the fraud on the market theory, plaintiffs also allege that "in reliance on the integrity of the market, they paid artificially inflated prices for Adelphia Business securities [and they] would not have purchased Adelphia Business Securities at the price they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statement." (Compl. ¶ 94.)

and quotations omitted).  "[T]o establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Id. at 173 (citation and quotations omitted) (emphasis omitted).

Plaintiffs have pled exactly this.  The Complaint alleges that defendants' misrepresentations in ABIZ press releases and SEC filings about line counts, overhead expenses, and off-balance sheet debts caused ABIZ securities to trade at artificially inflated prices, and that plaintiffs purchased ABIZ stock at these artificially inflated prices.  (Id. ¶¶ 38-62, 81-83, 94.)  Plaintiffs also allege that in March 2002, after ACC revealed the existence of $2.3 billion of off-balance sheet debt under which ACC and ABIZ were jointly obligated  and ABIZ announced that it would default on $15.3 million in secured notes, ABIZ was forced to file for bankruptcy.  (Id. ¶¶ 63-68.)  ABIZ, now renamed Telcove, is undergoing a reorganization, that would allegedly leave plaintiffs with no value for their shares of ABIZ stock.[9]  (Id. ¶ 69.)  Plaintiffs allege that, as a result, they have lost their complete investments in ABIZ, resulting in a collective injury of $3,308,608.  (Id. ¶¶ 6, 12, 69.)  The Court finds these allegations sufficiently plead loss causation.

**B.  Purchase Requirement**

To state a claim under 10(b), a plaintiff must allege a material misstatement or omission "in connection with the purchase or sale of a security."  15 U.S.C. § 78j.  Only a plaintiff who engages in a "purchase or sale" of securities has the right to bring a private

---

[9] Telcove's proposed reorganization plan calls for a reduction in debt from $1.42 billion to $68.4 million by converting a majority of creditors' claims to equity and/or cash. (Id. ¶ 69.)

damages action. <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 732-49 (1975), expressly adopting the holding of <u>Birnbaum v. Newport Steel Corp.</u>, 193 F.2d 461, 464 (2d Cir. 1952).

In the present action, some class plaintiffs did not purchase ABIZ shares on the market; rather, they were shareholders of ACC and acquired ABIZ stock as a dividend on January 11, 2002. (Compl. ¶ 3.) It is unclear from the Complaint which plaintiffs received the stock as a dividend and which purchased them on the open market. (<u>See</u> <u>id.</u>)

Defendants argue that those class members who received their stock through ACC's spin-off of ABIZ stock cannot satisfy the "purchase or sale" requirement of Section 10(b) because receipt of a dividend does not qualify as a purchase, and therefore the claims of those members should be dismissed. (Defs.' Mem. at 7-8; Defs.' Reply at 6-9.) This Court agrees.

### 1. Second Circuit Precedent

Initially, in order to understand the term "purchase," the Court looks to the statutory definitions. In the Securities Exchange Act of 1934, in which Section 10(b) is found, the definition section states: "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire. For security futures products, such term includes any contract, agreement, or transaction for future delivery." 15 U.S.C. § 78c(a)(13). The definition section is prefaced with the phrase "unless the context otherwise requires." 15 U.S.C. 78c(a). Notably, the words "for value" are not found in the definition section of the 1934 Act, but are in the definition section of the Securities Act of 1933, 15 U.S.C. § 77b(3). The Second Circuit has expanded, in two seminal cases, on the "purchase or sale" requirement as used in the 1934 Act. The Court will

examine each case individually and then analyze how the two cases provide a framework for analyzing the purchase and sale requirement.

### a) **Shaw v. Dreyfus**

In Shaw v. Dreyfus, 172 F.2d 140, 141 (2d Cir. 1949), a stockholder of Celanese Corporation brought a derivative action against an officer, Dreyfus, for violations of Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b).  The corporation had issued to common stockholders the right to purchase additional stock at a discounted price of $50 per share.  Dreyfus received a large number of rights; he sold some of these rights without exercising them.  172 F.2d at 141.  Section 16(b) prohibits the "unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the [corporation]" and provides that "any profit realized by [such an insider] from any purchase or sale . . . within any period of less than six months . . . shall inure to and be recoverable by the [corporation]."  15 U.S.C. § 78p(b).  Plaintiff sought to recover the profits gained by Dreyfus through the sale of the rights, arguing that he traded on insider information.  172 F.2d at 141-42.

