```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
                                      :
IN RE ADELPHIA COMMUNICATIONS         :
CORPORATION SECURITIES AND DERIVATIVE :
LITIGATION                            :
- - - - - - - - - - - - - - - - - - - X
THIS MEMORANDUM AND ORDER APPLIES TO  :
No. 03 Civ. 7301,                     :
Appaloosa Investment Limited          :      03 MD 1529(LMM)
Partnership I, et al.                 :      MEMORANDUM
                                      :      AND ORDER
- -- -- - - - - - - - - - - - - - - - X
```

McKENNA, D.J.,


      This action is part of a multi-district securities litigation pending before this Court.  In re Adelphia Communications Corp. Sec. and Deriv. Litig., No. 03 MDL 1529.  In the instant case, Appaloosa Investment Limited Partnership and similarly situated funds[1] ("Plaintiffs") purchased debt securities issued by Adelphia Communications Corporation ("Adelphia" or "the company") and Arahova Communications Inc. f/k/a Century Communications Corporation ("Century").  Plaintiffs allege that they purchased Adelphia debt securities at inflated prices in reliance upon announcements and SEC filings that contained

---

[1] Appaloosa Investment Limited Partnership I and Palomino Fund Ltd., purchased through investment advisor Appaloosa Management L.P. (collectively, "Appaloosa") and Mutual Beacon Fund, Mutual Discovery Fund, Mutual Qualified Fund, Mutual Shares Fund, Mutual Shares II Fund, Mutual Beacon Fund (Canada), Franklin Mutual Beacon Fund, Mutual Discovery Securities Fund, Mutual Shares Securities Fund and Franklin Mutual Beacon Fund, through investment advisor Franklin Mutual Advisers LLC (collectively "Franklin Mutual")

material misstatements and omissions, and seek relief under §§10b, 18, and 20 of the Securities Exchange Act of 1934 and §§11 and 15 of the Securities Act of 1933.  Defendants[2] move to dismiss those claims under Rule 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  The Court assumes familiarity with its Prior Orders addressing Defendants' statute of limitations arguments and laying out the facts of the case.  See In re Adelphia Communications Corp. Sec. and Deriv. Litig., No. 03 MD 1529(LMM), 2005 WL 1278544 (S.D.N.Y. May 31, 2005); In re Adelphia Communications Corp. Sec. and Deriv. Litig., No. 03 MD 1529(LMM), 2005 WL 1679540 (S.D.N.Y. July 18, 2005); In re Adelphia Communications Corp. Sec. and Deriv. Litig., No. 03 MD 1529(LMM), 2005 WL 1981566 (S.D.N.Y. Aug. 16, 2005).

## Standard to be Applied

Under Federal Rule of Civil Procedure 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."  Fed. R. Civ. Proc. 12(b)(6).  In evaluating a complaint, a court must

---

[2] Count I asserts §11 claims against all Defendants except Buchanan. Count II, §15 claims against all individual defendants [including the moving Outside Directors]. Count III, §18 against Individual Defendants, Buchanan, and Deloitte. Count IV, §10b against Individual Defendants. Count V, §20a against the Individual Defendants.  Count VI, §10b against Deloitte. Count VII, §10b against Salomon, Credit Suisse ["CSFB"], BMO, and Banc of America [together, "Underwriter Defendants"]. Count VIII, §10b against BOA, Bank of Montreal, Citibank, Citicorp, and Citigroup ["Lending Banks"].  The moving parties are defined in full in the Notice of Motion.

read it generously, accepting the truth of, and drawing all reasonable inferences from, well-pleaded factual allegations.  See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The complaint must provide "plausible grounds" for the allegations with "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.[3]  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007).  A court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

## Rule 10b-5 Claims

Plaintiffs bring Rule 10(b)-5 claims, under §10(b) of the Exchange Act, against the Outside Directors, Deloitte,

---

[3] The Supreme Court recently overturned the pleading standard set in *Conley v. Gibson,* which had provided that a motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Bell Atlantic Corp., v. Twombly*, 127 S.Ct. 1955, 1959 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In *Twombly*, the Supreme Court provides that "*Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough," has "earned its retirement," and is now "best forgotten."  *Twombly*, 127 S.Ct. at 1966.  The Second Circuit has recognized in *Iqbal v. Hasty* that *Twombly* "explicitly disavowed" the "no set of facts" standard that previously had been applied at the pleading stage, and "require[s] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, ___ F.3d ___, 2007 WL 1717803 at *9, *11 (2d Cir. June 14, 2007).  Furthermore, while *Twombly* was an antitrust case, the Second Circuit and the Southern District of New York have applied *Twombly* more broadly, as in: (1) *Iqbal*, ___ F.3d. ___, 2007 WL 1717803 (qualified immunity defense), and (2) *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, ___ F.3d ___, 2007 WL 1989336 at *15 n.2. (2d Cir. July 11, 2007) (declining, in the context of securities fraud, "to read *Twombly*'s flexible 'plausibility standard' as relating only to antitrust cases")

the Underwriter Defendants, and the Lending Banks, who here move to dismiss.

