UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                  )
In Re:  ADELPHIA COMMUNICATIONS  CORP.            )          03MD 1529 (LMM)
SECURITIES & DERIVATIVE LITIGATION                )
_____  )
                                                  )
This Document Relates To:                         )
                                                  )
FRANKLIN STRATEGIC INCOME FUND, et al.            )          Case No. 03-CV-5751
v. RIGAS, et al.,                                 )
_____  )

## SECOND AMENDED COMPLAINT

Plaintiffs, by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of prospectuses, press releases, loan documents, indentures, news articles, analysts' statements, decisions rendered in related proceedings before the Securities & Exchange Commission ("SEC" or "Commission"), and publicly filed documents of Adelphia Communications Corporation ("Adelphia" or the "Company"), including but not limited to those discussed herein.  Plaintiffs make the following allegations against John J. Rigas, Timothy J. Rigas, James P. Rigas, Michael J. Rigas, and Deloitte & Touche LLP (collectively, "Defendants").  Plaintiffs believe that substantial, additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is an action against Adelphia's outside auditor, Deloitte & Touche LLP ("Deloitte"), and against four members of the Rigas family who were formerly officers and directors of Adelphia and who held voting control over the Company's common stock.  Between

June 2000 and May 16, 2002, Plaintiffs collectively purchased more than $329,615,000 principal amount of debt securities issued by Adelphia, which they continued to hold when Adelphia filed for bankruptcy protection on June 25, 2002.  These purchases were made based upon financial information and other public disclosures that, as Plaintiffs only learned after-the-fact via a series of Company announcements beginning in late March 2002, understated Adelphia's liabilities by more than *$2 billion*, overstated Adelphia's revenues by at least *$500 million* over a two-year period, and misrepresented or failed to disclose other material information about the Company. The fall-out from these disclosures would ultimately lead to criminal convictions and prison sentences for John and Timothy Rigas, an SEC censure and large monetary penalties against Deloitte, and detailed factual findings by the SEC of "extensive" failures to comply with generally accepted auditing standards ("GAAS") and "a troubling disregard of some of the most basic auditing principles" by Deloitte's lead audit partner for the year 2000 audit.

2.      On March 27, 2002, the Company revealed for the first time that billions of dollars in off-balance sheet debt had not been disclosed in its prior SEC filings or related financial reports.  This debt arose out of borrowings by entities affiliated with the Rigas family under a series of co-borrowing agreements between those entities and subsidiaries of Adelphia, which the Company estimated at $2.8 billion in its press release.  During a conference call later that day, Adelphia revealed that an undisclosed amount of these borrowings had been used by the Rigas family to purchase Adelphia securities.  Thus, the Rigas family was using Adelphia's credit to obtain low-interest bank loans, and then purchasing high-interest debt securities and preferred stock from Adelphia, thereby reaping personal profits from the interest spread and maintaining control of Adelphia through increased stock ownership, all at the Company's expense.

3.      Adelphia's subsidiaries were jointly and severally liable for the full amount of the Rigas family entities' borrowings under the co-borrowing agreements – which amounted to billions of dollars – but prior to March 27, 2002, Adelphia's consolidated financial statements and other public statements failed to disclose either the amount of these liabilities, or the fact that the money was used by the Rigas family.  Those financial statements were audited by Deloitte, and Deloitte issued unqualified opinions stating – falsely – that the financial statements complied with generally accepted accounting principles ("GAAP") in all material respects.

4.      Between March 27, 2002 and May 23, 2002, Adelphia made additional announcements relating to the co-borrowing debt.  For example, in early April, Adelphia announced that it was delaying the release of its Annual Report on Form 10-K for the year ended December 31, 2001, so it could "review[] certain accounting matters relating to co-borrowing credit facilities."  Then, on April 17, Adelphia disclosed that the SEC had launched a formal investigation into the co-borrowing agreements.  On May 2, the Company announced that it expected to restate its previously-issued financial statements for 1999 and 2000, and its interim financial statements for 2001, to reflect as additional liabilities the borrowings by Rigas family-owned entities under the co-borrowing agreements.  On May 23, the Company disclosed that "the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion."

5.      From March 27, 2002 through May 23, 2002, the Company's disclosures of problems at Adelphia were confined to the issue of Adelphia's liabilities under the co-borrowing facilities, and the use of draw-downs under those facilities to fund the Rigas family's purchases of Adelphia securities.  On May 24, 2002, however, the Company disclosed that there were numerous other previously undisclosed (or inadequately disclosed) relationships and transactions

involving Adelphia and the Rigas family (or entities they control), by which the Rigas family had diverted tens of millions of dollars in corporate funds and resources for their own personal use and benefit.   Additional information about these relationships and transactions later came to light and revealed, as the government alleged in its successful criminal prosecution of John Rigas and Timothy Rigas, that the Rigases had systematically looted the Company and used it as their "personal piggy bank."

6.      During the week following May 24, 2002, NASDAQ announced that it was delisting the Company's securities, and Adelphia defaulted on several bank loans and missed interest payments on its debt securities.  On June 25, 2002, Adelphia filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

7.      As a result of these and other announcements between March 27, 2002 and the filing of this action, the trading prices of Adelphia's securities dropped precipitously.  Adelphia's Class A common stock dropped more than 99%, from $20.39 per share on March 26, to $0.14 per share on June 13.  The price of Adelphia's bonds also dropped materially in response to the adverse news: the Company's 10.875% notes maturing in 2010 fell from a bid of 97 cents on March 27, to 67 cents on May 16, and its bond rating declined to BB- on March 28, 2002, to CCC+ on April 22, 2002, and to C- on May 20, 2002.  The prices and ratings of the other bonds issued by Adelphia similarly dropped in response to the disclosures.

8.      In the wake of Adelphia's abrupt collapse into bankruptcy, John Rigas and Timothy Rigas were criminally convicted of securities fraud, conspiracy, and other crimes as a result of their deceptive conduct toward Adelphia's investors, and they are currently serving prison time for those offenses.  Moreover, following a series of SEC proceedings and other investigations and lawsuits, it has become clear that the Rigases are not the only ones who bear

4

responsibility for investors' losses. Deloitte – whose very function was to provide an independent "check" on the conduct of Adelphia's management through the performance of annual audits and quarterly reviews of Adelphia's financial statements – facilitated the fraud by conducting audits that were so severely deficient as to be essentially worthless.

9.      Deloitte had a long-standing relationship with Adelphia, dating back to 1980, which gave Deloitte detailed knowledge of Adelphia's business and regular access to Adelphia's financial records and personnel. During the 1999 through 2001 time period, Deloitte knew that Adelphia was issuing new securities and that investors – both new and old – were relying upon Deloitte's audits to provide comfort concerning the Company's financial statements. Nonetheless, despite identifying Adelphia as presenting a "much greater than normal" risk of fraud as compared to other audit clients, Deloitte simply accepted at face value the representations made to it by Adelphia management, failed to obtain independent verification of important accounting entries, and allowed itself to be bullied by Adelphia's management into concealing Adelphia's full liabilities under the co-borrowing agreements even though Deloitte knew this undisclosed information was material to investors. Unwilling to challenge its long-term client, year after year Deloitte raked in huge fees from Adelphia and issued unqualified audit opinions indicating that Adelphia's financial statements complied with GAAP, when in fact those financial statements were riddled with GAAP violations and materially overstated the Company's financial condition.

10.      The SEC has censured Deloitte and one of its audit partners for their conduct in connection with the Adelphia audits, and has found that the actions of Deloitte's audit partner (which are imputable to Deloitte) were a cause of Adelphia's violations of the securities laws. Deloitte has paid $50 million in penalties and sanctions as a result of its settlement of the SEC

charges.  In addition, Deloitte has paid $167.5 million to settle claims brought against it by

Adelphia's creditors.  Plaintiffs, however, have not been compensated for the hundreds of

millions of dollars in losses that they suffered as a result of their purchases of Adelphia debt

securities at prices that were artificially inflated due to the misconduct of Deloitte and the Rigas

family.  Plaintiffs seek to recover those losses in this action.

## JURISDICTION AND VENUE

11.     This Court has personal jurisdiction over Defendants pursuant to Section 22 of the

Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77v; Section 27 of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and

1337; and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

12.     The claims herein arise under Section 11 of the Securities Act, 15 U.S.C. § 77k;

Section 15 of the Securities Act, 15 U.S.C. § 77o; Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the

Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);

California Corporations Code §§ 25400, 25500, 25504, 25504.1 and 25504.2; and common law.

13.     This action was originally filed in the Superior Court of the State of California,

County of Los Angeles on November 8, 2002, and was subsequently removed to the United

States Bankruptcy Court for the Central District of California.  On July 23, 2003, the Judicial

Panel on Multidistrict Litigation ordered that 46 Adelphia-related actions, including this action,

be transferred to this Court for coordinated pretrial proceedings.

14.     In connection with the acts, conduct, and course of conduct alleged in this

Complaint, the defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the United States mails and interstate telephone communications.

## THE PARTIES AND OTHER RELEVANT ENTITIES

### Adelphia

15.　　Adelphia, a non-party to this action, was the sixth largest cable company in the United States at the time relevant to this action.  In addition to providing telecommunications services to subscriber customers, Adelphia and its subsidiaries provided management and consulting services to other partnerships, corporations and limited liability companies engaged in the ownership and operation of cable television systems (the "Managed Entities").  At all relevant times, John J. Rigas (Adelphia's former President, Chairman and CEO) and members of his immediate family, and entities they owned or controlled, had controlling interests in the Managed Entities.  Adelphia was a Delaware corporation with its principal place of business located at 5619 DTC Parkway, Greenwood Village, CO 80111 (formerly One North Main Street, Coudersport, PA 16915).  Adelphia filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on June 25, 2002, and its Chapter 11 plan was confirmed in 2007.

### Plaintiffs

16.　　Plaintiffs Franklin Strategic Income Fund, Franklin Custodian Fund-Income Fund, FIST-Franklin Convertible Securities Fund, FTVIPT-Strategic Income Fund, FTIF-Franklin High Yield Fund, FTVIPT-Franklin Income Securities Fund, FTIF-Franklin Income Fund, Franklin AGE High Income Fund, FTVIPT-Franklin High Income Fund, Franklin Institutional High Yield Fixed Income Fund, Franklin Multi-Income Fund, and FIST-Franklin Total Return Fund, are funds that purchased and held debt securities issued by Adelphia and its subsidiaries.  They purchased the following Adelphia securities, which they continued to hold at the time of the Company's bankruptcy filing:

**Adelphia 6% Convertible Notes Due February 15, 2006 (CUSIP 006848BG9)**

| Fund | Date | Principal Amount |
|---|---|---|
| Franklin Strategic Income Fund | 1/18/01 | $2,400,000 |
| Franklin Custodian Fund-Income Fund | 1/18/01 | $27,700,000 |
| FTVIPT-Franklin Income Securities Fund | 1/18/01 | $2,700,000 |
| FTVIPT-Strategic Income Fund | 1/18/01 | $200,000 |
| FTIF-Franklin Income Fund | 1/18/01 | $100,000 |
| FIST-Franklin Convertible Securities Fund | 3/23/01 | $200,000 |
| FIST-Franklin Convertible Securities Fund | 3/27/01 | $1,000,000 |
| FTVIPT-Franklin Income Securities Fund | 3/27/01 | $100,000 |
| Franklin Custodian Fund-Income Fund | 3/27/01 | $400,000 |
| FTIF-Franklin Income Fund | 3/27/01 | $10,000 |
| Franklin Custodian Fund-Income Fund | 4/4/01 | $6,900,000 |
| FTVIPT-Franklin Income Securities Fund | 4/4/01 | $400,000 |
| Franklin Custodian Fund-Income Fund | 4/19/01 | $5,000,000 |
| FTVIPT-Franklin Income Securities Fund | 4/19/01 | $200,000 |
| FIST-Franklin Convertible Securities Fund | 4/19/01 | $2,500,000 |
| FTIF-Franklin Income Fund | 4/19/01 | $30,000 |
| FIST-Franklin Convertible Securities Fund | 4/24/01 | $1,000,000 |
| FTIF-Franklin Income Fund | 6/29/01 | $60,000 |
| Franklin Custodian Fund-Income Fund | 8/14/01 | $750,000 |
| Franklin Custodian Fund-Income Fund | 8/15/01 | $1,750,000 |
| Franklin Custodian Fund-Income Fund | 8/16/01 | $1,000,000 |
| Franklin Custodian Fund-Income Fund | 8/21/01 | $1,500,000 |
| FTVIPT-Strategic Income Fund | 8/22/01 | $100,000 |
| Franklin Custodian Fund-Income Fund | 8/22/01 | $5,000,000 |
| FIST-Franklin Convertible Securities Fund | 8/22/01 | $2,300,000 |
| Franklin Strategic Income Fund | 8/22/01 | $600,000 |
| Franklin Custodian Fund-Income Fund | 10/2/01 | $5,000,000 |
| FTIF-Franklin Income Fund | 11/27/01 | $15,000 |
| FTVIPT-Strategic Income Fund | 1/30/02 | $100,000 |

| Fund | Date | Principal Amount |
|---|---|---|
| FIST-Franklin Convertible Securities Fund | 3/20/02 | $1,000,000 |
| Franklin Custodian Fund-Income Fund | 3/20/02 | $5,000,000 |
| Franklin Custodian Fund-Income Fund | 3/25/02 | $5,000,000 |
| FTVIPT-Franklin Income Securities Fund | 3/28/02 | $200,000 |
| Franklin Custodian Fund-Income Fund | 3/28/02 | $8,000,000 |
| FIST-Franklin Convertible Securities Fund | 3/28/02 | $1,250,000 |
| Franklin Strategic Income Fund | 3/28/02 | $500,000 |
| FTVIPT-Strategic Income Fund | 3/28/02 | $50,000 |
| Franklin Custodian Fund-Income Fund | 5/16/02 | $11,000,000 |
| Franklin Custodian Fund-Income Fund | 5/16/02 | $3,700,000 |
| Franklin Custodian Fund-Income Fund | 5/16/02 | $1,800,000 |
| Franklin Custodian Fund-Income Fund | 5/16/02 | $5,500,000 |
| FIST-Franklin Convertible Securities Fund | 5/16/02 | $1,000,000 |
| FIST-Franklin Convertible Securities Fund | 5/16/02 | $300,000 |
| FIST-Franklin Convertible Securities Fund | 5/16/02 | $500,000 |
| FIST-Franklin Convertible Securities Fund | 5/16/02 | $200,000 |

### Adelphia 7.875% Senior Notes Due May 1, 2009 (CUSIP 006848BD6)

| Fund | Date | Principal Amount |
|---|---|---|
| Franklin Custodian Fund-Income Fund | 6/15/00 | $4,500,000 |
| FTIF-Franklin Income Fund | 6/15/00 | $10,000,000 |
| FTVIPT-Franklin Income Securities Fund | 6/15/00 | $500,000 |
| FTVIPT-Franklin Income Securities Fund | 6/27/00 | $500,000 |
| Franklin Custodian Fund-Income Fund | 6/27/00 | $5,500,000 |
| Franklin Custodian Fund-Income Fund | 7/26/00 | $4,500,000 |
| FTVIPT-Franklin Income Securities Fund | 7/26/00 | $500,000 |
| FTVIPT-Franklin Income Securities Fund | 8/4/00 | $300,000 |
| FTIF-Franklin High Yield Fund | 8/4/00 | $1,000,000 |
| Franklin Custodian Fund-Income Fund | 8/4/00 | $3,700,000 |
| FTIF-Franklin High Yield Fund | 8/11/00 | $2,000,000 |

| Fund | Date | Principal Amount |
|---|---|---|
| FTVIPT-Franklin Income Securities Fund | 8/11/00 | $600,000 |
| Franklin Custodian Fund-Income Fund | 8/11/00 | $5,400,000 |
| FTIF-Franklin High Yield Fund | 08/14/00 | $2,500,000 |
| FTIF-Franklin High Yield Fund | 08/15/00 | $1,500,000 |
| FTIF-Franklin Income Fund | 9/19/00 | $10,000,000 |
| FTVIPT-Franklin Income Securities Fund | 11/10/00 | $400,000 |
| Franklin Custodian Fund-Income Fund | 11/10/00 | $4,600,000 |
| FTIF-Franklin Income Fund | 1/10/01 | $200,000 |
| FTIF-Franklin Income Fund | 4/17/01 | $100,000 |
| Franklin Custodian Fund-Income Fund | 4/17/01 | $4,900,000 |
| Franklin Custodian Fund-Income Fund | 5/1/01 | $4,700,000 |
| Franklin Custodian Fund-Income Fund | 5/14/01 | $4,700,000 |
| FTVIPT-Franklin Income Securities Fund | 5/16/01 | $200,000 |
| Franklin Custodian Fund-Income Fund | 5/16/01 | $4,600,000 |
| Franklin Custodian Fund-Income Fund | 6/7/01 | $1,900,000 |
| FTVIPT-Franklin Income Securities Fund | 6/18/01 | $400,000 |
| Franklin Custodian Fund-Income Fund | 6/18/01 | $4,600,000 |

### Adelphia 10.875% Senior Notes Due October 1, 2010 (CUSIP 006848BF1)

| Fund | Date | Principal Amount |
|---|---|---|
| Franklin Multi-Income Fund | 9/15/00 | $1,000,000 |
| FTVIPT-Franklin Income Securities Fund | 9/15/00 | $900,000 |
| Franklin AGE High Income Fund | 9/15/00 | $27,500,000 |
| Franklin Custodian Fund-Income Fund | 9/15/00 | $12,000,000 |
| FTIF-Franklin High Yield Fund | 9/15/00 | $6,000,000 |
| FIST-Franklin Total Return Fund | 3/7/01 | $200,000 |
| FTVIPT-Franklin Income Securities Fund | 6/20/01 | $300,000 |
| Franklin Custodian Fund-Income Fund | 6/20/01 | $4,700,000 |
| Franklin Institutional High Yield Fixed Income | 1/15/02 | $100,000 |
| Franklin Custodian Fund-Income Fund | 3/28/02 | $2,000,000 |
| FTIF-Franklin Income Fund | 4/3/02 | $2,100,000 |

| Fund | Date | Principal Amount |
|---|---|---|
| Franklin AGE High Income Fund | 4/3/02 | $900,000 |
| Franklin AGE High Income Fund | 4/11/02 | $800,000 |
| Franklin AGE High Income Fund | 4/11/02 | $800,000 |
| Franklin Custodian Fund-Income Fund | 4/11/02 | $2,700,000 |
| Franklin Custodian Fund-Income Fund | 4/11/02 | $2,300,000 |
| FTIF-Franklin High Yield Fund | 4/11/02 | $2,100,000 |
| FTIF-Franklin High Yield Fund | 4/11/02 | $1,900,000 |
| Franklin Custodian Fund-Income Fund | 4/22/02 | $2,000,000 |
| Franklin Custodian Fund-Income Fund | 4/23/02 | $10,000,000 |
| Franklin Custodian Fund-Income Fund | 5/14/02 | $4,300,000 |
| FTVIPT-Franklin Income Securities Fund | 5/14/02 | $700,000 |
| Franklin Custodian Fund-Income Fund | 5/15/02 | $5,000,000 |
| Franklin Custodian Fund-Income Fund | 5/16/02 | $10,000,000 |

**Adelphia 10.25% Senior Notes Due June 15, 2011 (CUSIP 006848BJ3)**

| Fund | Date | Principal Amount |
|---|---|---|
| Franklin AGE High Income Fund | 6/7/01 | $12,500,000 |
| FTIF-Franklin High Yield Fund | 6/7/01 | $5,000,000 |
| FTVIPT - Franklin High Income Fund | 6/7/01 | $2,500,000 |
| Franklin AGE High Income Fund | 3/27/02 | $5,000,000 |
| Franklin AGE High Income Fund | 3/28/02 | $2,500,000 |

17.     Plaintiffs sold all of the above-listed securities at a loss prior to confirmation of Adelphia's Chapter 11 plan.  Plaintiffs did not receive any recoveries in connection with Adelphia's bankruptcy proceedings on their investments in these securities.

**Defendants**

18.     Defendant John J. Rigas founded Adelphia and was a director of the Company at all relevant times until his resignation effective May 22, 2002.  John Rigas was also Adelphia's

President, Chairman, and Chief Executive Officer at all relevant times until May 15, 2002, when

he resigned from those positions.  John Rigas was also President of Adelphia's subsidiaries at all

relevant times, as well as Chairman and a director of Adelphia Business Solutions Inc.

("Adelphia Business"), which was a consolidated subsidiary of the Company until a January 11,

2002 spin-off transaction.  For each of 1998 and 1999, John Rigas received a salary from

Adelphia in excess of $1.35 million, and in 1999 he also received Adelphia Business stock

options valued at $1.575 million.

19.     Defendant Timothy J. Rigas, son of defendant John Rigas, was a director of

Adelphia at all relevant times until his resignation effective May 22, 2002.  He was also

Executive Vice President, Chief Financial Officer, Chief Accounting Officer, and Treasurer of

Adelphia until his resignation from those positions on May 16, 2002.  Timothy Rigas was a

director, Vice Chairman, Chief Financial Officer, and Treasurer of Adelphia Business, as well as

Executive Vice President, Chief Financial Officer, Chief Accounting Officer, and Treasurer of

Adelphia's subsidiaries, at all relevant times.  Timothy Rigas was Chairman of Adelphia's Audit

Committee until June 13, 2001.

20.     Defendant James P. Rigas, son of defendant John Rigas, was a director of

Adelphia and Adelphia Business, as well as Executive Vice President of Strategic Planning of

Adelphia, at all relevant times until his resignation from those positions effective May 22, 2002.

James Rigas was also Vice Chairman, President, Chief Executive Officer and Chief Operating

Officer of Adelphia Business, and Vice President of Adelphia's subsidiaries, at all relevant

times.  James Rigas holds a law degree.

21.     Defendant Michael J. Rigas, son of defendant John Rigas, was a director of

Adelphia and Adelphia Business, as well as Executive Vice President of Operations and

Secretary of Adelphia, at all relevant times until his resignation from those positions effective May 22, 2002. Michael Rigas was also Vice Chairman, Secretary, and a director of Adelphia Business, and Vice President of Adelphia's subsidiaries, at all relevant times. Michael Rigas is licensed to practice law in the District of Columbia.

22.     Together, defendants John Rigas, Timothy Rigas, Michael Rigas, and James Rigas, (collectively, the "Rigas Parties") at all relevant times effectively owned a 22% economic interest in Adelphia and an estimated 91% of Adelphia's voting control, through ownership of Adelphia's Class A and supervoting Class B common stock. The Class B common stock was entitled to ten votes per share and was 100% owned by the Rigas family. Until their resignations, the Rigas Parties were the Company's four highest paid officers. Further, the Rigas Parties owned a majority of Adelphia Business.

23.     Defendant Deloitte & Touche, LLP is a "Big Four" accounting firm that at all relevant times provided accounting and auditing services to Adelphia. For years, Adelphia was one of Deloitte's largest clients. Deloitte began serving as Adelphia's independent auditor in 1980, well before Adelphia's initial public offering, and continued to audit Adelphia's annual financial statements through 2000. These annual financial statements and Deloitte's audit reports concerning those financial statements were incorporated into and made a part of Adelphia's prospectuses and other public filings with Deloitte's knowledge and express consent, and Deloitte knew and expected that purchasers of Adelphia's securities would rely upon those financial statements and audit reports when making investment decisions.

24.     Deloitte was also engaged to conduct the audits of Adelphia's year 2001 annual financial statements, but its work on that audit was suspended pending completion of Adelphia's internal investigations into the co-borrowing agreements and related matters, and Deloitte was

13

ultimately terminated as the Company's auditor.  In addition to providing audit and accounting services to Adelphia, Deloitte provided such services to some or all of the Managed Entities, as well as other entities owned and/or controlled by the Rigas family.  Deloitte is a Delaware limited liability partnership with its principal place of business in New York.

**Other Former Adelphia Officers and Directors**

25.     Peter L. Venetis ("Venetis") is the son-in-law of John Rigas, by virtue of his marriage to John Rigas's daughter, Ellen Rigas Venetis.  Venetis was a director of Adelphia from 1999 until June 11, 2002.  He was also a director of Adelphia Business and the Managing Partner of Praxis Capital Ventures, L.P., a subsidiary of Adelphia.

26.     James R. Brown ("Brown") was an eighteen year veteran of Adelphia and its Vice President of Finance until his resignation on May 19, 2002.  Brown oversaw the accounting and finance functions at Adelphia.

27.     Michael C. Mulcahey ("Mulcahey") was Vice President, Assistant Treasurer, and Director of Internal Reporting for Adelphia at all relevant times.  Mulcahey oversaw Adelphia's cash management system.

**The Managed Entities**

28.     Highland Prestige Georgia, Inc. ("HPGI"), a Delaware corporation, is the parent company of a number of entities that own or operate cable systems, including Prestige Communications, Inc., Highland Carlsbad Cablevision, Inc., Highland Carlsbad Operating Subsidiary, Inc., Desert Hot Springs Cablevision, Inc., and Cablevision Business Services, Inc. These subsidiaries, together with HPGI, are collectively referred to herein as the "Highland Prestige Entities."  At all relevant times, the Rigas Parties and Ellen Rigas Venetis owned all of the equity interests in HPGI.

29.     Highland Holdings is a Pennsylvania general partnership, of which the Rigas Parties and Ellen Rigas Venetis were, at all relevant times, the general partners.

30.     Highland Video Associates, L.P. ("HVA") is a Pennsylvania limited partnership whose partnership interests, at all relevant times, were all owned, directly or indirectly through Highland Holdings, by the Rigas Parties and Ellen Rigas Venetis.  HVA owned substantially all of the partnership interests in a number of entities that owned or operated cable systems, including Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision of West Palm Beach II, LLC, Montgomery Cablevision Associates, L.P., Adelphia Cablevision Broadcasting Corporation, and Henderson Community Antenna Television, Inc.  Together with HVA, these entities are collectively referred to herein as the "HVA Entities."

31.     Hilton Head Communications, L.P., Doris Holdings, L.P., NCAA Holdings, Inc., Illiad Holdings, Inc., and Ionian Communications, L.P. (collectively referred to as the "HHC Entities") were, at all relevant times, entities that operated cable systems and were owned directly or indirectly by the Rigas Parties and Ellen Rigas Venetis.

32.     Coudersport Television Cable Company ("CTCC"), a Pennsylvania corporation, was at all relevant times an operating cable company that was 100% owned by John Rigas.

33.     Niagara Frontier Hockey, L.P. ("NFHLP") is a limited partnership in which John Rigas held a 99% limited partner interest.  Patmos, Inc., a corporation that was 100% owned by the Rigas Parties, at all relevant times held a 1% general partner interest in NFHLP.  NFHLP owned the National Hockey League franchise for the Buffalo Sabres.

34.     The Highland Prestige Entities, Highland Holdings, the HVA Entities, the HHC Entities, CTCC, and NFHLP are collectively referred to herein as the Managed Entities.

35.     During the period of conduct alleged in this Complaint, Adelphia managed and maintained virtually every aspect of the Managed Entities, including maintaining their books and records on a general ledger system shared by Adelphia and its subsidiaries.  The Managed Entities did not compensate Adelphia for these services.  As auditor of the financial statements of Adelphia and its subsidiaries, Deloitte had full access to Adelphia's general ledger system, including the Managed Entities' books and records.

**Other Rigas Family-Controlled Entities**

36.     Coudersport Theatre was, at all relevant times, a sole proprietorship owned 100% by John Rigas.

37.     Dorellenic Cable Partners ("Dorellenic") was, at all relevant times, a Pennsylvania general partnership of which the Rigas Parties and Ellen Rigas Venetis were the general partners.

38.     Eleni Interiors, Inc. ("EI"), a New York corporation, is an interior design firm that at all relevant times was 100% owned by John Rigas.

39.     ErgoArts, Inc. ("ErgoArts"), a film development company, at all relevant times was 100% owned by John Rigas and Ellen Rigas Venetis.

40.     Songcatcher Films, LLC ("Songcatcher") was a developer and provider of films. At all relevant times John Rigas and Ellen Rigas Venetis owned equity interests in Songcatcher.

41.     Dobaire Designs ("Dobaire") was, at all relevant times, a design services firm that was wholly owned by Doris Rigas, the wife of John Rigas and the mother of Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis.

42.     Highland 2000, L.P. ("Highland 2000") was, at all relevant times, a Delaware limited partnership of which the Rigas Parties and Ellen Rigas Venetis were the limited partners. The Rigas Parties owned the general partner of Highland 2000.

43.     Wending Creek Farms, Inc. ("Wending Creek"), a Pennsylvania corporation, was at all relevant times 100% owned by John Rigas and was a provider of facilities maintenance services and related materials, including snow removal, lawn care, landscaping, minor construction, electrical, heating, ventilation and air conditioning services.

44.     Wending Creek 3656, LLC ("Wending 3656") was, at all relevant times, an entity that owned certain real property near Coudersport, Pennsylvania.  Wending 3656 was owned by the Rigas Parties and Ellen Rigas Venetis.

## **THE BONDS**

45.     Plaintiffs' claims arise out of their purchases of the following debt securities issued by Adelphia:  6% convertible notes due February 15, 2006 (the "2006 Bonds"); 7.875% Senior Notes due May 1, 2009 (the "2009 Bonds"); 10.875% Senior Notes due October 1, 2010 (the "2010 Bonds"); and 10.25% Senior Notes due June 15, 2011 (the "2011 Bonds") (collectively, the "Bonds").

46.     The 2006 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated January 17, 2001, and filed with the SEC as of January 18, 2001 (the "2006 Prospectus"). The 2006 Prospectus constituted part of a Registration Statement on Form S-3, which was initially filed with the SEC as a shelf registration statement on May 7, 1999 (the "May 1999 Registration Statement").  The 2006 Prospectus incorporated by reference all documents filed with the SEC from the date of the May 1999 Registration Statement through the completion of the offering, including Adelphia's Form 10-K for the year ended December 31, 1999, and

Adelphia's Form 10-Qs for the quarters ended March 31, 2000, June 30, 2000, and September 30, 2000 (all as amended). Plaintiffs Franklin Strategic Income Fund, Franklin Custodian Fund-Income Fund, FTVIPT-Franklin Income Securities Fund, FTVIPT-Strategic Income Fund, purchased 2006 Bonds in the initial offering, as well as in the secondary market. Plaintiff FIST-Franklin Convertible Securities Fund also purchased 2006 Bonds in the initial offering and in the secondary market, but it sold its initial offering purchases prior to March 27, 2002.

