# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ADELPHIA COMMUNICATIONS CORPORATION SECURITIES AND DERIVATIVE LITIGATION | 03 - MD - 1529 (JMF) |
| | Civil Case No.: 03 Civ. 5785 |
| This Document Relates to: | |
| Consolidated Class Action Complaint (Nos. 03-CV-5755;   03-CV-5756; 03-CV-5757; 03-CV-5758; 03-CV-5759; 03-CV-5760; 03-CV-5761; 03-CV-5762; 03-CV-5763; 03-CV-5764; 03-CV-5765; 03-CV-5766; 03-CV-5768; 03-CV-5769; 03-CV-5770; 03-CV-5771; 03-CV-5774; 03-CV-5775; 03-CV-5776; 03-CV-5778; 03-CV-5780; 03-CV-5781; 03-CV-5783; 03-CV-5784; 03-CV-5785; 03-CV-5786; 03-CV-5787; 03-CV-5790; 03-CV-5791; 03-CV5792). | |

### LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR (I) PRELIMINARY APPROVAL OF SETTLEMENT, (II) CERTIFICATION OF THE SETTLEMENT CLASS FOR PURPOSES OF THE SETTLEMENT AND (III) APPROVAL OF NOTICE TO THE SETTLEMENT CLASS

ABBEY SPANIER, LLP
Arthur N. Abbey
Judith L. Spanier
Richard B. Margolies
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
aabbey@abbeyspanier.com
jspanier@abbeyspanier.com
rmargolies@abbeyspanier.com

KIRBY McINERNEY LLP
Mark A. Strauss
Peter S. Linden
Beverly T. Mirza
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: 212-371-6600
Facsimile: 212-751-2540
mstrauss@kmllp.com
plinden@kmllp.com
bmirza@kmllp.com

*Co-Lead Counsel for Lead Plaintiffs*

Dated: June 14, 2013

**TABLE OF CONTENTS**

I.     PROCEDURAL BACKGROUND AND MEDIATION .................................................. 2

II.    REASONS FOR THE SETTLEMENT ..................................................................... 4

III.   THE TERMS OF THE SETTLEMENT ................................................................... 5

IV.   ARGUMENT ....................................................................................................... 5

     A.    The Settlement Should Be Preliminarily Approved ................................ 5

          1.    The Settlement Was Negotiated at Arm's-Length and Is Supported by Lead Plaintiffs and Experienced Counsel .................................. 6

          2.    The Settlement Terms Are Fair, Reasonable and Adequate ...................... 8

               a.    Continued Litigation Would Be Complex and Protracted ............. 9

               b.    Lead Plaintiffs Have Sufficient Information to Make an Informed Decision as to Settlement ................................. 9

               c.    Lead Plaintiffs Faced Significant Risks ....................................... 10

               d.    Risks of Maintaining Class Action Status Through Trial ............. 13

               e.    Ability to Withstand Greater Judgment ....................................... 14

               f.    The Settlement Amount Is in the Range of Reasonableness ........ 14

     B.    A Settlement Class Should Be Certified ............................................... 15

          1.    Numerosity .................................................................................. 16

          2.    Commonality ............................................................................... 17

          3.    Typicality .................................................................................... 18

          4.    Adequacy ..................................................................................... 19

          5.    Predominance and Superiority ..................................................... 20

     C.    Notice to the Settlement Class Should be Approved ............................ 21

V.    THE SUPPLEMENTAL AGREEMENT SHOULD REMAIN CONFIDENTIAL ......... 22

VI.   CONCLUSION .................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Cases**

*In re Adelphia Communications Corp. Securities & Derivative Litigation*,
  No. 03 MD 1529, 2005 WL 1278544 (May 31, 2005) ..................................................... 4, 9, 11

*In re Alloy, Inc. Securities Litigation*,
  No. 03 Civ. 1597, 2004 WL 2750089, (S.D.N.Y. Dec. 2, 2004) ............................................ 11

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) .......................................................................................... 16, 19, 20

*In re AOL Time Warner, Inc. Securities & "ERISA" Litigation*,
  MDL No. 1500, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................................ 9, 11

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  No. 07 Civ. 2207, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) ............................................ 10

*Chatelain v. Prudential-Bache Securities, Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) ...................................................................................... 6, 14

*Cinelli v. MCS Claim Services, Inc.*,
  236 F.R.D. 118 (E.D.N.Y. 2006) ............................................................................................ 10

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ......................................................................................... *passim*

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
  258 F.R.D. 545 (N.D. Ga. 2007) ............................................................................................ 23

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994) ..................................................................................................... 16

*Consolidated Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ..................................................................................................... 16

*County of Suffolk v. Long Island Lighting Co.*,
  710 F. Supp. 1422 (E.D.N.Y. 1989) ....................................................................................... 16

*D'Amato v. Deutsche Bank*,
  236 F.3d 78, (2d Cir. 2001) ................................................................................................ 8, 14

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................................................... 16

*Dorn v. Eddington Securities, Inc.*,
  No. 08 Civ. 10271, 2011 WL 382200 (S.D.N.Y. Jan. 21, 2011) ............................................ 22

*In re Drexel Burnham Lambert Group*,
  960 F.2d 285 (2d Cir. 1992) ....................................................................................................... 19

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation*,
  MDL No. 1446, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ................................................. 15

*General Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982) ............................................................................................................... 18, 19

*In re Global Crossing Securities & ERISA Litigation*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................................... 10, 15

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000) ........................................................................................................... 8

*In re Healthsouth Corp. Securities Litigation*,
  334 F. App'x. 248 (11th Cir. 2009) ............................................................................................ 23

*In re Herald, Primeo and Thema Securities Litigation*,
  No. 09 Civ. 289, 2011 WL 4351492 (S.D.N.Y. Sept. 15, 2011) ............................................. 24

*Hicks v. Stanley*,
  No. 01 Civ. 10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............................................. 9

*In re Initial Public Offering Securities Litigation*,
  226 F.R.D. 186 (S.D.N.Y. 2005) ..................................................................................... 5, 6, 23, 24

*In re Initial Public Offering Securities Litigation*,
  243 F.R.D. 79 (S.D.N.Y. 2007) .................................................................................................. 17

*In re Initial Public Offering Securities Litigation*,
  260 F.R.D. 81 (S.D.N.Y. 2009) ................................................................................................... 8

*In re Ivan F. Boesky Securities Litigation*,
  948 F.2d 1358 (2d Cir. 1991) ...................................................................................................... 5

*Janus Capital Group, Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011) ........................................................................................................... 11, 15

*Marisol A. by Forbes v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997) .................................................................................................. 17, 18

