**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ADELPHIA COMMUNICATIONS CORPORATION SECURITIES AND DERIVATIVE LITIGATION<br><br>This Document Relates to:<br><br>Consolidated Class Action Complaint (Nos. 03-CV-5755;  03-CV-5756; 03-CV-5757; 03-CV-5758; 03-CV-5759; 03-CV-5760; 03-CV-5761; 03-CV-5762; 03-CV-5763; 03-CV-5764; 03-CV-5765; 03-CV-5766; 03-CV-5768; 03-CV-5769; 03-CV-5770; 03-CV-5771; 03-CV-5774; 03-CV-5775; 03-CV-5776; 03-CV-5778; 03-CV-5780; 03-CV-5781; 03-CV-5783; 03-CV-5784; 03-CV-5785; 03-CV-5786; 03-CV-5787; 03-CV-5790; 03-CV-5791; 03-CV5792). | 03 - MD - 1529 (JMF)<br><br>Civil Case No.: 03 Civ. 5785 |

**JOINT DECLARATION OF JUDITH L. SPANIER**
**AND MARK A. STRAUSS IN SUPPORT OF CO-LEAD COUNSEL'S**
**UNOPPOSED MOTION FOR (I) PRELIMINARY APPROVAL OF SETTLEMENT,**
**(II) CERTIFICATION OF THE SETTLEMENT CLASS FOR PURPOSES OF THE**
**SETTLEMENT AND (III) APPROVAL OF NOTICE TO THE SETTLEMENT CLASS**

We, Judith L. Spanier and Mark A. Strauss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      We are members in good standing of the Bar of the State of New York, and are admitted to practice before this Court.

2.      We, Judith L. Spanier of the law firm of Abbey Spanier, LLP, and Mark A. Strauss of the law firm of Kirby McInerney LLP (collectively, Co-Lead Counsel) represent Eminence Capital LLC, Argent Classic Convertible Arbitrage Fund L.P., Argent Classic Convertible Arbitrage Fund (Bermuda), Ltd., Argent Lowlev Convertible Arbitrage Fund, Ltd., UBS O'Connor LLC f/b/o UBS Global, Equity Arbitrage Master, Ltd., and UBS O'Conner LLC

f/b/o UBS Global Convertible Portfolio (collectively, "Lead Plaintiffs") in the above captioned

matter.  We are actively involved in the prosecution of the above-captioned class action

(hereinafter, the "Action"), are familiar with its proceedings, and have personal knowledge of the

matters set forth herein based upon our active supervision and participation in all material

aspects of the Action.  We make this declaration in support of Lead Plaintiffs' Unopposed

Motion for (I) Preliminary Approval of Settlement, (II) Certification of the Settlement Class for

Purposes of the Settlement and (III) Approval of Notice to the Settlement Class.[1]

## I.      RELEVANT PROCEDURAL HISTORY AND THE MEDIATION PROCESS

### A.      The March 27, 2002 Disclosure of Off-Balance Sheet Debt and the Commencement of Litigation

3.      On March 27, 2002, Adelphia for the first time disclosed the existence of up to

$2.3 billion in off-balance sheet debt.  Members of the Rigas Family who served as the

Company's directors and officers (or entities owned and controlled by the Rigas Family)

incurred that debt under the terms of certain co-borrowing credit facilities guaranteed by

Adelphia.  The March 27, 2002 announcement and the market's negative reaction to it triggered

the filing of securities class and individual actions against Adelphia, its officers and directors and

Adelphia's auditor, Deloitte.

4.      Between April and June 2002, eight individual and 31 class actions were filed by

purchasers of Adelphia debt and equity securities against Adelphia, its officers and directors,

Adelphia's auditor, Deloitte, and various of Adelphia's underwriters and lenders (the "Banks").

Virtually all of the actions were filed in the United States District Court for the Eastern District

of Pennsylvania (the "Eastern District of Pennsylvania") and assigned to the Honorable Herbert

---

[1] All capitalized terms not otherwise defined herein shall carry the meaning set forth in the Stipulation and
Agreement of Settlement, dated May 15, 2013 ("Stipulation") filed with the Court on May 23, 2013 [Dkt. No. 795].