First, the Court held that Dreyfus's receipt of the stock rights was not a purchase and was therefore not a transaction to which Section 16(b) applied.  The court reasoned that "[t]he generally understood meaning of 'purchase' is to acquire something by one's own act or agreement for a price.  Dreyfus performed no act, made no agreement, paid no consideration for the receipt of his rights."  Id. at 142 (footnotes omitted).  The transaction, however, could be converted into a purchase if Dreyfus had chosen to exercise the rights.  Id.

The court also reasoned that such a transaction was not within the purpose of

16(b), which is to "to protect the outside stockholders against at least short-swing speculation by insiders with advance information." Id. (citation and quotations omitted). "Inside information which the directors may have cannot possibly be used to the detriment of other stockholders in voting to grant rights to all stockholders of record in proportion to their existing holdings [because] all are treated equally." Id. It is in this capacity that the court analogized the transaction to receipt of stock dividends: "[the] preemptive right to be offered the new stock and on equal terms inheres in their original shares and is essentially analogous to a stock dividend." Id. Thus, Shaw found three factors significant: whether Dreyfus performed an act and made a choice to receive the rights; whether Dreyfus paid consideration; and whether the transaction was within the purpose of 16(b).[10]

### b) Int'l Controls Corp. v. Vesco

The Second Circuit revisited the "purchase or sale" requirement in Int'l Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir. 1974). In Vesco, plaintiff corporation, International Controls Corp. ("ICC") brought an action against former directors for violations of Section 10(b). Plaintiff alleged that Vesco and other directors of ICC fraudulently induced the remaining ICC directors to approve a dividend in kind of ICC's stock in its subsidiary, the Fairfield Group, to ICC's shareholders. Id. at 1340-42. The dividends of stock were issued on a pro rata basis to all stockholders and did not require any consideration. Plaintiff alleged that defendants' statements greatly undervalued the

---

[10] In addition to the rights Dreyfus sold, he also exercised some of the rights and gave the additional shares he received as gifts. Id. at 141. The court held that Dreyfus's exercise of the rights was a purchase because he took an action and decided to exercise those rights. However, because Dreyfus gave these rights as gifts instead of selling them, he did not receive any profits and therefore the court found Section 16(b) to be inapplicable. Id. at 142-43.

subsidiary, and that the directors would not have issued the dividend had they known the true value of the Fairfield Group.  Id.

The court examined the issue of whether the issuance of a stock dividend by the plaintiff corporation was a "sale" within the meaning of 10(b).  Id. at 1344-46.  The court explained the holding in Shaw and held that it "d[id] not find it determinative" in the context of 10(b)  because "'Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws . . . [and w]e must therefore address ourselves to the meaning of the words "purchase or sale" in the context of 10(b).'"  Id. at 1345 (quoting SEC v. Nat'l Sec., Inc., 393 U.S. 453, 466 (1969)).

The court then went on to interpret the term "sale" in the context of 10(b).  The Court considered "whether the fraudulent conduct alleged . . . 'is the type of fraudulent behavior which was meant to be forbidden by [Section 10(b)].'"  Id. (quoting Nat'l Sec., 393 U.S. at 467).  The court emphasized that "§10(b) was intended by Congress to protect investors, including corporations, from deceptive devices and contrivances which would inhibit informed decision-making in the course of securities transactions."  Id. (citing Supt. of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)).  The court found the issuance of a dividend by a corporation to fit within 10(b)'s purpose because the denial of material information to a corporation would disable the corporation "from availing itself of an informed judgment" when deciding to spin-off a subsidiary.  Id.

The court also held that consideration was not necessary to qualify a transaction as a sale because "a rote emphasis on consideration [is] inconsistent with the broad scope of protection under § 10(b) for those who engage in transactions eventuating in the acquisition or disposition of securities."  Id.  at 1346.