In order to state a claim under Rule 10b-5, a plaintiff must allege that the defendant: (1) made misstatements or omissions of material fact (or, under Rule 10b-5(a) or (c), employed a device, scheme, or artifice to defraud); (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the cause of their injury.  See In re IBM Corp. Secs. Litig., 163 F.3d 102, 106 (2d Cir. 1998).  Defendants attack Plaintiffs' 10b-5 claims by alleging failure to adequately plead scienter, failure to adequately plead loss causation, and unreasonable reliance on discredited financial statements.


**Scienter**

### Rule 9(b)

Defendants ask this Court to dismiss Plaintiffs' fraud claims for failure to plead with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) provides that the circumstances of fraud must "be alleged with particularity," requiring "reasonable detail as well as allegations of fact from which a strong inference of fraud reasonably may be drawn." National

Council of Young Israel v. Wolf, 963 F.Supp. 276, 281
(S.D.N.Y. 1997).  The rule also provides that "condition of
mind of a person may be averred generally."  Fed.R.Civ.P.
9(b).  A more general standard of scienter is applicable
because "a plaintiff realistically cannot be expected to
plead a defendant's actual state of mind."  Wight v. Bank
America Corp., 219 F.3d 79, 91 (2d Cir. 2000) (citing
Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962
(2d Cir. 1987)).  However, "the relaxation of Rule 9(b)'s
specificity requirement for scienter must not be mistaken
for license to base claims of fraud on speculation and
conclusory allegations."  Shields v. CityTrust Bancorp,
Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation
marks and citations omitted).  Therefore, with respect to
"condition of mind," it is required that a plaintiff
"allege facts that give rise to a strong inference of
fraudulent intent."  Id., see also Polycast Technology Corp.
v. Uniroyal, Inc., 728 F. Supp. 926, 935 (S.D.N.Y. 1989)
(citing Connecticut Nat'l, 808 F.2d at 962).

Defendants here claim that Plaintiffs impermissibly
"lump together" several of the Underwriter and Lending
Banks defendants, or that Plaintiffs attempt to skirt the
PSLRA and Rule 9(b) with mere notice pleading.  To state a
Rule 10(b)-5 claim, a plaintiff must "allege facts giving

5

rise to a strong inference of fraudulent intent for each defendant." In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 2004 WL 992991, *14 (S.D.N.Y. May 5, 2004).  See also In re Citigroup, Inc. Sec. Litig., 2004 WL 1794465, *12 (S.D.N.Y. Aug. 10, 2004)("Plaintiffs must allege facts with regard to each Defendant that give rise to a strong inference of fraudulent intent.")

The Plaintiffs, in 321 numbered paragraphs and many pages of charts, have alleged the details of the Moving Banks' participation in the fraud with the particularity required by Rule 9(b).  The complaint notes every alleged misstatement, its speaker, and the relation of the banks to that speaker. Each defendant—as evidenced by their submissions to this Court—has been made acutely aware of what conduct is charged to whom, and when.  The Plaintiffs cannot be expected, prior to discovery, to allege the specific decisions, or interactions within groups, that led to the misstatements.  The motions to dismiss 10b-5 claims by the Moving Banks and Deloitte for failure to plead fraud with particularity as required by Rule 9(b) are DENIED.

**Fraudulent Intent**

All 10b-5 Defendants move to dismiss on the ground that Plaintiffs fail to adequately plead intent.  As noted above, the heightened pleading standard enshrined in the

6

PSLRA requires plaintiffs to allege facts creating a
"strong inference" of fraudulent intent.  15 U.S.C. § 78u-
4(b)(2); See, e.g. Ganino v. Citizens Utils. Co., 228 F.3d
154, 169 (2d Cir. 2000).  A complaint may give rise to a
strong inference of fraudulent intent in two ways.  Rothman
v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)(citation
omitted).  The plaintiff may allege "a motive for
committing fraud and a clear opportunity for doing so." Id.
at 90.  Where there is no apparent motive, it is also
possible to plead scienter by "identifying circumstances
indicating conscious behavior by the defendant;" but, "the
strength of circumstantial allegations must be
correspondingly greater." Kalnit v. Eichler, 264 F.3d 131,
142 (2d Cir. 2001)(citation omitted).   In light of the
PSLRA, the Court of Appeals has instructed district courts
not to treat terms such as "motive and opportunity" as
"magic words", but has held that the framework remains
instructive.  Novak 216 F.3d at 311.

### Motive and Opportunity

Defendants claim that Plaintiffs fail to establish the
"strong inference" of scienter that the PSLRA requires
through a showing of motive and opportunity to commit
fraud.  Motive is defined in the Second Circuit as
"concrete benefits that could be realized by one of more of

the false statements and wrongful nondisclosures alleged;" opportunity is defined as "the means and likely prospect of achieving concrete benefits by the means alleged." <u>Novak v. Kasaks</u>, 216 F.3d 300, 307 (2d Cir. 2000).

Plaintiffs cite the $189 million paid out in underwriting fees to the Underwriter Defendants for their various services in the several securities offerings that form the subject of this litigation (Appaloosa ¶ 203). Plaintiffs further cite the Lending Banks' and Underwriter Defendants' ability to "extract all kinds of revenue from Adelphia through a panoply of financial services," use the public offerings to "reduce their [Lending Banks'] exposure on the huge, risky loans they recklessly made to Adelphia," and retain "their [Lending Banks' and Underwriter Defendants'] lucrative business with Adelphia" (Pls. Jt. Scienter Br. 45). Acknowledging that standard desire for profit, common to all businesses, is insufficient to establish the motive required by Rule 10(b)-5, <u>See</u> <u>Kalnit v. Eichler</u>, 264 F.3d 131, 140 (2d Cir. 2001), Plaintiffs contend that "[t]he monetary bonanza, promise of additional long-term business, and increased security on extensions of credit, among other things alleged" create a stronger, and legally sufficient, motive for fraud (Pls. Jt. Scienter Br. at 46).