47.     The 2009 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated April 23, 1999, and filed with the SEC as of April 26, 1999 (the "2009 Prospectus"). The 2009 Prospectus constituted part of a Registration Statement on Form S-3, which was initially filed with the SEC on March 11, 1999, and was amended by Form S-3/A filed on April 20, 1999 (together, the "March 1999 Registration Statement"). The 2009 Prospectus incorporated by reference all documents filed with the SEC from the date of the March 1999 Registration Statement through the completion of the offering. Plaintiffs Franklin Custodian Fund-Income Fund, FTIF-Franklin High Yield Fund, FTVIPT-Franklin Income Securities Fund, and FTIF-Franklin Income Fund purchased 2009 Bonds in the secondary market between June 2000 and June 2001.

48.     The 2010 Bonds were issued by Adelphia pursuant to a Prospectus Supplement dated September 15, 2000, and filed with the SEC as of September 18, 2000 (the "2010 Prospectus"). The 2010 Prospectus constituted part of the May 1999 Registration Statement. The 2010 Prospectus incorporated by reference all documents filed with the SEC from the date of the May 1999 Registration Statement through the completion of the offering, including Adelphia's Form 10-K for the year ended December 31, 1999 (as amended) and Adelphia's Form 10-Qs for the quarters ended March 31, 2000 and June 30, 2000. Plaintiffs Franklin Multi-

18

Income Fund and Franklin AGE High Income Fund purchased 2010 Bonds in the initial offering.

Plaintiffs Franklin Custodian-Fund-Income Fund, FTIF-Franklin High Yield Fund, and FTVIPT-

Franklin Income Securities Fund purchased 2010 Bonds in the initial offering, as well as in the

secondary market.  Plaintiffs, Franklin Institutional High Yield Fixed Income, and FIST-Franklin

Total Return Fund purchased 2010 Bonds in the secondary market only.

49.     The 2011 Bonds were issued by Adelphia pursuant to a Prospectus Supplement

dated June 7, 2001, and filed with the SEC as of June 8, 2001 (the "2011 Prospectus").  The

2011 Prospectus constituted part of the May 1999 Registration Statement.  The 2011 Prospectus

incorporated by reference all documents filed with the SEC from the date of the May 1999

Registration Statement through the completion of the offering, including Adelphia's Form 10-K

for the year ended December 31, 2000 (as amended) and its Form 10-Q for the quarter ended

March 31, 2001.  Plaintiffs Franklin AGE High Income Fund, FTIF-Franklin High Yield Fund,

and FTVIPT-Franklin High Income Fund purchased 2011 Bonds in the initial offering.  Plaintiffs

Franklin AGE High Income Fund purchased 2011 Bonds in the secondary market as well.

50.     The March 1999 Registration Statement and the May 1999 Registration Statement

(together, the "Registration Statements"), and the 2006 Prospectus, the 2009 Prospectus, the

2010 Prospectus, and the 2011 Prospectus (collectively, the "Prospectuses"), each incorporated

by reference financial statements of Adelphia that were audited by Deloitte.  With Deloitte's

knowledge and consent, its audit reports on those financial statements were also incorporated by

reference in the Prospectuses and Registration Statements.  Deloitte knew and intended that

potential purchasers of securities issued pursuant to these Registration Statements and

Prospectuses would rely on Deloitte's audit reports when making their investment decisions.

## THE MULTI-FACETED FRAUD AT ADELPHIA

51.     Plaintiffs purchased Bonds from June 2000 through May 2002 based on Adelphia's published financial statements and other public information about the Company, including Deloitte's audit reports and other statements made and/or incorporated by reference in Adelphia's Registration Statements and Prospectuses.  Plaintiffs did not know at that time that (i) Deloitte's "unqualified" audit reports on Adelphia's financial statements were materially false because they wrongly stated that Deloitte had complied with GAAS and that the Company had complied with GAAP, and (ii) Adelphia's financial statements and other statements made by Adelphia and its management affirmatively misrepresented or omitted material information relating to the debt levels and financial condition of Adelphia and its subsidiaries, and failed to disclose rampant self-dealing by the Rigas family.

52.     In proceedings against a Deloitte audit partner concerning the audit of Adelphia's year 2000 financial statements, the SEC found numerous instances where Deloitte's audit violated GAAS and where Adelphia's financial statements contained material false and misleading statements in violation of GAAP.  Adelphia's financial statements for 1998, 1999 and the first three quarters of 2001 suffered from many of the same defects.  These misstatements were covering up, *inter alia*, manipulative accounting practices facilitated by Deloitte, artificial inflation of EBITDA, the true size of Adelphia's cable subscriber base, the true extent of completion of Adelphia's upgrade (or "rebuild") of its cable systems, and the existence of co-borrowing agreements and other related party transactions that personally benefitted the Rigas Parties while helping Adelphia hide its true financial condition from investors.  Each of these topics is discussed in detail below.

A.     **THE CO-BORROWING ARRANGEMENTS AND OTHER UNDISCLOSED TRANSACTIONS**

53.     Throughout the time period when Plaintiffs were purchasing Adelphia's securities, the Rigas Parties and their family members were converting billions of dollars of Adelphia's corporate funds to finance their own personal endeavors.  They did so by blatantly commingling corporate and non-corporate funds, borrowing substantial monies pursuant to co-borrowing facilities with Adelphia, and causing Adelphia to enter into numerous related-party transactions for little or no consideration.  None of this was disclosed to the investing public prior to March 27, 2002, but it should have been readily obvious to Deloitte – and in some cases was actually known to Deloitte – during the course of its audits.

(i)     **Adelphia CMS and Related Party Balances**

54.     During the period from at least 1998 through May 2002, the Company operated a cash management system (the "Adelphia CMS") on behalf of Adelphia, its subsidiaries, and other entities controlled by Rigas family members, including the Managed Entities (collectively, the "Adelphia CMS Participants").  Each Adelphia CMS Participant (i) deposited all or some of its cash generated or otherwise obtained from its operations, borrowings and other sources into the Adelphia CMS, (ii) withdrew cash from the Adelphia CMS to be used for its expenses, capital expenditures, repayments of debt and other uses, and (iii) engaged in transfers of funds with other Adelphia CMS Participants.

55.     As Adelphia acknowledged in a Form 10-K filing dated December 23, 2004, the operation of the Adelphia CMS resulted in the improper commingling of funds among the Adelphia CMS Participants, which included Company subsidiaries and entities controlled by the Rigas family.  These transactions created numerous related-party payables and receivables among the Adelphia CMS Participants.  In addition, transactions involving Adelphia CMS

Participants sometimes resulted in payables and receivables between and among various Adelphia CMS Participants and/or other Rigas family members and/or the entities they controlled. Adjustments to these payables and receivables were recorded between the parties on a quarterly basis through accounting entries. According to Adelphia's December 23, 3004 Form 10-K, the Managed Entities purported to "settle" their debts to the Company through journal entries that purported to "reclassify" debt from the books of an Adelphia subsidiary to the books of one of the Managed Entities, even though the Adelphia subsidiary in fact remained jointly and severally liable for this debt. Thus, the Rigas family deemed the Managed Entities to have satisfied their obligations to the Company, even though the Company was not released from the underlying debt and received no consideration from the Managed Entities.

56.     The Adelphia CMS, far from being a reasonable corporate control on the use of the Company's cash, was a vehicle by which Rigas family members converted Company funds to their own personal use.

57.     Neither the structure nor operation of the Adelphia CMS, nor the commingling of funds among the Adelphia CMS Participants, was publicly disclosed by the Company prior to May 24, 2002.

58.     Deloitte, for its part, knew about the problems with the Adelphia CMS but ignored the issue to the detriment of Adelphia's investors. In a 2006 decision in an SEC proceeding against a Deloitte audit partner, an administrative law judge found that "[t]he Deloitte engagement team … knew that Adelphia managed a centralized treasury system for Adelphia, its subsidiaries, and the [Managed] Entities," and that "the commingling of funds through the centralized treasury system constituted a related party transaction that should have been

disclosed to the public and … Adelphia's failure to do so violated [GAAP]."[1]   The judge further

stated:

> Investors were not aware that the commingling contributed
> to thousands of other related-party transactions.  Nor were
> investors able to determine whether the transactions were
> fair to Adelphia.  By failing to insist on note disclosure
> regarding the commingling of funds of related parties
> through the centralized treasury system, [Deloitte's audit
> partner] violated [several GAAS provisions].

### (ii)   The Company's Co-Borrowing Credit Facilities

59.     Certain of the Managed Entities were co-borrowers with certain of the Company's

subsidiaries under revolving credit and term loan agreements.  Each co-borrower under each of

these credit facilities was permitted to borrow up to the entire amount of the available credit

under the applicable facility.  Each co-borrower was jointly and severally liable for the entire

amount of the indebtedness under the applicable co-borrowing credit facility regardless of

whether that co-borrower actually borrowed that amount.

60.     The Company's subsidiaries were parties to the following co-borrowing credit

facilities:

> a.     On March 29, 1996, Telesat Acquisition Limited Partnership ("TALP"),
> Global Acquisition Partners, L.P. (a subsidiary of the Company), and
> HVA (a Managed Entity), entered into a $200 million co-borrowing loan
> agreement.  TALP was a subsidiary of Olympus, which, until October
> 1999, was a joint venture owned by the Company and FPL Group, Inc.
> The Company was jointly and severally liable for the full amount of all
> co-borrowings under this agreement.  This agreement was refinanced and
> terminated on September 28, 2001.

> b.     On May 6, 1999, UCA Corp., UCA LLC, National Cable Acquisition
> Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P.
> and Tele-Media Company of Hopewell-Prince George (each a subsidiary

---

[1] On appeal from that decision, the SEC declined to reach the issue of whether Adelphia made adequate disclosures
concerning the Adelphia CMS.

of the Company), and HHC (a Managed Entity) closed on an $850 million co-borrowing credit facility with several banks, consisting of a $600 million 8-1/2 year reducing revolving credit loan and a $250 million 9 year term loan, which remained in effect at December 31, 2001.  As of December 31, 2001, the full $850 million credit facility had been drawn down, with $210 million of the co-borrowings being attributable to the Company and its subsidiaries, and the other $640 million being attributable to HHC (a Managed Entity).  As of April 30, 2002, $831 million was outstanding under this credit facility.  The Company (through its subsidiaries) was jointly and severally liable for the full amount of all co-borrowings.

c.     On April 14, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, (each a subsidiary of Adelphia and/or its subsidiaries), and HPGI (a Managed Entity) closed on a $2.25 billion co-borrowing credit facility, consisting of a $1.5 billion 8-3/4 year reducing revolving credit loan and a $750 million 9 year term loan.  In addition, on September 28, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, and HPGI, closed on a $500 million 9-1/4 year term loan.  This term loan was part of the credit facility that closed on April 14, 2000, and all of the indebtedness under this facility remained outstanding at December 31, 2001.  ABSO, an unrestricted borrower under the revolving credit portion of this co-borrowing credit facility, borrowed $500 million in a number of transactions.  The proceeds of these transactions were deposited into the Adelphia CMS.  The Company's subsidiaries under this credit facility and HPGI were each jointly and severally liable for the ABSO borrowings.  ABSO, as an unrestricted borrower, was liable only for its own borrowings.  ABSO is one of the Adelphia Business subsidiaries that filed for bankruptcy court protection on March 27, 2002.  As of December 31, 2001, $2.2 billion of this credit facility had been drawn down, with $1,039,361,333 in co-borrowings being attributable to the Company and its subsidiaries, and the remaining $1,160,638,667 being attributable to Managed Entities.  As of April 30, 2002, $2.48 billion in co-borrowings had been drawn down.  The Company was jointly and severally liable for the full amount of all co-borrowings.

d.     On September 28, 2001, Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, and Adelphia Holdings 2001, LLC (each a subsidiary of the Company), and HVA and CTCC (both Managed Entities) closed on a $2.03 billion co-borrowing credit facility with several banks.  The credit facility consists of a $765 million 8-3/4 year reducing revolving credit facility, a $765 million 8-3/4 year term loan, and a $500 million 9 year term loan, all of which remained in effect at December 31, 2001.  A portion of the proceeds from this facility were used to repay and terminate the $200 million co-borrowing credit facility dated March 29, 1996.  As of December 31, 2001, $1.99 billion had been borrowed under this credit facility, with $1,340,971,553 being attributable to Adelphia and

its subsidiaries and $649,028,447 being attributable to Managed Entities. As of April 30, 2002, $1.265 billion was outstanding under this credit facility. The Company was jointly and severally liable for the full amount of the co-borrowings.

61.     As of December 31, 2001, the maximum aggregate amount that could be borrowed by the co-borrowers under all of the co-borrowing credit facilities was $5.63 billion. As of that date, the aggregate amount borrowed under these facilities was $5.04 billion. As of April 30, 2002, the total amount outstanding was approximately $4.58 billion.

62.     Annual interest rates under the co-borrowing credit facilities described above were based upon one or more of the following rates at the option of the co-borrowers: prime rate plus 0% to 2.0%; or LIBOR plus .625% to 3.0%. At December 31, 2001, the weighted average interest rate on notes payable to banks and other institutions under these agreements was 4.31%. Borrowings under these credit facilities were collateralized by a pledge of the stock of each co-borrower, and the stock of the co-borrower's pledged or guarantor subsidiaries.

(a)     **Omission of Co-Borrowing Debt from Adelphia's Balance Sheet**

63.     Although the financial affairs of Adelphia and the Managed Entities were commingled, and although Adelphia managed nearly all aspects of the Managed Entities' businesses, the Managed Entities' financial results were not consolidated on Adelphia's financial statements. This non-consolidation – of which Deloitte was fully aware – enabled Adelphia to manipulate its reported financial results by shifting debt to the Managed Entities.

64.     From at least the second quarter of 1999 until March 27, 2002, Adelphia systematically and fraudulently understated its consolidated liabilities by up to $2.3 billion by failing to record the liabilities associated with Managed Entities' borrowings under the co-borrowing agreements. The omission of these liabilities was a deliberate scheme to under-report Adelphia's overall debt, to portray Adelphia as not over-leveraged, and to conceal Adelphia's

inability to comply with debt ratios in loan covenants and indentures.  This scheme was undertaken at the direction of the Rigas Parties.

65.     From the second quarter of 1999 through the third quarter of 2001, a total of $2,283,416,421 in debt was improperly removed from Adelphia's books and excluded from Adelphia's reported liabilities.  In the fourth quarter of 2001, although no figures were reported, Adelphia removed another $448,159,322 in debt from its books.

66.     As a result of the schemes relating to the co-borrowing facilities, Adelphia's public statements between at least the second quarter of 1999 and March 27, 2002 were materially false and misleading because, among other reasons, they (a) stated Adelphia's total liabilities and debts without including the co-borrowings of the Managed Entities, (b) stated that Adelphia was in compliance with its debt covenants and indentures, when it would not have been in compliance if its actual debt levels were disclosed, and (c) stated that Adelphia was increasing shareholder equity.

67.     The following chart shows (a) the quarterly liabilities reported by Adelphia and its subsidiaries on a consolidated basis from the second quarter of 1999 through the third quarter of 2001; (b) the actual liabilities for those quarters; and (c) the amount by which the reported liabilities were understated in those quarters:

| Quarter | Reported Liabilities | Actual Liabilities | Amount of Understatement |
|---------|---------------------|--------------------|--------------------------|
| Second quarter 1999 | $4,162,154,000 | $4,412,154,000 | $250,000,000 |
| Third quarter 1999 | $4,324,424,000 | $4,574,424,000 | $250,000,000 |
| Fourth quarter 1999 | $12,400,605,000 | $12,650,605,000 | $250,000,000 |
| First quarter 2000 | $12,478,372,000 | $13,096,372,000 | $618,000,000 |
| Second quarter 2000 | $12,990,935,000 | $13,387,935,000 | $397,000,000 |
| Third quarter 2000 | $14,083,426,000 | $15,225,716,826 | $1,142,290,826 |

| Quarter | Reported Liabilities | Actual Liabilities | Amount of Understatement |
|---|---|---|---|
| Fourth quarter 2000 | $16,287,376,000 | $17,468,058,512 | $1,180,682,512 |
| First quarter 2001 | $17,270,883,000 | $18,500,298,239 | $1,229,415,239 |
| Second quarter 2001 | $17,854,801,000 | $19,129,787,649 | $1,274,986,649 |
| Third quarter 2001 | $18,604,914,000 | $20,440,171,099 | $1,835,257,099 |

68.     The size of the borrowings under the co-borrowing credit facilities was not publicly disclosed prior to March 27, 2002, and even then the full amount was not disclosed.  In addition, the Company's March 27, 2002 press release falsely represented that the co-borrowing debt had been apportioned between the books of Adelphia and books of the Managed Entities based on which entity had borrowed the funds.  That was entirely false.  A significant portion of the co-borrowing debt that was placed on the Managed Entities' books was either arbitrarily assigned to them in quarterly "reclassification" transactions designed to reduce Adelphia's outstanding liabilities, or removed from the Company's books as part of sham transactions.  Contrary to the representation in the March 27, 2002 press release, there was no principled allocation of co-borrowing debt between Adelphia and the Managed Entities.

69.     Deloitte knew that the full amount of Adelphia's liabilities under the co-borrowing facilities was not disclosed in the Company's financial statements.  On several occasions beginning at least during its 2000 audit, Deloitte urged Adelphia to enhance the disclosures in its financial statements to include the total amount that had been borrowed under the co-borrowing agreements by the Managed Entities.  Adelphia management, including Timothy Rigas and James Brown, rejected that recommendation, **but Deloitte nonetheless issued unqualified audit opinions, knowing that material amounts of Adelphia's liabilities had not been disclosed to investors**.  In a 2008 decision, the SEC found that the Deloitte

27

partner in charge of the Adelphia audit violated GAAS by failing to insist on full disclosure of the co-borrowings.

70.     The Company's December 23, 2004 Form 10-K states that the Company's recording of its full liability for the co-borrowing debt, together with related restatement of interest expense, had increased the Company's accumulated deficit as of January 1, 2001 by more than $22 million.

(b)     **Improper Reclassification of Co-Borrowing Debt**

71.     Although the co-borrowers could initiate the process resulting in a draw-down under the co-borrowing facilities, in practice draw-downs were initiated by Adelphia personnel and deposited in the Adelphia CMS.  Through the Adelphia CMS, the funds were disbursed in accordance with the needs of Adelphia or the Managed Entities.  On a quarterly basis, the Company recorded journal entries to attribute draw-downs to Managed Entities, with corresponding adjustments to their receivables or payables.  Notwithstanding these adjustments, all co-borrowers remained jointly and severally liable to the lenders for all borrowings under the co-borrowing credit facility.

72.     Adelphia management allocated and re-allocated co-borrowing liabilities among Adelphia's consolidated subsidiaries and the unconsolidated Managed Entities at will, through a single, quarterly cash management reconciliation of the inter-company receivables and payables. From the second quarter of 2000 through the third quarter of 2001, Adelphia allocated hundreds of millions of dollars of co-borrowing debt to Managed Entities and removed the same amount of debt from Adelphia's books, through a process referred to by Company management as "quarterly reclassification."  These transactions occurred after the end of the quarter, and involved post-closing journal entries that were retroactive to the last day of the quarter.

73.     During 2000, for example, Adelphia's accounting department transferred the reporting of approximately $296 million of debt from the books of Adelphia's subsidiaries to the books of various Managed Entities:  $36 million was transferred to the books of Hilton Head in the second quarter, approximately $222 million was transferred to the books of HPGI in the third quarter, and more than $38 million was transferred to the books of HPGI in the fourth quarter. At the end of the third quarter of 2001, Adelphia reclassified approximately $215 million of co-borrowing debt to HVA.  In exchange, Adelphia eliminated from its books receivables owed to it by the respective Managed Entities equal to the amount of debt transferred.

74.     No attempt was made in the quarterly reclassification process to match the particular co-borrowings with specific Managed Entities or to attribute portions of the outstanding debt to particular co-borrowing facilities.  Rather, in some quarters, Adelphia personnel simply reduced Adelphia's co-borrowing debt by the net intercompany balance and increased the debt of the Managed Entities by the same amount.  In other quarters, Adelphia personnel compared the net intercompany balances between quarters and reclassified the difference as debt of the Managed Entities, reducing the Company's debt by the same amount. In each instance, the transaction took place after the end of the quarter and involved a post-closing journal entry that was retroactive to the last day of the quarter.

75.     Incredibly, Deloitte claims to have been unaware of these clearly fraudulent reclassification entries, even though auditors are required under GAAS to pay particular attention to large end-of-accounting-period transactions, and even though Deloitte's own audit planning documents (i) acknowledged that Adelphia made a large number of post-closing journal entries and (ii) required Deloitte's audit team carefully to review all such entries.  If Deloitte did not know about these reclassification transactions, its ignorance can only be the product of a reckless

failure to comply with basic auditing standards and with its own audit plan.  The SEC, when it

examined these transactions, concluded that the Deloitte audit partner "was at least

unreasonable" in his conduct of the audit of Adelphia's accounting for debt.

### (c)   Concealment of Co-Borrowing Debt Through Sham "Direct Placement" Transactions

76.     On at least four occasions, Adelphia removed a portion of co-borrowing debt

from its books as part of sham transactions in which a Rigas-controlled entity received Adelphia

securities and "assumed" debt of Adelphia.  In each instance, Adelphia claimed in SEC filings

and other public statements that Adelphia had applied some or all of the proceeds from these

securities transactions to pay down debt, when in fact these transactions were shams with no

bona fide proceeds, and resulted only in the transfer of debt from Adelphia's books to the books

of the co-borrowers, even though Adelphia remained jointly and severally liable for that debt.  In

three of these four transactions, Rigas-controlled entities were issued shares of Adelphia Class B

stock, which in light of their weighted voting power helped the Rigas family maintain voting

control over Adelphia.

### (I)   The January 2000 Direct Placement

77.     Adelphia concealed $368 million of its liabilities through a January 24, 2000

direct placement of Adelphia Class B shares to Highland Holdings.  To do this, the co-borrowers

drew down $368 million on the May 6, 1999 credit facility and directed that the money be wired

to the account of UCA, an Adelphia subsidiary ("UCA-Adelphia").  UCA-Adelphia recorded on

its books the receipt of the $368 million in cash and a corresponding note payable in the same

amount, evidencing debt owed by UCA-Adelphia to the lenders.  Adelphia later claimed that the

co-borrowers had intended the $368 million to go to Hilton Head Communications, L.P. ("Hilton

Head") but had mistakenly entered UCA-Adelphia's account number in the wiring instructions to

the lenders.  However, UCA-Adelphia neither returned the money nor transferred it to Hilton

Head; rather, Adelphia used the money to pay down existing debt of UCA-Adelphia and another

Adelphia subsidiary.

78.     In attempt to make its books show that Hilton Head, not UCA-Adelphia, was

primarily responsible for the borrowed $368 million, Adelphia made journal entries in the books

of both entities.  Adelphia transferred the $368 million "draw" (the recording of debt from the

lenders) from UCA-Adelphia to Hilton Head, resulting in the removal of that debt from UCA-

Adelphia's books and the recording of that debt on Hilton Head's books.  There is no indication

either that Adelphia tried to notify the lenders of this attempt to reallocate responsibility for the

borrowed $368 million or that the lenders knew about (much less approved) the reallocation.  To

reflect UCA-Adelphia's retention of the $368 million, Adelphia also recorded on UCA-

Adelphia's books a note payable to Hilton Head in the amount of $368 million, representing the

$368 million that UCA-Adelphia "owed" Hilton Head for the "miswired" cash it had retained.

The borrowed $368 million had not been repaid to the lenders or given to Hilton Head, but, at

least as far as the journal entries were concerned, that debt was now the responsibility of Hilton

Head, not UCA-Adelphia.

79.     Because the debts of Hilton Head (a Managed Entity) were excluded from

Adelphia's balance sheet, the net effect was to hide $368 million of Adelphia's liabilities.

Adelphia then issued $368 million of Adelphia Class B stock to Highland Holdings, which

assigned the shares to Highland 2000.  Adelphia booked a receivable from Highland Holdings

for the value of the stock.

80.     Thus, Adelphia's accounting for the January 2000 direct placement resulted in the

creation of a note payable by Adelphia to Hilton Head in the amount of $368 million, and the

creation of a $368 million note receivable from Highland Holdings to UCA-Adelphia.

Consistent with its practice of netting affiliate payables and receivables discussed above,

Adelphia netted the $368 million note payable by Adelphia to Hilton Head against the $368

million note receivable from Highland Holdings to UCA-Adelphia, and both the payable and the

receivable disappeared from Adelphia's books.

### (II)    The July 2000 Direct Placement

81.    In a July 3, 2000 direct placement of Class B stock to Highland Holdings,

Adelphia drew-down $145 million on the April 14, 2000 co-borrowing agreement, deposited the

funds in the Adelphia CMS, and attributed the debt to HPGI.  Through journal entries, HPGI

transferred the money to Highland Holdings, a Rigas-controlled entity that was not a co-

borrower.  Highland Holdings then transferred $144,537,533 to Adelphia in exchange for shares

of Adelphia stock.  Adelphia recorded an increase in equity.  The net effect was to exclude the

$145 million draw-down, which benefitted Adelphia, from Adelphia's reported liabilities, since

the debts of HPGI (a Managed Entity) were excluded from Adelphia's balance sheet.  Highland

Holdings assigned the Adelphia shares to its subsidiary, Highland 2000.

### (III)    The 2001 and 2002 Direct Placements

82.    Highland 2000, which was owned and controlled by the Rigas Parties and Ellen

Rigas Venetis, also entered into several other transactions in 2001 and 2002, relating to the

acquisition of debt or equity securities of the Company.  In each of these transactions, the

"purchase price" for the securities was settled through a series of bookkeeping entries as follows:

    a.    The securities were issued by the Company to Highland 2000, and the Company recorded a receivable from Highland 2000 for the amount of the purchase price.

    b.    An obligation of one of the Company's consolidated subsidiaries under a co-borrowing facility was reallocated to a Managed Entity in an amount equal to the purchase price, thereby transferring the debt off of the

Company's consolidated balance sheet. The Company recorded an account payable to the Managed Entity for the amount of the purchase price. Notwithstanding this reallocation, the Company's subsidiaries that were parties to that facility remained jointly and severally liable for all amounts thereunder.

83.     On or about October 22, 2001, pursuant to an agreement dated January 17, 2001 (and executed by Michael Rigas on behalf of both Adelphia and Highland 2000), Adelphia issued approximately $423 million in Adelphia securities to Highland 2000 in a private placement, including 5,819,367 shares of Class B common stock for an aggregate purchase price of $259,900,000, and $167,400,000 aggregate principal amount of 6% convertible subordinated notes due 2006. In exchange, Adelphia recorded a receivable from Highland 2000 for $423 million. Simultaneously, Adelphia reduced its bank debt by $423 million and recorded a corresponding payable to HVA. HVA then recorded a receivable from Adelphia and an increase in intercompany notes payable. In essence, HVA had assumed bank debt of Adelphia in exchange for a payable from Adelphia to HVA. The transaction was a sham because (1) the $423 million in Adelphia bank debt was not paid down, but simply transferred to HVA, (2) Highland 2000 never paid cash for the securities, (3) Adelphia remained jointly and severally liable for the debt, and (4) HVA never received any economic benefit from its "assumption" of debt and was not dealing at arm's length.

84.     On January 22, 2002, pursuant to an agreement dated April 19, 2001, Adelphia issued $400,000,000 aggregate principal amount of 3.25% convertible subordinated notes due 2021 to Highland 2000 in a direct placement, for an aggregate purchase price of $393,500,000. Simultaneously, Adelphia transferred $396,489,318 in bank debt off its balance sheet in a non-cash transaction. This bank debt was reallocated to HVA.

85.     The effect of the January 24, 2000, July 3, 2000, October 22, 2001, and January 22, 2002 "transactions" alleged above — i.e., the transfer of Adelphia's bank debt to

33

unconsolidated Managed Entities and the issuance of securities to entities owned and controlled

by the Rigas family for no cash — was not publicly disclosed prior to March 27, 2002.

Moreover, Adelphia's SEC filings falsely represented that these transactions had resulted (or

would result) in additional cash that Adelphia would use to pay down debt.  For example,

Adelphia's Form 10-Q for the third quarter of 2001 falsely stated that the proceeds from the

October 2001 transactions would be used "to repay subsidiary bank debt."  Similarly, its Form

10-Qs for the second and third quarters of 2000 and its 2000 Form 10-K falsely stated that the

proceeds from the January 2000 and July 2000 direct placements were used to repay borrowings

under revolving credit facilities of its subsidiaries.

86.     In addition to understating Adelphia's liabilities, these sham transactions resulted

in overstatements of Adelphia's shareholder equity by the amount of the Managed Entities' stock

acquisitions.  Adelphia's shareholder equity was overstated by $368 million at the end of each of

the first two quarters of 2000; $513 million at the end of the third and fourth quarters of 2000

and the first three quarters of 2001; and $772 million as of December 31, 2001.

87.     As the SEC would later conclude in a 2008 decision, the Deloitte audit partner

violated GAAS when auditing the direct placement transactions because, among other reasons,

he "failed to question the facts that underlay the direct placements, accepting as adequate the

superficial explanation that Adelphia got $368 million and issued $368 million in equity without

seeking to understand the transactions involved.  In doing so, he acted at least unreasonably."

**(d)     Transferring Co-Borrowing Debt Through Sales of Digital Converters**

88.     In the fourth quarter of 2001, Adelphia removed $101 million co-borrowing debt

from its books through a fraudulent transaction whereby Adelphia, through journal entries,

transferred excess inventory of 350,000 digital converters to Highland Holdings.  Adelphia

34

removed $101 million of co-borrowing debt from its books, representing the purchase price of the converters, and recorded it as a draw-down by HVA under the September 2001 co-borrowing agreement.

89.     This transaction was a sham, because HVA did not actually purchase the digital converters.  In fact, HVA had no cable operations, and therefore no need for the converters.  The transaction also enabled Adelphia to hide from analysts and investors unusually high capital expenditures for the quarter, which had resulted from its purchase of excess digital converters as part of a kickback scheme with certain suppliers.  As part of the transaction, Adelphia removed the cost of the transferred converters from its capital expenditures.