*In re Marsh & McLennan Securities Litigation*,
  No. 04 Civ. 8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................................... *passim*

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ........................................................................................................ 11

*In re Milken & Associates Securities Litigation*,
  150 F.R.D. 46, (S.D.N.Y. 1993) ...................................................................................... 12

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972) ......................................................................................... 5, 6

*In re Nortel Networks Corp. Securities Litigation*,
  No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) ........................................... 17

*In re Oxford Health Plans, Inc. Securities Litigation*,
  191 F.R.D. 369 (S.D.N.Y. 2000)....................................................................................... 18

*In re PaineWebber Limited Partnerships Litigation*,
  171 F.R.D. 104 (S.D.N.Y. 1997) .................................................................................. 8, 12

*In re Sumitomo Copper Litigation*,
  189 F.R.D. 274 (S.D.N.Y. 1999) ...................................................................................... 6

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta*,
  No. 01 Civ. 10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)......................................... 15

*In re Traffic Executive Association Eastern Railroads*,
  627 F.2d 631 (2d Cir. 1980) ............................................................................................ 6

*Trief v. Dun & Bradstreet Corp.*,
  840 F. Supp. 277 (S.D.N.Y. 1993) .................................................................................... 6

*In re Telik, Inc. Securities Litigation*,
  576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................................... 6

*In re Veeco Instruments Inc. Securities Litigation*,
  No. 05 MDL 01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..................................... 8, 14

*In re Vivendi Universal S.A. Securities Litigation*,
  242 F.R.D. 76 (S.D.N.Y. 2007)........................................................................................ 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................................................. 5, 9, 14, 22

iv

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) ...................................................................................... 16

**Statutes**

Federal Rule of Civil Procedure 23 ................................................................... *passim*

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ................................... 14, 22

**Other Authorities**

*Manual for Complex Litigation, Fourth* (2004) ............................................................. 5

4 *Newberg on Class Actions* (4th ed. 2002) ............................................................. 6, 16

2 *McLaughlin on Class Actions*   (9th ed. 2012) ......................................................... 23

Pursuant to this Court's Order dated June 4, 2013 (Dkt. No. 805), Lead Plaintiffs[1] in the above-captioned putative class action (the "Action") respectfully submit this memorandum in order to demonstrate that the proposed $12 million cash settlement satisfies all of the relevant legal standards for preliminary approval under Rule 23 of the Federal Rules of Civil Procedure, and to respond to the Court's question as to why the Supplemental Agreement referenced in paragraph 29 of the Stipulation[2] should not be publicly filed.

The Settlement is eminently fair considering the substantial recovery to the Settlement Class and the risks and costs attendant to further, protracted litigation. The Settlement resulted from participation in an extensive mediation, which led to an ADR Allocation Process (as defined in the Stipulation), and subsequent additional mediated negotiations, before a retired judge, the Honorable Daniel Weinstein ("Judge Weinstein").   Judge Weinstein was approved by the Court to aid the parties in reaching a settlement.   The Settlement reflects a reasoned compromise based on Lead Plaintiffs' and Co-Lead Counsel's knowledge of the strengths and weaknesses of the case gained through an extensive pre-complaint investigation, motion practice, consultations with damages experts, and review and analysis of voluminous discovery materials.

Lead Plaintiffs request that this Court enter the proposed Order Preliminarily Approving Final Settlement and Providing for Notice ("Preliminary Approval Order"), a copy of which is attached as Exhibit A to the accompanying Notice of Motion.   The Preliminary Approval Order will, among other things: (i) preliminarily approve the Settlement on the terms set forth in the Stipulation; (ii) certify the Settlement Class, appoint Lead Plaintiffs as class representatives and

---

[1] Lead Plaintiffs are Eminence Capital LLC, Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda), Ltd., Argent Lowlev Convertible Arbitrage Fund, Ltd., UBS O'Connor LLC f/b/o UBS Global, Equity Arbitrage Master, Ltd., and UBS O'Conner LLC f/b/o UBS Global Convertible Portfolio.

[2] All capitalized terms not otherwise defined herein shall carry the meaning set forth in the Stipulation and Agreement of Settlement, dated May 15, 2013 ("Stipulation") filed with the Court on May 23, 2013 [Dkt. No. 795].

1

Co-Lead Counsel as class counsel, for purposes of the Settlement only;[3] approve the form and manner of giving notice to the Settlement Class; and (iii) set a date for the settlement hearing at which the Court will consider final approval of the Settlement, approval of the Plan of Allocation for distribution of the Net Settlement Fund and Co-Lead Counsel's application for attorneys' fees and expenses.

Finally, in response to the Court's inquiry as to whether the Supplemental Agreement concerning opt outs should be publicly filed, Lead Plaintiffs submit that it should not.   Courts have repeatedly recognized that keeping such agreements confidential is consistent with the public policy of encouraging class action settlements.

## I.        PROCEDURAL BACKGROUND AND MEDIATION

This action arises out of disclosures in March 2002 that Adelphia Communications Corporation's ("Adelphia") financial statements materially understated the total amount of Adelphia's debt, overstated its equity capital, misrepresented Adelphia's capital structure and concealed its source of funds.   In the spring of 2002, approximately 31 class actions were filed in the United States District Courts on behalf of persons who purchased or otherwise acquired securities of Adelphia.   *See* Stipulation ¶ A (listing the 31 actions).   By order dated July 23, 2003, the Judicial Panel on Multidistrict Litigation transferred these actions and other related actions to the Southern District of New York (the "Court").   Pursuant to the Court's December 5, 2003 Order, Lead Plaintiffs were appointed lead plaintiffs for the consolidated actions, and Co-Lead Counsel were appointed co-lead counsel for the Class. *See* Dkt. No. 22.

On December 22, 2003, Lead Plaintiffs filed their Consolidated Class Action Complaint (the "Complaint"), which, *inter alia*, included a claim against defendant Buchanan Ingersoll &

---

[3] For purposes of the Settlement, the parties have stipulated to certification of the Action as a class action.

Rooney (formerly known as Buchanan Ingersoll P.C.) ("Buchanan") under Section 10(b) of the
Securities Exchange Act of 1934 on behalf of a class of persons who purchased or acquired
Adelphia securities from August 16, 1999 through June 10, 2002, inclusive (the "Class Period").
Lead Plaintiffs alleged that, during the Class Period, Buchanan acted as legal counsel to
Adelphia, was responsible for reviewing Adelphia's misleading prospectuses, registration
statements, and financial statements, and provided materially misleading expert legal opinions,
which Lead Plaintiffs alleged artificially inflated the prices of Adelphia securities.   Lead
Plaintiffs further alleged that once the truth was disclosed, Adelphia's stock declined in value,
thereby injuring Lead Plaintiffs and the Class.   During the litigation, Lead Plaintiffs responded
to motions to dismiss of the various defendants, including Buchanan.