Hutton.  On April 30, 2002, Judge Hutton entered an order consolidating the then pending actions filed in the Eastern District of Pennsylvania under the caption *In re Adelphia Communications Securities Litigation* (Master File No. 02 CV 1781) (the "Consolidated Action").

**B.    The Motions for Appointment of Lead Plaintiff**

5.      On June 3, 2002, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), motions were filed in the class actions in the Eastern District of Pennsylvania seeking the appointment of Lead Plaintiff.  The PSLRA, Section 21D(a)(3)(B), expressly directs the district court to consider any motions by a plaintiff or a purported class member[2] to serve as Lead Plaintiff by not later than ninety (90) days after the date of publication of notice and to appoint Lead Plaintiff(s) in accordance with the statutory requirements.

**C.    The Adelphia Bankruptcy Filings and the Commencement of Criminal Proceedings Against the Rigases**

6.      Following the filing of the lead plaintiff motions, on June 25, 2002, Adelphia filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Southern District of New York (the "Bankruptcy Court").   CCAC[3] ¶¶ 15, 35(d), 601.  On July 2, 2002, a "suggestion of bankruptcy" was filed in the Eastern District of Pennsylvania by Adelphia advising that court of the filing of the Chapter 11 petitions, and the application of the automatic stay applicable to claims by or against Adelphia pursuant to Section 362 of the Bankruptcy Code, 11 U.S.C. § 362.

---

[2] In accordance with the PSLRA, a movant for Lead Plaintiff need not file a complaint until after the resolution of the Lead Plaintiff motion.  *See* 15 U.S.C. §77z-1(a)(3)(B)(i) (2004); 15 U.S.C. 78u-4(a)(3)(B)(i) (2004).  Here, not all movants had filed complaints.

[3] "CCAC" refers to the Consolidated Class Action Complaint dated and filed with the Court on December 22, 2003. *See* Dkt. No. 32 in Case No. 03-md-1529.

7.     In addition to the proceedings in the Bankruptcy Court, the U.S. Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") commenced criminal and civil regulatory investigations concerning transactions between Adelphia and various members of the Rigas Family.  CCAC ¶ 579.  On July 24, 2002, the SEC filed a formal action against several of Adelphia's officers and directors (defendants John J. Rigas, Michael J. Rigas, Timothy J. Rigas, James R. Brown and Michael Mulcahey) in the Southern District of New York, and the DOJ instituted criminal proceedings against the same five individuals.  *Id.* at ¶¶ 19, 603, 605.  On the same day, John, Timothy and Michael Rigas were arrested.  The SEC charged Adelphia's officers with perpetrating "one of the most extensive financial frauds ever to take place at a public company."  *Id.* at ¶ 605.  On September 23, 2002, various members of the Rigas Family were indicted in the Southern District of New York on criminal charges for conspiracy, securities fraud and wire fraud.  *Id.*

### D.     The MDL Panel Transfer Motions and Subsequent Applications

8.     On September 17, 2002, Deloitte and various financial institutions named as defendants in the Huff Action moved the Judicial Panel on Multi-District Litigation (the "MDL Panel"), pursuant to 28 U.S.C. § 1407, to take jurisdiction of the actions then pending in the Eastern District of Pennsylvania and the Western District of New York and to enter an order transferring all cases to the Eastern District of Pennsylvania ("E.D. Pa. Court") for consolidated and coordinated pretrial proceedings.  *In re Adelphia Communication Corp. Sec. & Deriv. Litig.*, 237 F. Supp. 2d 1381 (J.P.M.L. 2002).

9.     Thereafter, the E.D. Pa. Court , sua sponte, in a summary order dated September 25, 2002, stayed all of the actions before it pending the disposition of the bankruptcy and criminal proceedings in the Southern District of New York.  *See Ruskin v. Adelphia Corp.*, No. 02 Civ. 1781-HH, Dkt. No. 71.  Additionally, in a separate order entered the same date, the E.D.

Pa. Court denied all pending motions, with leave to renew, including the five Lead Plaintiff motions. *See id.* Dkt. No. 72.