### c) Framework of <u>Shaw</u> and <u>Vesco</u>

Reading <u>Shaw</u> and <u>Vesco</u> together, there are three significant factors that both cases focus upon. First, both considered whether the transaction involved decision-making. 172 F.2d at 142; 490 F.2d at 1345. Other cases have followed this line of reasoning. For example, in <u>Fidelis Corp. v. Litton Indus., Inc.,</u> 293 F. Supp. 164, 166 (S.D.N.Y. 1968), shareholders of Fidelis brought a 10(b) action against Litton Inc. for fraudulent misrepresentation. In a corporate buyout of Fidelis by Litton, the stockholders of Fidelis had an election of how many shares of Litton stock they would receive in exchange for their stock in Fidelis and the assets of Fidelis. <u>Id.</u> at 166-67, 169. The Fidelis shareholders contended that they relied on the misrepresentations made by Litton in agreeing to receipt of a lower amount of Litton stock. <u>Id.</u> at 169. The court seemed to find it pivotal that the Fidelis shareholders had a choice as to how much Litton stock they would receive in the exchange and that they chose the amount of stock based on fraudulent information. <u>Id.</u> at 169-70. ("Since the Fidelis shareholders had an election as to how much Litton stock they would receive from Litton through Fidelis, they are deemed to be purchasers.")

Second, both <u>Shaw</u> and <u>Vesco</u> found significant whether the transactions at issue were within the purpose of the statute that defendants allegedly violated. 172 F.2d at 142; 490 F.2d at 1345; <u>see also</u> <u>Ingenito v. Bermec Corp.,</u> 376 F. Supp. 1154, 1180 n. 10 (S.D.N.Y. 1974) ("The <u>Vesco</u> Court relied heavily on the rule that the securities laws are to be interpreted flexibly, in order to affect Congress' purposes."). This second factor is closely tied to the first: if the purpose of 10(b) is to make an informed investment decision, <u>Vesco</u>, 490 F.2d at 1345, the opportunity to make a decision is a prerequisite to

this protection.

Finally, <u>Shaw</u> and <u>Vesco</u> suggest that Section 16(b) requires that transactions are made with consideration in order to qualify as a purchase or sale, but Section 10(b) does not. 172 F.2d at 142; 490 F.2d at 1346; <u>see also</u> <u>Ingenito</u>, 376 F. Supp. at 1180 n. 10 ("After [<u>Vesco</u>], it is not clear whether consideration must pass between the parties for purposes of determining whether a 10(b) purchase or sale has taken place.").

## 2.   Application to Plaintiffs Acquisition of ABIZ Stock

Applying <u>Shaw</u> and <u>Vesco</u> and their progeny to the transaction at issue, this Court finds that those plaintiffs who were shareholders of ACC and received ABIZ stock as a dividend on January 11, 2002 did not engage in a "purchase" within the scope of Section 10(b).

First, plaintiffs did not participate in any sort of investment decision.  They made no election whether or not to receive ABIZ stock (instead of a cash dividend), nor had any choice as to how much ABIZ stock to receive in the dividend.  Like the plaintiff in <u>Shaw</u>, plaintiffs here did not "acquire something by [their] own act or agreement for a price . . . [and] performed no act, made no agreement . . . for the receipt of [their] rights." 172 F.2d at 142.  Although <u>Vesco</u> and the transaction at issue both involved issuance of dividends, <u>Vesco</u> is not controlling here because the plaintiff in <u>Vesco</u> was the corporation that decided to issue the dividend, 490 F.2d at 1340-42; whereas, here plaintiffs are stockholders that passively received a dividend.  Simply receiving stock as a dividend does not have the element of decision-making necessary for a "purchase."

Second, the transaction at issue is not the type meant to be governed by 10(b). Section 10(b) seeks to ensure that investors make decisions based on honest information

and to prevent fraudulent information from impacting securities investment decisions.  Id. at 1345.  Plaintiffs who received ABIZ stock as a dividend cannot argue that defendants' fraudulent or misleading statements prevented them "from availing [themselves] of an informed judgment" in deciding to enter into a securities transaction because those plaintiffs never made an investment decision.  See id.  This is not the type of transaction Congress intended to bring within the scope of Section 10(b).[11]

Finally, the court turns to the issue of consideration.  Although plaintiffs did not give any consideration for receipt of the ABIZ stock, the court finds that fact not controlling after Vesco.

Thus, the Complaint is dismissed as to any purported class member who only received Adelphia Business stock as a dividend.[12]

---

[11] Plaintiffs allege that "in reliance on the integrity of the market, they paid artificially inflated prices for Adelphia Business securities [and they] would not have purchased Adelphia Business Securities at the price they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statement." (Compl. ¶ 94.)  This allegation applies only to those plaintiffs who actually purchased ABIZ stock for a price.  Those plaintiffs allege that they would not have purchased ABIZ stock at the price they paid, or at all, had defendants not made misrepresentations in public statements and press releases; this is exactly the type of decision-making based on false information that Section 10(b) seeks to prevent.