Plaintiffs, however, fail to allege any facts suggesting that the underwriting fees paid were "extraordinary", as were those at issue in In re WorldCom where the court found such out-of-the-ordinary fees an adequate showing of motive.  In re WorldCom, Inc. Secs. Litig., 294 F.Supp.2d 392, 425 (S.D.N.Y. 2003).  Here, merely noting $189 million paid out for billions of dollars in underwriting on numerous transactions and spread across a number of defendants cannot establish any motive greater than the common motive to profit that is insufficient to support scienter allegations.  Neither can conclusory statements such as "[t]he prospect of losing the Company's incredibly lucrative underwriting business is ample evidence of motive to commit fraud" (Appaloosa ¶ 300).

Nor do Plaintiffs resolve the logical problems encumbering their other motive theories.  As noted in America High Income Trust, it makes little sense for an underwriter to further entangle its affiliate with an issuer it knows to be committing fraud by spurring the affiliate to hand over large amounts of money.  See American High Income Trust v. AlliedSignal, 329 F.Supp.2d 534, 545 (S.D.N.Y. 2004).  Plaintiffs attempt to explain away this obstacle by asserting that the Lending Banks and Underwriting Defendants "saw Adelphia as a well that never

ran dry" and "stood to gain massive fees in all aspects of
their financial service businesses _ad infinitum_" (Pls. Jt.
Scienter Br. 47).  For lenders, or affiliates attempting to
benefit lenders, to throw billions of good dollars after
bad in the hope that their investments could be propped up,
profitably, by concealing a massive fraud "ad infinitum"
would be illogical, and Plaintiffs cite no authority
suggesting otherwise.  But illogical motives cannot satisfy
the requirements of Rule 10(b)-5.  "Where [Plaintiffs']
view of the facts defies economic reason … it does not
yield a reasonable inference of fraudulent intent." _Kalnit_,
264 F.3d at 140-41 (internal quotation marks omitted). _See
also_ _In re Merrill Lynch & Co. Research Reports Sec.
Litig._, 272 F.Supp.2d 243, 263-64 (noting that for one
affiliate to attempt to garner business for another is mere
profit motive recharacterized).  Plaintiffs, then, have
failed to adequately allege motive against the Underwriter
Defendants or the Lending Banks, and the Court need not
consider whether an opportunity existed.

### Conscious or Reckless Action

Plaintiffs failing to demonstrate defendants' motive
and opportunity may establish the "strong inference" of
fraudulent intent that the PSLRA requires "by alleging
facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." <u>In re Carter-Wallace, Inc., Sec. Litig.</u>, 220 F.3d 36, 39 (2d Cir. 2000). "Allegations of recklessness generally are sufficient when plaintiffs have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements or have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." <u>Global Crossing</u>, 2004 WL 763890 at *21(quoting <u>Novak</u>, 216 F.3d at 308)(internal quotation marks omitted).

It is well settled that allegations of negligent due diligence fail to establish scienter.  <u>See, e.g.</u> <u>WRT Energy Sec. Litig.</u>, No. 96 Cv. 3610 (JFK), 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999).  So, too, does the mere closeness of the relationship between a particular underwriter and its client. <u>See</u> <u>In re Indep. Energy Holdings PLC Sec. Litig.</u>, 154 F.Supp.2d 741, 764 (S.D.N.Y. 2001).

Here, the Plaintiffs' Joint Memorandum of Law ("Pls. Jt. Scienter Br."), in which the instant Plaintiffs join, outlines specific allegations of information possessed by the Lending Banks and Underwriter Defendants that would satisfy Plaintiffs' burden at this stage in the proceedings to create a strong inference of scienter.  These allegations—such as that Adelphia's books presented to

Defendants showed that co-borrowing arrangements had been used to pay for securities in lieu of cash—go beyond generalized accusations of negligence (Pls. Jt. Scienter Br. at 37-38) to show the Defendants "knew facts or had access to information suggesting that their public statements were not accurate." Novak, 216 F.3d at 311. None of these specific allegations, though, are contained in Appaloosa and Franklin's Complaint. The Plaintiffs make only general allegations insufficient to create a strong inference of scienter, such as claiming that Defendants generally conduct debt analyses as part of due diligence on their clients (Appaloosa ¶ 311).  The Complaint fails to sufficiently allege scienter, and the 10(b)-5 claims against the Lending Banks and Underwriter Defendants would be dismissed with leave to replead were they not also dismissed on other grounds noted below.


**10b-5 Claims against the Outside Directors**


The Outside Directors also move to dismiss the Rule 10(b)-5 claims against them for failure to adequately plead scienter.  As noted above, Plaintiffs can demonstrate a "strong inference" of scienter by showing either motive and

opportunity, or strong circumstantial evidence of conscious
misbehavior or recklessness.