### (e)     Rigas Parties' Involvement in Co-Borrowing Schemes

90.     Timothy Rigas was directly responsible for understating Adelphia's co-borrowing liabilities on its balance sheet while misrepresenting that all co-borrowing debt for which Adelphia was liable had been included on its balance sheet.  Specifically, Timothy Rigas:

    a.     directed Adelphia accounting and finance personnel to remove co-borrowing bank debt from Adelphia's financial statements by fraudulently "reclassifying" it as debt of Managed Entities;

    b.     directed Adelphia accounting and finance personnel to remove co-borrowing bank debt from Adelphia's financial statements by causing Adelphia to engage in sham transactions whereby Managed Entities "assumed" Adelphia bank debt in exchange for direct placements of Adelphia securities;

    c.     directed Adelphia personnel to record the bogus journal entries to reflect the purported sale of converter boxes to HVA;

    d.     directed Adelphia accounting and finance personnel to craft and include in Adelphia's financial statements the footnote that deceptively implied that all outstanding debt under the co-borrowing agreements had been included in Adelphia's "Total Subsidiary Debt" in its financial statements;

    e.     caused Adelphia to misrepresent, and personally misrepresented in conference calls with analysts, that the direct placements were enabling

> Adelphia to reduce its overall liabilities and to de-leverage, when in fact those transactions were adding to Adelphia's overall debt;

> f.    directed Michael Mulcahey to create phony documentation in support of the January 24, 2000 and October 20, 2001 direct placements.

91.    Timothy Rigas prepared and signed Adelphia's Form 10-K filings for 1999 and 2000 and its Form 10-Q filings from the second quarter of 1999 through the third quarter of 2001, with knowledge that the Company's liabilities were understated on the financial statements contained in those filings. Timothy Rigas also prepared and signed Registration Statements and Prospectuses which contained or incorporated these financial statements.

92.    Timothy Rigas approved fraudulent earnings reports and press releases that, among other things, contained inaccurate financial information for Adelphia and falsely claimed that Adelphia was de-leveraging when it was not.

93.    John Rigas was CEO and Chairman of Adelphia and a partner in and part owner of the Managed Entities that were co-borrowers under the co-borrowing agreements and those that received Adelphia securities through the sham stock transactions. John Rigas directed that Highland 2000 be created as a vehicle to receive Adelphia securities in the October 2001 and January 2002 sham stock transactions.

94.    Michael Rigas and James Rigas held ownership interests in the Managed Entities that were co-borrowers under the co-borrowing agreements and those that received Adelphia securities through the sham stock transactions.

95.    The Rigas Parties knew, or were reckless in not knowing, that Adelphia's co-borrowing debt was being improperly removed from Adelphia's balance sheet and that the direct placements of Adelphia securities to the Managed Entities were not paid for in cash as had been represented to investors but instead were sham transactions designed to remove bank debt from Adelphia's books.

96.     The Rigas Parties signed each of Adelphia's Form 10-Ks and Registration statements between the second quarter of 1999 and March 27, 2002, all of which contained materially false and misleading information about Adelphia's liabilities and shareholders' equity. They also reviewed and approved fraudulent earnings reports and press releases that contained similar inaccurate information.  Adelphia had a strict policy that each press release, including any press release containing an earnings report, had to be (and was) reviewed and approved by all of the Rigas Parties before it was issued, and that each of them had the ability to disapprove and prevent a particular press release or earnings report from being issued.

**(iii)     The Company's Undisclosed Payments to Managed Entities and Other Affiliates for Products and Services**

97.     During the year ended December 31, 2001, the Company entered into a number of transactions with related parties that were neither presented to, nor approved by, the Board of Directors or the independent directors of the Board.  These transactions, which also were not publicly disclosed until May 24, 2002, included:

a.     payment of approximately $12,416,000 to EI (wholly owned by John Rigas) and $371,000 to Dobaire (wholly owned by John Rigas's wife), primarily for office furniture and fixtures and related services (a Company manual required that all furniture be purchased from EI);

b.     payment of approximately $2,019,000 to Wending Creek for various maintenance and related services;

c.     payment of approximately $100,000 to Rigas family members and Rigas family-controlled entities for office and warehouse rent, including $41,700 to Ellen Rigas Venetis, $34,000 to Dorellenic, $12,000 to John Rigas, $6,600 to the Coudersport Theatre, and $1,200 to Wending Creek; and

d.     payment of approximately $50,000 to Ellen Rigas Venetis for community service and public relations consulting services.

(iv)     **The Buffalo Sabres Transactions**

98.     In the third quarter of 2000, the Rigas family acquired a controlling interest in NFHLP, a limited partnership that owned the Buffalo Sabres, a team in the National Hockey League.  Pursuant to the March 1998 agreement setting forth the terms of the acquisition, the Rigas family was to assume responsibility for operating and funding NFHLP.  However, the Rigas Parties instead caused Adelphia to provide the necessary funding to NFHLP.  To obtain the consent of NFHLP's existing bank lenders to the sale, the Rigas Parties caused the Company to purchase two NFHLP loans from these bank lenders in the amount of approximately $34 million ("NFHLP Bank Loans"), after giving effect to a $7,785,000 discount in the purchase price.

99.     The Company also provided financing to assist the Rigas Parties in their acquisition of all ownership interests in NFHLP.  In July 2000, the Rigas Parties acquired the remaining partnership interests of NFHLP from an investor group.  In connection with the closing of this acquisition, John Rigas paid approximately $25 million to NFHLP.  Of that amount, approximately $15 million was paid by NFHLP to the Company to pay down part of the outstanding debt owed to the Company.  Shortly after the closing, the Rigas Parties undertook a recapitalization of NFHLP.  As part of the recapitalization, NFHLP's then-outstanding obligations to the Company (after giving effect to the $15 million paydown) were converted into (i) an approximately $46.5 million aggregate principal amount, 10% partially subordinated note due in July 2010 and (ii) an approximately $30 million aggregate principal amount, 10% fully subordinated note due July 2010 (collectively, the "NFHLP Notes").  Approximately $9.6 million of outstanding advances to NFHLP from the Company were not converted into the NFHLP Notes as part of the recapitalization (the "Pre-Recapitalization Advances").  John Rigas

38

also contributed to the capital of NFHLP over $22 million of debt obligations owed to him by NFHLP.

100.    In August 2000, the Company issued 325,000 shares of treasury stock to the National Hockey League on behalf of NFHLP to satisfy a collective bargaining escrow requirement.  Based on a subsequent decline in the Company's stock price, the Company issued an additional 125,000 shares of treasury stock on behalf of NFHLP in October 2001.

101.    From time to time, NFHLP financed its operations through withdrawals of cash (and the generation of net payables to the Company) under the Adelphia CMS (the "NFHLP Advances").

102.    As of December 31, 2001, the total amount outstanding under the NFHLP Notes, NFHLP Bank Loans, NFHLP Advances and the Pre-Recapitalization Advances (including all accrued interest thereon) was $150,157,000, before giving effect to a reserve of $19,889,000 the Company had established on its books.  The amount of the reserve was included in prepaid expenses and other assets of the Company at such date.  The amount outstanding under the NFHLP Notes, NFHLP Bank Loans, NFHLP Advances and Pre-Recapitalization Advances at December 31, 2001 was the largest amount of such indebtedness outstanding during the year ended December 31, 2001.

**(v)    Advances to ErgoArts and Songcatcher Films**

103.    From 1998 through 2002, the Company advanced funds to ErgoArts and Songcatcher Films on an unsecured basis.  These entities were owned by John Rigas and his daughter, Ellen Rigas.  At December 31, 2001, the outstanding balances due to the Company from ErgoArts and Songcatcher Films under these arrangements were approximately $677,000

and \$3,077,000, respectively, which were the largest amounts of each such indebtedness outstanding during the year ended December 31, 2001.

104.    The advances to ErgoArts were made principally in connection with the development and potential production of documentary films.  The advances to Songcatcher Films were made in connection with the creation and production of the motion picture entitled "Songcatcher."  These transactions were wholly unrelated to the business of Adelphia, and were not presented to, or approved by, the Board of Directors or the independent directors of the Board of Directors.

105.    Prior to May 24, 2002, the Company's loans to ErgoArts and Songcatcher Films had not been publicly disclosed.

(vi)    **Other Payments and Loans to and from Affiliates of the Rigas Family**

106.    On October 30, 1999, April 30, 2000, and February 1, 2001, Highland Holdings purchased a total of \$59 million of Adelphia securities in the open market.  These shares were purchased with cash Adelphia had deposited in the Adelphia CMS, and for which Highland Holdings never reimbursed or compensated Adelphia.  The source of these funds was not publicly disclosed prior to May 24, 2002.  To the contrary, when questioned by investors and analysts about the source of the funds, Adelphia's investment relations personnel responded that the Rigas family had substantial other assets to fund their investments.

107.    From at least 1999 through April 2002, Adelphia paid at least the following amounts to the Rigas Parties in cash, in excess of their publicly disclosed compensation: \$46,457,411 to John Rigas, \$1,053,707 to Timothy Rigas, and \$1,000,849 to Michael Rigas.  At least \$3,813,238 was paid to other Rigas family members.  These advances were executed through the Adelphia CMS, either by transferring funds directly from Adelphia to a member of

40

the Rigas family, or by transferring the funds from Adelphia to one of the Rigas-controlled entities, and then to the Rigas family members.

108.    In early 2001, Timothy Rigas informed Mulcahey that John Rigas had been spending unacceptably large amounts of Adelphia funds. Timothy Rigas instructed Mulcahey to obtain Timothy Rigas's approval on any requests for disbursements of more than a total of $1 million per month to John Rigas. From early 2001 through early 2002, John Rigas, Timothy Rigas, and Mulcahey caused Adelphia to pay John Rigas at least $1 million per month, for a total of at least $12 million, via wire transfers from the Adelphia CMS to John Rigas's personal bank account at the Bank of New York. Those cash advances were not disclosed to the public.

109.    Certain members of the Rigas family and certain entities controlled by them (including Doris Holdings, L.P., Highland Preferred Communications 2001, LLC, Highland Communications, Highland Holdings II, G.P., and Highland Preferred Communications) entered into margin loan agreements with various investment banks and other financial institutions and pledged equity and debt securities issued by the Company to secure such loans. Under these agreements, if the market value of the collateral securities declined, the lender could make a "margin call" against the borrower, requiring that the borrower pledge additional cash or securities. Although the total amount of these margin loans is unknown, from July 2000 to May 2002 the Rigas family and the entities they controlled made at least $252,157,176 of payments in connection with margin calls. Of that amount, at least $177,789,669 was paid in 2002, with at least $174,638,151 having been paid after March 27, 2002. The funds for these margin call payments came from the Adelphia CMS, per the direction of John Rigas, Timothy Rigas, James Rigas, Brown, and Mulcahey. The use of the Adelphia CMS to fund margin calls on behalf of Rigas family members of Rigas-controlled entities was not presented to, or approved by, the

Board of Directors or the independent directors of the Board of Directors, nor was it publicly disclosed prior to May 24, 2002.  In addition, payment of these margin calls substantially increased the amount of Adelphia's liabilities under the co-borrowing agreements.

### (vii)   Adelphia Business

110.   Adelphia Business was a consolidated subsidiary of Adelphia until January 11, 2002, when it was spun off to Adelphia's stockholders.  Adelphia Business continued to be an affiliate of the Company because the Rigas Parties and Ellen Rigas Venetis owned, directly or indirectly, approximately 17% of the common stock and approximately 53% of the voting interests in Adelphia Business.  The Rigas Parties were also executive officers and directors of Adelphia Business.

111.   At December 31, 2001, Adelphia Business and its subsidiaries owed the Company approximately $7.8 million for accounts payable to the Company and $19.2 million for accrued interest owing to the Company in connection with borrowings under the ABSO Loan.  In early 2002, the Company also advanced to Adelphia Business and its subsidiaries, including ABSO, approximately $36.8 million on an unsecured basis prior to the filing by Adelphia Business and certain of its subsidiaries, including ABSO, for bankruptcy protection.  From January 1, 2002 until the bankruptcy filings, Adelphia Business accumulated approximately $18,794,000 in accounts payable, and $15,600,000 in accrued interest owing to the Company in connection with the allocation of borrowings of $500,000,000 outstanding at December 31, 2001, under the ABSO Loan.

### (viii)   ML Media Recapitalization Agreement

112.   On December 13, 2001, the Company reached a settlement of certain litigation relating to a joint venture with ML Media Partners, L.P. ("ML") and Century.  In connection

42

with the settlement, the joint venture, ML, Century, and Highland Holdings entered into a recapitalization agreement (the "ML Media Recapitalization Agreement").

113.    Pursuant to the ML Media Recapitalization Agreement, the joint venture agreed to redeem the 50% joint venture interest of ML for a purchase price ranging from $275 million to $280 million, depending on the closing date.  Highland Holdings, which was a Rigas family general partnership, agreed to arrange debt financing for the joint venture in the amount required to effect the redemption and to fund certain capital expenditures.  The Company agreed to guarantee this indebtedness.  The Company, the joint venture and Highland Holdings also agreed that immediately after the closing, the joint venture would be recapitalized so that the Company had a 40% joint venture equity interest and Highland Holdings had a 60% joint venture equity interest.

114.    Upon consummation of this transaction, the Company, which previously owned a 50% interest in an unleveraged joint venture, would own a 40% interest in a leveraged joint venture.  In the event the redemption failed to occur for any reason, the Company agreed to purchase ML's 50% joint venture interest under similar terms.  The Company's 50% joint venture interest was pledged to ML as collateral for the Company's obligations.  In addition, the Company, Century and Highland were jointly and severally liable for the performance by the Company of its obligations.  Under the terms of the agreement, if the closing did not occur by October 2, 2002 (or earlier if the closing was accelerated), ML would replace Century as the manager of the joint venture systems, would be entitled to management fees that were otherwise for the benefit of Century, and could pursue damages for breach, without any obligation to mitigate such damages.

115.    The redemption and recapitalization did not occur, and ML filed suit against Adelphia, Century, and others, seeking to enforce the ML Media Recapitalization Agreement.

116.    Although the Board of Directors approved the proposed acquisition by Highland Holdings of a 60% interest in the joint venture, the ML Media Recapitalization Agreement was not presented to the Board of Directors for approval and the Board of Directors did not approve of the Company incurring financial obligations as a result of this acquisition.

117.    Neither the ML Media Recapitalization Agreement, nor any of its terms, was disclosed until May 24, 2002, when the agreement was disclosed in the Company's Form 8-K filing setting forth some of the numerous related party transactions between the Company and other Rigas family-controlled entities.

118.    On September 30, 2002, the ML/Century joint venture filed for bankruptcy protection under Chapter 11.

**(ix)    Praxis**

119.    Praxis Capital Ventures, L.P. ("Praxis"), an investment partnership, was a subsidiary of the Company.  Praxis Capital Partners, LLC ("Praxis Capital") was the general partner of Praxis.  Praxis Capital Management, LLC ("Praxis Management") was the management company of Praxis, which received a management fee of approximately $1,307,000 annually.

120.    Venetis was the Managing Director of Praxis Capital, and at all relevant times owned a substantial majority of the membership interests in Praxis Capital.  Venetis, along with an investment committee comprised of himself, John Rigas and Timothy Rigas, controlled the investment decisions of Praxis.  Venetis also owned Praxis Management.

121.    In approximately June 2001, the Company signed a contract calling for the commitment of $65,000,000 of capital to Praxis.  As of May 2002, approximately $2.95 million of that amount had actually been funded by the Company.  Additionally, upon the formation of Praxis, the Company had contributed preferred stock of a private company that it had previously purchased for $7,500,000.  The Company was required to make capital contributions upon the request of Praxis Capital when funds were necessary for investment purposes or for the management fee.

122.    Praxis invested $8.5 million during 2001 and 2002; the remainder of the Company's capital contributions to Praxis were used to pay approximately $1.96 million in management fees to Praxis Management.

123.    Nothing about the formation or funding of Praxis, the Company's obligations to Praxis, or Venetis's interests in Praxis, Praxis Capital, and Praxis Management (other than his position as Managing Director of Praxis Capital) was publicly disclosed by the Company until May 24, 2002, when a special committee of Adelphia's Board of Directors (the "Special Committee") announced that it was investigating the formation and funding of Praxis, including matters relating to the approval thereof by the Board of Directors.

**(x)    The Golf Club**

124.    From the fourth quarter of 2000 until May 2002, the Golf Club at Wending Creek Farms, LLC (the "Golf Club"), a wholly-owned subsidiary of the Company, was constructing a golf club and golf course on approximately 830 acres of land near Coudersport, Pennsylvania, of which 535 acres were owned by Wending Creek, 126 acres were owned by Wending 3656, and 169 acres were owned by a wholly-owned subsidiary of the Company.  At the direction of the Rigas Parties, the Company paid all costs of construction, totaling more than $13,000,000.

45

125.    This transaction was not presented to, or approved by, the Board of Directors or the independent directors of the Board of Directors, and was not publicly disclosed by the Company until May 24, 2002, when the Special Committee announced it was investigating the transaction.

126.    On June 14, 2002, the Company announced that it had ceased construction on this project.  The Company recorded an impairment loss of $13.2 million in the second quarter of 2002 as a result of the decision to cease construction.

### (xi)    The Timber Rights Transaction

127.    In February 2000, Wending 3656 purchased 3656 acres of land located in Potter County, Pennsylvania, from an unaffiliated third party for a purchase price of $464,930. Simultaneously, ACC, a subsidiary of the Company, purchased timber rights on those 3656 acres, covering a twenty-year period from the date of closing, from the same unaffiliated third party for a purchase price of $26,535,070.  At the end of the twenty-year period, the timber rights revert to the owner of the underlying land at such time.

128.    The timber purchase agreement provided that if a change in ownership of the Company occurred during the twenty-year period, then the timber rights would revert to Wending 3656 as part of the consideration received by Wending 3656 as a result of the change in ownership transaction.  A change in ownership of the Company was defined to occur if the cumulative voting percentage of the Company stock held by John Rigas and the members of his immediate family fell below 50% of all outstanding voting shares.

129.    On June 13, 2002, both the land and the timber rights were sold to a third party for an aggregate purchase price of $20 million.  The Company recorded a $6,747,000 loss on the disposition.

130.     Nothing about the purchase of the timber rights or of the underlying land was publicly disclosed prior to May 24, 2002, nor were these transactions presented to, or approved by, the Board or the independent directors of Adelphia.

**(xii)     Loans to Brown and Other Company Employees**

131.     On June 14, 2002, the Company disclosed for the first time that it had approximately $1.9 million in loans outstanding to current and former employees of the Company, and that the Company had taken a reserve of approximately $500,000 against non-payment of these loans.  The Company also disclosed that the Special Committee had identified four employees of Adelphia and four employees of Adelphia Business for whom the Company had guaranteed, either in whole or in part, loans from Citizens Trust Company.  As of May 31, 2002, the aggregate outstanding amount of those guarantees was approximately $278,000.

132.     Brown received a loan from the Company in the aggregate principal amount of $700,000.

133.     The foregoing loans were not publicly disclosed prior to June 14, 2002.

**(xiii)     The Rigas Family's Personal Use of Company-Owned Property**

134.     Company funds and resources were used to construct, acquire and maintain luxury condominiums in Beaver Creek, Colorado, and Cancun, Mexico, for the exclusive use of members of the Rigas family.

135.     The Company owned two apartments in New York City.  Since some time in 1998, Ellen Rigas Venetis and Peter L. Venetis had exclusive use of these apartments on a rent free basis.

47

136.     The Rigas Parties, Ellen Rigas Venetis, and the entities they control, used three Company aircraft for reasons unrelated to the business or operations of the Company or any of its subsidiaries.  The Company was not reimbursed for this use.

137.     The Rigas family's personal use of property purchased with Company funds was never publicly disclosed prior to May 24, 2002.

## B.     IMPROPER ACCOUNTING SCHEMES

138.     As reflected in the Company's Form 8-K dated June 10, 2002 and Form 10-K dated December 23, 2004, Adelphia used a number of manipulative and improper accounting practices in order to inflate artificially its revenue, earnings, net income, stockholders' equity, assets, and EBITDA figures for at least the years 1999 through 2001.  To correct these improper practices – all of which occurred on Deloitte's watch – the Company was forced to adjust its accumulated deficit downward by nearly *$1.65 billion* as of January 1, 2001.  These practices and adjustments included the following items:

(i)     **Capitalization of Property and Equipment.**  In its Form 10-K dated December 23, 2004, the Company admitted that it had "determined that certain of its prior accounting policies and procedures resulted in the improper capitalization of property and equipment," including the improper capitalization of costs associated with reconnecting disconnected subscribers, service calls, set-top box repairs, equipment repairs, maintenance contracts, normal service and maintenance activities, interest allocated to construction activities, and other "inappropriate overhead costs, such as cable system electrical power, excessive engineering costs, customer care costs and costs to insure the Company for business interruption and other general risks."  Adelphia acknowledged that "[d]ue to the volume, complexity and magnitude of the errors discovered in the capitalized property and equipment costs that were included in the

48

Company's previously issued consolidated financial statements, the Company has concluded that it was necessary to (i) reverse substantially all of the previously recorded accounting entries related to the capitalization of internal labor, overhead and material costs, and (ii) create new accounting entries to properly capitalize such costs in accordance with GAAP …"  Deloitte's failure to detect and correct accounting "errors" that had **nearly a billion-dollar impact** on Adelphia's deficit is further evidence of Deloitte's reckless disregard for its responsibilities to Adelphia and its investors.  (Adjustments to correct the improper capitalization of property and equipment resulted in a $955.5 million increase in the Company's accumulated deficit as of January 1, 2001.)

(ii)     **Marketing Support Agreements.**  In January 2001, the Company entered into agreements with its two main vendors of digital converter boxes to raise retroactively the price paid by the Company for "set-top" boxes by $26 apiece, and to receive separately the same amount from the vendors as kick-backs disguised as "marketing support" payments.  The Company did not provide a material amount of marketing support in exchange for such payments.  The marketing support payments were improperly recorded as "contra-expenses" (thereby increasing current income), and the $26 premiums paid for the boxes were recorded as capital expenditures to be amortized over time.  The agreements were back-dated to 2000, and Adelphia recognized fraudulent amounts of marketing support in both 2000 and 2001.  In the June 10, 2002 Form 8-K, the Company stated that it believed proper accounting for these matters would reduce EBITDA by approximately $54 million in 2001 and $37 million in 2000.  In the December 23, 2004 Form 10-K, Adelphia admitted that "these transactions lacked a valid business purpose and were in fact entered into with the objective of improving the Company's reported operating results."  The aggregate effect of the restatement adjustments on Adelphia's

balance sheet was to increase the Company's accumulated deficit at January 1, 2001 by approximately $34.5 million.  The marketing support agreement scheme was orchestrated by, and carried out under the direction of, Timothy Rigas and James Brown.  Deloitte, the Company's purportedly independent professional auditor, either recklessly failed to detect or ignored this fraud, thus allowing it to continue.

      **(iii)**    **Recognition of Revenue and Income From Interactive Cable Service Providers.**  During 2000, Adelphia entered into agreements whereby, in exchange for allowing certain interactive cable service providers' services to be carried on the Company's cable television systems, Adelphia received warrants to purchase those providers' common stock.  Adelphia recorded those warrants at fair value with an offsetting amount recorded as deferred income.  The Company then amortized the deferred income to revenue on a straight-line basis without regard for the extent to which the interactive cable services had actually been deployed.  In its December 23, 2004 Form 10-K, the Company admitted that it had reversed the previously recognized revenue that was not supported by deployment of interactive services, and had deferred the recognition of unearned income until the services were deployed or the carriage agreement expired.  These adjustments increased the Company's accumulated deficit as of January 1, 2002 by $6.5 million.  Deloitte should have detected this clear GAAP violation during its audit of the 2000 financial statements, but it either failed to do so, or it turned a blind eye to what it had found.

      **(iv)**    **Impairment of Cost and Available-for-Sale Investments**.  In its December 23, 2004 Form 10-K, the Company stated that it had experienced significant declines in the fair value of certain investments during 2000, and that its accounting policy in 2000 was to treat such declines as temporary unless a given investment declined for three consecutive quarters.  This

policy failed to consider the severity of the decline, the prospects for future recovery, or the individual circumstances of the investments – all factors that Deloitte knew or should have known about and should have insisted that Adelphia recognize in its financials. After reevaluating the adequacy and timing of other-than-temporary write-downs of its investments as part of its restatement process, Adelphia concluded that write-downs had not been taken on a timely basis. Restating the Company's financial statements to reflect these declines in the appropriate periods resulted in a $46.5 million increase in the Company's accumulated deficit as of January 1, 2001.

(v)      **Programming Contracts.**  The Company had contracts with providers of cable television programming under which the Company made fixed payments over a number of years. The Rigas Parties determined the amount per subscriber to be charged as an expense in any year by estimating the number of subscribers who would receive the service over the life of the contract and dividing that figure into the total amount paid by the Company over the life of the contract. This resulted in a lower expense during the early years of a contract than if the Company had simply reflected the contract payments due in such years as an expense. Due to the uncertainty in the number of subscribers who would receive these services, the Company should have accounted for these contracts by charging the amount due under the contracts each year as an expense for the year. The Company stated in the June 10, 2002 Form 8-K that it expected this change to reduce EBITDA by approximately $42 million in 2001 and $23 million in 2000. Additionally, in the December 23, 2004 Form 10-K the Company reported that it had received incentive payments from content providers upon the execution or extension of a programming contract, and had recorded those payments as reductions of costs and expenses in the periods received. Because those payments represented an integral component of the overall

economic relationship with the content provider, the Company should have recognized the expense reductions on a straight-line basis over the life of the contract. Yet again, Deloitte failed to detect or prevent these relatively straightforward GAAP violations by Adelphia's management. Adjustments to correct this improper accounting treatment increased the Company's accumulated deficit as of January 1, 2001 by $9.1 million.

> (vi)   **Revenue Recognition In Connection With Deferred Billing Arrangements**.

During the Rigas Parties' tenure in management, the Company offered free introductory periods to attract new subscribers. The Company recognized revenue ratably over the expected period of service, even if the subscriber was not required to continue services after the free introductory period. The Company later determined – as Deloitte should have done during its audits – that revenue should not have been recognized under GAAP until the customer payments began. The Company's June 10, 2002 Form 8-K reported that this change was expected to reduce revenue and EBITDA by approximately $4 million for 2001, and approximately $13 million for 2000. The Company's December 23, 2004 Form 10-K reported that reversing the improper recognition of revenue had increased the Company's accumulated deficit as of January 1, 2001 by $12.8 million.

> (vii)   **Purchase Accounting**. In connection with certain acquisitions by the Company

after 1996, which were accounted for using the purchase method of accounting, Adelphia failed to record certain aspects of the purchase price allocations in accordance with GAAP. According to the December 23, 2004 Form 10-K, "allocations of purchase prices to property and equipment and intangible assets generally were not adequately supported by third party appraisals or other documentation evidencing the rationale supporting the values assigned to the various categories.…" Deloitte issued unqualified audit opinions on Adelphia's financial statements

despite this lack of support or documentation.  To correct these improper allocations, the Company recorded adjustments that increased its accumulated deficit at January 1, 2001 by $96.6 million.

      **(viii)**    <u>**Consolidation of Subsidiaries' Financial Results**</u>.  Adelphia acquired a 50% equity interest in St. Mary's Television Inc. in 1995, and acquired 50% equity interests in Century Venture Corp. and Century/ML Cable Venture on October 1, 1999.  Adelphia improperly consolidated these entities' financial results on its financial statements, even though the Company did not own a controlling financial interest in these entities.  Conversely, prior to 1999, Adelphia had acquired controlling financial interests in three Brazilian cable companies, but had failed to consolidate their financial results.  Deloitte either recklessly failed to recognize, or recognized but ignored, these inconsistent and GAAP-violative accounting treatments.  Restatement adjustments to account for consolidation of the appropriate entities on Adelphia's financial statements produced a total increase in the Company's accumulated deficit as of January 1, 2001 of $20.6 million.

      **(ix)**    <u>**Understatement of Interest Expense Owed to Banks.**</u>  The Company's December 23, 2004 Form 10-K reveals that "[d]ue to the significant adjustments made to the Company's previously issued consolidated financial statements, the leverage ratios contained in the debt compliance documentation submitted by certain of Adelphia's subsidiaries to bank lenders were misstated."  Because the interest rates payable to those bank lenders depended in part upon the subsidiaries' leverage ratios, Adelphia paid lower interest rates than it should have. The Company recorded increases in interest expense, increasing the Company's accumulated deficit as of January 1, 2001 by over $52 million.

139.     As a result of these and other manipulative accounting practices – all of which occurred on Deloitte's watch – Adelphia's financial results as reported in its press releases, SEC filings, prospectuses, and other public statements during at least the years 1999 through 2001 and the first quarter of 2002 were materially false and misleading.  As a result, the Prospectuses, the Registration Statements, and the other SEC filings and public statements containing financial information of Adelphia for those periods were materially false and misleading and failed to disclose the true financial status of the Company.

140.     Each of Plaintiffs' purchases of Adelphia securities was made prior to the disclosure of any of these accounting practices, or of the resulting inaccuracies in the financial statements.  Plaintiffs trusted Deloitte to conduct appropriate audits of the Company's financial statements, and took comfort in Deloitte's issuance of unqualified audit opinions.  Little did Plaintiffs know that Deloitte's audits had been conducted so recklessly that numerous significant GAAP violations – not to mention downright fraud – were being allowed at Adelphia.

## C.     MISREPRESENTATIONS OF THE COMPANY'S EBITDA

141.     In order to ensure that Adelphia's reported EBITDA met its publicly disclosed predictions and the market's expectations, beginning in at least October 2000, Timothy Rigas and others carried out a scheme to inflate artificially Adelphia's reported EBITDA by creating transactions between Adelphia and certain of the Managed Entities after the closing of the relevant financial reporting period which misrepresented the amount of revenue earned from those Managed Entities.  In some instances, false journal entries were recorded in order to justify the company's publicly disclosed EBITDA.  Although recorded as revenue, these transactions did not result in any actual funds being paid to Adelphia.

142.     The Rigas Parties also caused the Company to enter into a number of other transactions with Adelphia Business, the Rigas Parties, various Rigas family-controlled entities

and/or other parties, which had the purpose and effect of artificially increasing the Company's reported EBITDA.  These transactions included:  (a) increasing the management fees charged by the Company to the Managed Entities, with no corresponding increase in the services provided, but based instead on the amount of additional EBITDA Timothy Rigas and James Brown determined was needed to meet analysts' expectations for the quarter; (b) transferring approximately $4 million in expenses from Adelphia to a joint venture controlled by Adelphia Business; and (c) entering into arrangements with other entities affiliated with the Rigases (including Adelphia Business, Niagara, and Devon Mobile Communications Corp.), under which Adelphia accrued additional fee income that it did not earn.  The Company admitted in its June 10, 2002 Form 10-K that it had been unable to substantiate these arrangements, and therefore expected to exclude the fee income under these arrangements from gross revenues, reducing EBITDA by approximately $18 million in 2001, and $19 million in 2000.  These transactions were orchestrated by, and carried out at the direction of, Timothy Rigas and James Brown.  At the same time, and with knowledge of the misstatements, Timothy Rigas conveyed inflated earnings figures to investors and analysts in conference calls, press releases, earnings reports, SEC filings, and Registration Statements.  Deloitte, meanwhile, facilitated the fraud by conducting deficient audits and issuing clean audit reports on the financial statements containing these inflated figures.