Since September 2005, Lead Plaintiffs, along with other parties and other defendants,
have participated in several mediation sessions with the Honorable Daniel Weinstein, a retired
judge who was approved by the Court to aid the parties in reaching a settlement. The Court has
already approved three partial settlements of the claims in this case resulting from such
mediation, which partial settlements total approximately $460 million (a $250 million settlement
with the defendant Banks; a $210 million settlement with defendant Deloitte & Touche LLP,
Adelphia's auditor; and a $6,725,000 settlement with certain of Adelphia's officers and
directors).   *See* Dkt. Nos. 466-67, 683.

Lead Plaintiffs and Buchanan, along with other plaintiffs and claimants in the ADR
Actions participated in multiple mediation sessions with Judge Weinstein, which resulted in
Buchanan informing Lead Plaintiffs and other individual plaintiffs that it had secured an
agreement of its insurance carriers to pay a total of $40 million to fund an equitable allocation
process to settle Lead Plaintiffs' and other individual plaintiffs' claims against Buchanan.

3

Following an intensive ADR Allocation Process, which involved the review of voluminous

discovery materials and extensive briefing, and additional extensive negotiations with Judge

Weinstein and Buchanan, Lead Plaintiffs and Buchanan reached the proposed Settlement.

Lead Plaintiffs respectfully refer the Court to paragraphs 3-32 of the accompanying Joint

Declaration of Judith L. Spanier and Mark A. Strauss ("Joint Decl.") for a more extensive

description of the relevant procedural history and the mediation.

## II.     REASONS FOR THE SETTLEMENT

The principal reason for the Settlement is the significant benefit that it provides to the

Settlement Class now.    This benefit must be compared to the risk that there will be no recovery

from Buchanan absent this Settlement considering the Court's ruling on claims against other

defendants in this consolidated action,[4]  and therefore any future success could depend on

securing a reversal on appeal, and then prevailing on a contested trial and further likely appeals.

Co-Lead Counsel has conducted a thorough investigation into and analysis of the facts

and law relating to the matters at issue; considered carefully the likelihood of success and the

likely total recoverable damages; conducted extensive arm's-length settlement negotiations with

Buchanan's counsel, including with the assistance of a mediator; and determined, after taking

into account the substantial benefits conferred by the Settlement, that the Settlement is fair,

reasonable and adequate and is in the best interest of the Settlement Class.

As fully described below (*see infra* Section V.A.2.c), Lead Plaintiffs faced the risks of,

*inter alia*, the inherent difficulties associated with complex securities litigation, potential

disparate damage calculations by experts, and the inherent difficulty of establishing that

---

[4]  The Court ruled against Lead Plaintiffs on various statute of limitations issues respecting Lead Plaintiffs' claims
against the Bank Defendants.   *See In re Adelphia*, 2005 WL 1278544.   Buchanan would undoubtedly have argued
that those rulings applied equally to Lead Plaintiffs' claims against Buchanan.

Buchanan, as legal counsel to Adelphia, knew or recklessly provided materially misleading expert legal opinions to Adelphia in connection with Adelphia's financial statements, which Lead Plaintiffs alleged were materially understated.    While Lead Plaintiffs believe they can prevail on each of these issues, they unquestionably faced the risk of no recovery or lesser recovery for the Class.    In light of these risks, Co-Lead Counsel believes the Settlement represents an excellent result for Lead Plaintiffs and the Class and merits preliminary approval.

## III.    THE TERMS OF THE SETTLEMENT

The Settlement resolves all claims of Lead Plaintiffs and the Settlement Class against all Released Parties.    *See* Stipulation ¶ 3.    Buchanan has agreed to cause $12 million to be paid into a Settlement Fund on behalf of Lead Plaintiffs and the Settlement Class.[5]

The Stipulation also provides for the form and manner of class notice, the proof of claim procedures, the procedures by which potential Settlement Class members may seek exclusion or object to any terms of the Settlement, and the procedure by which Co-Lead Counsel will apply for attorneys' fees and reimbursement of expenses incurred in prosecuting this Action.

## IV.    ARGUMENT

### A.    The Settlement Should Be Preliminarily Approved

Whether a proposed settlement is fair is a determination left to the trial court's sound discretion.[6]    *See In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir. 1991); *Newman*

---

[5]  The Settlement Fund was deposited into an escrow account within fifteen business days of the final execution of the Stipulation and is earning interest pending distribution, in accordance with the Stipulation.

[6]  The law expresses a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal citation and quotations omitted). A court's review of a proposed class action settlement generally involves a two-step process: preliminary approval and a subsequent fairness hearing. *See In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 191 (S.D.N.Y. 2005) ("*IPO*") (citing *Manual for Complex Litigation, Fourth* § 21.632 (2004)); *see also* Fed. R. Civ. P. 23(e).    At the preliminary approval stage, a court will review the proposed settlement and make an initial determination as to its fairness, reasonableness, and adequacy.    "Where the proposed settlement appears to be the product of serious, informed,

*(footnote continued)*

*v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972).   When exercising its discretion, a court should review the proposed settlement in light of the strong judicial and public policies that favor settlements.   *See In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999).   There is a strong initial presumption that a proposed settlement negotiated during the course of litigation is fair and reasonable.   *See Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992) (citation omitted).   Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993).

Preliminary approval requires only an "initial evaluation" of the fairness of the proposed settlement on the basis of written submissions and an informal presentation by the settling parties. 4 *Newberg on Class Actions* §11.25 (4th ed. 2002).   To grant preliminary approval, a court need only find that there is "'probable cause' to submit the [settlement] to class members and hold a full-scale hearing as to its fairness." *In re Traffic Exec. Ass'n Eastern Railroads*, 627 F.2d 631, 634 (2d Cir. 1980). "Courts determine the fairness of a settlement by looking both at the terms of the settlement and the negotiation process leading up to it."   *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008).   As detailed below, both the negotiation process and the terms of the Settlement support a finding of fairness.   Thus, preliminary approval is warranted.

### 1.     The Settlement Was Negotiated at Arm's-Length and Is Supported by Lead Plaintiffs and Experienced Counsel

The Settlement was negotiated at arm's-length by counsel who are experienced in complex securities litigation and who were acting in an informed manner.   On October 9, 2006,

---

non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted."   *IPO*, 226 F.R.D. at 191.   These procedures safeguard class members' procedural due process rights and enable the court to fulfill its role as the guardian of class interests.