10.     Subsequently, in October 2002, various class plaintiffs made several applications before the E.D. Pa. Court including, but not limited to, motions to lift the stay of the actions, to appoint a Lead Plaintiff under the PSLRA and to set a schedule for the filing of consolidated pleadings and related motion practice.

11.     On December 2, 2002, the MDL Panel denied the motion to transfer, without prejudice." *In re Adelphia*, 237 F. Supp. 2d at 1382.

12.     On February 20, 2003, Deloitte and various financial institutions renewed their motion before the MDL Panel to consolidate the Adelphia litigation in a single forum and to transfer the cases to the Eastern District of Pennsylvania.

13.     On July 23, 2003, the MDL Panel granted Deloitte's renewed transfer motion and assigned all of the pending actions to the Honorable Harold Baer, Jr., in the Southern District of New York.

14.     Judge Baer, however, recused himself from the transferred actions.  By order dated October 1, 2003, the MDL Panel assigned these cases to Judge McKenna.  On December 5, 2003, Judge McKenna entered an order appointing Lead Plaintiffs and lead counsel, consolidating the class actions and providing for the coordination of the class actions and individual actions for pretrial purposes.  *In re Adelphia Commun. Corp. Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM) (S.D.N.Y. Dec. 5, 2003).

   **E.     Lead Plaintiffs' Consolidated Class Action Complaint and The Motions to Dismiss**

15.     On December 22, 2003, Lead Plaintiffs filed the CCAC asserting claims under Sections 11, 12 and 15 of the Securities Act, Sections 10(b) of the Exchange Act (and Rule

10(b)(5) promulgated thereunder), Section 20(a) of the Exchange Act and certain state law fraud claims on behalf of all persons who purchased or otherwise acquired Adelphia securities from August 16, 1999 through June 10, 2002 (the "Class Period").   The 270-page consolidated class action complaint (the "CCAC") was brought on behalf of investors during the period of August 16, 1999 through June 10, 2002 inclusive.  The Complaint named numerous defendants including Adelphia's long-time outside counsel, Buchanan Ingersoll Professional Corporation ("Buchanan").   Over the next year, motions to dismiss the CCAC and the individual cases were filed by all defendants and extensively briefed by the parties.  Except as otherwise pertinent, the discussion below concerns the Buchanan motions only.

16.     Lead Plaintiffs asserted Section 10(b) claims against Buchanan for primary liability were based on: (1) Buchanan's furnishing of false and misleading opinion letters in connection with Adelphia's offerings of debt securities; and (2) Buchanan's participation in a scheme to defraud Adelphia's investors by drafting, preparing, reviewing and approving Adelphia's false and misleading registration statements, 10-Ks, 10-Qs and other SEC filings during the Class Period.

17.     On March 8, 2004, Buchanan moved to dismiss the §10(b) claims on the grounds that (i) the allegedly false "legal opinions" that it rendered in connection with various Adelphia securities were not actionable because they were "forward looking statements" which could not be read to have spoken to Adelphia's debt-covenant compliance; (ii) it had no duty to disclose Adelphia's alleged breach of its debt covenants; (iii) under *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, N.A., 511 U.S. 164 (1994), it could not be held liable under Section 10(b) for false statements contained in Adelphia's SEC filings merely on the ground that it allegedly "drafted and reviewed" those filings; (iv) plaintiffs' §10(b) claims purportedly failed to

plead "loss causation;" and (v) it lacked *scienter* because the allegedly false "legal opinions" it rendered were "not false" and plaintiffs failed to plead motive and opportunity or recklessness with respect to Buchanan's knowledge of the alleged falsity of the legal opinions or of Adelphia's SEC filings.

18.     In addition to its own motions to dismiss, Buchanan incorporated the Banks' and Deloitte's statute of limitation arguments, contending that (i) certain federal securities claims were time-barred under the one-year inquiry notice period and under the three-year statute of repose; (ii) the then new, two-year notice period/five-year statute of repose contained in the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") was inapplicable because the Complaint constituted a "proceeding" commencing before the effective date of the Sarbanes-Oxley Act; and (iii) "relation back" under Fed .R. Civ. P. 15(c) was not available to Lead Plaintiffs.