[12] The "forced seller" doctrine is an exception to the classic purchase and sale definitions.  Under that doctrine, even if a plaintiff did not have a choice as to whether to enter into a transaction, the transaction could still be considered a sale if the exchange "effected such significant change in the nature of [plaintiff's] investment . . . as to amount to a new investment."  In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 676 F. Supp. 458, 476 (S.D.N.Y. 1987) (citation and quotations omitted).  The forced seller doctrine does not apply in this case because a prerequisite to the application of this doctrine is an exchange.  Here, stockholders of Adelphia Communications were not forced to exchange their ACC stock for ABIZ stock; rather, they received ABIZ stock in addition to the ACC stock they already held, and their investment in ACC remained unchanged.  See Vine v. Beneficial Fin. Co., 374 F.2d 627, 634-35 (2d Cir. 1967) (holding minority shareholders to be forced "sellers" for the purpose of 10(b) because corporation forced shareholders to sell their shares for cash or else realize no value from the stock); see also Blau v. Hodgkinson, 100 F. Supp. 361, 373-74 (S.D.N.Y. 1951) (finding a "purchase" for purpose of 16(b) when stockholders of subsidiary were forced to exchange their stock in subsidiary for stock in parent because the latter was "something totally different from that which [the stockholders] surrendered").

**III.    Section 20(a) Claim**

Defendants also move to dismiss plaintiffs' claim against the Rigases for liability as control persons under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).[13]  In order to make out a prima facie case under Section 20(a), plaintiffs must show:  "(1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation."  Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

**A.  Dual Claims for Primary and Secondary Liability**

Defendants argue that Plaintiff cannot plead both primary and secondary liability against the same set of defendants.  (Defs.' Mem. at 9.)

The Complaint alleges a 10(b) claim against the Rigas defendants for various securities violations.  (Compl. ¶¶ 90-94.)  The Complaint also contains a 20(a) claim against the defendants alleging that they controlled ABIZ while ABIZ engaged in various 10(b) violations.  (Id. ¶¶ 95-99.) (See also id. ¶ 96 ("[E]ach of the Defendants acted as a controlling person of Adelphia Business . . . [and] Adelphia Business, by the conduct set forth herein, violated the federal securities law in the manner set forth herein.")) Plaintiffs do not allege that the Rigas defendants are both the controlling persons and the

---

[13] Section 20(a), 15 U.S.C. § 78t(a), reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

controlled persons in their 20(a) claim.  Rather, plaintiffs allege that ABIZ is the controlled entity and the Rigases are the controllers.

"'Controlling-person liability' under § 20 of the Securities Exchange Act is a separate inquiry from that of primary liability and provides an alternative basis of culpability." Suez Equity Invs. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001). "Although a defendant may ultimately not be held liable as both a primary violator and a controlling person, such alternative theories are permissible" in the pleadings stage. In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 310 (2005) (citing In re Scholastic Corp. Sec. Litig., 252 F. 3d 63, 77 (2d Cir. 2001)); see also In re Globalstar Sec. Litig., No. 01 Civ. 1748, 2003 WL 22953163, at *13 (S.D.N.Y. Dec. 15, 2003); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., No. 05 Civ. 1898, 2005 WL 2148919, at *15 & n. 207 (S.D.N.Y. Sept. 6, 2005) (quoting Parmalat with approval and allowing plaintiffs to proceed with both 20(a) and 10(b) claims against the same set of defendants); Fed. R. Civ. Proc. 8(e)(2) ("A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses.").

## B.  Control Requirement

Finally, defendants contend that Plaintiffs have not sufficiently alleged control on the part of defendant John Rigas.

Control for the purpose of Section 20(a) may be established by showing that each individual defendant "possessed 'the power to direct or cause the direction of the management and policies'" of ABIZ.  See First Jersey, 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b-2).  "'A person's status as an officer, director, or shareholder, absent

more, is not enough to trigger liability under § 20.'" Sloane Oversees Fund, Ltd. v. Sapiens Int'l Corp., N.V., 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (quoting Hemming v. Alfin Fragrances, Inc., 690 F. Supp. 239, 245 (S.D.N.Y. 1988)). To survive a motion to dismiss under 20(a), a plaintiff need only "plead facts which 'support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator.'" Sloane, 941 F. Supp. at 1378 (quoting Food and Allied Serv. Trades Dept., AFL-CIO v. Millfeld Trading Co., 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994)).