Plaintiffs' attempt to plead motive is essentially
limited to noting that:

> The Individual Defendants [including the insider
> directors] were motivated to conceal Adelphia's
> true financial condition because disclosure of
> that condition to the investing public would
> likely result in reduced investment in and
> liquidity for Adelphia, which in turn would
> deprive Adelphia of the ability to continue to
> provide funds for the Rigas Family's personal
> use, and deprive them of the continued benefit of
> their unlawful conduct.

(Appaloosa ¶ 266).  It is unclear to whom "them" and
"their" refer to in the final sentence of the paragraph,
and, if those terms refer to the Outside Directors, in what
way Plaintiffs believe they stood to benefit from the
fraud.

Plaintiffs' pleadings directed to the "circumstantial
evidence" method of showing scienter are similarly vague,
and amount to asking the Court to infer, from the fact that
the Outside Directors served as outside directors or audit
committee members, that Plaintiffs' burden of pleading
scienter satisfies itself automatically.  Plaintiffs note
that the "Individual Defendants [again, referring to both
insider and outside directors] knew or recklessly
disregarded that Adelphia's financial statements…were not

13

prepared and presented in accordance with GAAP" (Appaloosa
¶ 260).  They further note that "[t]he Individual
Defendants, as directors and officers of Adelphia, are
liable as direct participants in the wrongs complained of
herein"(Appaloosa ¶ 261) and "…they [Individual Defendants]
failed to ascertain and disclose the true facts, even
though such facts were available to them" (Appaloosa ¶
263).

        Plaintiffs have not satisfied the PSLRA's heightened
pleading requirements, either by showing "concrete benefits
that could be realized by one of more of the false
statements and wrongful nondisclosures alleged," or that
Defendants "knew facts or had access to information
suggesting that their public statements were not accurate."
Novak, 216 F.3d at 307, 311.  The Outside Directors motions
to dismiss the 10(b)-5 claims against them are GRANTED.
Plaintiffs have the Court's permission to replead.


        **Reckless Reliance by Appaloosa and Franklin**


        The Underwriters, Lending Banks, and Deloitte further
challenge Plaintiffs' 10b-5 claims on the ground that,
since Plaintiffs were aware of the fraud before purchasing
any securities, they cannot claim to have reasonably relied

on any of Defendants' misstatements.   Investors seeking the
protection offered by Rule 10b-5 must have relied
justifiably on a defendant's statements; "reckless"
decisions do not create valid 10b-5 claims if they turn out
badly. See Steed Finance LDC v. Nomura Securities Int'l.,
Inc., 2001 WL 1111508, at *8 (S.D.N.Y. Sept. 20,
2001)(citing Brown v. E.F. Hutton Group, Inc., 991 F.2d
1020, 1032 (2d Cir. 1993)).   Recklessness is not to be
confused with negligence: only conduct found "highly
unreasonable" and "an extreme departure from the standards
of ordinary care" invokes this prohibition. Acito v. IMCERA
Group, 47 F.3d 47, 52 (2d Cir. 1995).

Franklin began purchasing Adelphia securities on April
2, 2002.  Appaloosa began purchasing on May 15, 2002
(Appaloosa ¶ 7).  It is undisputed here that by March 27,
2002, the market was on notice of serious problems with
Adelphia's public statements (Appaloosa ¶ 1).  By that
date, the Rigases' securities purchases and the existence
of the co-borrowing facilities—hence, insider fraud—as well
as the understatement of the company's debt load by
"several billion dollars" were public knowledge (Appaloosa
¶ 3)("In other words, the Rigas Family used money loaned by
Adelhpia's banks—and effectively guaranteed by Adelphia—to
buy Adelphia's equity and debt securities" (Appaloosa ¶

22)).  By April 1, the day before Franklin began
purchasing, Adelphia warned that it would be unable to file
a timely 10-K because it needed to "review [] certain
accounting matter relating to co-borrowing credit
facilities which [Adelphia] is party to" (Lowenthal Decl.
Ex. 31).  By April 2, Adelphia's stock price had fallen 42
percent and the first of many lawsuits alleging violations
of the securities laws had been filed (Adelphia Stock Price
Chart, Lowenthal Decl. Ex. 57).  The cascade of bad news
continued with the announcement of an SEC investigation on
April 3, withdrawal of the March 27 earnings guidance on
April 15, and an announcement that the previous three
years' worth of financial statements would have to be
corrected on May 2.  It was at that point that Appaloosa
began purchasing Adelphia securities, with the stock price
down 72 percent (Id.).

The Plaintiffs argue, despite the cascade of reports
confirming pervasive fraud at Adelphia that emerged during
the spring of 2002, that they relied reasonably on all
statements not explicitly disavowed by the corporation up
until June 10, 2002, when new management issued an 8-K
disclosing further misreporting of important financial data
and pummeling the already-reeling equity and debt security
prices (Appaloosa ¶ 8).

The Second Circuit imposes a "more stringent standard" on sophisticated investors, holding that "they have an enhanced duty to obtain available information material to investment decisions" and that a plaintiff "placed on guard or practically faced with the facts" must exercise a "heightened degree of diligence." In re Livent, Inc. Noteholders Sec. Litig., 151 F.Supp.2d 371, 439 (S.D.N.Y. 2001)(citing Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541 (2d Cir. 1997); Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir. 1997)). Livent, considering facts similar to those in the instant case, further held that plaintiffs could not rely on positive statements made alongside strong indications of fraud because they "did not overcome the releases' clear message that [defendant's] prior financial statements could no longer be relied upon." Livent, 151 F.Supp.2d at 440.