## D.      MISREPRESENTATIONS OF THE COMPANY'S SUBSCRIBER BASE

143.    The size of the subscriber base of Adelphia and its subsidiaries was a material fact to the Company's investors and analysts (including Plaintiffs), and was widely relied upon to gauge the Company's strength.  Among other reasons, basic cable subscribers provide a predictable cash flow during times of economic downturn.

144.     During at least 2000 and 2001, the Company's public disclosures regarding its number of subscribers were materially overstated.  The overstatements were the result of, among other things, the Company's application of a different accounting system to its public disclosures than it used internally.  For example, unlike the Company's internal figures, its publicly disclosed figures counted connections to multifamily units as multiple connections, even if there was only one paying subscriber.

145.     Beginning in the second quarter of 2000 and continuing through the fourth quarter of 2001, Adelphia included in its reported count of basic cable subscribers 15,000 subscribers of an unconsolidated affiliate in Brazil.  These subscribers had never previously been included in Adelphia's basic subscriber count, and were added in the second quarter of 2000 solely to enable Adelphia to report growth since the prior quarter.

146.     In the third quarter of 2000, Adelphia included in its basic cable subscriber count 28,000 customers of an unconsolidated affiliate in Venezuela.  Again, these subscribers had never previously been included, and were added in the third quarter of 2000 solely to enable Adelphia to report growth since the prior quarter.

147.     Beginning in or about the third quarter of 2000, Adelphia included long distance telephone subscribers of an Adelphia subsidiary in its basic cable subscriber base.  The services provided to these customers were wholly unrelated to cable television, and there was no basis for their inclusion in the basic cable subscriber count.

148.     In the fourth quarter of 2000, Adelphia included subscribers in its reported basic cable subscriber base that had not become subscribers until the first month of 2001.

149.     In the last three quarters of 2001, Adelphia included subscribers to "Powerlink," Adelphia's internet service, in its basic cable subscriber count, even though they did not fit

Adelphia's definition of a basic cable subscriber (i.e., "a home with one or more television sets connected to a cable system").  These subscribers were added for the sole purpose of meeting market expectations.  They added 27,000, 33,000, and 39,000 subscribers, respectively, to Adelphia's basic cable subscriber counts for the second, third, and fourth quarters of 2001.

150.    In the third and fourth quarters of 2001, Adelphia included in its reported basic cable subscriber count 60,000 customers who subscribed to Adelphia's home security service, who also did not fit Adelphia's definition of basic cable subscribers.  They were included for the sole purpose of inflating Adelphia's reported basic cable subscriber base.

151.    Also in the third and fourth quarters of 2001, Adelphia included the basic cable subscribers of the Managed Entities' cable systems in Adelphia's basic cable subscriber count.  This was improper given that the Managed Entities' financial results were not consolidated into Adelphia's financial statements.

152.    On March 27, 2002, the Company stated that its cable systems had 5,810,253 "basic cable subscribers" as of December 31, 2001.  On June 10, 2002, the Company filed a Form 8-K admitting that its March 27, 2002 press release had overstated its subscriber base by more than 47,000 subscribers due to an overstatement of the number of subscribers who receive service under bulk billing arrangements — a statistic that the Company did not have, but which new management believed was approximately 47,000 less than the figure used by the Rigas Parties.

153.    Timothy Rigas, along with others, directly and knowingly caused Adelphia to fraudulent overstate its reported basic cable subscriber figures.  Specifically, between the first quarter of 2000 and the last quarter of 2001, he:

      a.      directed Adelphia accounting and finance personnel to boost artificially Adelphia's number of basic cable subscribers by making false additions to the actual numbers received from Adelphia's operations division;

      b.      communicated the fraudulently inflated numbers to analysts and investors in conference calls, presentations and press releases, and directed others at Adelphia to make the same misrepresentations; and

      c.      prepared and filed SEC filings containing the fraudulent figures.

154.    Michael Rigas, the Executive Vice President of Operations, knew the true numbers of basic cable subscribers and knew that Adelphia was reporting fraudulently inflated numbers. Despite this knowledge, he approved press releases and signed Registration Statements and SEC filings containing the false numbers. On at least two occasions, Michael Rigas assured his staff that, despite Adelphia's true operating performance, his staff would still receive performance-based bonuses due to the inflated numbers of basic cable subscribers that were being reported.

**E.**      **MISREPRESENTATIONS OF THE EXTENT OF ADELPHIA'S "REBUILD"**

155.    In conference calls and other communications with investors from late 1999 through at least the end of 2001, Adelphia overstated the percentage of its cable plant that had been "rebuilt" or made "two-way capable." For Adelphia, "rebuild" was a measure of the percentage of its cable plant that had been upgraded such that it could transmit signals at speeds greater than 550 MHz. "Two-way capable" means that Adelphia's plant could transmit both to and from customers, thus enabling premium services such as internet access.

156.    During the same period Adelphia was overstating its "rebuild" and "two-way capability," and as a result of these misrepresentations, Adelphia was understating its quarterly capital expenditures devoted to its upgrade efforts. This was done intentionally to ensure that financial analysts and investors would not figure out that Adelphia was exaggerating its progress on its upgrades. To maintain the illusion, Adelphia kept two sets of accounting books with

regard to its capital spending:  one containing the actual expenditures, and one containing phony numbers that were provided to Wall Street analysts.

157.    Timothy Rigas caused Adelphia to inflate its upgrade results by, among other things:

        a.       directing Adelphia accounting and finance personnel to inflate artificially the actual rebuilt percentage obtained from Adelphia's operations division;

        b.       conveying the inflated rebuilt percentage to investors and analysts in conference calls, presentations and press releases from 1999 through 2002; and

        c.       directing others at Adelphia to make similar misrepresentations.

158.    Michael Rigas knew the true percentage of Adelphia's cable plant that had been "rebuilt" and made "two-way capable," and knew that Adelphia was reporting fraudulently inflated percentages to investors.  Nevertheless, he approved press releases and signed Registration Statements and SEC filings containing the false numbers.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

159.    As a result of the schemes described herein, Adelphia's financial statements, SEC filings, Registration Statements, Prospectuses, and other public statements made by Adelphia and the Rigas Parties from 1999 through May 2002 were false and misleading in material respects. Deloitte's "clean" audit reports on Adelphia's financial statements were likewise false and misleading.  Defendants' false and misleading statements included those described below.

160.    On March 11, 1999 and April 20, 1999, Adelphia filed the Form S-3 and Form S-3/A, which constituted the March 1999 Registration Statement.  The March 1999 Registration Statement incorporated by reference, among other documents, the Company's Form 10-K for the year ended March 31, 1998 (as amended), and its Form 10-Q filings for the quarters ended June 30, September 30, and December 31, 1998.  It also incorporated by reference Deloitte's audit

opinion on the Company's annual financial statements for the year ended March 31, 1998.   The

March 1999 Registration Statement was signed by, among others, defendants John Rigas,

Michael Rigas, Timothy Rigas, and James Rigas.  The March 1999 Registration Statement failed

to disclose material information, including the significant related-party transactions between

Adelphia and the Rigas family, or entities controlled by the Rigas family, and the diversion of

material amounts of Company funds and property to the Rigas family, with no corresponding

benefit to the Company.

161.    On April 26, 1999, Adelphia filed the 2009 Prospectus with the SEC with respect

to the issuance of $350 million aggregate principal amount of 2009 Bonds.  In this prospectus,

Adelphia stated that the net proceeds of the offering were expected to be about $345 million,

which would be contributed to Adelphia subsidiaries and used to repay borrowings under

revolving credit facilities of those subsidiaries.  The 2009 Prospectus failed to disclose material

information, including the significant related-party transactions between Adelphia and the Rigas

family, or entities controlled by the Rigas family, and the diversion of material amounts of

Company funds and property to the Rigas family, with no corresponding benefit to the Company.

162.    On May 7, 1999, Adelphia filed the May 1999 Registration Statement with

respect to debt securities, preferred stock, and common stock in an aggregate amount of up to

$4,601,880,000.  The May 1999 Registration Statement constituted a shelf registration statement,

providing for the offering of securities on a delayed or continuous basis pursuant to Rule 415

under the Securities Act.  Attached to the May 1999 Registration Statement was a preliminary

prospectus.  The preliminary prospectus described the general terms and provisions of the

securities, and stated:  "We will describe the particular terms and provisions of the series of debt

securities offered by a prospectus supplement, and the extent to which such general terms and

provisions . . . may apply thereto, in the prospectus supplement relating to such series of debt securities." The May 1999 Registration Statement incorporated by reference, among other documents, the Company's Form 10-K for the year ended March 31, 1998 (as amended), and its Form 10-Q filings for the quarters ended June 30, September 30, and December 31, 1998. It also incorporated by reference Deloitte's audit opinion on the Company's annual financial statements for the year ended March 31, 1998. The May 1999 Registration Statement was signed by each of the Rigas Parties. The May 1999 Registration Statement failed to disclose material information, including the significant related-party transactions between Adelphia and the Rigas family, or entities controlled by the Rigas family, and the diversion of material amounts of Company funds and property to the Rigas family, with no corresponding benefit to the Company.

163.    On August 16, 1999, Adelphia issued a press release in which John Rigas announced the Company's financial results for the second quarter of 1999. On a consolidated basis, the Company reported record quarterly revenue of $226.3 million, a quarterly net loss applicable to common stockholders of $47.3 million, quarterly capital expenditures of $53 million, and total debt of $3,794,539,000 as of June 30, 1999.

164.    Also on August 16, 1999, the Company filed a Form 10-Q with the SEC, signed by Timothy Rigas, which set forth the Company's consolidated financial results for the quarter ended June 30, 1999, including the same revenue, net loss, debt, and capital expenditure figures that were set forth in its press release of August 16, 1999. The Form 10-Q also stated that the Company's total debt of $3,794,539,000 included approximately $2.4 billion of parent debt and approximately $1.4 billion of subsidiary debt. These figures did not include the Managed Entities' borrowings under a March 1996 co-borrowing agreement, for which Adelphia's subsidiaries were jointly and severally liable.

165.     The August 16, 1999 Form 10-Q also described purchases of Adelphia securities by affiliates of the Rigas family, including the following:  on January 14, 1999, Adelphia sold 4,000,000 shares of Class A common stock in a private placement at $43.25 per share to Highland Holdings II (a Managed Entity); on March 2, 1999, Hyperion (an Adelphia subsidiary) issued $300,000 of 12% Senior Subordinated Notes due 2007, $100,000 of which an entity controlled by members of the Rigas family purchased directly from Hyperion; and, on April 9, 1999, Adelphia entered into a stock purchase agreement with Highland Holdings (a Managed Entity) in which Adelphia agreed to sell to Highland Holdings, and Highland Holdings agreed to purchase, from $250,000 to $375,000 of Adelphia's Class B common stock.   The Form 10-Q failed to disclose that certain of those purchases were funded by draw-downs under the co-borrowing agreements for which Adelphia was liable.

166.     The August 16, 1999 Form 10-Q also states that Adelphia's public indentures and subsidiary credit agreements contain covenants that, among other things, require the maintenance of certain financial ratios (including compliance with certain debt to cash flow ratios in order to incur additional indebtedness), and that Adelphia's ability to borrow under current credit facilities and to enter into refinancings and new financings is limited by covenants contained in Adelphia's indentures and its subsidiaries' credit agreements, including covenants under which the ability to incur indebtedness is, in part, a function of applicable ratios of total debt to cash flow.  These disclosures created the materially false impression that the Company was actually in compliance with the various covenants when, in fact, Adelphia would not be in compliance if its true financial condition were disclosed.

167.     On November 15, 1999, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 1999.  On a consolidated

basis, the Company reported record quarterly revenue of $242.3 million, a quarterly net loss applicable to common stockholders of $56.9 million, quarterly EBITDA of $85,394,000, quarterly capital expenditures of $177.2 million, and total debt of $3,968,180,000 as of September 30, 1999.

168.    Also on November 15, 1999, the Company filed a Form 10-Q with the SEC, signed by Timothy Rigas, which set forth the Company's consolidated financial results for the quarter ended September 30, 1999, including the same revenue, net loss, debt, and capital expenditure figures as were stated in the November 15, 1999 press release.  The Company reported that its total consolidated debt of $3,968,180,000 included approximately $2.4 billion of parent debt and approximately $1.56 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the March 1996 or May 1999 co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.

169.    The November 15, 1999 Form 10-Q also described purchases of Adelphia securities by affiliates of the Rigas family, including the following:  on January 14, 1999, Adelphia completed offerings of Class A common stock in which it sold 4,000,000 shares at $43.25 per share to entities controlled by the Rigas family; on March 2, 1999, Adelphia Business Solutions issued $300,000 of 12% Senior Subordinated Notes due 2007, of which an entity controlled by members of the Rigas family purchased $100,000 directly from Adelphia Business Solutions; on April 9, 1999, Adelphia entered into a stock purchase agreement with Highland Holdings, pursuant to which Adelphia agreed to sell to Highland Holdings and Highland Holdings agreed to purchase, $375,000 of Adelphia's Class B common stock at $60.76 per share; and on October 1, 1999, Adelphia entered into a stock purchase agreement with Highland Holdings in which Adelphia agreed to sell to Highland Holdings and Highland Holdings agreed

63

to purchase $137,500 of Adelphia's Class B common stock.  The Form 10-Q failed to disclose that some or all of those purchases were funded by draw-downs under the co-borrowing agreements for which Adelphia was liable.

170.     Like the previous quarter's Form 10-Q, the November 15, 1999 Form 10-Q also described the covenants in Adelphia's public indentures and credit agreements, without disclosing that the Company would be in violation of those covenants if its true financial condition were disclosed.

171.     In a late-1999 road show attended by analysts and investors, Adelphia presented an overhead slide that contained a pie chart indicating that approximately 50% of Adelphia's cable plant had capacity of 550 Mhz or greater, meaning that Adelphia's cable plant was approximately 50% "rebuilt."  This claim was false because Adelphia's cable plant was only approximately 35% rebuilt at that time.  Subsequent updates of this slide that were presented to analysts and investors from 2000 through the first half of 2002 similarly overstated the extent of completion of Adelphia's cable plant upgrades.

172.     On March 30, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the fourth quarter of 1999.  On a consolidated basis, the Company reported record quarterly revenue of $635.3 million, a quarterly net loss applicable to common stockholders of $128 million, quarterly EBITDA of $267.7 million, quarterly capital expenditures (for cable) of $194.4 million, and total debt of $9,291,732,000 as of December 31, 1999.  The Company reported that its pro forma revenue and EBITDA had increased 10.4% and 11.4%, respectively, since the fourth quarter of 1998.

173.     Also on March 30, 2000, Adelphia filed its Form 10-K with the SEC for the year ended December 31, 1999, signed by each of the Rigas Parties.  The Form 10-K included annual

financial statements that had been audited by Deloitte, and reported the same revenue, net loss, debt, and capital expenditure figures that were reported in the March 30, 2000 press release. The financial statements included a balance sheet indicating that the total debt of Adelphia and its subsidiaries as of December 31, 1999 was $9,291,732,000 (consisting of approximately $2.8 billion of parent debt and approximately $6.5 billion of subsidiary debt), and that total stockholders' equity was approximately $3.7 billion. The filing indicated that $3,088,477,000 of Adelphia's subsidiaries' debt was owed to banks and financial institutions. The Form 10-K stated that certain subsidiaries of Adelphia were co-borrowers with Managed Entities under credit facilities for borrowings of up to $1.025 billion, and that each co-borrower was liable for all borrowings under the credit agreements (except that the lenders had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries), but the full amount of the outstanding borrowings under these co-borrowing agreements was not disclosed, and the 10-K did not disclose that the figure reported therein for "Total Subsidiary Debt" did not include the full amount of those borrowings. In fact at least $700 million of Managed Entities' borrowings, for which Adelphia's subsidiaries were liable, was omitted from Adelphia's consolidated balance sheet as of December 31, 1999.

174.    The Form 10-K also stated that "[m]anagement believes the Company is in compliance with the financial covenants and related financial ratio requirements contained in its various credit agreements." Disclosure of the true facts concerning Adelphia's liability for its co-borrowers' debts would have revealed that the Company was, in fact, not in compliance with these covenants.

175.    The Form 10-K for 1999 also stated that entities controlled by the Rigas family had purchased 4 million shares of the Company's Class A common stock for cash in 1999, and

that Highland Holdings (a Managed Entity) had entered into agreements during the year to purchase $512.5 million of Class B common stock, of which $375 million were purchased on January 21, 2000 and $137.5 million were purchased on July 3, 2000.  The Form 10-K failed to disclose that those purchases were funded by draw-downs under the co-borrowing agreements for which the Company was liable.

176.    Adelphia's Form 10-K for the year ended December 31, 1999, contained an Independent Auditors' Report by Deloitte.  In that report, Deloitte stated that it had audited the consolidated balance sheets and related financial statements of Adelphia and its subsidiaries as of December 31, 1998 and 1999, and that it had conducted its audits in accordance with GAAS. Deloitte reported that it believed its audits provided a reasonable basis for its opinion that the financial statements "present fairly, in all material respects, the financial position of Adelphia . . . and subsidiaries at December 31, 1998 and 1999 . . . in conformity with generally accepted accounting principles," and that the "financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects the information set forth therein."

177.    On May 1, 2000, the Company filed an amendment to its Form 10-K filing for the year ended December 31, 1999.  The amendment disclosed the existence of certain co-borrowing agreements, including a March 29, 1996 agreement and a May 6, 1999 agreement.  The amounts outstanding under those agreements still were not disclosed.

178.    On May 15, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the first quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $672.7 million, a quarterly net loss applicable to common stockholders of $115.9 million, quarterly EBITDA of $262.3 million, and quarterly

capital expenditures (for cable) of $216.7 million.  The press release also stated that the Company had 5,003,517 basic subscribers.  John Rigas was quoted as saying that this figure represented 3% annualized basic subscriber growth.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

179.    Also on May 15, 2000, the Company filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended March 31, 2000, including the net loss, revenue, and capital expenditure figures set forth in its May 15, 2000 press release.  The Company reported total consolidated debt of $9,384,508,000 as of March 31, 2000, which included approximately $2.8 billion of parent debt and approximately $6.6 billion of subsidiary debt.  The Form 10-Q also reported that on April 14, 2000, "certain subsidiaries and affiliates of Adelphia" had closed on a $2,250,000 bank credit facility, consisting of a $1,500,000 8-3/4 year reducing revolving credit loan and a $750,000 9 year term loan.  However, the debt figures reported in the Form 10-Q did not include the Managed Entities' borrowings under that co-borrowing agreement or the earlier co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

180.    On August 14, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the second quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $704.1 million, a quarterly net loss applicable to common stockholders of $85.3 million, quarterly EBITDA of $273.2 million, and quarterly capital expenditures (for cable) of $237.9 million.  The press release also stated that the Company had 5,145,917 basic subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

181.    Also on August 14, 2000, Adelphia filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended June 30, 2000, including the revenue, net loss and capital expenditure figures set forth in its August 14, 2000 press release.  The Company reported total consolidated debt of $9,978,775,000 as of June 30, 2000, which included approximately $2.8 billion of parent debt and approximately $7.2 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

182.    On September 13, 2000, Adelphia issued a press release announcing a proposed offering of $500 million principal amount of the 2010 Bonds.  Two days later, on September 15, 2000, Adelphia issued a press release announcing that it had sold $750 million aggregate principal amount of 2010 Bonds, that it planned to use the net proceeds to repay existing indebtedness of its subsidiaries, and that the transaction (which had increased from its previously-announced size of $500 million) was expected to close on September 20, 2000.

183.    On September 18, 2000, Adelphia filed the 2010 Prospectus with the SEC with respect to the issuance of $750 million aggregate principal amount of 2010 Bonds.  The prospectus stated that the net proceeds of the offering were estimated at $732.5 million, which would be contributed to Adelphia subsidiaries to repay borrowings under their revolving credit facilities.  According to the prospectus, as of June 30, 2000, the Company had approximately 5.6 million basic subscribers and approximately $10 billion in long-term debt, consisting of $2.8 billion of parent company debt and approximately $7.2 billion of subsidiary debt.  These debt figures did not include the Managed Entities' borrowings under the co-borrowing agreements,

for which Adelphia's subsidiaries were jointly and severally liable.  The basic subscriber figure was overstated.

184.   The 2010 Prospectus described several covenants that would be set forth in the indenture, including:  (a) a requirement that the consolidated indebtedness of Adelphia and its subsidiaries not exceed 8.75 times the annualized pro form EBITDA for the latest fiscal quarter for which financial statements are available; (b) a prohibition on transactions between Adelphia (or its subsidiaries) and any affiliates (including the Managed Entities) on terms that are less favorable than what could be obtained in an arm's length transaction; and (c) a prohibition on transactions between Adelphia (or its subsidiaries) and any affiliates (including the Managed Entities) that involve more than $1 million and are not approved by the independent members of Adelphia's Board, except for dividends, redemption or repurchase of notes or common stock, or Board-approved payments of compensation for the personal services of officers, directors, or employees of Adelphia or its subsidiaries.

185.   The 2010 Prospectus failed to disclose material information, including the off-balance sheet debt for which the Company was responsible under the co-borrowing agreements, and the fact that the Company would not be in compliance with the covenants in the proposed indenture if the truth about Adelphia's debts and related party transactions were disclosed.

186.   On November 14, 2000, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $727.9 million, a quarterly net loss applicable to common stockholders of $145.3 million, quarterly EBITDA of $280.3 million, and capital expenditures (for cable) of $399.5 million.  The press release also stated that the

Company had 5,543,067 basic cable subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

187.    Also on November 14, 2000, Adelphia filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended September 30, 2000, including the revenue, net loss, and capital expenditure figures set forth in its November 14, 2000 press release.  Adelphia reported total consolidated debt of $11,005,411,000 as of September 30, 2000, which included approximately $3.42 billion of parent debt and approximately $7.58 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

188.    On December 18, 2000, Adelphia filed amendments to its Form 10-K for the year ended December 31, 1999 and its Form 10-Qs for the quarters ended March 31, 2000, June 30, 2000, and September 30, 2000, which contained restated financial statements for those quarters reflecting a revision in the Company's accounting treatment for an April 1998 swap of cable systems.  These restatements did not correct any of the misstatements or omissions in the Company's prior financial statements relating to its revenues, subscriber numbers, debt levels, or its liabilities under the co-borrowing agreements.

189.    On January 18, 2001, Adelphia issued a press release announcing the final pricing and increased size terms for its public offering of the 2006 Bonds.  The Company disclosed that $750 million aggregate principal amount of 2006 Bonds would be offered, and that they would be convertible to Class A common stock at a conversion price of $55.49 per share.  The Company stated that the transaction was expected to close on January 23, 2001, and that the proceeds of the offering would initially be invested in cash equivalents or used to repay

revolving credit facilities of Adelphia's subsidiaries, and thereafter would be used for general corporate purposes.  In the press release, the Company also announced that the Rigas family had entered into agreements to purchase approximately $167 million aggregate principal amount of 6% Convertible Subordinated Notes due 2006 (which are convertible into Class B common stock), as well as approximately 5.8 million shares of Class B common stock.  The Company failed to disclose that those purchases were funded by draw-downs under the co-borrowing agreements for which the Company was liable.  This press release was attached as an exhibit to a Form 8-K signed by Timothy Rigas and filed with the SEC on January 18, 2001.

190.    On January 18, 2001, Adelphia filed the 2006 Prospectus with the SEC with respect to the issuance of $750 million aggregate principal amount of 2006 Bonds.  In the prospectus, the Company stated that the proceeds would be invested in cash equivalents or advanced or contributed to Adelphia's subsidiaries to be applied to the repayment of such subsidiaries' revolving credit facilities.  According to the prospectus, as of June 30, 2000, the Company had approximately 5.7 million basic subscribers and approximately $11 billion in long-term debt, consisting of $3.4 billion of parent company debt and approximately $7.6 billion of subsidiary debt.  These debt figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The basic subscriber figure was overstated, and the related capital expenditure figure was understated.

191.    On April 2, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the fourth quarter of 2000.  On a consolidated basis, the Company reported record quarterly revenue of $804.6 million, a quarterly net loss applicable to common stockholders of $255.8 million, quarterly EBITDA of $275.9 million, and quarterly

capital expenditures (for cable) of $547.4 million.  The press release also stated that the Company had 5,547,690 basic cable subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

192.     Also on April 2, 2001, Adelphia filed its Form 10-K with the SEC for the year ended December 31, 2000.  The Form 10-K included annual financial statements that had been audited by Deloitte, and reported the same revenue, net loss, capital expenditure, and subscriber base figures that were reported in the April 2, 2001 press release.  The financial statements included a balance sheet indicating that the total debt of Adelphia and its subsidiaries as of December 31, 1999 was $12,603,413,000 (consisting of approximately $3.4 billion of parent debt and approximately $9.2 billion of subsidiary debt), and that stockholders' equity was $4,150,279,000 as of that date.  The filing indicated that $5,708,529,000 of Adelphia's subsidiaries' debt was owed to banks and financial institutions.  The Form 10-K stated that certain subsidiaries of Adelphia were co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250,000, and that each co-borrower was liable for all borrowings under the credit agreements (except that the lenders had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries), but the full amount of the outstanding borrowings under these co-borrowing agreements was not disclosed, and the 10-K did not disclose that the figure reported therein for "Total Subsidiary Debt" did not include the full amount of those borrowings.  In fact, Adelphia included on its December 31, 2000 consolidated balance sheet only the $2.1 billion in debt that had been drawn down by Adelphia and its subsidiaries under those agreements, and excluded approximately $1.6 billion that had been drawn by Managed Entities but for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-K also indicated that Highland 2000 had purchased 8,401,522 shares of Adelphia Class B common

stock in 2000. The source of the funds used to make these purchases – *i.e.*, co-borrowings for which Adelphia was liable – was not disclosed. The Form 10-K was signed by defendants John Rigas, Timothy Rigas, Michael Rigas, and James Rigas.

193.    Adelphia's Form 10-K for the year ended December 31, 2000, incorporated an Independent Auditors' Report by Deloitte. In that report, Deloitte stated that it had audited the consolidated balance sheets and related financial statements of Adelphia and its subsidiaries as of December 31, 1999 and 2000, and that it had conducted its audits in accordance with GAAS. Deloitte reported that its audits provided a reasonable basis for its opinion that the financial statements "present fairly, in all material respects, the financial position of Adelphia . . . and subsidiaries at December 31, 1999 and 2000 . . . in conformity with accounting principles generally accepted in the United States of America," and that the "financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects the information set forth therein."

194.    In an administrative proceeding against Deloitte's audit partner for the audit of Adelphia's year 2000 financial statements, the SEC later concluded that, contrary to the representations in Deloitte's audit opinion, those financial statements violated GAAP in material respects and were not audited in conformity with GAAS.

195.    On April 20, 2001, the Company issued a press release and filed a Form 8-K (signed by Timothy Rigas) announcing the final terms for a public offering of $500 million aggregate principal amount of 3.25% convertible subordinated notes due 2021. These documents also disclosed that the Rigas family had entered into an agreement with Adelphia to purchase $400 million aggregate principal amount of similar notes, which would be convertible

to Class B common stock.  The Company did not disclose that those purchases were funded by draw-downs under the co-borrowing agreements for which the Company was liable.

196.   On May 14, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the first quarter of 2001.  On a consolidated basis, the Company reported record quarterly revenue of $838.2 million, quarterly EBITDA of $315.6 million, quarterly net income (for cable) of $240.2 million, and quarterly capital expenditures (for cable) of $547.2 million.  The press release also stated that the Company had 5,723,315 basic cable subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

197.   On May 15, 2001, Adelphia filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended March 31, 2001, including the revenue, net income, capital expenditure, and basic subscriber numbers set forth in its May 15, 2001 press release.  The Company reported total debt on a consolidated basis of $13,661,372,000 (consisting of $4,286,551,000 of parent debt and approximately $9.4 billion of subsidiary debt) as of March 31, 2001.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable. The Form 10-Q was signed by Timothy Rigas.

198.   On June 6, 2001, Adelphia issued a press release announcing its intention to issue $400 million aggregate principal amount of the 2011 Bonds.  On June 7, 2001, Adelphia issued a press release announcing that it had increased the offering to $1 billion aggregate principal amount.

199.   On June 8, 2001, Adelphia filed the 2011 Prospectus with the SEC with respect to the issuance of $1 billion aggregate principal amount of 2011 Bonds.  According to the

prospectus, as of March 31, 2001, the Company had approximately 5.8 million basic subscribers and approximately $13.7 billion in long-term debt, consisting of $4.3 billion of parent company debt and approximately $9.4 billion of subsidiary debt.  The basic subscriber figure was overstated, and the debt figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.

200.    The 2011 Prospectus described several covenants that would be set forth in the indenture, including those described above that were set forth in the 2010 Prospectus.  The 2011 Prospectus stated that the proceeds from the offering would be invested in cash equivalents or contributed to a subsidiary and used to repay borrowings under its revolving credit facility.  The 2011 Prospectus failed to disclose material information, including the off-balance sheet debt for which the Company was responsible under the co-borrowing agreements, and the fact that the Company would be in violation of the indenture covenants if the true facts were disclosed.  The offering was completed on June 12, 2001.

201.    On July 6, 2001, Adelphia filed its proxy statement with the SEC with respect to the annual stockholders meeting scheduled for August 7, 2001.  In the proxy statement, the Company repeated selected financial data from the Company's prior financial statements, including the previously reported debt figures, and incorporated Deloitte's audit report for the year ended December 31, 2000.  The proxy statement also disclosed the existence of co-borrowing agreements dated March 29, 1996, May 6, 1999, April 14, 2000, and September 28, 2000, and that certain subsidiaries of Adelphia were liable for all borrowings under those agreements, but stated that the lenders had no recourse against Adelphia other than against Adelphia's interest in the subsidiaries.  The amounts outstanding under these agreements, and in particular the amount of borrowings by Managed Entities, were not disclosed.  Adelphia's

audited annual financial statements for the year ended December 31, 2000 (which also contained audited financial results for the year ended December 31, 1999) were included in an appendix to the proxy statement, along with Deloitte's unqualified audit opinion thereon.