Lead Plaintiffs and Buchanan, along with other plaintiffs, in the ADR Actions (as defined in the Stipulation) participated in a mediation session with Judge Weinstein.   At that initial meeting, Judge Weinstein and Buchanan informed Lead Plaintiffs and other individual plaintiffs that Buchanan had secured the agreement of its insurance carriers to pay a total of $40 million to fund an equitable allocation process to settle Lead Plaintiffs' and other individual plaintiffs' claims against Buchanan.   Judge Weinstein proposed a plan where pursuant to an ADR Allocation Process he would determine each of the plaintiffs' equitable apportionment to the $40 million global settlement fund.   Thereafter, Lead Plaintiffs and other individual plaintiffs had periodic discussions with Judge Weinstein regarding the proposed ADR Allocation Process.

On March 22, 2011, Lead Plaintiffs and Buchanan, along with other plaintiffs in the ADR Actions (as defined in the Stipulation), participated in another mediation session with Judge Weinstein.   After months of negotiations with Judge Weinstein and Buchanan, in August 2012, the plaintiffs in the ADR Actions entered into a Binding ADR Agreement (as defined in the Stipulation).   *See* Joint Decl. Ex. 2.

Between August 2012 and September 2012 the plaintiffs in the ADR Actions submitted several rounds of briefing and made oral presentations to Judge Weinstein regarding their respective claims.   On November 20, 2012, Judge Weinstein issued his decision in the ADR Allocation Process.   In December 2012, Lead Plaintiffs and Buchanan held meetings with Judge Weinstein regarding his decision on the allocation to the Class in the ADR Allocation Process.

On or about January 15, 2013, after extensive additional negotiations between Lead Counsel and Buchanan, under the auspices of Judge Weinstein, Buchanan agreed to increase the settlement consideration to the Class. The additional consideration that Buchanan agreed to pay

to the Class was in addition to the Class's allocation in the ADR Allocation Process. The parties thereby reached the agreement that led to the Settlement, which is separately set forth in greater detail in the Stipulation.   The use of an experienced mediator in settlement negotiations further supports this presumption of fairness and the conclusion that the Settlement was free of collusion.[7]

Moreover, given that Co-Lead Counsel have litigated the Class Action for over nine years and obtained and analyzed extensive discovery materials from Buchanan, the parties and their counsel were well-informed about the strengths and weaknesses of the claims and defenses in the Action.   Finally, the judgment of Lead Plaintiffs, who are sophisticated institutional investors, and of Co-Lead Counsel, which are highly experienced securities litigators, that the Settlement is in the best interests of the Settlement Class, should be given considerable weight.[8]

### 2.      The Settlement Terms Are Fair, Reasonable and Adequate

In determining whether the substantive terms of a settlement are fair, reasonable, and adequate, courts in this Circuit look to the *Grinnell* factors.[9]   An evaluation of these factors weighs in favor of preliminary approval of the proposed settlement.

---

[7]  *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("mediator's involvement . . . ensure[d] that the proceedings were free of collusion and undue pressure"); *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 116 (S.D.N.Y. 2009) (finding settlement was entitled to presumption of fairness where it was "the product of arms' length bargaining" over several months and multiple mediation sessions facilitated by Judge Weinstein, among others).

[8]  *See, e.g.*, *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115809, at *12 (S.D.N.Y. Nov. 7, 2007) (courts should "consider the opinion of experienced counsel with respect to the value of the settlement"); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) *aff'd*, 117 F.3d 721 (2d Cir. 1997) ("'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation").

[9]  These factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.   *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).   Because the second *Grinnell* factor - the reaction of the class to the settlement - is only applicable at the "fairness hearing" stage, it is not addressed below.

### a.   Continued Litigation Would Be Complex and Protracted

Courts have consistently recognized that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement, especially in a securities class action.[10]

The parties resolved this Action after the Court had effectively dismissed Lead Plaintiffs' claim against Buchanan by ruling against Lead Plaintiffs on statute of limitations issues as to other defendants, which logically would have resulted in the dismissal of Lead Plaintiffs' claims against Buchanan as well.   *See In re Adelphia*, 2005 WL 1278544.   Reaching a settlement at this juncture avoids an appellate process in which the likelihood of Lead Plaintiffs' success was uncertain.   Moreover, even if Lead Plaintiffs prevailed on appeal, they would still need to pursue contentious and expensive discovery proceedings, additional motion practice, a complex and costly trial, and likely appeals. Throughout this process, Lead Plaintiffs would face numerous hurdles such as challenges to loss causation, and arguments that there were no actionable misrepresentations during the Class Period and no recoverable damages.

Moreover, even if Lead Plaintiffs were to prevail on their appeal, any potential recovery (in the absence of a settlement) would occur years in the future, substantially delaying payment to the Settlement Class.   By contrast, the Settlement offers the opportunity to provide definite recompense to the Settlement Class now.   *See Hicks*, 2005 WL 2757792, at *6.

### b.   Lead Plaintiffs Have Sufficient Information to Make an Informed Decision as to Settlement

The third *Grinnell* factor, which looks to the "stage of the proceedings and the amount of discovery completed," *Wal-Mart*, 396 F.3d at 117, focuses on whether the plaintiffs "obtained

---

[10]   *See, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,* No. 1500 MDL, 02 Civ. 5575, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *Hicks v. Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *5-6 (S.D.N.Y. Oct. 24, 2005).

sufficient information through discovery to properly evaluate their case and to assess the

adequacy of any settlement proposal." *Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ.

2207, 2010 WL 3119374, at *3 (S.D.N.Y. Aug. 6, 2010).

      The volume and substance of Co-Lead Counsel's knowledge of the merits and potential

weaknesses of Lead Plaintiffs' claims are unquestionably adequate to support the Settlement.

Although Lead Plaintiffs have not had the opportunity to engage in formal discovery proceedings

against Buchanan, Co-Lead Counsel have litigated this Action against all defendants for over

nine years and the briefing on the motions to dismiss and discovery (including the review and

analysis of millions of pages of documents produced in the related bankruptcy proceedings and

in the context of the Allocation Process with Buchanan) has given Co-Lead Counsel the

opportunity to assess the strengths and weaknesses of all defendants' defenses.   Therefore,

Co-Lead Counsel were extremely knowledgeable of the relevant issues and able to recommend

the Settlement to the Lead Plaintiffs and to the proposed class.   *See In re Global Crossing Sec.

& ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite

[to settlement]; the question is whether the parties had adequate information about their claims").

Accordingly, this factor also supports approval of the Settlement.

c.      **Lead Plaintiffs Faced Significant Risks**

      In analyzing the risks concerning liability, the Court does not "need to decide the merits

of the case or resolve unsettled legal questions." *Cinelli v. MCS Claim Servs., Inc.*, 236 F.R.D.