19.     On July 13, 2004, Lead Plaintiffs along with other individual plaintiffs filed their joint oppositions to Buchanan's motions to dismiss.  Lead Plaintiffs argued that (i) the § 10(b) and claims against Buchanan could not be determined on a motion to dismiss, as a "reasonable investor" could have found the statements in Buchanan's "opinion letters" to have been materially false and misleading; (ii) the misstatements at issue concerned then existing facts including, contrary to Buchanan's mischaracterization, facts relating to Adelphia's purported debt covenant compliance - and thus were not "forward-looking" statements; (iii) Buchanan had affirmative duties of disclosure relating to Adelphia's debt covenant compliance as counsel to Adelphia under Regulation S-K and under the ERISA; (iv) Buchanan assumed a duty of investigation and disclosure under the securities laws by rendering opinion letters; (v) Plaintiffs adequately alleged Buchanan's "primary participation" in Adelphia's fraudulent scheme,

consistent with *Central Bank*, by virtue of Buchanan's drafting, preparing, reviewing and approving Adelphia's materially false SEC filings; (vi) Buchanan's scienter was adequately pled as the Complaint alleged that the subject opinion letters represented that Buchanan had examined all information necessary to render its opinions, and that Buchanan had drafted or prepared the documentation for the co-borrowing credit facilities and thus knew or recklessly disregarded that these transactions were not arms-length as between Adelphia and the Rigas Entities; (vii) contrary to Buchanan's "loss causation" argument, Buchanan's violations were a substantial and "but for" causal factor in plaintiffs' losses, as the misrepresentations concerning Adelphia's compliance with debt covenants directly affected the value of Adelphia's securities, which declined in price upon the corrective disclosures; and (viii) plaintiffs' claims were not time barred against Buchanan.

20.     On May 27, 2005, this Court issued a decision with respect to the Banks' motions to dismiss the Complaint limited to the statute of limitations issues. *See In re Adelphia Communications Corp.*, No. 03 MD 1529(LMM), 2005 WL 1278544 (S.D.N.Y. May 31, 2005). The Court determined that the filing of an amended complaint did not constitute the commencement of a new proceeding for the purposes of the Sarbanes-Oxley Act.  Consequently, Lead Plaintiffs' new claims in the Complaint against new defendants (*i.e.*, previously unnamed lending banks and underwriters) and claims against certain defendants based on new transactions (*i.e.*, previously unchallenged securities and debt offerings) were governed under the one-year/three year limitations period as opposed to the two-year/five year Sarbanes-Oxley framework.  The Court also held that plaintiffs were placed on inquiry notice of any new claims against certain Bank defendants by the "storm warnings" between March and June 2002, and the filing of certain other actions against various defendants.  As a result, while certain claims were

sustained, certain claims (the "New Claims") were dismissed without prejudice, as time-barred under the one-year statute of limitations period.

21.     The May 27, 2005 Opinion permitted plaintiffs to amend the Complaint in order to replead events transpiring during the months after they were placed on inquiry notice that justified a delay in filing the New Claims. The Court also granted plaintiffs leave to replead to allege facts sufficient to argue that equitable tolling was appropriate to stop the running of the limitations period to the New Claims.  The Court expressly ordered that repleading await the resolution of all of the pending motions to dismiss.

**F.     The Mediation and Buchanan's Supplemental Briefing In Support of Its Motion to Dismiss Lead Plaintiffs' Section 10(b) Claims**

22.     Prior to any such repleading or the resolution of the various other pending motions to dismiss that were sub judice, in mid-2005, at the suggestion of the Court, the parties agreed to participate in mediation to resolve the pending class action.  Given the number of parties involved, selection and agreement upon a single mediator was far from a simple task. Ultimately, the various parties agreed to mediation before the Honorable Daniel Weinstein (Ret.).  Mediation ensued in stages over the course of the next year that ultimately resulted in partial settlements with various defendants including Adelphia's auditor Deloitte, the Banks and the Individual Defendants.