Defendants contend that plaintiffs have not properly alleged that defendant John Rigas is a control person because he is only a minority shareholder of ABIZ (17%) and Chairman of its Board of Directors but not an officer. (Defs.' Mem. at 10 & n. 2). A defendant need not be an officer in order to fit within the scope of 20(a). A court "must consider the total effect of the various indicia of control in combination," rather than examining any one indicia in isolation. In re Leslie Fay Cos., Inc. Sec. Litig., 918 F. Supp. 749, 763 (S.D.N.Y. 1996).

The Complaint alleges that John Rigas was the Chairman of the Board of Directors of ABIZ, the founder of ACC (ABIZ's parent corporation), (Compl. ¶ 21), owned 17% of stock in ABIZ, (Compl. ¶ 22), and signed ABIZ's 1999 Annual Reports, (Compl. ¶ 43). The Complaint also alleges that the Rigas family, headed by John Rigas, owned a majority of the voting power of ABIZ stock, directed the company's affairs, and caused the company to engage in the alleged fraud. (See Compl. ¶¶ 5, 6, 22, 23, 39, 42-43, 47, 51, 53, 54, 55, 61, 63, 73, 89, 97-98). Further, the Complaint alleges that defendants, including John Rigas, "participat[e]d in and/or [were] aware[] of the

Company's operations," had "intimate knowledge of the Company's actual performance," "had unlimited access to copies of the Company's reports, press releases [and] public filings" that were allegedly misleading "and had the ability to prevent the issuance" of those statements, and "had direct involvement in the day-to-day operations of the Company." (Compl. ¶¶ 97-98; <u>see also</u> Compl. ¶ 23.)

Other district courts in this Circuit have found allegations of control sufficient in similar circumstances. <u>See, e.g.</u>, <u>In re Leslie Fay</u>, 918 F. Supp. at 763 (finding allegations of control sufficient in the case of outside directors who held 12% of stock and signed public disclosure documents that allegedly contained misrepresentations); <u>Robbins v. Moore Medical Corp.</u>, 788 F. Supp. 179, 188 (S.D.N.Y. 1992) (finding allegations of control sufficient as against defendants who were directors or officers and signed company statements that were allegedly misleading); <u>see also</u> <u>In re Solucorp Indus., Ltd.</u>, No. 98 Civ. 3248, 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000) ("As either a member of Solucorp's senior management or a director with access to information regarding Solucorp's day-to-day business, the individual defendants are alleged to have had the power and influence to cause Solucorp to engage in the alleged fraudulent conduct.").

This Court finds plaintiffs' allegations sufficient to support a "reasonable inference" that John Rigas "had the potential power to influence and direct the activities" of ABIZ. <u>See</u> <u>Sloane</u>, 941 F. Supp. at 1379. The motion to dismiss the 20(a) claim is therefore denied.

## IV. Leave to Amend

While plaintiffs have not requested leave to amend any deficient claims, the decision whether to grant leave to amend rests within the sound discretion of the district court.  See <u>Cresswell v. Sullivan & Cromwell</u>, 922 F.2d 60, 72 (2d Cir. 1990).  Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend a complaint "shall be freely granted when justice so requires."  See <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991). However, plaintiffs need not be granted leave to amend where amendment would be futile. See <u>Marchi v. Board of Coop. Educ. Servs. of Albany</u>, 173 F.3d 469, 478 (2d Cir. 1999); <u>Chill v. General Elec. Co.</u>, 101 F.3d 263, 272 (2d Cir. 1996).

Plaintiffs may, to the extent required, amend the Complaint with respect to the 10(b) claims within 45 days of the date hereof if they can cure the defects regarding particularity set forth above.  However, leave to amend is denied with respect to plaintiffs who received ABIZ stock as a dividend because any amendment would be futile.  As it is unclear from the face of the Complaint which plaintiffs fall into this category, plaintiffs are to include in an amended complaint the names of those plaintiffs who actually purchased ABIZ securities on the open market.

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part, and plaintiffs are granted limited leave to amend their Complaint.

So Ordered.

Dated: November 4, 2005
       New York, New York

Lawrence M. McKenna
U.S.D.J.