Defendants attempt to paint the Plaintiffs as "vulture" investors undeserving of the securities laws' protection.  The market for distressed securities, however, is an important one, and the securities markets as a whole are well served by buyers standing ready to purchase securities from hapless investors eager to extricate themselves from (potentially) collapsing corporations. Both sides make well-developed policy arguments for their

respective positions—arguments that are better weighed in another forum.  However, Plaintiffs cite, and this Court is aware of, no legal authority supporting their proposition that a securities purchaser aware of fraud and misstatements can selectively rely on statements not yet disavowed without falling awry of 10b-5's bar against recovery by reckless investors.

Plaintiffs here actually knew that a fraud perpetrated by the family controlling Adelphia had led to false statements vastly overvaluing the corporation and, by extension, its securities.  The Plaintiffs purchased anyway in the hope that the market, overreacting, might have undervalued the securities.  To rely on statements made by a corporation tied up in fraud at its highest levels in the mere hope that the dishonesty was selective is reckless, and the Underwriters, Lending Banks, and Deloitte motions to dismiss the 10b-5 claims are GRANTED. [4]

## Section 11 Claims

Plaintiffs bring claims under §11 of the Securities Act against all defendants except Buchanan.

---

[4] The Outside Directors did not join in this argument.  They are free to do so if Plaintiffs exercise the right to replead granted them above.

Defendants attack the claims against them under § 11 of the Securities Act of 1933 on two grounds, arguing that Plaintiffs cannot prove any set of facts entitling them to recovery because 1) they were aware of the misstatements when they purportedly relied upon them and 2) the Amended Complaint establishes Defendants' loss causation defense under § 11(e).  The Lending Banks also move on the grounds that they are not underwriters, and CSFB and the Outside Directors argue that the §11 claims against them sound in fraud, and must be pleaded with particularity.

**Awareness**

Section 11 bars recovery by a securities purchaser if "it is proved that at the time of such acquisition he knew of such untruth or omission." 15 U.S.C. § 77k(a). Defendants argue, convincingly, that plaintiffs aware that a statement is false need not be shown to know the truth behind it to have their claims barred.  See Livent, 151 F.Supp.2d at 141 ("Knowledge that a misstatement or omission exists is sufficient to defeat a § 11 or 12(a)(2) claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth." (citing Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1032 (5th Cir. 1990))). Defendants further argue that because Plaintiffs knew some statements were false, they cannot recover for damages

19

caused by other statements held out at as true when the securities were purchased.  The language of the statute will not support such an interpretation.

Beginning as it must with the language of the statute itself, the Court notes that the statute bars recovery where the purchaser knows of "such untruth or omission", not "any" or a similar construction. 15 U.S.C. § 77k(a)(emphasis added).  The only logical interpretation of "such" is that it limits the bar to those untruths or omissions that the purchaser was aware of.  The statute's ambiguity precludes further analysis. See In re Initial Public Offering Sec. Litig., 241 F.Supp.2d 281, 349 (S.D.N.Y. 2003) ("Because the statute is written in clear and unambiguous language, judicial inquiry is complete.")(quoting Marvel Characters, Inc. v. Simon, 310 F.3d 280, 290 (2d Cir. 2002) (quoting Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992))(internal quotation marks omitted).  The cases Defendants cite opposing this conclusion are inapposite.  Livent dealt with a purchaser purporting to rely on financial statements already known to be false, not a purchaser purporting to rely on a different statement not yet disavowed.  151 F.Supp.2d at 439-40.  The other cases cited by Defendants— Haralson, a Fifth Circuit case, and Xerox, N.D. of

20

Illinois—do not support their view of the law.  919 F.2d at
1032; No. 92-C-1767, 1993 WL 195257, at *1.

**Loss Causation**

Defendants next assert that Plaintiffs' losses are
attributable to their high-risk investment strategy, not to
any misstatements or omissions, and that Plaintiffs' § 11
claims therefore must be dismissed under § 11(e) (See Defs.
Appaloosa Reply Br. at 17)("…any losses they may have
suffered resulted from the risk they knowingly accepted as
part of their distressed debt investment strategy.")
Section 11 provides that where the "defendant proves that
any portion or all of such damages represents other than
the depreciation in value of such security resulting from
such part of the registration statement…not being true…such
portion of or all such damages shall not be recoverable."
15 U.S.C. § 77k(e).

Section 11(e) establishes an affirmative defense, with
the burden of proof squarely on the defendant. See Adair v.
Kaye Kotts Associates, Inc., No. 97 Cv. 3375 (SS), 1998 WL
142353, at *7 (S.D.N.Y. March 27, 1998).  Further,
attribution of losses presents "…necessarily a fact
question…[e]ven if this were a pleading requirement, in
this Circuit any decline in value is presumed to be caused

by the representation…" <u>In re Initial Public Offering Sec.</u> <u>Litig.</u>, 241 F.Supp.2d at 351, n.80 (citations omitted).