202.    On August 14, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the second quarter of 2001.  On a consolidated basis, the Company reported record quarterly revenue of $893.3 million, quarterly EBITDA of $342.2 million a quarterly net loss (for cable) of $168.6 million, and quarterly capital expenditures (for cable) of $518.1 million.  The press release also stated that the Company had 5,672,225 basic cable subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

203.    Also on August 14, 2001, the Company filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended June 30, 2001, including the revenue, net loss, capital expenditure, and basic subscriber numbers set forth in its August 14, 2001 press release.  The Company reported that it had total consolidated debt of $14,407,631,000 as of June 30, 2001, which included approximately $5.86 billion of parent debt and approximately $8.55 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

204.    On October 23, 2001, Adelphia issued a press release announcing that it had closed on the previously announced agreements with the Rigas family to purchase approximately 5.8 million shares of Class B common stock for $42.96 per share and approximately $167.4 million principal amount of 6% convertible notes.  The press release was attached as an exhibit to a Form 8-K that was signed by Timothy Rigas and filed by Adelphia on October 23, 2001.

205.    On November 9, 2001, Adelphia issued a press release in which John Rigas announced the Company's financial results for the third quarter of 2001.  On a consolidated basis, the Company reported record quarterly revenue of $898.6 million, quarterly EBITDA of $357.1 million, a quarterly net loss (for cable) of $152.3 million, and quarterly capital expenditures (for cable) of $512.8 million.  The press release also stated that the Company had 5,693,035 basic cable subscribers.  This basic subscriber figure was overstated, and the related capital expenditure figure was understated.

206.    Also on November 9, 2001, Adelphia filed a Form 10-Q with the SEC, which set forth its consolidated financial results for the quarter ended September 30, 2001, including the revenue, net loss, capital expenditure, and basic subscriber numbers set forth in the November 9, 2001 press release.  The Company reported total consolidated debt of $14,849,773,000 as of September 30, 2001, which included approximately $5.8 billion of parent debt and approximately $9 billion of subsidiary debt.  These figures did not include the Managed Entities' borrowings under the co-borrowing agreements, for which Adelphia's subsidiaries were jointly and severally liable.  The Form 10-Q was signed by Timothy Rigas.

207.    Also on November 9, 2001, Adelphia issued a press release announcing that it had sold 30 million shares of Class A common stock and $300 million of convertible preferred stock, and that the Rigas family had entered into agreements with Adelphia to purchase $50 million of the preferred stock and 7.5 million share of Class B common stock.  The Company failed to disclose that those purchases were funded by draw-downs under the co-borrowing agreements for which the Company was liable.  The press release was attached as an exhibit to a Form 8-K that was signed by Timothy Rigas and filed by Adelphia on November 12, 2001.

208.   The foregoing statements were false and misleading because, among other

reasons:

a.   Contrary to the statements in Deloitte's audit opinions for the 1999 and 2000 financial statements, Deloitte's audits of those financial statements were not conducted in accordance with GAAS, and Deloitte had no reasonable basis for stating that the financial statements presented the financial position of Adelphia and its subsidiaries in accordance with GAAP

b.   From 1998 through May 23, 2002, Adelphia's financial statements, SEC filings, Registration Statements and Prospectuses misrepresented or failed to disclose material information relating to related party transactions between Adelphia and its subsidiaries on one hand, and the Rigas family and the entities they own and control, on the other.  In particular, there was no disclosure of the substantial benefits conferred upon the Rigas family by virtue of these undisclosed related party transactions.  For example, it was not disclosed that Company funds were being used to pay for vacation properties and New York City apartments used personally by the Rigas family, to develop a golf course on land mostly owned by the Rigas family, and to finance the acquisition of over $1 billion in Adelphia securities by or for the benefit of the Rigas family.

c.   From the second quarter of 1999 through March 27, 2002, Adelphia's financial statements, SEC filings, Registration Statements and Prospectuses included debt figures for Adelphia and its subsidiaries that did not include the borrowings by the Managed Entities under the various co-borrowing agreements for which subsidiaries of Adelphia were jointly and severally liable, even though the footnotes to the Company's financial statements deceptively indicated that these borrowings actually were included on its balance sheet.

d.   From the second quarter of 1999 through March 27, 2002, the Company's statements regarding purchases of Adelphia securities by members or affiliates of the Rigas family were materially misleading and omitted material facts because they failed to disclose that those purchases were funded by draw-downs under the co-borrowing agreements for which the Company was liable.

e.   From the second quarter of 1999 through at least March 27, 2002, the Company's statements that it was in compliance with the financial covenants and other requirements under its credit facilities and indentures were materially false and misleading and without a reasonable basis; failure of the Company to comply with those requirements would have been apparent if its true debt and liability figures were disclosed.

f.      The Company's financial statements and other public statements by the Rigas Parties regarding the Company's revenues, net income/loss, earnings, and EBITDA for each quarter in 1999 through 2001 were materially overstated and false by virtue of a number of improper accounting devices.

g.      From the second quarter of 2000 through at least May 23, 2002, the Company's statements regarding the number of Adelphia's basic cable subscribers were materially overstated.

h.      From late 1999 through at least May 23, 2002, the Company's statements regarding the extent of the Company's "rebuild," or upgrade of its cable systems, were materially overstated.

### ADELPHIA'S FINANCIAL STATEMENTS AND
### SEC FILINGS VIOLATED GAAP AND SEC REGULATIONS

209.    In addition, Adelphia's financial statements and other disclosures for 1998, 1999, 2000 and the first three quarters of 2001 violated GAAP and SEC regulations.

210.    The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience."  SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120, at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).  Under Item 303 of SEC Regulation S-K, there is a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results.  17 C.F.R. § 29.303(a)(l)-(3) and Instruction 3.  In addition to filing periodic reports, management of a public company has a duty "to make full and prompt announcements of material facts regarding the company's financial condition."  SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120A, at 17,095, 17 C.F.R. § 241.8995 (October. 15, 1970).  In Accounting Series Release 173, the SEC reiterated that "it is important that the overall

impression created by the financial statements be consistent with the business realities of the company's financial position and operations."

211.   Additionally, SEC Regulation S-X requires that financial statements filed with the SEC conform with GAAP.  Financial statements filed with the SEC which are not prepared in conformity with GAAP are presumed to be misleading.  17 C.F.R. § 210.4-01(a)(1).  Some of the general GAAP principles that were applicable to Adelphia during 1998-2002 include:

a)   that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (Financial Accounting Standards Board Statements ("FASB") Statement of Concepts No. 1, ¶ 40);

b)   that financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

c)   that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it — to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

d)   that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59); and

e)   that information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶¶ 79, 80).

212.   Adelphia's financial statements for 1998, 1999 and 2000 and the first three quarters of 2001 violated the foregoing general GAAP principles and SEC regulations because, *inter alia*, they:  provided inaccurate information about Adelphia, its resources, and the claims against those resources; omitted information that was material to the investment decisions of present and prospective investors; failed to disclose that management was abusing its power by

80

causing Company resources to be diverted for their own personal benefit; and presented information that was neither reliable nor complete.

213.     Adelphia's financial statements also violated numerous other specific GAAP provisions, as discussed *infra* at paragraphs 271-322.

## THE TRUTH BEGINS TO EMERGE

214.     On March 27, 2002, Plaintiffs and the investing public learned the first of many painful truths about Adelphia:  far from being the financially stable company that the Company's financial statements and Adelphia's audit reports portrayed it to be, Adelphia had several ***billion*** dollars in undisclosed liabilities.  However, even after this disclosure, the Rigas Parties committed fraud as they tried to cover up their conduct and diverted $174 million in Adelphia funds to pay off personal loans of Rigas family members.  It was not until May 24, 2002 that Plaintiffs discovered, or reasonably could have discovered, that the Rigas Parties' misconduct extended beyond the omission of bank debt from Adelphia's balance sheet and included defalcation of corporate funds and assets for the personal benefit of the Rigas family, none of which was publicly disclosed prior to May 24, 2002.  Once the truth was finally out, John Rigas and Timothy Rigas were convicted and sent to prison for securities fraud and other crimes, while Deloitte was censured by the SEC and paid large fines for its role in allowing the Adelphia fraud to go unchecked.

215.     The truth first began to emerge on March 27, 2002, when Adelphia issued a press release announcing its fourth quarter and full year 2001 financial results.  In a footnote to that press release, Adelphia delivered the shocking news that it had at least $2.284 billion in off-balance sheet debt as of December 31, 2001:

> Certain subsidiaries of the Company are co-borrowers with certain
> companies owned by the Rigas Family and managed by the

Company ("Managed Entities") for borrowing amounts of up to [$5,630,000,000]. Each of the co-borrowers is liable for all borrowings under the credit facilities and may borrow up to the full amount of the facilities. Amounts borrowed under these facilities by the Company's subsidiaries are included as debt on the Company's consolidated balance sheet. **Amounts borrowed by Managed Entities under the facilities are not included on the Company's consolidated balance sheet.** The Company expects the Managed Entities to repay their borrowings in the ordinary course. The Company does not expect that it will need to repay the amounts borrowed by the Managed Entities. **As of December 31, 2001, co-borrowing credit facilities balances, net of amounts otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately [$2,284,000,000]** . . . .

Reference is made to the Company's Annual Report on Form 10-K to be filed for the year ended December 31, 2001 for further information.

(Emphasis added.)

216.    The footnote to the March 27, 2002 press release was the first public disclosure of the fact that Adelphia's consolidated balance sheets did not include the Managed Entities' borrowings under the co-borrowing agreements.

217.    Even as the Company began to disclose the truth about its debt levels, it perpetuated other falsehoods by stating in the very same press release that it had 5,810,253 basic cable subscribers, and by announcing the Company's fourth quarter and year-end financial results, including record consolidated quarterly revenue of $950 million, quarterly EBITDA of $395.3 million, annual revenue of $3,580.1 million (up 23% since 2000), and annual EBITDA of $1,409.4 million (up 29% since 2000).  Subsequent announcements would reveal each of those figures to be materially overstated.

218.    Later on March 27, 2002, Adelphia disclosed in a conference call that an undisclosed amount of the Managed Entities' borrowings under the co-borrowing agreements had been used by the Rigas family to purchase Adelphia securities, and that the $2.284 billion in

off-balance sheet debt was secured by assets that included cable systems with about 300,000 customers.  This was the first public disclosure of the fact that money borrowed under the co-borrowing agreements had been used for the benefit of members of the Rigas family.

219.    Also on March 27, 2002, Adelphia Business and certain of its subsidiaries filed for bankruptcy protection under Chapter 11, and Adelphia announced that it may be liable for $500 million in unsecured bank debt of one of the bankrupt Adelphia Business subsidiaries, which was an unrestricted borrower under a joint credit facility for which Adelphia subsidiaries were guarantors.  Adelphia also stated that it had agreed to provide debtor-in-possession financing of up to $67.5 million so that Adelphia Business could continue day-to-day operations while it reorganized, that the bankruptcy presented potentially material risks and uncertainties to Adelphia, and that Adelphia might not be able to realize any significant amount on claims against Adelphia Business and its subsidiaries.

220.    On April 1, 2002, Adelphia announced that it was delaying the release of its Annual Report on Form 10-K for the year ended December 31, 2001, so it could "review[] certain accounting matters relating to co-borrowing credit facilities" to which it was a party.

221.    On April 3, 2002, the Company disclosed that the SEC was conducting an informal inquiry into the co-borrowing agreements.

222.    On April 4, 2002, the Company announced that it had hired a law firm and three financial advisors to explore ways to reduce Adelphia's debt and strengthen its balance sheet, including a possible sale of cable assets.

223.    On April 16, 2002, the Company announced that it was continuing to review the accounting treatment of matters relating to its co-borrowing agreements, that it would not be able to meet its extension to file its 2001 Form 10-K, and that there were "a number of possible

83

outcomes with respect to the Company's consolidated financial statements for 2001 and certain prior years" regarding the co-borrowing agreements.  The Company also stated that it was reviewing the accounting treatment in its subsidiaries' financial statements of $500 million of unrestricted co-borrowing obligations of an Adelphia Business subsidiary and the related impact as a result of Adelphia Business's bankruptcy filing.

224.    On April 17, 2002, Adelphia disclosed that the SEC had launched a formal investigation into the Company's co-borrowing agreements.

225.    On April 18, 2002, after the markets closed, Adelphia said that its securities were subject to delisting from the NASDAQ stock market.

226.    On May 2, 2002, the Company announced that it expected to restate its previously issued financial statements for 1999 and 2000, and its interim financial statements for 2001.  The Company stated that it had "tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements associated with amounts payable directly or indirectly by certain Rigas family owned entities, primarily incurred in connection with other Rigas entities which purchased Adelphia securities, as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity."  At the time, the Company estimated that these borrowings had approximated $1.6 billion as of December 31, 2001, $1.2 billion as of December 31, 2000, and $700 million as of December 31, 1999.

227.    On May 15, 2002, the Company announced John Rigas's resignation as Chairman, President and CEO.  The Company further announced that Deloitte's auditing work on the Company's financial statements for the year ended December 31, 2001 would be suspended while the Company continued its investigation of issues raised in connection with the preparation of its Form 10-K.  Also on May 15, Adelphia and certain of its subsidiaries missed a

total of $38.3 million in interest payments on their outstanding debt securities and Adelphia

missed an approximately $6.5 million dividend payment on its preferred stock.

228.     On May 16, 2002, the Company announced Timothy Rigas's resignation as

Executive Vice President, CFO, Chief Accounting Officer, and Treasurer.  The Company also

announced the appointment of a Special Committee of the board of directors with "broad powers

to conduct a full and thorough investigation into a number of issues, including ones regarding

transactions between the Company and certain entities controlled by the Rigas family."

229.     Also on May 16, 2002, Adelphia and one of its subsidiaries filed notices with the

SEC indicating that the filing of their Form 10-Q reports for the quarter ended March 31, 2002

would be delayed as a result of their continuing review of "certain accounting matters, including

those relating to certain co-borrowing credit facilities" to which they were parties.

230.     On May 17, 2002, the Company announced that it was being investigated by

grand juries in two states.

231.     On May 19, 2002, the Company announced Brown's resignation as Vice

President of Finance.  Brown had worked for Adelphia for eighteen years, and no reason was

given for his resignation.

232.     On May 23, 2002, the Special Committee of Adelphia's Board of Directors

announced that the Rigas family had agreed to relinquish control of the Company, and that the

Rigas Parties had resigned their positions as directors and officers of the Company.  The Special

Committee further announced that the Company had tentatively concluded that it would have to

increase the amount of indebtedness to be reflected on the Company's financial statements to

$2.5 billion as of December 31, 2001, to reflect the full amount of principal borrowings and

interest expense by entities affiliated with the Rigas family under co-borrowing arrangements

with the Company, and that "this higher amount . . . includes co-borrowing debt associated with Rigas family entities that are valued at approximately $1 billion." The Company stated that it believed that, as of April 30, 2002, "the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion," and that the proper accounting treatment for this increased indebtedness had not yet been determined.

233.   Also on May 23, 2002, the Company announced that it believed it was not in compliance with certain covenants in its public indentures, including restrictions on the Company's ability to enter into related party transactions without approval by the independent members of the Board. The Company stated that, unless cured, its failure to make $38.3 million in interest payments on its outstanding bonds would result in defaults under the indentures for those bonds and cross-defaults under the indentures for its other public debt securities.

234.   On May 24, 2002, the Company filed a Form 8-K with the SEC that disclosed a number of previously undisclosed (or inadequately disclosed) relationships and related party transactions involving the Company and its subsidiaries, on the one hand, and members of the Rigas family and entities controlled by them, on the other hand. The Form 8-K further stated that the Company had not yet completed its financial statements for the year ended December 31, 2001, received its independent auditors' report thereon, or filed with the SEC its Form 10-K for the year ended December 31, 2001. The Company also stated that in May 2002, Deloitte had suspended its auditing work on the Company's financial statements for the year ended December 31, 2001. The Company stated that defendants John J. Rigas, Timothy J. Rigas, James P. Rigas and Michael J. Rigas had refused to review, or provide information for, the Form 8-K.

235.    The May 24, 2002 Form 8-K filing also announced that the Special Committee had reached an agreement with the Rigas Parties whereby, among other things, all stock owned by the Rigas family would be placed into a voting trust until all obligations to the Company under the co-borrowing agreements were satisfied.  In addition, the Rigas family's equity ownership in the Managed Entities was pledged to the Company until all obligations under the co-borrowing agreements were satisfied.  Other assets were also transferred to the Company by the Rigas family and the Managed Entities.  As part of the agreement, John Rigas would receive $1.4 million per year in severance payments for the following three years, so long as he was not convicted of a felony.

236.    On May 29, 2002, the Wall Street Journal reported that Adelphia was in negotiations to sell about one million of its subscribers and to raise about $1 billion in additional funding, and that the Company could run out of cash within the following ten days unless it got a sizeable investment or sold some assets.

237.    On May 30, 2002, NASDAQ announced that it would delist Adelphia's securities, effective upon the open of business on June 3, 2002, based on Adelphia's failure to timely file its periodic reports with the SEC, and further based on "public interest concerns."

238.    On May 31, 2002, Adelphia announced that its subsidiaries were in default on certain bank loans due to Adelphia's failure to provide the lenders with financial information and related compliance certificates.  Adelphia further announced that, as a result of its delisting by NASDAQ, it would be required to make an offer to purchase certain outstanding debt securities.

239.    On June 6, 2002, the Company filed a Form 8-K which stated that "the Board of Directors, based on the recommendation of the Special Committee and consultation with counsel to the Special Committee, has determined that each of John Rigas, Timothy Rigas, Michael

Rigas, Peter Venetis and James Brown deliberately breached his duty to the Company and/or its shareholders."

240.     On June 7, 2002, the Wall Street Journal reported that Adelphia had inflated the number of its cable television subscribers by between 400,000 and 500,000, or as much as 10% of the Company's total customer base.  It also reported that investigators had uncovered evidence that Adelphia kept two sets of accounting books for its capital expenditures, with the one that was shown to Wall Street overstating the amount Adelphia spent to upgrade its cable systems.

241.     On June 9, 2002, the Company terminated Deloitte as its independent accountants and auditors.  Later that day, the Company received a letter from Deloitte in which Deloitte stated that it was not prepared to resume its audit because the Company continued to employ executives who might have been involved in inappropriate conduct relating to the Company's financial reporting.  In the letter, Deloitte stated:  "To the extent that any of those persons have been involved in illegal activities, there is no way that we would be willing to rely on their representations, and indeed the mere fact that they remain in their positions raises additional concerns."

242.     On June 10, 2002, the Company filed a Form 8-K which stated that, based on the preliminary results of the Special Committee's investigation, current management of the Company had determined that it would make adjustments to its results of operations for 2000 and 2001 and its guidance with respect to management's expectations regarding EBITDA for 2002, and that it would revise certain previous public statements regarding the number of subscribers to the Company's cable television systems because those statements were inaccurate. The Form 8-K contained the Company's preliminarily revised consolidated revenues and EBITDA for 2000 and 2001, which reflected: (a) a $160 million (15.3%) reduction in reported

consolidated EBITDA for 2000; (b) a $210 million (17.5%) reduction in reported consolidated EBITDA for 2001; (c) a $60 million reduction in reported consolidated revenues for 2000; and (d) a $70 million reduction in reported consolidated revenues for 2001.  The Company stated that the revised estimates of EBITDA for 2000 and 2001 "correct[] the items in the previously announced operating results that current management believes were erroneous, and reflects more conservative accounting policies that the Company intends to follow in the future."  The Company further stated that its new management believed EBITDA for the first quarter of 2002 was approximately equal on an annualized basis to the preliminary revised EBITDA for the full year 2001.

243.   Also on June 10, 2002, Century Communications Corporation ("Century") (an Adelphia subsidiary) filed for bankruptcy protection under Chapter 11.  It stated that it made the bankruptcy filing because it was notified that ML Media Partners LP intended to seize control of the joint venture between Century and ML Media Partners LP by foreclosing on the half owned by Century.

244.   Also on June 10, 2002, two directors resigned from Adelphia's Board after less than two weeks of service.  In a letter to the Chairman of the Board, one of them explained that "revelations of the unreliability of corporate data, as well as the ongoing serial disclosures of wrongdoing, have made it impossible to contribute meaningfully to the process" of restoring the Company's credibility and stabilizing it financially.

245.   On June 11, 2002, Adelphia announced the resignation of Venetis from the Board.

246.   On June 14, 2002, Adelphia filed a Form 8-K announcing its retention of PricewaterhouseCoopers, LLP ("PwC") to replace Deloitte as its independent accountants.  In that Form 8-K, Adelphia also discussed the investigation by the Special Committee, and stated

that the Special Committee had "identified accounting and disclosure issues, some of which raised questions about whether the Company's management had engaged in improper activities." The Company stated that, when Deloitte suspended its audit of the Company's 2001 financial statements on May 14, 2002, it provided the Company with a list of issues that needed to be resolved before issuance of the 2001 Form 10-K, including "circumstances that raised questions about whether employees of the Company had falsified accounting records and/or engaged in other conduct in violation of the law."

247.    In its Form 8-K dated June 14, 2002, the Company provided additional details regarding some of the related party transactions that had been disclosed in its Form 8-K dated May 24, 2002.

248.    On June 17, 2002, Adelphia issued a press release announcing that it had missed a $51,250,000 interest payment on its debt securities (later identified as the 2011 Bonds). Adelphia also announced that, based on the Company's decision to restate its financial statements, Deloitte was withdrawing its certifications of the financial statements issued by Adelphia and its subsidiaries since March 2001.

249.    On June 25, 2002, Adelphia filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

250.    The foregoing announcements on and after March 27, 2002 had a swift and detrimental impact on the trading price of the Company's securities.  The closing price of Adelphia's Class A common stock dropped from $20.39 per share on March 26, to $16.70 on March 27, $14.90 on March 28, $13.12 on April 1, $11.04 on April 3, $7.25 on April 17, $5.70 on May 14, $2.62 on May 23, $1.16 on May 30, $0.70 on May 31, $0.23 on June 10, and $0.14 in over-the-counter trading on June 13, 2002 – down more than 99% since March 26, 2002.  The

price of Adelphia's bonds also dropped materially in response to the adverse news:  For example, the 2010 Bonds fell approximately 9 cents on the dollar on March 27, 2002 (to a bid of 97 cents) and an additional 6 cents on March 28, 2002 (to a bid of 91 cents), and subsequently fell to a bid of about 67 cents (on May 16, 2002).  The other Bonds also dropped in price in response to the disclosures.  Standard & Poor's reduced Adelphia's bond rating from BB- on March 28, 2002, to CCC+ on April 22, 2002, to C- on May 20, 2002.

251.    On August 14, 2002, the Company filed a statement with the SEC stating that the Company was unable to state and attest that recent SEC filings did not contain untrue statements of a material fact or did not omit material facts, because the Company did not yet have audited financial results for the most recent reporting period.  In a press release the same day, the Company said it expected to restate its 1999, 2000, and interim 2001 financial results, and that "[o]ther periods may also be restated."

252.    On September 16, 2002, the Company announced that it had losses of $173.9 million in June and July 2002 because of interest expense.

253.    On February 25, 2003, in a Form 8-K filing, the Company revealed that "[u]nder Rigas management accounting policies and practices, labor and labor-related expenses for service calls and normal, on-going maintenance to cable systems, as well as certain overhead expenses and certain materials, were being accounted for at least in substantial, if not in total, part as capitalized costs in PP&E."  The 8-K reported that, effective January 1, 2003, Adelphia had corrected many of its erroneous accounting policies and practices for Property, Plant and Equipment (PP&E) relating to capitalization of labor, labor-related expenses, certain overhead expenses and certain materials used in the maintenance of its cable systems.  The 8-K stated that "[c]urrent management believes that the corrections are necessary in order to be in accordance

with GAAP." The need for these corrections should have been readily obvious to Deloitte during its audits, yet Deloitte issued unqualified audit opinions without requiring such corrections to be made.

254. In April 2003, the Company announced that it had likewise corrected its improper accounting policies and practices related to capitalized installation and construction activities. These improper accounting practices – which Deloitte had approved during its audits – included capitalization prohibited by GAAP as well as improper capitalization or overcapitalization of certain overhead costs.

255. In a Form 8-K filing dated May 23, 2003, the Company stated that it estimated that the new accounting policies and practices relating to capitalized costs for PP&E would increase expenses and decrease capital expenditures by approximately $300 million on an annualized basis in 2003 as compared to the accounting policies and practices of the Company under Rigas management. The Company also stated that it was unable to determine the impact on depreciation expense attributable to the corrections in accounting policies and practices but that the impact of the changes would likely be material.

256. As of December 3, 2003, Adelphia still had not completed its financial statements for fiscal years 2001 and 2002, received its independent auditors report thereon, or filed its Form 10-K with the SEC for 2001 or 2002. In a Form 8-K filed that day, Adelpha stated: "current management believes that the public information provided by Rigas management on other matters of interest to investors, such as the Company's rebuild percentage (the percentage of the Company's cable television systems that the Company believes have been upgraded to current standards), was unreliable."

257.   On December 23, 2004, the Company filed a Form 10-K for the year ended December 31, 2003.  In that Form 10-K, the Company stated that it had "identified a number of accounting and bookkeeping errors that required adjustment," and that "[i]n general, the accounting errors arose in connection with prior management's misinterpretation or misapplication of GAAP and its failure to maintain adequate internal controls and appropriate books and records."  The Company further stated that it was unable to locate appropriate supporting documentation with respect to certain amounts reflected in its consolidated balance sheets for the years ended December 31, 2000 and 1999, and was unable to prepare restated consolidated financial statements for those years that would comply with GAAP.  The Company's revelation that it could not find support for its 1999 and 2000 financial statement balances was a shocking indictment of the quality of the audits conducted by Deloitte, which had issued unqualified opinions on the financial statements for those years.

258.   Although the Company could not restate its 1999 and 2000 financial statements, it stated in the December 23, 2004 Form 10-K that the amount of its accumulated deficit as of January 1, 2001 was being restated downwards by approximately $1.648 billion, thereby increasing the deficit as of that date from approximately $2.525 billion to approximately $4.173 billion.

## DELOITTE'S ROLE AND RESPONSIBILITIES

259.   As the outside auditor of Adelphia and its subsidiaries, Deloitte assisted in the preparation of their annual and quarterly financial statements, reviewed the quarterly financial statements and the text that accompanied them in the companies' Form 10-Qs, and audited the annual financial statements and the text that accompanied them in the companies' Form 10-K filings.  Deloitte was also responsible for, among other things, examining Adelphia's systems of

internal controls to identify and report any material weaknesses or reportable conditions that might impact the accuracy or reliability of their financial statements.  In connection with its quarterly reviews and annual audits, Deloitte had full access to Adelphia's books and records, as well as the books and records of the Managed Entities, which shared a general ledger system with Adelphia.

260.    The federal securities laws require public companies like Adelphia to have annual audits conducted by outside audit firms like Deloitte.  The reason for this requirement is to provide an independent "check" on the conduct of company management, and to provide investors with a level of comfort that a company's financial condition and results are not being misrepresented by management.  Deloitte was fully aware at all relevant times that its audit reports would be reviewed and relied upon by investors and potential investors in Adelphia. Indeed, Deloitte expressly consented to the inclusion of its audit reports in the registration statements and prospectuses for the Bonds, knowing that those documents would form the basis for investors' decisions whether to purchase the Bonds.  Under those circumstances, Deloitte assumed a special duty to Plaintiffs and others who purchased Bonds in the initial offerings, to issue its audit reports in a careful and non-negligent fashion.

261.    Additionally, Deloitte was at all times required to perform its audit services according to GAAS, which included Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"), and to issue an unqualified opinion only if the Company's financial statements were fairly presented in accordance with GAAP.

262.    GAAS requires that an auditor exercise due professional care in performing an audit and in preparing the audit report.  GAAS also requires that each audit be planned and

performed with an attitude of professional skepticism, which includes a questioning mind and a critical assessment of audit evidence.  AU §§ 230.07-08.  Certain audit conditions require auditors to increase their professional care and skepticism, such as when the audit presents a risk of material misstatement or fraud.  When an audit includes review of related party transactions, auditors must tailor their examinations to obtain satisfaction concerning the purpose, nature, and extent of those transactions on the financial statements.  Unless and until an auditor obtains an understanding of the business purpose of material related party transactions, the audit is not complete.

263.    Audit planning involves developing an overall strategy for the expected conduct and the scope of the audit.  In planning an audit, the auditor must obtain knowledge of the matters which relate to the nature of the entity's business, its organization, and operating characteristics.  The auditor is required to design the audit with professional skepticism (AU 316.27) in order to provide reasonable assurance of detecting errors and irregularities (AU 311.03), material misstatements (AU 312) or fraud (AU 316).  The auditor also must design the audit plan to account for the possibility that an entity may be unable to continue as a going concern (AU 341).

264.    In developing its audit plan, GAAS required Deloitte to consider the "audit risk" that Deloitte might fail to recognize that Adelphia's financial statements were materially misstated as a result of errors or irregularities.  (AU 312.02).  For several years, including for the audits of Adelphia's 1999 and 2000 financial statements, Deloitte performed this risk assessment and concluded that the Adelphia engagement posed a "much greater than normal" risk of fraud, misstatement, or error – the highest risk category that Deloitte recognized.  Risk factors that

Deloitte specifically identified in reaching this assessment for the 2000 audit included the following:

- Adelphia operated in a volatile industry, expanded rapidly, and had a large number of decentralized operating entities with a complex reporting structure;

- Adelphia carried substantial debt and was near the limit of its financial resources, making it critical that the Company comply with debt covenants;

- Management of Adelphia was concentrated in a small group without compensating controls;

- Adelphia management, including CFO Timothy Rigas, lacked technical accounting expertise but nevertheless appeared willing to accept unusually high levels of risk, tended to interpret accounting standards aggressively, and was reluctant to record adjustments proposed by auditors; and

- Adelphia engaged in significant related party transactions with affiliated entities that Deloitte was not auditing.

265.    Having recognized a high risk of fraud at Adelphia, Deloitte was required to take that risk – and the specific contributing factors – into account, and to design its audit plan to provide reasonable assurance of detecting material error as required by Statement of Auditing Standards No.82, The Auditor's Responsibility to Detect and Report Errors and Irregularities (AU 316A).