118, 121 (E.D.N.Y. 2006) (internal quotations and alterations omitted).   Rather, the Court

weighs the likelihood of success on the merits against the relief provided by the Settlement.   *Id.*

Courts routinely approve settlements where plaintiffs would have faced significant legal and

factual obstacles to establishing liability.   *See In re Global Crossing*, 225 F.R.D. at 459.

10

In assessing the Settlement, the Court should balance the benefits afforded the Settlement Class, including the immediacy and certainty of a recovery, against the continuing risks of litigation.   *See Grinnell*, 495 F.2d at 463.   Securities class actions present hurdles to proving liability that are difficult for plaintiffs to meet.[11]

Lead Plaintiffs recognized the significant risks of prevailing at trial against Buchanan. The outcome of the claims against Buchanan was uncertain, and whether any claims would survive the still pending motions to dismiss or any subsequent motions for summary judgment and trial was an open question.   If Lead Plaintiffs continued to litigate their claims against Buchanan, they faced significant hurdles.

Although Lead Plaintiffs believed that their claims against Buchanan were timely, they confronted the significant risk that Judge McKenna's May 27, 2005 Opinion dismissing as time-barred certain of Lead Plaintiffs' claims against the Banks, *see In re Adelphia*, 2005 WL 1278544, would apply equally against their Section 10(b) claims against Buchanan.[12]

Lead Plaintiffs also faced a significant risk in pursuing their claims against Buchanan as a result of the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), which narrowed the scope of liability under Section 10(b) for "secondary actors" like attorneys.   In *Janus*, the Supreme Court determined that to be held liable for a misrepresentation under Section 10(b), a defendant must have "made" the statement. *Id*. at 2301.   One cannot be the "maker" of a statement unless one had "ultimate authority over

---

[11]  *See AOL Time Warner*, 2006 WL 903236, at *11 (noting that "[t]he difficulty of establishing liability is a common risk of securities litigation"); *In re Alloy, Inc. Sec. Litig.*, No. 03 Civ. 1597, 2004 WL 2750089, at *2 (S.D.N.Y. Dec. 2, 2004) (finding that issues present in a securities action presented significant hurdles to proving liability).

[12]  Since the issuance of the May 27, 2005 Opinion on statute of limitations issues, the United States Supreme Court has rejected the inquiry notice standard employed by the District Court.   *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).   Under that now controlling authority, Lead Plaintiffs believed that they could arguably demonstrate the timeliness of their claims against Buchanan.   Buchanan, however, would undoubtedly have argued to the contrary.

the statement."   *Id.* at 2302 ("For purposes of Rule 10b-5, the maker of a statement is the person

or entity with ultimate authority over the statement, including its content and whether and how to

communicate it.").   There was a very real risk that if this Court addressed the pending motions

to dismiss, it would apply the holding in *Janus* and determine that Buchanan was not the

"maker" of any false and misleading statements to the public.

Lead Plaintiffs also faced significant risks with respect to proof of damages.   Buchanan

would surely have challenged Lead Plaintiffs' damage claims in the context of motions for

summary judgment and/or at trial.   Lead Counsel and counsel for Buchanan had extensive

discussions concerning damages during the course of settlement negotiations that confirmed the

parties' polarized views on this issue.   Because of the multiple parties involved in the ADR

Allocation Process, the strengths and weaknesses of Lead Plaintiffs' Section 10(b) claims against

Buchanan was fully briefed and Lead Plaintiffs had every opportunity to evaluate the various

arguments that might defeat their claims were they to proceed to litigation.

Under Section 10(b) of the Exchange Act, plaintiffs must prove "loss causation," *i.e.*, the

damages recoverable are limited to the amount of stock price inflation caused by defendants'

misleading statements and omissions.   In this case, Lead Plaintiffs would have faced the risk of

being unable to prove loss causation and damages.   *See In re Milken & Assocs. Sec. Litig.*, 150

F.R.D. 46, 54 (S.D.N.Y. 1993) (approving settlement of a small percentage of the total damages

sought because the magnitude of damages often becomes a "battle of experts . . . with no

guarantee of the outcome"); *see also In re PaineWebber*, 171 F.R.D. at 129.   The determination

of loss causation and damages is a complex and uncertain process, typically involving conflicting

expert opinions and testimony.   The reaction of a jury to such contradictory testimony, which

could be rejected by a jury as speculative or unreliable, is highly unpredictable.   Conceivably, a

12

jury could disagree substantially with any damage presentation proffered by Lead Plaintiffs. Accordingly, proving damages involved substantial risk.

Perhaps most critically, even if Lead Plaintiffs succeeded in their litigation efforts against Buchanan, any significant recovery was far from assured.   Lead Plaintiffs recognize that the Class faced the very real risk of no recovery at all if it did not participate in the ADR Allocation Process and instead continued to litigate its claims against Buchanan.   Lead Plaintiffs were well aware of the difficulties and risks of collecting a judgment against a law firm and the sometimes ephemeral nature of a law firm's assets.

As indicated above, after many years of discussions, in February 2011, Judge Weinstein proposed a plan where, pursuant to an ADR Allocation Process, he would determine each of the plaintiffs' equitably apportioned share of the $40 million global settlement fund.   All parties confronted a very serious risk if they decided not to participate in the ADR Allocation Process and continued to litigate against Buchanan. Lead Plaintiffs determined to participate in the Allocation Process for the foregoing reasons and believe that the Settlement will provide tangible, certain and substantial relief to the proposed Class now, without subjecting them to the risk of continued litigation and the strong possibility of a limited recovery or no recovery at all.

> **d.      Risks of Maintaining Class Action Status Through Trial**

Co-Lead Counsel is confident that even if they were ultimately successful in defeating dismissal of the claims against Buchanan, they would have obtained class action status and maintained that status through trial.   Nonetheless, Buchanan would have been able to continue

to raise challenges to class certification, and could have moved to de-certify the Class before trial or on appeal at the conclusion of trial.[13]

### e.    Ability to Withstand Greater Judgment

It is unclear whether Buchanan is capable of withstanding a greater judgment.    Even if it is, that factor alone is insufficient to defeat approval of the Settlement, especially where, as here, the other *Grinnell* factors weigh in support of approving the Settlement.[14]

### f.    The Settlement Amount Is in the Range of Reasonableness

The size of the Settlement provides support for its reasonableness when viewed in light of the best possible recovery and all of the risks of litigation.    *See Wal-Mart*, 396 F.3d at 119 ("there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion") (internal citation omitted).