23.     On October 9, 2006, Lead Plaintiffs and Buchanan, along with other plaintiffs and claimants participated in a mediation session with Judge Weinstein.  At that initial meeting, Lead Plaintiffs and other individual plaintiffs understood that Buchanan had secured the agreement of its insurance carriers to pay a total of forty million dollars to fund an equitable allocation process to settle Lead Plaintiffs and other individual plaintiffs' claims against Buchanan. Judge Weinstein proposed a plan where, pursuant to an ADR Allocation Process, he would determine

each of the plaintiffs' equitably apportioned share of such fund.  Thereafter, Lead Plaintiffs and other individual plaintiffs and claimants had discussions with Judge Weinstein regarding the proposed ADR Allocation Process.

24.     In May 2008, Buchanan filed supplemental briefing in support of its motion to dismiss Lead Plaintiffs Section 10(b) claims.  The brief addressed the United States Supreme Court's then newly issued decision in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761 (2008). Buchanan argued that under *Stoneridge*, it could not be held liable under Section 10(b) because it made no false public statements and engaged in no deceptive conduct communicated to the securities markets.  Buchanan also argued that the Supreme Court had rejected Lead Plaintiffs' alternative theory of Rule 10b-5(a) and (c) "scheme liability."

25.     In July 2008, Lead Plaintiffs filed their opposition to Buchanan's supplemental *Stoneridge* briefing.  Lead Plaintiffs argued that a correct reading of *Stoneridge* indicated that the Supreme Court's holding did not require that secondary actors make a direct public misrepresentation as a condition to liability under Section 10(b).  Rather, deceptive conduct was still adequate.  Thereafter, further delays ensued in the mediation process that delayed the commencement of what ultimately became the ADR Allocation Process.

### G.     The Buchanan ADR Allocation Process

26.     In February 2011, an ADR Allocation Process was proposed in which Judge Weinstein would determine each of the plaintiffs' equitably apportioned share of the $40 million global settlement fund.  All parties confronted a very serious risk if they decided not to participate in the ADR Allocation Process and continued to litigate against Buchanan.

27.     On March 22, 2011, Lead Plaintiffs and Buchanan, along with other plaintiffs in the ADR Actions, participated in another mediation session with Judge Weinstein at which all of the parties preliminarily agreed to participate in the ADR Allocation Process.  The ADR

Allocation Process was delayed for almost an entire year while the Adelphia Recovery Trust[4]
engaged in mediation concerning unique claims that it had against Buchanan that were covered
under a separate Buchanan insurance policy.

28.     After resolution of the Adelphia Recovery Trust's claims against Buchanan,
which resolution was announced publicly on June 27, 2012 (*see* Ex. 1, which is a true and
accurate copy) and after additional negotiations with Judge Weinstein and Buchanan regarding
the specific language of the ADR Allocation Agreement, in August 2012, Lead Plaintiffs and all
of the other participants in the ADR Actions entered into a Binding ADR Agreement, a true and
accurate copy is attached hereto as Ex. 2.  Once the parties signed on to the Binding ADR
Agreement, Buchanan provided certain discovery to Lead Plaintiffs and other claimants in the
ADR Actions.

29.     Throughout August and September 2012, the plaintiffs and claimants in the ADR
Actions submitted several rounds of briefing addressing their own claims as well as the
competing claims of the other eight claimants in the Allocation Process.  The briefing was
followed by formal oral presentations by each claimant to Judge Weinstein regarding the
strengths and weaknesses of its claims and the competing claims of others in the ADR Actions.
During October 2012, Lead Plaintiffs continued to confer with and provide information to Judge
Weinstein regarding the issues presented in the ADR Allocation Process.

30.     On November 20, 2012, Judge Weinstein issued his decision in the ADR
Allocation Process making Allocation Awards to each participant in the Allocation Process.  On

---

[4] The Adelphia Recovery Trust is a Delaware Statutory Trust formed pursuant to the First Modified Fifth Amended
Joint Chapter 11 Plan of Reorganization of Adelphia Communications Corporation and Certain Affiliated Debtors,
which became effective February 13, 2007.   The Trust holds certain litigation claims transferred pursuant to the
Plan against various third parties and exists to prosecute the causes of action transferred to it for the benefit of
holders of Trust interests.  *See* http://www.prnewswire.com/news-releases/adelphia-recovery-trust-announces-30-
million-distribution-183929151.html.