Defendants have not established their affirmative defense at this stage in the proceedings. Whether Plaintiffs' losses owed to their investment strategy or to the misstatements and omissions they cite is a question of fact, and no motion to dismiss can thus be granted on these grounds.

**Lending Banks as Statutory Underwriters**

The Lending Banks offer a further defense to Plaintiffs' § 11 claims by arguing that they cannot be held liable under the Securities Act because they are not statutory underwriters.

Section 11 provides that:

In case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading, any person acquiring such security…may…sue…every underwriter with respect to such security.

15 U.S.C. § 77k(a). The statute also defines underwriters:

The term "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a

> participation in the direct or indirect
> underwriting of any such undertaking…

15 U.S.C. § 77b(11). Whether or not a party may be termed

an underwriter hinges on its relationship to the particular

offering, not the kind of business it conducts in general.

In re Laser Arms Corp. Sec. Litig., 794 F.Supp 475, 484

(S.D.N.Y. 1989), aff'd 969 F.2d 15 (2d Cir. 1992). There

is no enterprise theory available in §11 claims, See In re

WorldCom, Inc. Sec. Litig., 308 F.Supp.2d 338, 342-45

(S.D.N.Y. 2004), so plaintiffs must plead that the

defendant "participated in the transmission process between

the issuer and the public." Ingenito v. Bermec Corp., 441

F.Supp 525, 536 (S.D.N.Y. 1977).[5]

In WorldCom, the court rejected the idea that a

corporate parent could become an underwriter "through" the

acts of its subsidiaries. Echoing Ingenito, Judge Cote

noted that the statute limits §11 liability to "any person

who has purchased securities from an issuer for

distribution, or who offers or sells securities for an

issuer for that purpose, or who participates directly or

indirectly in those tasks." 308 F.Supp.2d at 344 (citations

---

[5] Noting that in that case "[Plaintiff] has not alleged any activity…that would bring [defendant] within the meaning of the term [underwriter], as it appears in the statute and as it has been interpreted by case law. An underwriter buys securities directly or indirectly from the issuer and resells them to the public, or he performs some act (or acts) that facilitates the issuer's distribution. He participates in the transmission process between the issuer and the public." (citations omitted)

omitted).  A bare pleading that the lending defendants
extended loans to Adelphia in order to help their
affiliated underwriting banks, that the lending defendants
"through their Underwriter Defendant affiliates...induced
and structured numerous public offerings…", and that the
lending banks had "direct or indirect participation in the
distribution of Adelphia securities" will not suffice to
turn lenders into underwriters (Appaloosa ¶¶ 218-19).  Nor
will pleading that the underwriters benefited from their
for-profit underwriting contracts and saw Adelphia as a
"cash cow" (Appaloosa ¶¶ 208-10, 214).

Plaintiffs cite Global Crossing for the proposition
that a court should avoid dismissing a §11 claim even where
the complaint pleads no more than that affiliates of the
underwriters "participated" in the offering.  See  In re
Global Crossing, Ltd. Sec. Litig., 313 F.Supp.2d 189, 212
(S.D.N.Y. 2003).  There, though, the court was faced with
sorting out a large number of misnamed defendants, and
merely gave the plaintiffs extra time to correct their
pleadings with a warning that any plaintiff failing to drop
claims that could not be sustained might face sanctions.
Id. at 212-13.  A court's sound use of its discretion to
best manage a complicated case is not persuasive legal
authority.  Nor is Harden, a decision of no moment here

because it dealt with an entirely different animal, the "qualified independent underwriter," that accepts §11 liability per NASD regulations. See Harden v. Raffensperger, Hughes & Co., 65 F.3d 1392, 1401 (7th Cir. 1995).

**Sound in Fraud**

Finally, the Outside Directors and CFSB argue that the §11 claims against them sound in fraud, and must be pled with particularity. As noted above, Plaintiffs' fraud claims against both Defendants under 10b-5 were dismissed with leave to replead for failure to plead with particularity.

Plaintiffs' claims sound in fraud. In their Count I §11 claim, they note:

> For purposes of this claim, Appaloosa and
> Franklin Mutual expressly exclude and disclaim
> any allegation that could be construed as
> alleging fraud or intentional or reckless
> misconduct, as this claim is based solely on
> claim of strict liability and/or negligence under
> the Securities Act.

(Appaloosa ¶ 225)  In the preceding paragraph, though, Plaintiffs otherwise reassert the allegations made in the remainder of their Amended Complaint.  The Complaint as a whole is targeted at the fraud perpetrated by Adelphia and other parties, not

negligence, and the few paragraphs set aside under
Count I do not alter the character of Plaintiffs'
allegations.

The Second Circuit in <u>Rombach</u> rejected a similar
attempt to merely disclaim allegations of fraud where
doing do would allow Rule 9(b) to be avoided. <u>Rombach
v. Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004)("Plaintiffs
assert that their <u>Section 11</u> claims do not sound in
fraud but the wording and imputations of the complaint
are classically associated with fraud")(internal
quotations and citations omitted).  Plaintiffs
acknowledge that <u>Rombach</u> is controlling authority, but
believe it wrongly decided and seek to preserve that
issue for appeal (Pls. Jt. Scienter Br. at 49, n.25).
Judge Lynch, explaining <u>Rombach</u>, held that a Plaintiff
had established negligence claims under §11 that
avoided Rule 9(b) where

> [t]he complaint in this case is carefully
> structured so as to draw a clear distinction
> between negligence and fraud claims. The
> Securities Act claims are found in the first half
> of the complaint; the Exchange Act allegations…in
> the second half…[t]his careful division makes it
> easy to distinguish between the two, and the
> substance of the allegations keeps the
> distinction as clear as does the complaint's
> structure. The relevant factual allegations are
> contained in a section called "Defendants'
> Negligence", which alleges exactly that.