266.    Deloitte recklessly failed to comply with GAAS in the performance of its audits of Adelphia's financial statements.  Among other ways, Deloitte failed to adhere to professional standards by:  inadequately planning its audit; failing to understand Adelphia's internal control structures sufficiently; failing to obtain sufficient competent evidential matter; and improperly issuing unqualified audit reports.

267.    Deloitte issued unqualified audit opinions on Adelphia's annual financial statements for 1999 and 2000, stating that Deloitte's audits were conducted in accordance with GAAS and that, in Deloitte's opinion, the financial statements "present[ed] fairly, in all material

respects" Adelphia's financial position, results of operations, and cash flows for those years in accordance with GAAP.  However, as alleged herein, Adelphia's financial statements represented an extreme departure from GAAP, and Deloitte's audits did not comply with GAAS.  As a result, Deloitte's audit opinions were materially false and misleading.

## RELATED CRIMINAL PROSECUTIONS AND
## SEC PROCEEDINGS AGAINST DEFENDANTS

### A.      Criminal Prosecutions of the Rigas Parties

268.      On July 24, 2002, John Rigas, Timothy Rigas, Michael Rigas, Brown and Mulcahey were arrested by federal agents and charged with "systematically looting" the Company and using the Company as their "personal piggy bank" while investors lost over $60 billion.  A 24-count indictment against these defendants was handed down on September 23, 2002.  Each of them was charged with one count of conspiracy, 16 counts of securities fraud, 5 counts of wire fraud, and 2 counts of bank fraud.  Federal prosecutors called the scheme "one of the most elaborate and extensive corporate frauds in United States history."

269.      On November 14, 2002, Brown pleaded guilty to conspiracy and fraud charges and agreed to cooperate in the government's investigation of illegal activity at Adelphia.  In pleading guilty, Brown admitted that he had participated in a conspiracy by which he and his co-conspirators misrepresented the state of the Company's finances, the level of growth of the Company's earnings, and the number of its cable subscribers.  He also admitted that, during a January 18, 2002 meeting with Moody's Investors Service — one of the primary bond rating agencies — he and others had falsely represented that the Company was in compliance with its loan covenants.

270.      In July 2004, a jury found John and Timothy Rigas guilty of conspiracy (one count), bank fraud (two counts), and securities fraud (fifteen counts).  Michael Rigas was found

not guilty of conspiracy and wire fraud, but the jury was deadlocked as to the remaining charges and the Court declared a mistrial as to those charges.

**B.**     <u>**SEC Proceedings Against the Rigas Parties**</u>

271.    On July 24, 2002, the SEC filed a civil injunctive action against Adelphia, the Rigas Parties, Brown and Mulcahey.  *SEC v. Adelphia Communications Corp.*, No 02 Civ. 5776 (S.D.N.Y.).  The SEC charged that Adelphia, at the direction of these individuals:  (a) fraudulently excluded billions of dollars in liabilities from its financial statements; (b) falsified operations statistics and inflated earnings to meet Wall Street's expectations; and (c) concealed rampant self-dealing by the Rigas family.  SEC Director of Enforcement Stephen M. Cutler stated:  "This case presents a deeply troubling picture of greed and deception at a large, publicly-held company."

272.    In April 2005, the Department of Justice, Adelphia, and the Rigases reached a global settlement of all outstanding issues.  Among other things, the Rigas Parties agreed to forfeit to the United States a substantial portion of its assets, and Adelphia agreed to cooperate with the government's investigation and to make a deferred contribution of $715 million in stock and cash to a victims' restitution fund.  As part of the global settlement, the SEC settled its civil action against Adelphia and the Rigas Parties.  Adelphia and the Rigas Parties were permanently enjoined from violating the antifraud, periodic reporting, record keeping, and internal controls provisions of the federal securities laws.  The Rigas Parties were barred from acting as officers or directors of public companies.  The SEC agreed not to require Adelphia to pay disgorgement or a civil penalty in return for Adelphia's promise to pay $715 million in stock and cash to the victims' restitution fund.

C.    **Adelphia's Civil Suit Against Deloitte**

273.    On November 6, 2002, Adelphia filed a lawsuit against Deloitte charging it with, among other things, professional negligence, breach of contract, fraud and wrongful conduct. Deloitte filed preliminary objections to the complaint but the bankruptcy court denied the preliminary objections in their entirety.  Deloitte then answered and counterclaimed.  As part of a settlement reached in July 2007, Deloitte paid $167.5 million for the benefit of the Adelphia Recovery Trust, a trust formed pursuant to Adelphia's Chapter 11 Plan of Reorganization to, among other things, prosecute claims belonging to Adelphia's estate.  At the time, the settlement was among the largest settlements ever reached between a public accounting firm and its audit client.

D.    **SEC Proceedings Against Deloitte**

274.    The SEC commenced a number of administrative proceedings against Deloitte and members of Deloitte's audit team.  As described below, these included:  an administrative proceeding against Deloitte; a civil suit against Deloitte; an administrative proceeding against William Caswell ("Caswell"), a senior member of Deloitte's audit teams for the years 1995 through 2001; and an administrative proceeding against Gregory Dearlove ("Dearlove"), the Deloitte partner in charge of the 2000 audit.

275.    On April 26, 2005, the SEC instituted and settled an administrative proceeding against Deloitte pursuant to Rule 102(e) of the SEC's Rules of Practice, by which the SEC may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found to have engaged in improper professional conduct.

276.    In its Order Instituting Public Administrative Proceedings, the SEC noted that from at least 1998 through March 2002, at the direction of senior management, Adelphia had transferred billions of dollars of liabilities to off-balance sheet affiliates, inflated earnings to meet Wall Street's expectations, falsified operational statistics, and concealed varied instances of blatant self-dealing by the Rigases.  The SEC alleged that Adelphia had committed massive fraud resulting in the issuance of a Form 10-K for the year-ended December 31, 2000 that contained significant material misstatements in its year-end 2000 financial statements ("2000 Financial Statements"), and cited Adelphia's understatement of its subsidiary debt by $1.6 billion, overstatement of equity by at least $368 million, improper netting of related party receivables and payables between Adelphia and related parties, and failure to disclose the extent of related party transactions.  The SEC stated that Deloitte did not act in accordance with GAAS and that Deloitte engagement team's failure to object to Adelphia's misstatements had allowed the Company to engage in accounting practices that departed from GAAP.  Accordingly, Deloitte caused Adelphia's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, which govern securities issuers' regulatory obligations with respect to reports filed with the SEC.

277.    Calling Deloitte's audit of Adelphia 2000 Financial Statements critically flawed, the SEC charged, among other things, that Deloitte knew or should have known that:  (a) Adelphia's failure to include all co-borrowing debt on its balance sheet, or to otherwise disclose that a portion had been excluded, did not conform to GAAP; (b) the $1.6 billion of co-borrowing debt was Adelphia's liability and should have been reflected in its financial statements; (c) Adelphia had not performed the assessments required under Statement of Financial Accounting Standards No. 5 ("FAS 5") to determine if its potential contingency for the amount of co-

borrowing debt that it excluded from its balance sheet was "probable" or even "reasonably possible" under FAS 5 and would have had to be disclosed; (d) Adelphia's practice of drawing down co-borrowing funds into an Adelphia bank account but recording debt on the books of the Rigas co-borrowers violated GAAP; (e) Adelphia had failed to disclose significant related party transactions by improperly netting related party payables and receivables; (f) Adelphia overstated its stockholders' equity by $375 million; (g) Adelphia's books and records did not accurately reflect related party transactions (such as co-borrowing debt, Rigas securities purchases and other transactions); and (h) Adelphia had significant flaws in its internal controls.

278.    To resolve the administrative proceeding, **Deloitte consented to the entry of findings that it engaged in repeated instances of unreasonable conduct** with respect to the audit of the 2000 Financial Statements.  The SEC censured Deloitte pursuant to Rule 102(e) of the Commission's Rules of Practice.  Deloitte agreed to pay $25 million into a fund to compensate the victims of Adelphia's fraud and to undertake major remedial overhauls to its policies and procedures for future audits of high-risk audit clients.

279.    Simultaneously with commencement of its administrative proceeding, the SEC initiated and settled a civil action against Deloitte, *SEC v. Deloitte & Touche LLP,* 05 Civ 4119 (S.D.N.Y) , asserting the same GAAS violations by Deloitte detailed in the administrative proceeding and seeking civil monetary penalties for causing Adelphia to violate Section 10(A) of the Exchange Act.  Specifically, the Commission asserted that Deloitte violated Section 10A(a) of the Exchange Act by failing to:  (a) implement audit procedures that were "designed to provide reasonable assurance of detecting illegal acts that would have a direct and material effect on the determination of financial statement amounts"; and (b) implement audit procedures that

were "designed to identify related party transactions that are material to the financial statements or otherwise require disclosure."

280.    The settlement of the SEC's civil action required Deloitte to pay a $25 million civil penalty, above and beyond the $25 million it had paid pursuant to the settlement of the administrative proceeding.

281.    On September 30, 2005, the SEC issued an Order Instituting Proceedings against Caswell, who had held the most senior, non-partner position on Deloitte's audits of Adelphia from 1995 through 2001.  Simultaneously with the institution of those proceedings, Caswell consented to the entry of findings that he had committed repeated instances of unreasonable conduct, that he "did not adhere to [GAAS] when participating in the audit of the 2000 Financial Statements, and that he "should have known that Adelphia's 2000 Financial Statements had not been prepared in conformity with GAAP."  Among the findings set forth in the September 30, 2005 Order were that Caswell had reviewed the co-borrowing agreements, knew that Adelphia's liability was "joint and several" with the co-borrowers, knew that $1.6 billion in co-borrowed debt was not disclosed in the 2000 Financial Statements, and accepted Adelphia management's rationale for omitting Adelphia's true debt obligations without ensuring that this rationale conformed to GAAP.  The SEC findings also included the fact that, since 1986, Adelphia had violated GAAP and fraudulently concealed its liabilities by netting related party payables against related party receivables as of year-end, and presenting only the net balance in its financial statements.  The SEC found:  "The acceptance by Caswell and others on the engagement team of Adelphia's practice of netting permitted Adelphia to reflect a mere $3 million net receivable in its 2000 Form 10-K. If Caswell and others on the engagement team had taken the appropriate action to require correction by Adelphia of its disclosure, however, Adelphia would have had to

report that, as of the year-ended December 31, 2000, Adelphia had gross related party

receivables of $1.351 billion and gross related party payables of $1.348 billion, much more

relevant numbers."  Caswell agreed to be barred from appearing or practicing as an accountant

before the Commission, with a right to apply for reinstatement after two years.

282.    On September 20, 2005, the SEC issued an Order Instituting Proceedings against

Dearlove, the former Deloitte partner who served as engagement partner on Deloitte's audit of

Adelphia's 2000 Financial Statements.  Dearlove took over as audit partner for Adelphia in 2000

and signed the audit opinion included in Adelphia's 2000 Form 10-K, which stated that Deloitte

had conducted its audit in accordance with GAAS, that Adelphia had prepared its financial

statements in conformity with GAAP, and that the financial statements fairly presented

Adelphia's financial condition.  The SEC maintained that the audit Dearlove planned, directed,

and supervised was not conducted in accordance with GAAS.  The SEC's Division of

Enforcement sought to bar Dearlove from appearing and practicing before the Commission and

to require him to disgorge his compensation received in connection with the audit, asserting that

he had engaged in "improper professional conduct" under Rule 102(e)(1)(iv) that resulted in a

violation of GAAP, GAAS and SEC regulations.

283.    As it had in its administrative proceeding against Deloitte, the SEC asserted that

Adelphia's 2000 Financial Statements were materially false and misleading and failed to comply

with GAAP; that they misstated the Company's total liabilities, equity, and related-party

receivables; that Adelphia failed to make and keep books, records, and accounts that accurately

reflected transactions and dispositions of its assets or liabilities; and that Adelphia failed to

devise and maintain a system of internal accounting controls that provided reasonable assurances

against the recording of false journal entries.  The SEC asserted that Dearlove caused Adelphia

to violate Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-1 and 12b-20 thereunder.

284.    In January and February 2006, the Administrative Law Judge in the SEC proceeding against Dearlove conducted nine days of public hearings.  On July 26, 2006, the Administrative Law Judge issued an Initial Decision in which he expressly found that **many of Adelphia's accounting practices in 2000 were improper and violated GAAP, that Deloitte's audit violated GAAS in many respects, and that Dearlove was a cause of Adelphia's violations of the reporting and recordkeeping provisions of the Exchange Act**.  Finding that Dearlove had engaged in improper professional conduct within the meaning of Rule of Practice 102(e), the Administrative Law Judge ordered that Dearlove be permanently denied the privilege of appearing or practicing before the SEC in any capacity.

285.    In reaching his decision, the Administrative Law Judge found, *inter alia*, that:

- "**Deloitte failed to obtain sufficient competent evidential matter to afford a reasonable basis for its opinion** that Adelphia's contingent liability [for its co-borrowers' debts] was 'remote'";

- "**Deloitte … failed to document its audit evidence** [concerning Adelphia's contingent liability] in the work papers or elsewhere";

- "**Dearlove should not have signed a report stating that the financial statements had been prepared in accordance with GAAP and audited in accordance with GAAS**";

- Deloitte had repeatedly urged Adelphia to enhance its disclosures concerning the co-borrowing agreements, but Dearlove had **agreed to more limited disclosure, and in doing so he "disregarded his GAAS obligations** to obtain competent evidential matter to support his conclusions, to employ professional skepticism in analyzing the issue, and to render an unqualified audit opinion only on financial statements and note disclosure that complied with GAAP";

- "Adelphia's note disclosure of co-borrowed debt **failed to conform to FAS 5 ¶ 12.  It was materially misleading because it omitted disclosure of Adelphia's $1.6 billion guarantee [of the debts of the co-borrowers].**";

- Despite identifying the Rigases' control of both Adelphia and the Managed Entities as posing a special risk to the audit, **Deloitte never audited three related party transactions in 2000 whereby Adelphia violated GAAP** by reclassifying large debts from the books of Adelphia's subsidiaries to the books of Managed Entities. "… Dearlove violated his GAAS obligations to supervise, … to exercise due professional care, … to obtain sufficient competent evidential matter, … to exercise professional skepticism as to large and unusual transactions occurring at year-end, … and to obtain satisfactory evidence of the purpose, nature, and extent of these related party transactions and their effect on Adelphia's financial statements …";

- "Adelphia's practice of netting related-party transactions on its 2000 Financial Statements **violated both Commission Regulation S-X and GAAP. As a result, the financial statements were materially misleading.**";

- "**Deloitte lacked sufficient competent evidential matter to afford a reasonable basis for its opinion** that Adelphia's netting of related-party transactions complied with GAAP.";

- Adelphia engaged in direct placements of stock to Rigas-affiliated entities, and these were "significant and unusual transactions" because the co-borrowers that drew down funds to pay for the stock were not the same entities that purchased the stock. "Yet **the auditors exhibited no curiosity as to why the transactions had been structured the way they were,**" and therefore violated GAAS;

- "[T]he commingling of funds through the [Adelphia CMS] constituted a related party transaction that should have been disclosed to the public and … Adelphia's failure to do so violated [GAAP]… **By failing to insist on note disclosure regarding the commingling of funds of related parties through the [Adelphia CMS], Dearlove violated [GAAS]**."

286.    Dearlove appealed the Administrative Law Judge's decision and lost.  On January 31, 2008, the SEC issued an Opinion that affirmed many of the Administrative Law Judge's findings.  *See* Securities Exchange Act Of 1934 Rel. No. 57244 (Jan. 31, 2008) (the "SEC Opinion").  As discussed in detail *infra*, the SEC found that the Adelphia 2000 Financial Statements violated GAAP in several respects and that the lack of conformity with GAAP rendered the financial statements and Form 10-K misleading.  Adelphia's filing of the Form 10-

K, together with the financial statements and Deloitte's audit report, therefore, was a primary violation of Exchange Act Section 13(a) and Rules 13a-1 and 12b-20 thereunder.

287.     **The SEC further found that Deloitte's audit of the 2000 Financial Statements did not comply with GAAS**, and stated:   "In the high risk auditing environment presented by the circumstances attending Deloitte's audit of Adelphia's 2000 financial statements, with the array of potential problem areas discussed above, **it is likely that an audit conducted in accordance with GAAS would have brought to Dearlove's attention some, if not all, of the GAAP violations that the [SEC] found.**"   Because of the requirement in SEC Regulation S-X that financial statements filed with annual reports be prepared in conformance with GAAP, Adelphia could not have filed its 2000 Form 10-K without an unqualified audit opinion.  The SEC found that by conducting a deficient audit and signing the audit report, Dearlove engaged in acts that contributed to Adelphia's primary violation, and thus was a cause of Adelphia's violations of Exchange Act Section 13(a) and Rules 13a-1 and 12b-20.

288.     In conjunction with the SEC Opinion, the SEC issued an Order Imposing Remedial Sanctions on Dearlove which required him to cease and desist from causing any violations or future violations of Exchange Act Section 13(a) and Rules 13a-1 and 12b-20 and denied him the privilege of appearing or practicing before the SEC as an accountant, with the right to reapply after four years.

### THE SEC'S FINDINGS OF GAAP AND GAAS VIOLATIONS WITH RESPECT TO THE 2000 FINANCIAL STATEMENTS

289.     The SEC Opinion makes clear that Adelphia's 2000 Financial Statements – the only financial statements at issue in that proceeding – violated myriad GAAP provisions and that Dearlove and Deloitte violated GAAS in numerous ways when auditing those financial statements.  The SEC focused on four accounting areas:  (a) co-borrowed debt;  (b) netting of

related party payables and receivables; (c) debt reclassification; and (d) direct placements of stock through the July 2000 Direct Placement and the January 2000 Direct Placement. Each of these is discussed below.

A.      **Adelphia's Co-Borrowed Debt**

290.    For fiscal year 1999 as well as in preceding years, Adelphia included in the liabilities recorded on its balance sheet the amount its own subsidiaries had borrowed under the co-borrowing agreements, but it did not consider itself the primary obligor for the amounts the other co-borrowers had drawn down and therefore did not include those amounts as liabilities on its balance sheet. Deloitte had approved this treatment in the audits it conducted from 1997 to 1999. In its 2000 financial statements, Adelphia planned to account for its co-borrowed debt in the same way it had in prior years. Therefore, Adelphia included $2.1 billion as a liability on its balance sheet, but did not include the additional $1.6 billion that the Managed Entities had drawn down because Adelphia considered itself only contingently liable as a guarantor for that amount.

291.    When a company deems itself to be merely contingently liable for a debt, FAS 5 provides a three-tiered system for determining the appropriate accounting treatment of the contingent liability. If a loss is "probable" and its amount can be reasonably estimated, the liability should be accrued on the company's financial statements as if the company were the primary obligor. If the likelihood of loss is only "reasonably possible" (defined as "more than remote but less than likely"), or if the loss is probable but not reasonably estimable, the company need not accrue the loss but should disclose the nature of the contingency and either give an estimate of the possible loss or state that such an estimate cannot be made. If the likelihood of loss is only "remote," the issuer need not accrue the loss but must disclose the "nature and amount" of the liability.

292.    Dearlove and Deloitte knew that Adelphia deemed it unnecessary to accrue the co-borrowers' debt on Adelphia's balance sheet because Adelphia considered it to be a contingent liability for which its chances of suffering a loss were merely "remote."  Deloitte created no work papers documenting its examination of Adelphia's decision, but claims to have reviewed the likelihood that Adelphia would have to pay the Managed Entities' share of co-borrowed debt.   Dearlove says he estimated the value of the Managed Entities' cable systems and assets by multiplying the number of their basic cable subscribers by the market value per subscriber as established by industry transactions in 1999 and 2000, and concluded that the Managed Entities' subscriber assets were worth approximately $1 billion.  Dearlove and Deloitte did not consider whether those entities' cash flow was sufficient to service the debt, did not perform a cash flow analysis for the Managed Entities, and did not know if the Managed Entities serviced any portion of their co-borrowed debt with funds provided by Adelphia.

293.    Dearlove claimed that he held the belief that, although the Rigas family was not legally obligated to contribute funds in the event of a default by the co-borrowers, the family would be economically compelled to protect their Adelphia holdings by stepping in to prevent a default by the Managed Entities.  Dearlove and Deloitte did not, however, conduct any inquiry into whether the family actually had the resources to prevent such default or would in fact provide any such financial assistance.  Dearlove and Deloitte estimated the value of the Rigas family's holdings of Adelphia stock by multiplying the number of shares the Rigases owned by the price per Class A share, resulting in a figure of approximately $2.3 billion, which they concluded was by itself ample to cover the Managed Entities' debt.  However, Deloitte did not determine if these Rigas family assets were already encumbered by other debt, and requested no

financial statements or other proof of the family's financial condition, relying instead on media reports that the Rigases were "billionaires."

294.     Dearlove testified that, at the end of the 2000 audit, he spoke to senior manager Caswell for about fifteen minutes regarding the requirements of FAS 5.  During this meeting, they concluded that "the assets of the cable systems and the Adelphia common stock that the Rigases owned exceeded the amount of debt that was on the co-borrowed entities, and the overhang . . . exceeded the co-borrowing by hundreds of millions if not billions of dollars." Based on this brief conversation and Dearlove's sense that the Rigases were wealthy, Deloitte approved Adelphia's decision to exclude the co-borrowers' $1.6 billion in draw-downs from its balance sheet.

295.     **The Commission found that Dearlove's review of the accounting treatment for the co-borrowing debt violated the GAAS requirements that Deloitte exercise due professional care and skepticism, adequately plan the audit, and obtain sufficient competent evidential matter** to afford a reasonable basis for the conclusion that Adelphia's chances of incurring a loss were "remote."  Deloitte had concluded that the Adelphia audit presented a "much greater than normal risk" based on several factors, including its multiple related party transactions, recent significant growth, and substantial debt load.  The Commission found that Adelphia's accounting for co-borrowed debt implicated all of these risk factors, thereby requiring Deloitte to apply increased professional care and skepticism to it.  Rather than applying increased professional care, Deloitte relied only on baseless assumptions about the Managed Entities' and the Rigas family's willingness and ability to back-stop the co-borrowers' debt.  **The Commission found that "Dearlove failed to apply even basic – let alone heightened – scrutiny to Adelphia's accounting for co-borrowed debt."**

296.     According to the SEC, "Dearlove's failures in examining the critical assumptions underlying his FAS 5 determination were at least unreasonable in light of the circumstances of this audit area that clearly called for increased care and scrutiny.  Adelphia's co-borrowed debt was a multi-billion dollar related-party transaction used, in part, to finance recent significant growth in the company, and it represented a substantial portion of the company's total debt load of approximately $12 billion.  Adelphia's accounting treatment of the debt warranted more than a brief discussion about assets potentially available for liquidation:  it called, at least, for testing and analysis of the actual availability, liquidity, and encumbrances of those assets."

297.     **The Commission also found that Dearlove violated GAAS by allowing Adelphia to make inadequate note disclosures concerning the co-borrowed debt.**  When Deloitte reviewed the adequacy of the note disclosure that Adelphia planned to use in 2000 (which was identical to the language it had used in previous years), the audit team believed the disclosure should be revised.  During the 2000 quarterly reviews, Deloitte repeatedly encouraged Adelphia management to disclose the specific dollar amount of Managed Entity co-borrowings, but Adelphia continually ignored Deloitte's suggestions.  At the end of March 2001, as Deloitte was concluding its audit of the 2000 financials, Brown informed the audit team that he did not think the additional disclosure was necessary and proposed new language for the footnote disclosure.  Dearlove did not bother to ask why Brown opposed full disclosure of the co-borrowers' debt, and did not confer with Deloitte's risk reviewer or concurring partner (*i.e.*, the Deloitte partner assigned to provide a second-level review of the audit) about the disclosure language.  Dearlove simply acceded to Brown's wishes and accepted his language, knowing that it would result in the full amount of Adelphia's liabilities not being disclosed.

298. FAS 5 requires that a company must disclose the "nature and amount" of the liability when it is a guarantee of another's indebtedness. Adelphia disclosed the total amount of credit available to the co-borrowers ("up to" $3.75 billion in 2000) without indicating whether any portion of that available credit had actually been drawn down, much less that all of it had. **The SEC found the footnote disclosure was inadequate to inform the investing public that Adelphia was already primarily liable for $2.1 billion and a guarantor for the remaining $1.6 billion that had been borrowed by others.** Therefore, it did not comply with the requirement in FAS 5 to disclose the amount of the contingent liability.

299. The SEC also found that the footnote disclosure was materially misleading to investors, noting that a reasonable investor would think it significant that the footnote disclosure spoke only in terms of potential debt when, in fact, the entire line of credit had been borrowed and $1.6 billion of it was excluded from Adelphia's balance sheet but potentially payable by Adelphia. It was especially important for this information to appear in Adelphia's financial statements because investors had no access to the financial statements of the privately-held co-borrowers.

300. The Commission found that Dearlove "acted at least unreasonably in his audit of Adelphia's note disclosure, resulting in several violations of GAAS." Management's insistence on its own accounting interpretation was precisely the type of behavior identified by the audit plan as presenting a much higher than normal risk of misstatement in the audit. Moreover, Dearlove and Deloitte knew that the audit team believed that the previous years' footnote disclosure was inadequate and had urged additional disclosure that would have made clear the extent of actual borrowings and Adelphia's potential liability therefor. Dearlove did not think Brown's language helped achieve such clarification, yet he accepted Brown's language without

probing his reasons for the change, without understanding Adelphia's reasons for rejecting Deloitte's language, and without discussing the issue with the concurring or risk review partners assigned to the audit.  This unquestioning acceptance of Brown's proposed disclosure language was a clear — and at least unreasonable — departure from the requirements of GAAS to apply greater than normal skepticism and additional audit procedures in order to corroborate management representations in a high-risk environment.  Dearlove's conduct resulted in violations of applicable professional standards:  Dearlove and Deloitte failed to exercise the level of professional care called for by the high-risk account, failed to employ professional skepticism in analyzing the note disclosure, and failed to apply audit procedures necessary to afford a reasonable basis for an opinion regarding the financial statements.

**B.**  **Adelphia's Netting of Related Party Payables and Receivables**

301.  Adelphia calculated its net related party receivable balance by subtracting the balances of all accounts payable that Adelphia and its subsidiaries owed to related parties from the balances of all the accounts receivable that the related parties owed to Adelphia and its subsidiaries.  Dearlove discussed Adelphia's practice of netting with the Deloitte senior manager who had worked on Adelphia's 1999 financial statement audit, and in approving Adelphia's use of netting in the 2000 Financial Statements he relied on the fact that Deloitte had permitted it in the past.

302.  Deloitte reviewed the net related party receivables Adelphia presented during each quarterly review and knew that Adelphia's net related party receivables were reported as $178 million at the end of 1999, $254 million at the end of the first quarter in 2000, $263 million at the end of the second quarter, and $19 million at the end of the third quarter.  Adelphia management told Dearlove that they were concerned about the growing net related party

112

receivable balance in the second quarter review, and that they would seek to reduce it through additional related party borrowing.  Ultimately, a line item titled "Related Party Receivables – Net" on Adelphia's balance sheet and Form 10-K for 2000 reported the amount of $3,071,000. Adelphia's 2000 year-end gross related party accounts payable and receivable, however, totaled more than $1 billion each.

303.    Dearlove and Deloitte knew of the dramatic reduction of the net balance over the course of 2000.  Nevertheless, Dearlove did not know whether or how the audit team tested Adelphia's affiliate receivables, could not explain how his team tested management's explanations for the fluctuations in Adelphia's reported net balance, and could not recall having any discussions with his team about the propriety of Adelphia's netting.

304.    Accounting Principles Board Opinion No. 10 states that "the offsetting of assets and liabilities in the balance sheet is improper except where a right of setoff exists."  FASB Interpretation 39, Offsetting of Amounts Related to Certain Contracts ("FIN 39"), defines a right of setoff as "a debtor's legal right, by contract or otherwise, to discharge all or a portion of the debt owed to another party by applying against the debt an amount that the other party owes to the debtor."   It also provides that a right of setoff exists only when all of four conditions are met:

  a.  each of two parties owes the other determinable amounts;

  b.  the reporting party has the right to set off the amount owed with the amount owed by the other party;

  c.  the reporting party intends to set off; and

  d.  the right of setoff is enforceable at law.

305.    **The Commission found that Adelphia's presentation of a net figure for its related party payables and receivables violated GAAP**.  Adelphia netted the accounts payable and receivable of its various subsidiaries against the accounts payable and receivable of various

related parties on a global basis, and did not comport with FIN 39's basic requirement that netting is appropriate only when two parties are involved.

306.    The SEC found that "Dearlove's conduct in his audit of Adelphia's net presentation of affiliate accounts payable and receivable was at least unreasonable, resulting in several GAAS violations."  Given that Deloitte considered the Adelphia audit to present much greater than normal risk, GAAS required "more extensive supervision by the auditor with final responsibility for the engagement during both the planning and conduct of the engagement" and should have caused the auditors to "expand the extent of procedures applied, apply procedures closer to or as of year end, particularly in critical audit areas, or modify the nature of procedures to obtain more persuasive evidence."  Where, as with Adelphia's practice of netting, a specific audit area involves related party transactions, GAAS require auditors to obtain an understanding of the business purpose of those transactions; if the auditor "lacks sufficient specialized knowledge to understand a particular transaction, he should consult with persons who do have the requisite knowledge."  Heightened scrutiny was particularly appropriate here because Dearlove (and Deloitte) knew that Adelphia management tended to embrace aggressive accounting interpretations and that they had dramatically reduced Adelphia's reported net affiliate receivables in order to deflect investor criticism.

307.    The Commission found that Dearlove did not exercise appropriate skepticism despite circumstances requiring heightened scrutiny, did not obtain sufficient competent evidential material to support his conclusion that Adelphia's netting was properly done, and did not properly supervise the audit team to ensure that significant related party transactions like these were afforded appropriate review.  Despite the requirement of heightened scrutiny and despite his admitted lack of experience with the practice of netting in general, Dearlove neither

pursued nor directed the Deloitte team to pursue the reason behind the dramatic reduction in

Adelphia's net receivable balance.  Dearlove also did not consult with members of the audit team

or anyone in Deloitte's national office about the issue and could not confirm that he ever

considered FIN 39 during the audit.  He instead turned a blind eye to all of these issues.

308.    The SEC found no evidence that Dearlove made any attempt to determine the

gross amounts of Adelphia's related party accounts payable and receivable, which each totaled

more than $1 billion.  Instead, Dearlove accepted Adelphia's accounting treatment primarily, if

not solely, because prior auditors had done so.  The Commission held that such reliance was

unreasonable because, *inter alia*, there had been a precipitous drop in the amount of net

receivables that Adelphia reported compared to prior years.  Taking note of the fact that

Adelphia's practice of netting effectively defeated investor scrutiny of over $2 billion of related

party accounts, the Commission found that Dearlove's lack of attention to the issue violated

GAAS.