When compared to other securities class action settlements, the Settlement is clearly within the range of reasonableness especially since this Action had effectively been dismissed. According to a 2013 report by Cornerstone Research entitled "Securities Class Action Settlements: 2012 Review and Analysis" ("Cornerstone Report"), the median settlement amount of all Private Securities Litigation Reform Act ("PSLRA") cases in 2012 was $10.2 million and "[m]ore than half of post-Reform Act cases that have reached settlement have settled for less than $10 million."    *See* Joint Decl. Ex. 4 at 3, 5.    This $12 million Settlement, when taken together with the approximately $460 million from other defendants in prior settlements in this

---

[13]  *See* Fed. R. Civ. P. 23(c); *Chatelain*, 805 F. Supp. at 214 ("Even if certified, the class would face the risk of decertification.   This factor indicates that settlement is advantageous to the class at this time.").

[14]  *See D'Amato*, 236 F.3d at 86 (the ability to withstand higher judgment, "standing alone, does not suggest that the settlement is unfair"); *In re Veeco Instruments*, 2007 WL 4115809, at *11 (defendant's substantial net worth "alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied").

case, places this action among the top 2% of all securities class action settlements.    *See id.* at 5.

The Settlement here represents a recovery well in excess of these amounts.    Moreover,

securities class action settlements typically involve recoveries from issuers, underwriters, and

auditors.    *See id.* at 13, 19.    Here, Lead Plaintiffs recovered $12 million from a law firm that

represented the issuer, which represents an excellent result.[15]    Thus, the Settlement is favorable

in comparison to other securities class action settlements and represents a significant recovery.

## B.    A Settlement Class Should Be Certified

In the prior settlements with the other defendants, Judge McKenna certified the class for

settlement purposes.[16]    For the same reasons, the settlement class should also be certified here.[17]

---

[15]    *See, e.g., In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, MDL No. 1446, 2008 WL 4178151, at *1 n.2 (S.D. Tex. Sept. 8, 2008) (defendant law firm contributing $10,160,000 to settle securities class action settlement); *see also In re Global Crossing*, 225 F.R.D. at 447 (obtaining $19.5 million from a non-defendant law firm but a release under the settlement agreement).    The recoveries obtained in these cases were prior to the Supreme Court's decision in *Janus*, cited *supra*, and *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761 (2008), which made it more difficult to recover from secondary actors, such as attorneys for issuers.

[16]    *See* June 15, 2006 Preliminary Approval Order [as against the defendant Banks] (Dkt. No. 401); June 15, 2006 Order Preliminarily Approving Final Settlement and Providing for Notice [as against defendants Deloitte & Touche LLP] (Dkt. No. 402); January 20, 2010 Order Preliminarily Approving Final Settlement and Providing for Notice [as against the Director and Officer Defendants] (Dkt. No. 628).

[17]    The proposed Settlement Class, which has been stipulated to by the parties, would consist of:

all Persons who purchased or otherwise acquired Adelphia Securities from August 16, 1999, through June 10, 2002, inclusive.    The Class includes persons or entities who acquired shares of Adelphia stock by any method including but not limited to in the secondary market, in exchange for shares of acquired companies pursuant to a registration statement, or through the exercise of options including options acquired pursuant to employee stock plans, if any, persons or entities who acquired debt securities of Adelphia in the secondary market or pursuant to a registration statement, and persons who beneficially acquired securities of Adelphia not held in such persons' names, and who were injured thereby. Excluded from the Settlement Class are Adelphia, Adelphia Business Solutions, Inc., Buchanan, all Individual Defendants named in the Complaint, any member of the families of the Individual Defendants, any entity in which any Individual Defendant has or had a controlling interest, any other defendant named in the Complaint or any entity that is a parent or subsidiary of, or which is controlled by, such defendant and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of all defendants named in the Complaint. Also excluded from the Settlement Class are (i) those Persons who timely and validly request exclusion pursuant to the "Notice of pendency and settlement of Class Action" to be sent to potential Settlement Class Members; and (ii) all parties to the ADR Allocation Process and their successors in interest other than Lead Plaintiffs and the Class.

Stipulation ¶ 1(ff).

It is well-settled that a court may certify a class for settlement, *see Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *In re Marsh & McLennan Sec. Litig.*, No. 04 Civ. 8144, 2009 WL 5178546, at *8 (S.D.N.Y. Dec. 23, 2009), provided it conducts an inquiry under Rules 23(a) and (b).   *See Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006). While a class generally must meet all of the requirements of Rule 23, "[s]ettlement is relevant to a class certification" and is "a factor in the calculus."   *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619, 622 (1997).[18]  The Court should: (i) make a determination that the proposed settlement class satisfies Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation, and at least one of the subsections of Rule 23(b); and (ii) certify the settlement class, and appoint Interim Lead Counsel as Lead Class Counsel and the Plaintiffs as class representatives.

As discussed below, all of the certification requirements for settlement purposes are met for this proposed settlement class, and Buchanan consents to certification for settlement purposes only. *See* Stipulation ¶ 3(d).[19]

### 1.    Numerosity

Class certification under Rule 23(a)(1) is appropriate where a class contains so many members that joinder of all would be "impracticable."   *Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir. 1994) (quoting Fed. R. Civ. P. 23).   Numerosity is presumed when a class consist of forty members or more.   *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.

---

[18]  In determining whether to certify a settlement class, the manageability concerns of Rule 23(b)(3) are not at issue. *See Amchem*, 521 U.S. at 593.

[19]  *See Newberg* § 11.27 at 11-40 ("When the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only."); *County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989) ("It is appropriate for the parties to a class action suit to negotiate a proposed settlement of the action prior to certification of the class."), *aff'd*, 907 F.2d 1295 (2d Cir. 1990).

1995).   Also, "[i]n securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464, at *2 (S.D.N.Y. Sept. 8, 2003) (citation omitted).

Lead Plaintiffs believe that the Settlement Class consists of many thousands of members. Throughout the Class Period, investors actively traded Adelphia's common stock on the NASDAQ.   The exact number of Class members is unknown to Lead Plaintiffs, but Co-Lead Counsel believe there are, at a minimum, hundreds, if not thousands of members of the Class.[20] Thus, numerosity is readily established.