December 7, 2012, Buchanan caused the various Allocation Awards to be deposited in an interest bearing escrow account pending appropriate documentation of the dismissal of the various claims.  Only the dismissal and resolution of Lead Plaintiffs' claims were subject to Court approval.

31.     In December 2012, Lead Plaintiffs and Buchanan conferred with each other and ultimately participated in additional meetings with Judge Weinstein regarding the sufficiency of the Class Allocation in the ADR Allocation Process.

32.     On or about January 15, 2013, after additional negotiations between Lead Plaintiffs and Buchanan under the auspices of Judge Weinstein, Buchanan and Lead Plaintiffs reached an agreement in principle to settle the Class claims against Buchanan. Buchanan agreed to pay consideration in addition to the Class's Allocation in the ADR Allocation Process.

## II.     THE SUPPLEMENTAL AGREEMENT

33.     The parties' Stipulation identifies a Supplemental Agreement within Rule 23(e)(3), which discusses a "blow provision." Stipulation ¶ 29.  Specifically, the blow provision grants Buchanan the option to terminate the proposed Settlement if the aggregate Recognized Claims (as that term is described in the Plan of Allocation of the Notice of Pendency and Proposed Partial Settlement of Class Action, Dkt. No. 795-2) of all Settlement Class Members who deliver timely and valid requests for exclusion from the Settlement Class equals or exceeds a certain threshold percentage.

34.     In prior settlements in this case with the other defendants in this case (specifically, Adelphia's auditors Deloitte & Touche, various of Adelphia's underwriters and lenders - *e.g.*, the Banks - and certain of Adelphia's directors and officers), the parties had blow provisions in the respective settlement agreements – similar to the one in this settlement - and submitted the

supplemental agreements detailing the blow provisions to Judge McKenna *in camera* for review. Following Judge McKenna's review, the Court did not require the parties to publicly file the supplemental agreements.

35.     Co-Lead Counsel has reviewed recent PSLRA securities class action cases in the Southern District of New York and found that at least fifty cases involved settlement agreements that referred to blow provisions that permitted the defendant to terminate the settlement if a specific number of class members request exclusion from the settlement but where the specific number remained confidential in a separate supplemental agreement.  Attached hereto as Exhibit 3 is a compendium of the relevant provisions from the stipulations in those cases that contained a blow provision reference and a supplemental agreement.  Further, based on Co-Lead Counsel's review of the dockets from the time the stipulation of settlement was filed through preliminary approval of the settlements, many, if not all, of the dockets did not show that the supplemental agreements were publicly filed on the dockets.

36.     The only case that Co-Lead Counsel could find where a court in this district ordered a purported blow provision to be disclosed was *In re Herald, Primeo and Thema Sec. Litig.*, No. 09 Civ. 289 (RMB), 2011 WL 4351492 (S.D.N.Y. Sept. 15, 2011).  In that case, Judge Berman declined preliminary approval to an apparently collusive settlement wherein lead counsel for the class would have received millions of dollars in fees for work that it had not yet done but purportedly anticipated doing in the future, in a separate litigation in Europe, and the settling defendants would have received assignments of valuable rights of absent class members. *Id.* at **2, 10-12.

## III.    ADDITIONAL EXHIBITS

37.     True and accurate copies of the following documents are reproduced and annexed hereto:

Exhibit 4:      Cornerstone Research, "Securities Class Action Settlements: 2012 Review and Analysis," (2013).

Exhibit 5:      Bloomberg graph of Adelphia's class period stock price movement including daily trading volume and average daily trading volume for the class period.

Exhibit 6:      Firm resume of Co-Lead Counsel, Abbey Spanier, LLP.

Exhibit 7:      Firm resume of Co-Lead Counsel, Kirby McInerney LLP.


I declare under the penalty of perjury under the laws of the State of New York that the foregoing is true and correct.  Executed this 14th day of June 2013, in New York, New York.


_____*/s/ Judith L. Spanier*_____
Judith L. Spanier


I declare under the penalty of perjury under the laws of the State of New York that the foregoing is true and correct.  Executed this 14th day of June 2013, in New York, New York.


_____*/s/ Mark A. Strauss*_____
Mark A. Strauss