In re Refco, Inc. Sec. Litig., 05 Civ. 8626 (GEL) 2007
U.S. Dist. LEXIS 31969  at *42-48 (S.D.N.Y April 30,
2007).  The Plaintiffs here have made no such effort
to either conform with the requirements of Rule 9(b)
or avoid its applications.

## Section 11 Conclusion

The Lending Banks' motions are GRANTED.  The Outside
Directors' and CSFB's motions are GRANTED, and Plaintiffs
have leave to replead. All others are DENIED.

## Outside Directors

The Court next addresses the motions to dismiss §15(a)
and §20(a) claims  put forth by the Outside Directors
(Kailbourne, Coyle, Metros, and Gelber). The Outside
Directors attack Plaintiff's claims under §15(a) of the
Securities Act for failure to plead control person
liability and §20(a) of the Exchange Act for failure to
plead culpable participation.

In order to plead a claim under §15(a) or §20(a), a
plaintiff must allege (a) a primary violation by a
controlled person and (b) direct or indirect control by the
defendant of the primary violator.  See In re Global
Crossing, 2004 U.S. Dist. LEXIS 5040, at 79-80.  The first

prong can be satisfied, as it is here, by adequately
pleading a §10(b) claim.  Id., citing In re Scholastic
Corp. Sec. Litig., 252 F.3d 63, 77-78 (2d Cir. 2001).  The
second prong is satisfied when a defendant signs an SEC
filing subject to a well-pleaded 10(b)-5 claim and the
plaintiff alleges knowing or reckless participation, as is
the case here (Appaloosa ¶¶ 263, 272). See In re Worldcom,
294 F.Supp.2d at 419-20; see also Jacobs v. Coopers and
Lybrand, LLP, No. 97 Cv. 337(RPP), 1999 WL 101772, at *9
(S.D.N.Y. Mar. 1, 1999)("It does comport with common sense
to presume that a person who signs his name to a report has
some measure of control over those who write the report").
Defendants cite no Southern District or Second Circuit
caselaw to the contrary, and the Court declines to look
elsewhere for conflicting interpretations.

Section 20(a) claims must, in addition, allege
"culpable participation." See Wallace v. Buttar, 378 F.3d
182 (2d Cir. 2004); see also In re Globalstar Sec. Litig.,
No. 01 Cv. 1748(SHS), 2003 WL 22953163, at *12 (S.D.N.Y.
Dec. 15, 2003)("In order to withstand a motion to dismiss a
section 20(a) claim, plaintiffs must, in addition to the
requirements of section 15, also show that the controlling
person was in some meaningful sense a culpable participant
in the fraud perpetrated by the controlled

person.")(citations and internal quotation marks omitted).
To do so, they must allege facts creating a "strong
inference that the control person knew, or should have
known, that the controlled person was engaging in
fraudulent conduct." In re Deutche Telekom AG Sec. Litig.,
C.A. No. 00 Cv. 9475(SHS), 2002 U.S. Dist. LEXIS 2627, at
*21 (S.D.N.Y. Feb. 20, 2002).[6]  Plaintiffs have here alleged
that by dint of their service as directors, Defendants
"directed and caused" the corporation's management to adopt
policies that later resulted in 10(b)-5 actions and "were
able to and did control the content of public statements
disseminated by Adelphia." (Appaloosa ¶¶ 261, 271-73).
Both the §15(a) and §20(a) claims have been sufficiently
alleged, and the motions to dismiss them are DENIED.

---

[6] Plaintiffs cite authority for the proposition that the PSLRA's "strong inference" requirement does not
apply to §20(a).  See In re Worldcom, 294 F.Supp.2d at 414-16; But see  Kalin v. Xanboo, Inc., No. 04 Cv.
5931(KMK), 2007 U.S. Dist. LEXIS 3342 (S.D.N.Y. Jan. 12, 2007)("Having surveyed the relevant cases,
the Court finds that the weight of Second Circuit precedent favors the view that a Plaintiff plead 'culpable
participation' to state a section 20(a) claim, and that such participation must be plead with particularity.
Thus, in order to withstand a motion to dismiss, a section 20(a) claim must allege, at a minimum,
particularized facts of the controlling person's conscious misbehavior or recklessness.")  The Court avoids
adding to the lengthy arguments cited in these cases and elsewhere for and against requiring a separate
allegation of culpable participation, or for requiring that it be pleaded with particularity, in the many
District Courts that have considered the issue in the absence of guidance from the Court of Appeals.  The
Plaintiffs here have pleaded culpable participation separately and with particularity, rendering the debate
moot.