**C.**    **Adelphia's Debt Reclassification**

309.    As noted, *supra*, after the end of the second, third, and fourth quarters of 2000,

Adelphia's accounting department transferred the reporting of approximately $296 million of

debt from the books of Adelphia's subsidiaries to the books of various Managed Entities,

through post-closing journal entries that were retroactive to the last day of the quarter.  In

exchange, Adelphia eliminated from its books receivables owed to it by the respective Managed

Entities equal to the amount of debt transferred.

310.    Paragraph 16 of Statement of Accounting Standards No. 125 ("FAS 125"),

Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities,

permits a debtor to derecognize a liability "if and only if it has been extinguished."  FAS 125 ¶16

provides that a liability is extinguished if either (a) the debtor pays the creditor and is relieved of

its obligation for the liability, or (b) the debtor is legally released from being the primary obligor

under the liability, either judicially or by the creditor.  *See also* FAS No. 140, "Accounting for

Transfers and Servicing of Financial Assets and Extinguishment of Liabilities — a Replacement

of FASB Statement No. 125".

311.    The SEC concluded that when the Adelphia subsidiaries posted the debt in

question to their books, they acknowledged their primary liability for the amounts posted.  They

could not properly remove the debt from their books without first satisfying the requirements of

FAS 125 ¶ 16 that either (1) the Adelphia subsidiaries repaid the debt to the creditor during the

relevant reporting periods, or (2) a creditor had released the subsidiaries from their liability for

repayment.  The SEC found that the evidence did not show, and Dearlove did not contend, that

either of these events occurred.  Accordingly, Adelphia's attempt to extinguish the debt

unilaterally merely by shifting the reporting to the Managed Entities violated GAAP and

rendered Adelphia's financial statements materially misleading by understating its debt.

312.    A checklist prepared by Deloitte in anticipation of the 2000 audit showed that

Deloitte knew of a significant number of related party transactions outside Adelphia's normal

course of business and that past audits had indicated a significant number of misstatements or

correcting entries made by Adelphia, particularly at or near year-end.  An audit overview

memorandum recognized this as a risk area ("Adelphia records numerous post-closing adjusting

journal entries") and provided as an audit response, "[Deloitte] engagement team to review

postclosing journal entries recorded and review with appropriate personnel.  Conclude as to

reasonableness of entries posted."  An audit planning memorandum provided that [p]rofessional

skepticism will be heightened to ensure that . . . related party transactions . . . are appropriately

identified and disclosed" and that auditors should "increase professional skepticism in [areas] where significant related party transactions could occur."

313.    Despite having identified the heightened risks associated with Adelphia's related party transactions and post-closing journal entries, and despite having acknowledged the importance of focusing particular attention on those issues during the audit, Dearlove claims that he was unaware during the audit of the three post-closing journal entries by which Adelphia reclassified debt at the end of the second, third and fourth quarters of 2000.  The magnitude of these entries was such that Deloitte should not only have known about them, but should have confronted management and requested an explanation, as required by Deloitte's audit planning documents.  After discussing the entries with appropriate Adelphia personnel, Deloitte should have documented management's explanation, and Deloitte's conclusions as to whether the accounting treatment was reasonable, in the audit work papers.  In reckless disregard of GAAS and its own audit planning documents, Deloitte took none of those steps.

314.    The SEC found that "Dearlove's conduct in his audit of Adelphia's accounting for debt was at least unreasonable, resulting in several GAAS violations."  The SEC concluded that a reasonable engagement partner would have closely examined the post-closing journal entries, would have developed a much more thorough understanding of Adelphia's accounting for debt than Dearlove did, and would have paid more attention to ensuring that the engagement team was asking the sorts of questions that would have brought matters like the accounting for reclassified debt to light.  Such questions would have included how Adelphia recorded debt or decided where debt belonged, how related party receivables were audited, and how Adelphia managed to reduce the receivable line item on its balance sheet by 98% over the prior year.

117

315.    Based on Dearlove's failure to comply with GAAS in auditing the Company's

accounting for debt, the Commission found that Dearlove also "acted at least unreasonably in

signing an unqualified audit opinion stating that Deloitte had conducted its audit in accordance

with GAAS and that such audit provided a reasonable basis for its opinion that Adelphia's 2000

financial statements fairly presented Adelphia's financial position in conformity with GAAP."

## D.    Adelphia's Direct Placements of Stock

316.    As discussed *supra*, from 2000 through 2002, entities controlled by the Rigases

acquired Adelphia Class B common stock through several direct placements.  Because the SEC

proceeding against Dearlove focused on the year 2000 audit, the SEC Opinion addressed only

the January 2000 direct placement (when Adelphia issued $368 million of Class B common

stock to Highland Holdings, which assigned the shares to Highland 2000) and the July 2000

direct placement (when the Rigases acquired additional Adelphia Class B common stock through

the issuance of approximately $145 million of such stock to Highland Holdings, followed by a

transfer to Highland 2000).  As discussed above, the Rigases financed both transactions with co-

borrowed funds for which Adelphia was jointly and severally liable.

317.    With respect to the January 2000 direct placement, the SEC found that when

UCA-Adelphia received the borrowed $368 million and booked the loan, it became the primary

obligor for that amount.  At that point, FAS 125 applied, and Adelphia could not properly

remove the debt from UCA-Adelphia's books without first satisfying the requirements of FAS

125 ¶ 16.  Specifically, UCA-Adelphia could not extinguish the debt without showing either (1)

that it repaid the debt to the lenders, or (2) that the lenders had released UCA-Adelphia from its

liability for repayment.  The SEC found no evidence that either of these events occurred.  Thus,

the liability was not properly extinguished under FAS 125, and Adelphia should have shown the

liability on its balance sheet.  The SEC found that Adelphia's attempt to extinguish the debt unilaterally merely by transferring the "draw" from UCA-Adelphia to Hilton Head, rather than obtaining a release from the lender or otherwise satisfying the requirements of FAS 125, violated GAAP and rendered Adelphia's financial statements materially misleading.

318.    The SEC also cited Emerging Issues Task Force Consensus No. 85-1, Classifying Notes Received for Capital Stock (1985) ("EITF 85-1"), which provides that when an enterprise receives a note, rather than cash, for the sale of capital stock, the enterprise should generally report the note receivable as a reduction of shareholders' equity and not as an asset.  EITF 85-1 further provides that notes received for the sale of stock "may be recorded as an asset if collected in cash prior to issuance of the financial statements."  Rule 5-02.30 of Regulation S-X requires public companies to show on the face of their balance sheets the dollar amount of any common stock shares subscribed but unissued, and to show subscriptions receivable as a deduction from shareholders' equity; these two entries offset each other, resulting in no net change to the total amount of equity shown on the balance sheet.

319.    Applying EITF 85-1 and Rule 5-02.30, the SEC found that the January 2000 direct placement should have been treated as a stock subscription, with resulting reduction to shareholder equity, rather than as a stock sale.  Adelphia received only a note, not cash, in payment for the shares it issued.  The note therefore should have been recorded as a receivable, with a corresponding offsetting reduction to equity.

320.    The SEC further found that netting the $368 million receivable against the $368 million payable that resulted from the loan transaction did not cause the receivable to be "collected in cash" for purposes of EITF 85-1 analysis and thus did not permit Adelphia to report the receivable as an asset.  Adelphia's netting of its payable to Hilton Head against its receivable

Case 1:03-md-01529-JMF-RLE   Document 697   Filed 12/28/11   Page 120 of 161

from Highland Holdings was inappropriate, at the very least, because more than two parties were

involved:  Highland Holdings, to whom Adelphia issued the Class B shares, was not the same

entity as Hilton Head, to whom Adelphia attempted to transfer the co-borrowed debt.  Thus, even

if the transfer of the borrowed funds from UCA-Adelphia to Hilton Head and the resulting

creation of a payable owed by Adelphia to Hilton Head had been allowed under FAS 125, the

netting was improper, the receivable was not satisfied in cash, and Adelphia therefore should

have treated the stock transaction as a stock subscription.  The effect of treating the transaction

as a stock sale was that Adelphia showed an increase to equity of $368 million, with no

offsetting reduction.  In reality, Adelphia's financial position was not improved by either the

January loan transaction or the January stock transaction.

321.    The SEC also found that the disclosure of the January direct placement in the

notes to Adelphia's 2000 financial statements was incomplete because it did not disclose that a

stock subscription was involved, or that co-borrowed funds drawn by an Adelphia subsidiary had

been used to fund the direct placement.   The disclosure therefore failed to comply with

Statement of Accounting Standards No. 57 (FAS 57") which requires financial reporting to

disclose material related party transactions, such as transactions between a company "and its

principal owners, management, or members of their immediate families."  Such disclosures must

include a description of the nature of the relationship involved, a description of the transactions

(including the dollar amounts thereof), and amounts due from or to related parties as of the date

of the balance sheet.

322.    Dearlove and Deloitte knew that both the January 2000 and July 2000 direct

placements had occurred, and indeed the dates and amounts of both transactions had been

disclosed in Adelphia's quarterly and annual reports.  The Commission observed that the direct

120

placements involved many of the factors that Deloitte recognized had contributed to the high risk level assigned to the audit: they were significant transactions involving related parties, including affiliates that Deloitte was not auditing.  The transactions were unusual in that the co-borrowers that drew down the funds were not the entities that received the Class B shares.  Moreover, these were large transactions, totaling more than half a billion dollars, and the sources of funds paid for the shares were unclear.  Both GAAS and Deloitte's own audit plan required the engagement team to understand the impact of such transactions on Adelphia's financial statements and to investigate the sources of financial resources supporting significant or unusual transactions.  Yet Dearlove failed to question the facts that underlay the direct placements, accepting as adequate the superficial explanation that Adelphia got $368 million and issued $368 million in equity without seeking to understand the transactions involved.  In doing so, the Commission found, Dearlove acted at least unreasonably.

323.    With respect to the direct placements, as in other areas, Dearlove and Deloitte had a duty under GAAS to inquire in more detail about the direct placements, or to direct Deloitte staff to do so, rather than to rely on junior Deloitte auditors to make the judgment on their own. Dearlove was bound by his duty to supervise others' work, and he retained responsibility for doing so.  Under the circumstances, the SEC found that Dearlove violated his obligation under GAAS to supervise.

324.    The record in the SEC proceeding against Dearlove also showed that Deloitte's audit team knew that Adelphia had recorded the direct placements as stock purchases rather than stock subscriptions, but the team did not test this decision, nor did it take steps to ascertain the source of funds used for the stock purchases.  The large amount of money involved, and the fact that the transactions involved related parties (including ones that Deloitte would not be auditing),

rendered Deloitte's acceptance of the transactions at face value patently unreasonable.  Again,

Deloitte failed to employ the increased professional skepticism that the known risks of the audit

required, and thus violated GAAS.

## DELOITTE'S OTHER VIOLATIONS OF GAAS

325.     Although the SEC Opinion addressed the audit of the Company's 2000 Financial

Statements, Deloitte similarly violated GAAS by conducting severely deficient audits and

issuing unqualified audit opinions on Adelphia's annual financial statements for 1999, falsely

certifying Adelphia's compliance with GAAP.  As discussed *supra*, those financial statements

were wrong because Adelphia's management employed a variety of improper and manipulative

accounting practices.  Deloitte either knew about or recklessly failed to detect these improper

accounting practices during its audits as a result of its wholesale dereliction of responsibility:

Deloitte failed to apply appropriate professional skepticism, failed to plan its audits to take into

account its knowledge of numerous risk factors that gave rise to a high risk of fraud and

misstatement at Adelphia, and failed to obtain sufficient competent evidential matter.  Instead,

Deloitte simply took management's representations at face value and continued its flawed

practices from year to year.  Indeed, in the SEC Opinion, the Commission found that a number of

Dearlove's GAAS violations when auditing the 2000 Financial Statements were a result of his

accepting the same inappropriate accounting treatment that Deloitte had accepted during prior

years' audits.  Clearly, the audit partners and audit teams for Adelphia's 1998 and 1999 financial

statements had also violated GAAS and either failed to detect, or consciously overlooked,

violations of GAAP by Adelphia's auditors.

326.     Deloitte also violated GAAS Standard of Field Work No. 2, which requires the

auditor to make a proper study of existing internal controls, including accounting, financial and

managerial controls, to determine whether reliance on those controls is justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. A company's internal control structure consists of policies and procedures established by the company to provide reasonable assurance that its objectives will be achieved. The auditor must focus on the substance of management's policies and procedures, not their form, because management may establish appropriate policies and procedures but not act on them.

327.     An auditor must perform procedures to obtain a sufficient understanding of the three elements of a company's internal control structure: the control environment, the accounting system, and control procedures. The control environment, which includes management's integrity and ethical values, is the foundation of internal control and sets the tone of the organization. The auditor must assess control risk — the risk that a material misstatement contained in the company's financial statements will not be detected and prevented on a timely basis by the company's internal control structure policies. Indeed, the ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.

328.     When auditing Adelphia's financial statements, Deloitte knew that Adelphia had seriously deficient internal controls, and was subject to severe control risk. For example, prior to June 2001, Adelphia's CFO – Timothy Rigas – was Chairman of the Audit Committee. This was a clear conflict of interest given that the Audit Committee is supposed to serve as an independent check on the Company's financial reporting. In addition, the Adelphia CMS enabled the Rigases to commingle the Company's funds with those of the Rigas family's entities, and served as a primary instrument of the Rigases' self-dealing.

329.    Despite knowledge of these obvious weaknesses in Adelphia's internal controls, Deloitte failed to expand the scope of its procedures adequately, and as a result, issued unqualified audit opinions on Adelphia's financial statements when such statements materially misstated the Company's financial results.

330.    Standards under GAAS also require an auditor to evaluate whether "there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time not to exceed one year beyond the date of the financial statements being audited."  (AU 341.02).  Although there is a presumption of continuation of an entity as a going concern, "information that significantly contradicts the going concern assumption relates to the entity's inability to continue to meet its obligations as they come due without a substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions."  (SAS 59, 64 and 77, AU 341.01).

331.    Less than three months after the disclosure of Adelphia's off-balance sheet debt, the Company defaulted on bank loans and interest payments on its debt securities and filed for bankruptcy protection under Chapter 11.  Deloitte failed to properly evaluate Adelphia's ability to continue as a going concern when auditing Adelphia's financial statements.

## NO STATUTORY SAFE HARBOR APPLIES

332.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged herein.  The false and misleading statements alleged herein were not forward-looking, were not identified as forward-looking when made, and/or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those represented or projected.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED PLAINTIFF'S DAMAGES

333.   No market would have existed for the Bonds absent the materially false and misleading statements and omissions alleged herein.  In fact, in light of the Company's true debt load and its related party transactions, it was in violation of one or more indentures for its debt securities by at least the second quarter of 1999.  The subsequent offerings of the 2006, 2009, 2010, and 2011 Bonds were made in violation of those indentures and those bonds should never have been issued.

334.   At all relevant times, the market for the Bonds was an efficient market that promptly digested current information with respect to Adelphia and its subsidiaries from all publicly-available sources and reflected such information in the Bonds' prices.  Plaintiffs relied on the integrity of the market price of the Bonds.

335.   The investment decisions that were made on behalf of Plaintiffs with respect to the securities of Adelphia were made in reliance on the completeness and accuracy of the information that had been publicly disclosed by the Company and its management, including the information in the Prospectuses, the Registration Statements, the Form 10-K and 10-Q filings, and the press releases described herein.  Each of those investment decisions was made by Plaintiffs in reliance upon the false and misleading financial information in the documents referenced above that were publicly available at the time those decisions were made.  In addition, Plaintiffs relied on Deloitte to do its job as "watchdog" of the Company and of the accuracy of the Company's financial statements.

336.   Among the information that Plaintiffs found particularly important and relied upon when making their investment decisions was Adelphia's revenue and EBITDA figures, and information relating to Adelphia's capital structure (including the amount of debt that was senior

to the Bonds being purchased by Plaintiffs and how much equity capital the Company had) and Adelphia's ability to service its debt.  The less debt that was senior to the Bonds, and the more equity that was junior to the Bonds, the more attractive the Bonds were as an investment.  This was particularly true at Adelphia, which had a highly leveraged capital structure.  Plaintiffs also kept a close eye on Adelphia's publicly reported debt-to equity, cash flow-to-debt, and similar ratios, which reflected Adelphia's ability to service its debt.  As alleged herein, Adelphia materially understated the amount of its senior (e.g., bank) debt and materially overstated its stockholders' equity, EBITDA and revenue.

337.    Plaintiffs also relied on statements by Adelphia and the Rigas Parties regarding the amounts outstanding under Adelphia's credit agreements, because the Company could not cover its capital expenditures solely with the cash it generated through operations and therefore needed access to outside funding.  As alleged herein, by failing to disclose the extent of the Managed Entities' draw-downs under the co-borrowing agreements, Adelphia and the Rigas Parties materially misled investors (including Plaintiffs) and materially overstated the amount of credit that was available to the Company under those agreements.  In addition, by failing to disclose that the Rigas family had used substantial amounts of those borrowings to purchase Adelphia securities, Adelphia and the Rigas Parties compounded the fraud by creating the illusion that the Rigases had infused new equity into the Company when, in reality, they had merely created new, undisclosed bank debt with no corresponding benefit to the Company.

338.    When purchasing Adelphia securities, Plaintiffs also found it critically important that Adelphia's outside auditor, Deloitte, had conducted quarterly reviews and annual audits of the financial statements of Adelphia and its subsidiaries, and had consistently issued unqualified audit reports on Adelphia's annual financial statements.  These audit reports indicated that, based

on purportedly GAAS-compliant audits, Deloitte had found Adelphia's consolidated annual financial statements to present the Company's financial position fairly and in accordance with GAAP.

339.    Based on the Defendants' public statements, which Plaintiffs would only later learn to be false and misleading, Plaintiffs concluded that the Bonds were good investments and Adelphia maintained a consistent B+ credit rating from Standard & Poor's.

340.    Prior to March 27, 2002, Plaintiffs had no knowledge of any of the wrongful conduct alleged herein, or of the information misrepresented or withheld by Defendants, and Plaintiffs could not reasonably have discovered such information.

341.    On March 27, 2002, Plaintiffs learned for the first time of the billions of dollars of off-balance sheet debt related to the co-borrowing agreements.  However, it was not until May 24, 2002, that Plaintiffs learned, or had no reason to know, that Defendants' misstatements and omissions extended far beyond the non-disclosures relating to the co-borrowing debt.  Until May 24, 2002, when the Company disclosed a web of related-party transactions through which the Rigas Parties had been bilking the Company of hundreds of millions of dollars since at least 1998, Plaintiffs reasonably believed that the problems at the Company were limited to those associated with non-disclosure of the co-borrowing agreements.   Between March 27, 2002 and May 24, 2002, Plaintiffs relied upon the post-March 26, 2002 disclosures as being complete and accurate reflections of all of the negative information at Adelphia, when in fact there were still material undisclosed facts which, if known to Plaintiffs, would have caused Plaintiffs not to purchase Bonds during that period.

342.     If the truth about Adelphia's financial condition had been known to Plaintiffs, they would not have purchased the Bonds at undiscounted prices, or would have sold those Bonds that they already owned.

343.     The prices of the Bonds dropped swiftly and severely in response to the disclosures on and after March 27, 2002 of the false and misleading nature of the Adelphia's previously-filed financial statements.

## COUNT I

**(For Violation of Section 11 of the Securities Act)**
**(Against Defendants John Rigas, Timothy Rigas, James Rigas, Michael Rigas and Deloitte)**

344.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein, except Plaintiffs specifically exclude, for purposes of this cause of action, any allegations of fraudulent intent or scienter.

345.     This cause of action is brought by all Plaintiffs pursuant to Section 11(a) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Defendants John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Deloitte.

346.     The 2006 Bonds, the 2009 Bonds, the 2010 Bonds, and the 2011 Bonds were offered for sale, and sold, by means of prospectus supplements.  By their terms, and pursuant to SEC Rule 430A, 17 C.F.R. § 230.430A, each of these prospectus supplements constituted part of a registration statement on Form S-3 (the March 1999 Registration Statement for the 2009 Bonds, and the May 1999 Registration Statement for the 2006, 2010, and 2011 Bonds).  Thus, the 2006 Bonds, the 2009 Bonds, 2010 Bonds, and the 2011 Bonds were offered for sale and sold through a Registration Statement.

347.     Plaintiffs purchased 2006 Bonds, 2009 Bonds, 2010 Bonds, and 2011 Bonds after the effective dates of the registration statements for those bonds, which are traceable to the false and misleading Registration Statements and the prospectus supplements thereto.

348.     Defendants John Rigas, Timothy Rigas, Michael Rigas, and James Rigas signed the Registration Statements and were directors of Adelphia when those Registration Statements became effective with respect to the 2006 Bonds, the 2009 Bonds, the 2010 Bonds, and the 2011 Bonds.

349.     Deloitte's audit opinions on Adelphia's financial statements for the year ended March 31, 1998 were incorporated by reference in the March 1999 Registration Statement, the May 1999 Registration Statement, and the 2009 Prospectus, with Deloitte's knowledge and consent.

350.     Deloitte's audit opinion for Adelphia's 1999 annual financial statements was incorporated by reference in the 2010 Prospectus, with Deloitte's knowledge and consent.

351.     Deloitte's audit opinion for Adelphia's 2000 annual financial statements was incorporated by reference in the 2011 Prospectus, with Deloitte's knowledge and consent.

352.     In consenting to the incorporation of its audit opinions in the Prospectuses and Registration Statements, Deloitte knew and expected that purchasers of the Bonds would rely, and had a right to rely, on such reports.

353.     As alleged herein, the Registration Statements and the Prospectuses, each constituting part of a registration statement, contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the Prospectuses and the Registration Statements not misleading.  For example, each of the Prospectuses and Registration Statements failed to disclose material related party transactions

between the Company and the Rigas family and the entities controlled by the Rigas family. In addition, at least the 2006, 2010 and 2011 Prospectuses contained statements of Adelphia's debts, which were materially understated because they did not include the Managed Entities' borrowings under the co-borrowing agreements, and incorporated by reference financial statements (audited by Deloitte) that materially understated Adelphia's liabilities for the same reason.  Each of the Prospectuses and Registration Statements also incorporated by reference Deloitte's unqualified audit opinions for 1998, 1999 and/or 2000, all of which were materially false and/or misleading because they falsely stated that Deloitte's audits complied with GAAS and that Adelphia's financial statements complied with GAAP.

354.    John Rigas, Timothy Rigas, Michael Rigas, and James Rigas were negligent in that they failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in the Registration Statements and Prospectuses.

355.    Deloitte was negligent in that it failed to exercise reasonable care in ensuring the accuracy and completeness of the information provided in Adelphia's 1998, 1999 and 2000 annual financial statements, and in Deloitte's audit opinions thereon, all of which were incorporated by reference into the Registration Statements and Prospectuses with the knowledge and consent of Deloitte.

356.    At the time Plaintiffs purchased the Bonds, they did not know of any of the false and/or misleading statements and omissions, and Plaintiffs relied on the Registration Statements and Prospectuses as being true, complete, and accurate in all material respects.

357.    Plaintiffs suffered injury as a result of the actions alleged herein.

## COUNT II

**(For Violation of Section 15 of the Securities Act)**
**(Against Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas)**

358.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein, except Plaintiffs specifically exclude, for purposes of this cause of action, any allegations of fraudulent intent or scienter.

359.    This cause of action is brought by all Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas.

360.    Adelphia committed primary violations of Sections 11(a) and 12(a)(2) of the Securities Act by soliciting Plaintiffs to purchase the 2006 Bonds, 2009 Bonds, 2010 Bonds, and 2011 Bonds and by selling those Bonds by means of materially false, misleading, and incomplete Registration Statements and Prospectuses (as described herein).  Adelphia's actions of solicitation included preparation and distribution of the false and misleading Prospectuses and Registration Statements (and amendments thereto).

361.    In soliciting the purchase of the Bonds, Adelphia was motivated by its own financial interests.

362.    Adelphia was negligent in that it failed to exercise reasonable care in ensuring that the statements in the Prospectuses and the Registration Statements, and the amendments thereto, were accurate and complete.

363.    Each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas controlled Adelphia within the meaning of Section 15 of the Securities Act.

364.    Defendants James Rigas, Timothy Rigas, James Rigas, and Michael Rigas were directors and senior executive officers of Adelphia.  Together, they held voting control of the

Company.  Defendant Timothy Rigas directed Adelphia personnel to engage in a significant number of the fraudulent practices which caused the financial results to be misstated.

365.    Defendant Timothy Rigas also served on the Audit Committee of the Board.   As such, he was intimately involved with and controlled the Company's accounting and its financial reporting.  He was responsible for fully understanding the Company's accounting policies, procedures and internal control systems, and was, or should have been, in contact with the Company's auditors.  He also had the authority and duty to oversee, review and examine statements made in the name of the Company contained in reports and other documents, including financial statements filed with the SEC, and to be certain that the Company's financial condition was reported in a fair and accurate manner.

366.    By virtue of their high level positions with Adelphia, their participation in and/or awareness of Adelphia's finances and operations, and/or their intimate knowledge of the materially false, misleading, and incomplete statements which were disseminated to Plaintiffs as part of the Prospectuses and Registration Statements, the Rigas Parties had the power to influence and control, and did influence and control, directly or indirectly, the decision-making process of Adelphia, including the content and dissemination of the Prospectuses, Registration Statements, and other public statements which were false and misleading.  The Rigas Parties were provided with, or had unlimited access to, the Prospectuses, Registration Statements, and other statements that were false and misleading prior to and/or shortly after they were issued or publicly disseminated, and had the ability to prevent their issuance or public dissemination, or to cause the misstatements and omissions to be corrected, but failed to do so.

367.    Each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas was a culpable participant in Adelphia's violation(s) of Sections 11(a) and 12(a)(2) of the

Securities Act because, among other reasons: they directly or indirectly induced the violations by preparing and/or signing the Company's false and misleading financial statements, Registration Statements, and Prospectuses; they did not act in good faith when preparing, signing, and/or otherwise approving the Company's financial statements, Registration Statements, and Prospectuses; they did not conduct a reasonable investigation into the accuracy and completeness of such statements; and they did not believe and/or had no reasonable ground to believe that those documents were materially accurate and complete.

368.    At the time Plaintiffs purchased the Bonds, they did not know of any of the false and/or misleading statements and omissions.

369.    As a direct and proximate result of the wrongful conduct of Adelphia, Plaintiffs suffered damages.

370.    By virtue of their positions as controlling persons of Adelphia, defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas are liable pursuant to Section 15(a) of the Securities Act.

## COUNT III

**(For Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder)
(Against Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas)**

371.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

372.    This Count is brought by all Plaintiffs pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas.

373.    Adelphia's financial statements for at least the years 1999 and 2000 (including the related quarterly periods) and for the first three quarters of 2001, which were contained or incorporated by reference in the Registration Statements, the Prospectuses, and other public filings, including the Company's Forms 10-K and Forms 10-Q for the relevant periods, were materially false and/or misleading when issued.   Among other reasons alleged herein, they were materially false and misleading because they contained false statements of the Company's revenue and debt levels, and omitted material amounts of borrowings by the Managed Entities under the co-borrowing agreements for which the Company's subsidiaries were jointly and severally liable.

374.    Adelphia's Form 10-K filings for 1999 and 2000 were signed by, among others, defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas.  Adelphia's Form 10-Q filings for each quarterly period in 1999 and 2000 and for the first three quarters of 2001 were signed by Timothy Rigas.

375.    At all relevant times, each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas knew or was reckless in not knowing, *inter alia*, (1) that the Managed Entities had borrowed material amounts under the co-borrowing agreements, (2) that Adelphia's subsidiaries were jointly and severally liable for those borrowings, (3) that those borrowings were not included on Adelphia's balance sheet or otherwise disclosed in the Company's public filings, (4) that the Company had engaged in a number of manipulative accounting practices whose purpose and effect was to inflate the Company's reported revenue and EBITDA figures, (5) that the Company had fewer basic cable subscribers than it was reporting in its public statements, and (6) that the Company's "rebuild" of its cable systems was less extensive than the Company was reporting.  Consequently, each of these defendants knew that their own public

statements, as well as Adelphia's financial statements for the years 1999 and 2000 (including the related quarterly periods) and for the first three quarters of 2001, which were contained or incorporated by reference in the Registration Statement, the Prospectuses and other public filings, including the Company's Forms 10-K and Forms 10-Q for the relevant periods, were all materially false and/or misleading.  The Rigas Parties knew (or were reckless in not knowing) this information by virtue of their positions as directors and/or senior executives of Adelphia, their direct involvement in the fraudulent schemes, as well as their ownership and/or control of the Managed Entities.

376.    Each of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas, as senior officers and/or directors of Adelphia, had direct and supervisory involvement in and controlled the Company's day-to-day operations, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the financial statements, public filings and other public statements which were false and misleading.  These defendants were provided with or had unlimited access to the reports, press releases, public filings, financial statements and other statements which were false and misleading prior to and/or shortly after these statements were issued or publicly disseminated and had the ability to prevent their issuance or public dissemination or cause the statements to be corrected.  These defendants individually and collectively were responsible for, among other things, the Company's financial accounting system, the Company's system of internal controls, and the preparation and review of the audited and unaudited financial statements prepared and published in the name of the Company and contained in reports and other documents, including those filed with the SEC.  As alleged herein,

those documents contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements therein not misleading.

377.    Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.

378.    The Rigas Parties' scienter is evidenced by the fact that they were significant securities holders of Adelphia whose financial interests would be severely damaged if the Company's true financial condition had been disclosed.  Particularly since the Company and its subsidiaries could not satisfy their ongoing capital needs through operations, it was critical that they maintain access to capital markets.  The financial performance of Adelphia and its subsidiaries, as perceived by analysts and investors, was what enabled Adelphia to sell equity and assume debt, and thus to continue its corporate existence.  Similarly, to avoid default on its numerous debt instruments and credit agreements, Adelphia had to maintain compliance with its debt covenants.  Failure to do so would have put the Company, and these defendants' livelihoods, at risk.  Thus, the Rigas Parties had a motive to commit fraud in order to inflate the Company's financial results.  They also had an opportunity to do so by virtue of their positions with Adelphia and its subsidiaries.