### 2.    Commonality

Rule 23(a)(2) requires that, in order for an action to be properly maintained as a class action, there must be questions of law or fact common to the class.    The commonality requirement is satisfied if the named plaintiffs share at least one question of fact or law in common with the purported class.    *See Marisol A. by Forbes v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).   Cases like this one easily meet the commonality requirement, which is satisfied where "putative class members have been injured by similar material misrepresentations and omissions." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 85 (S.D.N.Y. 2007).   There are numerous common questions of law or fact including: (a) whether the federal securities laws were violated by Buchanan's acts as alleged herein; (b) whether statements disseminated by Buchanan to the investing public during the Class Period omitted and/or misrepresented material facts about Adelphia's business and operations; (c) whether Buchanan acted willfully or

---

[20]   Adelphia had approximately 228 million shares of its common stock outstanding, and an average weekly trading volume of approximately 62.373 million shares.   *See* Joint Decl. Ex. 5.   In addition, thousands of Adelphia debt securities also traded during the Class Period.   Indeed, over 13,000 class members filed valid proof of claims in the prior settlements in this consolidated action.

recklessly in omitting and/or misrepresenting material facts; (d) whether Buchanan's non-disclosures and/or misrepresentations constituted a fraud on the market by artificially inflating the market prices of Adelphia's securities during the Class Period; and (e) whether the members of the Settlement Class have sustained damages and, if so, what is the proper measure of such damages.    These issues are prototypical examples of those which have been found to present "common questions" meriting class certification.

### 3.    Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."    Fed. R. Civ. P. 23(a)(3).    This requirement is readily met where "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007) (citation omitted); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).    In this regard, the requirements of commonality and typicality tend to merge.    *See Marisol A.*, 126 F.3d at 376.    In essence, "[t]he crux of both requirements is to ensure that 'maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).    There is no requirement, however, that the claims of all members of a purported class be identical.    *Marsh & McLennan*, 2009 WL 5178546, at *10.    It is well-established that "factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements . . . ."    *Id.*

Here, the claims of Lead Plaintiffs and absent Settlement Class Members are based on the same alleged misleading misrepresentations in Adelphia's financial statements.    Lead Plaintiffs alleged that, during the Class Period, Buchanan acted as legal counsel to Adelphia, was responsible for reviewing Adelphia's misleading prospectuses, registration statements, and financial statements, and provided materially misleading expert legal opinions.    Lead Plaintiffs further alleged that once the truth was disclosed, Adelphia's stock declined in value, thereby injuring the Lead Plaintiffs and the Class.    Accordingly, Lead Plaintiffs' and the Class' interests are directly aligned and Lead Plaintiffs' claims are typical of the proposed Class.

### 4.    Adequacy

Federal Rule of Civil Procedure Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interest of the class."    The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 594 (citing *Falcon*, 457 U.S. 147, 157-58, n.13).    The requirement is met if it appears that: (1) the named plaintiffs' interests are not antagonistic to the class' interests; and (2) the named plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation.    *See In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 291 (2d Cir. 1992); *Marsh & McLennan*, 2009 WL 5178546, at *10.    Indeed, Lead Plaintiffs have successfully litigated this lawsuit for many years and collectively recovered over $450 million in settlements, not including the proposed Settlement before the Court.

Co-Lead Counsel are eminently qualified, experienced and able to conduct this litigation. Lead Plaintiffs have further demonstrated their adequacy by vigorously pursuing the claims in this Action against Buchanan and against the other defendants in this case that resulted in partial settlements.    In addition, Co-Lead Counsel have extensive experience and expertise in class

action and complex securities litigation in courts throughout the country, as documented in their résumés.   *See* Joint Decl., Exs. 6-7.   Moreover, as discussed above, because Lead Plaintiffs and the Settlement Class were injured by the same alleged misconduct, their interests and claims are coextensive.   Thus, Rule 23(a)(4) is satisfied.

### 5.   Predominance and Superiority

To certify a class under Rule 23(b)(3), a court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Marsh & McLennan*, 2009 WL 5178546, at *11.   The Supreme Court has defined this inquiry as establishing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.   This inquiry is "similar" to Rule 23(a)(3)'s typicality requirement.   *Id*. at 623 n.18.   The Court added that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Id*. at 625.

Here, the predominance requirement is readily satisfied.   The essence of the Complaint alleges that Adelphia's financial statements, prospectuses and registration statements were false and misleading, and that Buchanan provided Adelphia materially misleading expert legal opinions with respect to those documents.   Under these circumstances, Lead Plaintiffs' Section 10(b) claim is susceptible of proof applicable to all class members, through common evidence of Adelphia's public statements, Adelphia's internal business practices and procedures, and the impact of corrective disclosures on Adelphia securities that traded on an efficient market.

Rule 23(b)(3) also sets forth the following non-exhaustive factors to be considered in making a determination of whether class certification is the superior method of litigation: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). Courts have recognized that the "class action is uniquely suited to resolving securities claims," because "the prohibitive cost of instituting individual actions" in such cases gives class members "limited interest in individually controlling the prosecution or defense of separate actions." *Marsh & McLennan*, 2009 WL 5178546, at *12.

The scope and complexity of Lead Plaintiffs' claims against Buchanan, together with the high cost of individualized litigation, make it unlikely that the vast majority of the Settlement Class Members would be able to obtain relief without class certification.    Moreover, it is clearly desirable to concentrate the claims of all Settlement Class Members in this forum. Accordingly, the requirements of Rule 23(b)(3) are satisfied.

### C.    Notice to the Settlement Class Should be Approved

As outlined in the Preliminary Approval Order, Co-Lead Counsel will notify Settlement Class Members of the pendency of the Action and the proposed Settlement by mailing the Notice and Claim Form to all Class Members who can be identified with reasonable effort.    The Notice will advise Settlement Class Members of (i) the pendency of the Action as a class action; (ii) the essential terms of the Settlement; (iii) the proposed Plan of Allocation; and (iv) information regarding Co-Lead Counsel's motion for attorneys' fees and reimbursement of litigation expenses.    The Notice will also provide specifics on the date, time and place of the Settlement Fairness Hearing and set forth the procedures, as well as deadlines, for opting out of the Settlement Class, for objecting to the Settlement, the proposed Plan of Allocation and/or the motion for attorneys' fees and reimbursement of litigation expenses, and for submitting a Claim

Form.[21]   The proposed Preliminary Approval Order also requires Co-Lead Counsel to cause the

Summary Notice to be published once in the national edition of *The Wall Street Journal* and to

be transmitted once over the *PR Newswire* within fourteen (14) days of the Preliminary Approval

Order.   Co-Lead Counsel will also cause a copy of the Notice and Claim Form to be available

on the existing settlement website established by the Claims Administrator.

The form and manner of providing notice to the Settlement Class satisfy the requirements

of due process, Rule 23, and the PSLRA, 15 U.S.C. § 78u-4(a)(7).   The Notice and Summary

Notice "fairly apprise the prospective members of the class of the terms of the proposed

settlement and of the options that are open to them in connection with the proceedings."