**Section 18**

To establish civil liability under Section 18 of the 1934 Securities Exchange Act, Plaintiffs must prove that: "(1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) defendant[s] made or caused to be made the false or misleading statement; (3) plaintiff[s] relied on the false statement; and (4) the reliance caused loss to the plaintiff[s]." _In re Alstom SA Sec. Litig.,_ 406 F.Supp.2d 433, 478 (S.D.N.Y. 2005) (citation omitted).[7]

Section 18 requires actual, or what has sometimes been referred to as "eyeball," reliance. _Id._ at 479 (citing _Heit v. Weitzen_, 402 F.2d 909, 916 (2d Cir.1968)) (other citations omitted). Reliance cannot be presumed as in a Section 10(b) claim; a plaintiff must actually have read and relied on the filed document. _In re Alstom,_ 406

---

[7] 15 U.S.C. § 78r(a) provides in relevant part:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of Section 78 of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading…

F.Supp.2d at 479 (citing _Heit_, 402 F.2d at 916) (other
citations omitted).

Defendants move to dismiss the complaint's §18 claims
on the ground that, while Plaintiffs aver that they
actually read and reviewed the misstatements and relied
upon them, Plaintiffs themselves did not purchase
securities.  Rather, Plaintiffs purchased securities as
agents for their investment clients, who are not named here
as plaintiffs.  The issue, then, is whether an agent who
both reads and then relies on a covered SEC filing by
deciding to purchase the security may sue on behalf of the
owner for whom he acted.

The only authority the parties cite is Safety-Kleen,
where the district court held that §18 claims may go
forward where two distinct individuals within a single
legal entity 1) read the SEC filings and 2) purchased
securities.  In re Safety-Kleen Bondholders Litig., No.
3:00-1145-17, 2004 WL 3115871, at *4-*5 (D.S.C. Mar. 19,
2004).  That holding does not bear on the question before
this Court.

The operative language in the statute is "in reliance
upon such statement."  15 U.S.C. § 78r(a). It is settled
law that this language bars claims predicated on mere
constructive, as opposed to actual, reliance.  See In re

<u>Alstom SA Secs. Litig.</u>, 406 F. Supp. 2d at 479
("Constructive reliance is not sufficient.")(citations
omitted).  Defendants do not contest that Plaintiffs
actually relied on the SEC filings at issue.  They argue,
not that Plaintiffs constructively relied, but that they
relied through an agent.

Deloitte analogizes Plaintiffs' position to a
purchaser who, though failing to read a company's filings,
relies on the counsel of an advisor who does read them
(Deloitte Section 18 Br., at 4).  The analogy misses the
mark.  Where, as here, the person who actually decides to
purchase, and carries out the purchase of, a security is
the same one who read and relied on the misstatement, no
constructive reliance is pleaded and the §18 claim may
proceed.

**Buchanan**

Buchanan makes the additional argument that, as its
role was limited to rendering legal advice, <u>Central Bank</u>'s
prohibition of aiding and abetting liability under the
Exchange Act bars the §18 claims against it.  <u>Central Bank
of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>,
511 U.S. 164 (1994)("The important point for present
purposes, however, is that none of the express causes of

action in the 1934 Act further imposes liability on one who aids or abets a violation.").

Plaintiffs recognize the lack of aiding and abetting liability under §18 (Pls. Jt. Buchanan Br. at 43)("[O]ne who assists another who violates the statute…is not liable under the statute's plain terms.")  They counter that Buchanan was in fact a primary violator, pointing the text of the statute: "make or cause to be made false or misleading statements."(emphasis added) 15 U.S.C. § 78r(a).

Such language, though, will not bear the weight Plaintiffs place on it.[8]  In no sense can an attorney giving legal advice to a person or corporation making a statement, or assisting in its drafting, be understood to "cause" the statement to be made.  Plaintiffs claim that "[b]y drafting, preparing and reviewing Adelphia's SEC filings, Buchanan caused material misstatements and omissions to be made in those filings within the meaning of Section 18." (Pls. Jt. Buchanan Br. at 43).  But refusing to find that assisting attorneys "cause" statements to be made does not "render the words 'cause to be made' superfluous, reading them out of the statute."(Id. at 44).  Instead, it limits

---

[8] Neither Plaintiffs nor Defendants, in papers on this topic or the related one of whether attorneys might have "immunity" from §18 claims, cite a single applicable case.  This Court is similarly unaware of any authority on point.

that clause's meaning to its natural one: describing actors
who control the speaker in some way.

The motions to dismiss Plaintiffs' §18 claims are
GRANTED as to Buchanan, DENIED as to the Outside Directors
and Deloitte.

**Conclusion**

As noted above, for the reasons set forth herein, the
motions to dismiss are GRANTED in part and DENIED in part.
The motions to dismiss the Count I claims under §11 are
GRANTED as to the Lending Banks; GRANTED, with leave to
replead, as to the Outside Directors and CFSB; and
otherwise DENIED. The motions to dismiss §15 and §20 claims
against the Outside Directors in Counts II and V are
DENIED.  As to §18 claims in Count III against the Outside
Directors, Buchanan, and Deloitte, the motions are GRANTED
as to Buchanan and otherwise DENIED.  The motions to
dismiss §10b (Rule 10b-5) claims brought in Counts IV, VI,
VII, and VIII are GRANTED, with leave to replead, as to the
Outside Directors; and GRANTED, as to the Lending Banks,
Underwriter Defendants, and Deloitte.

SO ORDERED.

Dated: September 7, 2007

Lawrence M. McKenna
U.S.D.J.

35