379.    In addition, the Rigas Parties benefitted from the fraud, in that they owned and controlled the Managed Entities that were receiving the loans, and they used the proceeds of the Managed Entities' undisclosed borrowings for their own personal benefit, including to purchase additional Adelphia securities.  The Rigas Parties also received personal financial benefits from a number of undisclosed transactions with the Company, many of which the Board never

approved.  In essence, the Rigas Parties were using Adelphia as their own personal piggy bank, without regard for the interests of the other equity and debt holders.

380.    The materially false and misleading statements by these Defendants and the Company were made in connection with the purchases of the Bonds by Plaintiffs.

381.    Plaintiffs relied on the materially false and misleading statements of these Defendants and the Company in purchasing the Bonds.  Plaintiffs relied on the Company's public filings and press releases, including the Forms 10-K and 10-Q filings that contained the materially false and misleading financial statements, in deciding to purchase Bonds.  Plaintiffs also relied on the Prospectuses and the financial statements contained therein.

382.    At the time Plaintiffs purchased the Bonds, they did not know of any of the false and/or misleading statements and omissions, and they relied upon the representations made by the Defendants and the Company.

383.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds at an artificially high price, and thereby proximately caused Plaintiffs to suffer damages.

384.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## <u>COUNT IV</u>

**(Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder)
(Against Deloitte)**

385.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

386.    This Count is brought by all Plaintiffs pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Deloitte.

387.    As "independent" auditors of Adelphia, Deloitte had a duty to audit Adelphia's financial statements in accordance with GAAS to determine, among other things, whether the financials were presented in accordance with GAAP.

388.    As alleged herein, Adelphia's financial statements for the years 1999 and 2000 (and the related quarterly periods) and the first three quarters of 2001 were materially false and misleading, in that they violated GAAP and contained untrue statements of material fact and/or omitted material facts required to be stated therein to make the statements in those documents not misleading.

389.    Deloitte issued unqualified audit reports on the Company's 1999 and 2000 financial statements, indicating that they presented the Company's financial statements fairly and in accordance with GAAP.  These audit reports were contained or incorporated in the Registration Statements, Prospectuses, and Form 10-K filings during the time period when Plaintiffs were purchasing Bonds.

390.    Deloitte's unqualified audit reports on Adelphia's 1999 and 2000 annual financial statements were, at the time and in light of the circumstances under which they were issued, false and misleading with respect to material facts.  In those audit reports, Deloitte falsely represented that it had audited the financial statements of Adelphia and its subsidiaries in accordance with GAAS, when in fact its audits had not complied with GAAS.  Deloitte also falsely represented that the financial statements it had audited fairly presented, in all material respects, the companies' financial positions at each respective year-end in conformity with GAAP, when in fact the financial statements violated GAAP in numerous respects and were materially false.

Adelphia's financial statements were false because, among other things, they materially understated the Company's liabilities and materially overstated its stockholders' equity and revenues.

391.    Because Adelphia is a public company, Deloitte knew and understood that its audit reports concerning Adelphia's financial statements would be distributed to the investing public, and that investors and potential investors in Adelphia's securities would rely, and had a right to rely, on such reports.  Deloitte knew and understood that its audit opinions would be included in Adelphia's Form 10-K filings, and expressly consented to the incorporation of its audit opinions in the Prospectuses and Registration Statements and in the amendments thereto. The materially false and misleading statements in Deloitte's audit reports were made in connection with the purchase and sale of the Bonds.

392.    Deloitte acted with scienter in making, or causing to be made, the materially false and misleading statements and omissions alleged herein.  The evidence of Deloitte's scienter includes, among other things, the following facts as alleged in greater detail above:

a.      The magnitude by which Adelphia's financial results were misstated in its financial statements was staggering:  Adelphia's liabilities were understated by at least $3.1 billion, and its revenues were overstated by approximately $500 million over two years.  Absent intentional or reckless conduct, Deloitte would have detected these misstatements during the course of its audits and either taken corrective action or declined to issue unqualified audit opinions.

b.      Deloitte had a long-standing relationship with Adelphia dating back to 1980, had frequent contact with Adelphia management and was regularly present at Adelphia's

headquarters as it conducted quarterly reviews and annual audits, and had continual access to and detailed knowledge of Adelphia's corporate, financial and business matters.

        c.      Deloitte recognized at the outset of each audit that the Adelphia engagement posed a "much greater than normal" risk of fraud, misstatement, or error, yet Deloitte took grossly inadequate precautions to guard against fraud. Among other things, Deloitte failed to review significant end-of-period and post-closing journal entries, and blindly accepted representations made to it by management.

        d.      Deloitte knew that the Managed Entities had drawn down material amounts under the co-borrowing agreements, that subsidiaries of Adelphia were jointly and severally liable for those draw-downs, and that those borrowings were not included on Adelphia's balance sheets or disclosed in the notes to its financial statements. In fact, Deloitte repeatedly urged Adelphia's management to disclose the full amount borrowed by the co-borrowers, but capitulated when management refused to enhance its disclosures. Deloitte thus turned a blind eye to the truth, placing its own interest in maintaining good relations with its long-term client above its responsibilities to the investing public.

        e.      As discussed in detail in paragraphs 271-322, both an Administrative Law Judge and the SEC have made detailed factual findings that Deloitte's audit partner for the 2000 Financial Statements, Gregory Dearlove, violated GAAS repeatedly in connection with Deloitte's audits of the Company's co-borrowing debt, netting of related party receivables and payables, reclassification transactions among related parties, and direct placements of stock. These GAAS violations included numerous instances of, *inter alia*, failure to obtain sufficient competent evidential matter, failure to exercise appropriate skepticism, and failure to adequately

plan and supervise the audit.  As a partner of Deloitte, Dearlove's conduct is imputable to

Deloitte.

        f.      Although the findings of the SEC and the Administrative Law Judge relate

to the 2000 Financial Statements, the GAAP and GAAS violations that they identified had, in

many instances, been ongoing since at least 1999.  Deloitte's issuance of unqualified audit

reports on Adelphia's 1999 financial statements was, at best, severely reckless.

        g.      With respect to the improper accounting for co-borrowed debt, as alleged

*supra* in paragraphs 281 and 286-96, Dearlove, and by extension Deloitte, failed to exercise due

professional care and professional skepticism, failed to adequately plan the audit, and failed to

obtain sufficient competent evidential matter.  Indeed, despite the clear need for increased care

and skepticism, Deloitte failed to apply even basic — let alone heightened — scrutiny to

Adelphia's accounting for co-borrowed debt.  In a reckless departure from the requirements of

GAAS, Deloitte failed to apply greater than normal skepticism and additional audit procedures in

order to corroborate management representations in a high-risk environment.

        h.      With respect to netting of related party accounts payable and receivable,

Dearlove, and by extension Deloitte, failed to obtain sufficient competent evidential material to

support the conclusion that Adelphia's accounting was properly done, failed to exercise

appropriate skepticism despite circumstances requiring heightened scrutiny, and failed to

properly supervise the Deloitte audit team to ensure that significant related party transactions like

these were afforded appropriate review.  *See supra* ¶¶ 281, 297-304.

        i.      Deloitte also violated GAAS in the audit of Adelphia's accounting for

debt.  In planning for the audit of the 2000 Financial Statements, Deloitte acknowledged a

heightened risk of fraud at Adelphia.  Dearlove, and by extension Deloitte, knew that Adelphia

management wanted to reduce the amount of related party receivables they reported to the public.  In reckless disregard of GAAS obligations to exercise due professional care, supervise assistants, and gather sufficient competent evidential matter to support his audit conclusions, Deloitte nonetheless failed to investigate large post-closing journal entries by which Adelphia "reclassified" its debts, thereby concealing them from investors.  *See supra* ¶¶ 281, 305-313.

j.      Deloitte also committed GAAS violations with regard to the accounting for direct placements of Class B stock.  *See supra* ¶¶ 281, 314-22.  During the audit of the 2000 Financial Statements, Deloitte knew that the direct placements had occurred, but failed to consider the "much greater than normal" risk of the audit in determining the extent of procedures, assigning staff, and requiring appropriate levels of supervision.  Deloitte also failed to exercise professional skepticism, to obtain sufficient competent evidential matter to provide reasonable support for its conclusions, and failed to apply necessary procedures to obtain satisfaction concerning the purpose, nature, and extent of related party transactions and their effect on the financial statements.

k.      Deloitte also had motive and opportunity to commit the fraud alleged herein.  Deloitte audited the financial statements and issued audit opinions that it knew would be disseminated to, and relied upon by, investors.  Thus it had the opportunity to commit fraud. Deloitte's motive derives from its longstanding relationship with Adelphia, and the fact that to oppose Adelphia management and insist on full and accurate disclosures or issue qualified opinions might destroy that relationship, and the millions of dollars in fees Deloitte derived therefrom.  In the year ended December 31, 2001 alone, Deloitte received $1,319,000 in audit fees and $2,182,000 in non-audit fees from Adelphia.

393.    Plaintiffs relied on Adelphia's public filings, including the financial statements contained or incorporated in its Registration Statement, Prospectuses and Form 10-K filings and Deloitte's audit opinions contained therein, in deciding to purchase the Bonds.

394.    Deloitte's materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds at an artificially high price, and thereby proximately caused Plaintiffs to suffer damages.

395.    At the time Plaintiffs purchased the Bonds, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

396.    The fraudulent activity alleged in this Count constituted a manipulative or deceptive device in violation of Section 10(b) of the Exchange Act, and a device, scheme, or artifice to defraud, prohibited by Rule 10b-5.

## COUNT V

### (Violation of Section 18 of the Exchange Act)
### (Against Defendants John J. Rigas,
### Timothy J. Rigas, James P. Rigas, and Michael J. Rigas)

397.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

398.    This claim is brought by all Plaintiffs pursuant to Section 18 of the Exchange Act, against Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael J. Rigas.

399.    As set forth above, these Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Adelphia, including its Form 10-K filings for 1999 and 2000.

400.    In connection with the purchase of the Bonds, Plaintiffs specifically read and relied upon the Company's SEC filings, including its Form 10-Ks for the years 1999 and 2000

and the financial statements contained therein.  Specifically, Plaintiffs read and relied on the

Company's statements in those filings regarding its financial condition, including its revenue and

debt levels.  Plaintiff's further relied on the Company's statements in those filings as being

materially complete, and as not omitting material information, including information about the

Company's financial condition and debts.  Plaintiffs relied on these SEC filings not knowing that

they were false and misleading.

401.    The reliance by Plaintiffs was reasonable, particularly given the unqualified audit

opinions from Deloitte.

402.    The Company's Form 10-Ks for the years ended December 31, 1999 and 2000

were issued by Adelphia and signed by defendants John J. Rigas, Timothy J. Rigas, James P.

Rigas, and Michael J. Rigas.

403.    When the truth began to emerge about the false and misleading statements and

omissions in the Company's documents and reports filed with the SEC, Plaintiffs were

significantly damaged by the resulting drop in the value of the Bonds.

404.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

suffered damage in connection with its purchases of Bonds.

405.    By virtue of the foregoing, Defendants John J. Rigas, Timothy J. Rigas, James P.

Rigas, and Michael J. Rigas have violated Section 18 of the Exchange Act.

## COUNT VI

### (Violation of Section 18 of the Exchange Act)
### (Against Deloitte)

406.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

343 above as if fully set forth herein.

407.     This claim is brought pursuant to Section 18 of the Exchange Act, against Deloitte.

408.     As set forth above, Deloitte made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC.  Specifically, Deloitte's audit opinions on Adelphia's annual financial statements for 1999 and 2000 were included in Adelphia's Form 10-K filing for those periods.

409.     Because Adelphia is a public company, Deloitte knew and understood that its audit reports concerning Adelphia's financial statements would be incorporated in Adelphia's Form 10-K filings and distributed to the investing public, and that investors and potential investors in Adelphia's securities would rely, and had a right to rely, on such reports.

410.     In connection with the purchase of the Bonds, Plaintiffs specifically read and relied on the financial information contained in Adelphia's Form 10-K filings, including Deloitte's audit opinions, not knowing that they were false and misleading.

411.     When the truth began to emerge about the false and misleading statements and omissions in Adelphia's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of the Bonds.

412.     As a direct and proximate result of Deloitte's wrongful conduct, Plaintiffs suffered damage in connection with their purchases of Bonds.

413.     By virtue of the foregoing, Deloitte has violated Section 18 of the Exchange Act.

## COUNT VII

**(For Violation of Section 20(a) of The Exchange Act)**
**(Against John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas)**

414.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 and Counts III and V above as if fully set forth herein.

415.     This Count is brought by all Plaintiffs pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), against defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas.

416.     Adelphia committed a primary violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by making false and misleading statements of material fact, in connection with the purchase and sale of securities, which were relied upon by Plaintiffs to their detriment (as described herein).  At the time these false and misleading statements were made, the Company knew, or was reckless in not knowing, of their falsity.

417.     Adelphia committed a primary violation of Section 18 of the Exchange Act by making filings with the SEC pursuant to the Exchange Act which contained false and misleading statements of material fact and omitted material facts.  These false and misleading statements SEC filings, including the financial statements and other parts containing material misstatements or omitting material facts, were specifically read and relied upon by Plaintiffs to Plaintiffs' detriment (as described herein).

418.     Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas controlled Adelphia within the meaning of Section 20(a) of the Exchange Act.

419.     Defendants James Rigas, Timothy Rigas, James Rigas, and Michael Rigas were directors and/or senior executive officers of Adelphia.  Together, they held voting control of the Company.

420.     Defendant Timothy Rigas served on the Audit Committee of the Board.   As such, he was intimately involved with and controlled the Company's accounting and its financial reporting.  He was responsible for fully understanding the Company's accounting policies, procedures and internal control systems, and was, or should have been, in contact with the Company's auditors.  He also had the authority and duty to oversee, review and examine statements made in the name of the Company contained in reports and other documents, including financial statements filed with the SEC, and to be certain that the Company's financial condition was reported in a fair and accurate manner.

421.     By virtue of their high level positions with the Company, their participation in and/or awareness of the Company's finances and operations, and/or their intimate knowledge of the false statements which were disseminated to Plaintiffs, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making process of the Company, including the content and dissemination of the Registration Statement and Prospectuses (and/or the financial statements contained therein) and other SEC filings and public statements which Plaintiffs contend are false and misleading.  These Defendants were provided with, or had unlimited access to, copies of the statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after they were issued or publicly disseminated, and had the ability to prevent their issuance or public dissemination or cause the misstatements to be corrected, but negligently failed to do so.

422.     Each of defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas was a culpable participant in Adelphia's violation(s) of Sections 10(b) and 18 of the Exchange Act because, among other reasons: they directly or indirectly induced the violations by preparing and/or signing the Company's false and misleading financial statements, Form 10-Ks,

147

Registration Statements, Prospectuses, and/or other public statements; they did not act in good

faith when preparing, signing, and/or otherwise approving the Company's financial statements,

Form 10-Ks, Registration Statements, Prospectuses, and other public statements; they did not

conduct a reasonable investigation into the accuracy and completeness of such statements; and

they did not believe and/or had no reasonable ground to believe that those documents were

materially accurate and complete.

423.    By virtue of their positions as controlling persons, defendants John J. Rigas,

Timothy J. Rigas, James P. Rigas, and Michael R. Rigas are liable pursuant to Section 20(a) of

the Exchange Act.

424.    At the time the Bonds were purchased by Plaintiffs, Plaintiffs did not know of any

of the false and/or misleading statements and omissions, and they relied upon the representations

made by the Company.

425.    As a direct and proximate result of the wrongful conduct of these Defendants,

Plaintiffs suffered damages.

## **COUNT VIII**

### **(For Professional Negligence)**
### **(Against Deloitte)**

426.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through

343 above as if fully set forth herein.

427.    This cause of action is brought by all Plaintiffs against Deloitte, under common

law principles of negligence.

428.    Deloitte is in the business of auditing and reviewing financial statements of public

companies, issuing opinion letters concerning the financial statements audited, and providing and

certifying such information for the benefit of investors and others to use in their dealings with others.

429.    Deloitte expressly consented to the incorporation of its audit opinions in the Registration Statements and the Prospectuses, knowing that those Registration Statements and the Prospectuses would be disseminated to potential purchasers of the Bonds for the purpose of soliciting those investors to purchase the Bonds.  Deloitte knew and intended that the potential purchasers who received the Registration Statements and Prospectuses would rely on their contents, including the financial statements and Deloitte's audit reports, when deciding whether to purchase the securities.

430.    Deloitte owned a duty of reasonable care to the investors that received these Registration Statements and the Prospectuses, including Plaintiffs, because those investors were foreseeable and intended beneficiaries of Deloitte's audit opinions.

431.    As the independent auditor of Adelphia, Deloitte's duty of reasonable care included a duty to examine the financial statements of Adelphia in accordance with GAAS to determine, among other things, whether they were presented in accordance with GAAP, and to issue truthful and accurate audit opinions.

432.    Deloitte breached these duties knowingly, wantonly, recklessly, or at least negligently, by failing to conduct reasonable and GAAS-compliant audits, and by falsely representing in its audit opinions that it had audited the financial statements in accordance with GAAS and that those financial statements were presented in accordance with GAAP.

433.    At the time of the misrepresentations and omissions of material facts by Deloitte, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs relied upon the superior knowledge and expertise of Deloitte, and read and justifiably relied (to Plaintiffs'

detriment) on the audited financial statements in the Registration Statements and Prospectuses, and on the unqualified opinions issued by Deloitte in connection with those financial statements. Had Plaintiffs been aware of the true facts, they would not have purchased the Bonds.

434. Each purchase of the Bonds by Plaintiffs prior to March 27, 2002, was made in reliance upon, and without knowledge of the falsity of, Deloitte's audit opinions.

435. Deloitte's conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.  As a direct and proximate result of the negligent misrepresentations (and omissions) by Deloitte, and in reliance thereon, Plaintiffs suffered damages in connection with their purchases of the Bonds prior to March 27, 2002.

436. Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, prior to March 27, 2002.

## COUNT IX

### (For Common Law Fraud)
### (Against All Defendants)

437. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

438. This cause of action is asserted by all Plaintiffs against all Defendants, based on common law principles of fraud and conspiracy.

439. As alleged herein, each of the Defendants made material misrepresentations, or omitted to disclose material facts, to Plaintiffs and the investing public regarding Adelphia's financial condition.

440.    In addition, the Defendants each conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding Adelphia's financial condition, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

441.    The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.  Plaintiffs hereby incorporate by reference their allegations of Deloitte's scienter as alleged above in, *inter alia*, Counts III and IV and paragraphs 257-265 and 271-322.

442.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under applicable state law.

443.    The aforesaid conduct by Defendants also constitutes conspiracy to commit fraud and deceit under applicable state law.

444.    Plaintiffs actually read and relied on Defendants' misrepresentations — including but not limited to the misrepresentations in Adelphia's financial statements, Registration Statements, Prospectuses, Forms 10-K, and other SEC filings, regarding the amount of Adelphia's debt — when deciding to purchase the Bonds, and when deciding to hold (and refrain from selling) the Bonds.  Such reliance was reasonable.

445.    At the time the Bonds were purchased and held by Plaintiffs, Plaintiffs did not know of any of the false and/or misleading statements and omissions.

446.    As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their purchases of the Bonds.

447.     As a direct and proximate result of the fraud and deceit of Defendants, Plaintiffs suffered damages in connection with their decisions to refrain from selling the Bonds.

448.     Plaintiffs did not discover that the Defendants had engaged in wrongful conduct, or that Plaintiffs had suffered damages as a result thereof, and could not reasonably have discovered such information through the exercise of due diligence, prior to public disclosures in 2002.

## COUNT X

**(For Violation of California Corporations Code §§ 25400(d) & 25500)**
**(Against John Rigas, Timothy Rigas, James Rigas, and Michael Rigas)**

449.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 and Counts III and IV above as if fully set forth herein.

450.     This cause of action is brought by all Plaintiffs pursuant to California Corporations Code §§ 25400(d) and 25500, against defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas.

451.     Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas willfully participated in the violation of California Corporations Code § 25400(d).  The willful participation by these defendants included the preparation and provision of information, including financial information relating to Adelphia's debts and liabilities, for inclusion and incorporation in the Prospectuses which these defendants knew to be materially false and misleading.  The willful participation of defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas also included the preparation, signing, and distribution of the Registration Statements, and the financial statements incorporated therein, which they knew to be materially false and misleading.

452.     The Prospectuses and Registration Statements were materially false and misleading and/or omitted material facts required to be stated therein to make the statements in those documents not misleading.  For example, each of the Prospectuses failed to disclose material related party transactions between the Company and the Rigas family and the entities controlled by the Rigas family.  In addition, the 2006, 2010 and 2011 Prospectuses contained statements of Adelphia's debts which were materially understated because they not include the Managed Entities' borrowings under the co-borrowing agreements, and incorporated financial statements that were materially false and misleading due to, among other things, the removal of debt from Adelphia's balance sheet and the other improper accounting practices alleged herein.

453.     The Registration Statements and Prospectuses were distributed to investors and potential investors, including Plaintiffs, in California.

454.     These defendants caused the false and misleading Registration Statements and Prospectuses to be issued for the purpose of inducing investors, including Plaintiffs, to purchase the Bonds.

455.     These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds at prices which were affected by the Defendants' conduct, and thereby proximately caused Plaintiffs to suffer damages at least equal to the difference between the consideration paid by Plaintiffs for the Bonds and the value the Bonds would have had at the time of purchase in the absence of Defendants' conduct.

## COUNT XI

**(For Violation of California Corporations Code § 25504)**
**(Against John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas)**

456.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

457.     This cause of action is brought by all Plaintiffs pursuant to California

Corporations Code § 25504 against John J. Rigas, Timothy J. Rigas, James P. Rigas, and

Michael R. Rigas.

458.     Although Adelphia is not a party, nor are Plaintiffs asserting claims against

Adelphia in this action, Adelphia committed a primary violation of California Corporations Code

§ 25501 by soliciting Plaintiffs to purchase the 2006 Bonds, 2010 Bonds, and 2011 Bonds and by

selling those Bonds to Plaintiffs in California by means of materially false, misleading, and

incomplete Registration Statements, Prospectuses, Form 10-K and 10-Q filings, press releases,

and other public statements (as described herein).  Adelphia's actions of solicitation included

substantial participation in the preparation and distribution of the false and misleading

Registration Statements, Prospectuses, SEC filings, and press releases.

459.     Adelphia was negligent in that it failed to exercise reasonable care in ensuring

that the statements in the Registration Statements, Prospectuses, SEC filings, and press releases,

were accurate and complete.

460.     Each of defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael

R. Rigas was a director and principal executive officer of Adelphia at the time of Adelphia's

violations of § 25501.  These defendants also materially aided in acts or transactions by which

Adelphia violated of § 25501, including by supplying the financial data for and/or participating

in the preparation of the Registration Statements, Prospectuses, and/or Form 10-K and 10-Q

filings which were filed with the SEC and disseminated to investors, including Plaintiffs.

461.     Each of defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael

R. Rigas controlled Adelphia within the meaning of California Corporations Code § 25504.  By

virtue of their high level positions with Adelphia, their participation in and/or awareness of

Adelphia's finances and operations, and/or their intimate knowledge of the materially false, misleading, and incomplete statements which were disseminated to Plaintiffs as part of the Prospectuses, Registration Statements, SEC filings and press releases, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making process of Adelphia, including the content and dissemination of the public statements which were false and misleading.  These Defendants were provided with, or had unlimited access to, the Prospectuses and other statements that were false and misleading prior to and/or shortly after they were issued or publicly disseminated, and had the ability to prevent their issuance or public dissemination, or cause the misstatements and omissions to be corrected, but failed to do so.

462.    Each of defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas  knew, or had reasonable grounds to believe, that the Company's statements were materially false and misleading statements or omitted material facts.

463.    Each purchase of the Bonds by Plaintiffs was made without knowledge of the Company's uncorrected false and misleading statements and omissions of material fact, and was made in reliance on the truth, accuracy and completeness of the Company's public statements (which Plaintiffs read) in the Registration Statements, Prospectuses, and Form 10-K and 10-Q filings (including those later determined to be materially false and misleading).

464.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages in an amount at least equal to the difference between the consideration paid by Plaintiffs for the Bonds and the current value of the Bonds.

465.     By virtue of their positions as directors, principal executive officers, and/or controlling persons of Adelphia, defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas are liable pursuant to California Corporations Code §25504.

466.     Defendants John J. Rigas, Timothy J. Rigas, James P. Rigas, and Michael R. Rigas are also liable pursuant to § 25504 because they were employees of Adelphia who materially aided in the acts or transactions constituting Adelphia's violations of § 25501.

### COUNT XII

**(For Violation of California Corporations Code § 25504.1)**
**(Against John Rigas, Timothy Rigas, James Rigas, and Michael Rigas)**

467.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

468.     This cause of action is brought by all Plaintiffs pursuant to California Corporations Code § 25504.1 against John Rigas, Timothy Rigas, James Rigas, and Michael Rigas.

469.     Although Adelphia is not a party, nor are Plaintiffs asserting claims against Adelphia in this action, Adelphia committed a primary violation of California Corporations Code § 25401 by offering and selling the Bonds by means of the materially false and misleading Registration Statements, Prospectuses, Form 10-K and 10-Q filings, as well as other false and misleading statements (as described herein).

470.     Defendants John Rigas, Timothy Rigas, James Rigas, and Michael Rigas materially assisted Adelphia's violation of § 25401 by supplying the financial data for and/or participating in the preparation of the Registration Statements, Prospectuses, and/or Form 10-K and 10-Q filings which were filed with the SEC and disseminated to investors, including Plaintiffs.

471.    These Defendants intended to deceive or defraud investors, including Plaintiffs, knowing that the statements contained in the Registration Statements, Prospectuses, and Form 10-K and 10-Q filings were false and misleading.

472.    Each purchase of the Bonds by Plaintiffs was made without knowledge of the Company's uncorrected false and misleading statements and omissions of material fact, and was made in reliance on the truth, accuracy and completeness of the Company's statements (including those in the Registration Statements, Prospectuses, and Form 10-K and 10-Q filings which were later determined to be materially false and misleading).

473.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds.  As a result of Defendants' conduct, Plaintiffs are without a plain, speedy and adequate remedy at law and hereby tender their Bonds and seek rescission of their purchases to the extent that they continue to own such securities in an amount reflecting the consideration paid for the Bonds.

## COUNT XIII[2]

### (For Violation of California Corporations Code § 25504.2)
### (Against Deloitte)

474.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 343 above as if fully set forth herein.

475.    This cause of action is brought by all Plaintiffs pursuant to California Corporations Code § 25504.2 against Deloitte.

---

[2] In an Order dated November 4, 2011, the Court dismissed Count XIII of Plaintiffs' Amended Complaint and did not grant Plaintiffs leave to replead this Count.  Plaintiffs acknowledge the dismissal of Count XIII, but have included it in their Second Amended Complaint for the purpose of preserving their appellate rights.

476.     Although Adelphia is not a party, nor are Plaintiffs asserting claims against Adelphia in this action, Adelphia violated California Corporations Code § 25401 by selling the Bonds by means of the false and misleading 2006, 2010, and 2011 Prospectuses as well as other false and misleading statements (as described herein), including the Company's press releases and Form 10-K and Form 10-Q filings, and would be subject to liability for that violation under California Corporations Code § 25501.

477.     The 2006, 2010, and 2011 Prospectuses were distributed in connection with the offer and sale of the Bonds.

478.     The 2006, 2010, and 2011 Prospectuses contained untrue statements of material facts required to be stated therein and/or necessary to make the statements in the prospectuses not misleading, including, but not limited to, the audited financial statements from 1998, 1999, and 2000.

479.     On May 2, 2002, Adelphia publicly announced that its 1999 and 2000 financial statements would be restated.  By definition (see Accounting Principles Board Opinion No. 20), a restatement of financial statements means that those financial statements when issued were materially false. On June 17, 2002, Adelphia announced that Deloitte was withdrawing its certifications of the financial statements issued by Adelphia and its subsidiaries since March 2001.

480.     Defendant Deloitte was the auditor for Adelphia, and consented in writing to the inclusion (or incorporation by reference) of its audit opinions in the 2009, 2010, and 2011 Prospectuses, and to being named in those prospectuses as a party who certified the financial statements contained therein.  Deloitte certified the financial statements in the prospectuses as being prepared in accordance with generally accepted accounting principles and audited in

accordance with generally accepted auditing standards.  These certifications, as well as the financial statements themselves, were materially false and misleading.

481.    Deloitte was negligent in that it failed to exercise reasonable care in conducting its audits and, in failing to reasonably investigate, did not detect, disclose and/or correct the material omissions and materially false and misleading statements in the financial statements contained in the 2006, 2010, and 2011 Prospectuses.

482.    Plaintiffs did not know of the false or misleading statements contained in the Prospectuses (and the financial statements incorporated therein), or the omissions therefrom, and read and relied to their detriment on the accuracy and completeness of those statements.

483.    These materially false and misleading statements proximately caused Plaintiffs to purchase the Bonds and thereby proximately caused Plaintiffs to suffer damages in an amount at least equal to the difference between the consideration paid by Plaintiffs for the Bonds and the current value of the Bonds.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.    Awarding rescission and/or rescissionary damages in favor of Plaintiffs against all Defendants;

C.     Awarding punitive damages in favor of Plaintiffs and against all Defendants, based on Defendants' violations of state law;

D.     Awarding prejudgment interest and/or opportunity cost damages to Plaintiffs;

E.     Awarding Plaintiffs the fees and expenses incurred in this action, including allowance of fees for Plaintiffs' attorneys and experts; and

F.     Granting such other and further relief as the Court may deem just and proper.

DATED:  December 22, 2011                    GRANT & EISENHOFER, P.A.

By:   _Megan D. McIntyre_
       Stuart M. Grant
       Megan D. McIntyre
       Diane Zilka
       Michele S. Carino
       123 Justison Street
       Wilmington, DE  19801
       (302) 622-7000
       (302) 622-7100 (facsimile)

       Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Megan D. McIntyre, hereby certify that the foregoing Second Amended Complaint was served upon the following counsel of record, on December 22, 2011 via First Overnight Mail:

James E. Canning, Esq.
CRAVATH, SWAINE & MOORE, LLP
Worldwide Plaza, Suite 3900
825 - 8th Avenue
New York, NY 10019
*Counsel for Deloitte & Touche LLP*

John Joseph Higson, Esq.
DILWORTH PAXSON, LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103-7595
*Counsel for James P. Rigas, John J. Rigas,*
*Michael J. Rigas, and Timothy J. Rigas*

Megan D. McIntyre
Megan D. McIntyre