*Wal-Mart*, 396 F.3d at 114; *see also Dorn v. Eddington Sec., Inc.*, No. 08 Civ. 10271, 2011 WL

382200, at *4 (S.D.N.Y. Jan. 21, 2011).

## V.   THE SUPPLEMENTAL AGREEMENT SHOULD REMAIN CONFIDENTIAL

In the Court's June 4, 2013 Order, the Court asked the parties to "explain why the Court

should not require the parties to publicly file the Supplemental Agreement referenced in

paragraph 29 of the Stipulation and Agreement of Settlement, in light of the common law right

of access to judicial documents."   *See* Dkt. No. 805 at 1-2.   For the reasons below, the parties

respectfully respond that the Supplemental Agreement should not be publicly disclosed, or,

alternatively, it should be reviewed by the Court *in camera*.

It is a well-accepted practice in securities litigation for settling parties to agree not to

publicly disclose the terms of an agreement specifying that a defendant may seek to terminate the

settlement if a specific number of class members or quantum of claims seek exclusion from the

---

[21]   The proposed Notice expressly advises class members that if they previously filed a claim form in connection with any prior settlement in this consolidated class action and such claim was accepted and not rejected, they do not have to file another proof of claim to participate in this Settlement.

settlement.[22]   *See, e.g.*, *In re Healthsouth Corp. Sec. Litig.*, 334 F. App'x. 248, 250 n.4 (11th Cir. 2009) (as a policy concern, "the threshold number of opt outs required to trigger the blow provision is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out."); *2 McLaughlin on Class Actions*, § 6.22 (9th ed. 2012) ("Accordingly, a confidentially 'blow up' or termination provision allowing the defendant to terminate the settlement agreement if a designated number or percentage of class members opt out of the settlement may remain non-public."). Courts retain authority not to require public disclosure of the terms of any side agreement that does not influence the terms of the settlement by bargaining away possible advantages for the class in exchange for advantages for others.   *See, e.g.*, *IPO*, 226 F.R.D. at 205 (court reviewed side agreements *in camera* and concluded that the "agreements themselves do not affect the rights of, or consideration to, the proposed Settlement Classes" and rejected non-settling defendant's request for discovery relating thereto); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 560 (N.D. Ga. 2007) (court requested *in camera* review of side-agreement prior to concluding that agreement need not be publicly disclosed).

Here, the parties' Stipulation identifies a Supplemental Agreement within Rule 23(e)(3), which discusses a "blow provision." Stipulation ¶ 29.   Specifically, the blow provision

---

[22]   Fed. R. Civ. P. 23(e)(3) requires the parties seeking approval of a class action settlement to "file a statement <u>identifying</u> any agreement made in connection with the [proposed settlement]." (Emphasis added).   As recognized by the court in *IPO*:

> The Advisory Committee's 2003 Notes indicate that Rule 23(e)(2) [now Rule 23(e)(3)] is intended to ensure that the parties disclose undertakings related to a class action settlement because those 'side agreements' may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others.   The same Note states that '[f]urther inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors.'

226 F.R.D. at 204-05 (deciding motion for preliminary approval of securities class action settlement).   While "[t]he court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties . . . [a] direction to disclose a summary or copy of an agreement may raise concerns of confidentiality.   Some agreements may include information that merits protection against general disclosure."   Fed. R. Civ. P. 23(e)(2) Advisory Committee Note, 2003 Amendments.

grants Buchanan the option to terminate the proposed Settlement if the aggregate Recognized Claims (as that term is described in the Plan of Allocation) of all Settlement Class Members who deliver timely and valid requests for exclusion from the Settlement Class equals or exceeds a certain threshold percentage.    The blow provision does not "trad[e] away possible advantages for the class in exchange for advantages for others."[23]  *IPO*, 226 F.R.D. at 204-05.   The parties did not negotiate the blow provision until the parties had an agreement on the dollar value of the settlement considerations.    Thus, there was no risk of bargaining away any advantages. Further, not disclosing the specific terms of the Supplemental Agreement may discourage third parties from soliciting class members to opt out of the proposed Settlement.    Consistent with the prior settlements in this case, the parties had similar blow provisions and submitted the supplemental agreements to Judge McKenna *in camera*, which were not required to be publicly filed.    *See* Joint Decl. ¶ 34.

        Last, based on Co-Lead Counsel's review of recent PSLRA securities class action cases in this District, at least fifty cases involved settlement agreements that referred to blow provisions - like the one here - in separate confidential supplemental agreements, and where the supplemental agreements were not publicly filed documents with the Court.    *Id.* at ¶ 35 and Ex. 3 thereto.    Co-Lead Counsel submits that maintaining the confidentiality of the Supplemental Agreement is consistent with common practice in securities class action settlements and necessary to discourage third parties from soliciting opt-outs.    Thus, the parties should not be required to publicly file the Supplemental Agreement.

---

[23]  *Cf. In re Herald, Primeo and Thema Sec. Litig.*, No. 09 Civ. 289, 2011 WL 4351492, at **2, 10-12 (S.D.N.Y. Sept. 15, 2011) (declining to allow blow provision in securities class action settlement to be filed under seal where the proposed settlement appeared on its face to be an improper collusive settlement).

## VI.    CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court enter an order that will, among other things: (1) grant preliminary approval of the proposed Settlement; (2) certify the Settlement Class and appoint Lead Plaintiffs as class representatives and Co-Lead Counsel as class counsel, for purposes of the Settlement; (3) approve the parties' proposed form and method of proving notice of the Settlement to the Settlement Class, and direct that notice be given to Settlement Class members; and (4) schedule a hearing at which the Court considers (a) the parties' request for final approval of the Settlement Class, the Settlement, the Plan of Allocation, and entry of the Judgment and (b) Co-Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses.

Dated:   June 14, 2013                                    Respectfully submitted,

ABBEY SPANIER, LLP                              KIRBY McINERNEY LLP


By:     /s/ Judith L. Spanier                          By:     /s/ Mark A. Strauss

Arthur N. Abbey                                        Mark A. Strauss
Judith L. Spanier                                      Peter S. Linden
Richard B. Margolies                                   Beverly T. Mirza
212 East 39th Street                                   825 Third Avenue
New York, NY 10016                                     New York, NY 10022
Telephone: (212) 889-3700                              Telephone: 212-371-6600
Facsimile: (212) 684-5191                              Facsimile: 212-751-2540
aabbey@abbeyspanier.com                                mstrauss@kmllp.com
jspanier@abbeyspanier.com                              plinden@kmllp.com
rmargolies@abbeyspanier.com                            bmirza@kmllp.com

*Co-Lead Counsel for Lead Plaintiffs*