USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: **12/27/2013**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
IN RE ADELPHIA COMMUNICATIONS                                          :
CORPORATION SECURITIES AND                                             :
DERIVATIVE LITIGATION                                                  :
                                                                       :
-----------------------------------------------------------------------X     03 MDL 1529 (JMF)
                                                                       :
THIS DOCUMENT RELATES TO:                                              :     OPINION AND ORDER
                                                                       :
*Island Partners, et al. v. Deloitte & Touche LLP* (05cv2770)          :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiffs James Rigas, John Rigas, Zito I, L.P. ("Zito"), and Zito Media, L.P. ("Zito

Media") bring this action against accounting firm Deloitte & Touche LLP ("Deloitte"). Zito and

Zito Media assert rights as the putative successors-in-interest to entities formerly controlled by

James Rigas, John Rigas, and other members of their family. Specifically, Zito asserts its rights

as the successor-in-interest to entities known as Highland Holdings, Highland Preferred

Communications 2001 LLC ("Highland Preferred"), Highland Prestige Georgia, Inc. ("Highland

Prestige"), Highland Video Associates, L.P. ("Highland Video"), and Hilton Head

Communications, L.P. ("Hilton Head"). Zito Media asserts its rights as the successor-in-interest

to an entity known as the Coudersport Television Cable Company ("Coudersport TV").[1]

      The action arises out of the 2002 failure of Adelphia Communications Corporation

("Adelphia") and ensuing civil and criminal investigations. The Plaintiffs bring claims against

---

[1]     Plaintiffs erroneously state in the opening sentence of the Amended Complaint that
Coudersport TV, Highland Holdings, Highland Preferred, Highland Prestige, Highland Video,
and Hilton Head bring claims against Deloitte. (Am. Compl. (Docket No. 22) 1). These entities
are not listed as parties in the section of the Amended Complaint titled "The Parties," and do not
appear in the case caption. (Am. Compl. ¶¶ 1-5). Further, the Amended Complaint makes clear
that they transferred their litigation rights to Zito and Zito Media. (*Id.* ¶¶ 161-64).

Deloitte, the former auditor and accountant for Adelphia and entities managed by Adelphia, for the firm's alleged role in Adelphia's failure.  In essence, Plaintiffs claim that Deloitte directed the accounting decisions that ultimately ruined Adelphia, and then refused to stand behind these decisions once the government began to investigate the company.  On June 7, 2013, Plaintiffs filed an Amended Complaint asserting seven causes of action against Deloitte: breach of contract, breach of professional duty, negligent misrepresentation, tortious interference, breach of fiduciary duty, [2] contribution, and indemnity.  Deloitte now seeks to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true for purposes of this motion.  *See, e.g., LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

### A.  Adelphia, the Rigas Family, and Deloitte

In or about 1982, as the owner and co-owner of several cable television companies, John Rigas hired Deloitte to provide him and his companies with accounting and auditing services. (Am. Compl. ¶¶ 15-17).  John Rigas ran the companies with his sons James, Timothy, and Michael; in July 1986, they reorganized five of the companies into a single holding company, Adelphia, which they subsequently took public.  (*Id.* ¶¶ 14, 19, 22).  The Rigas family (including John, James, Timothy, Michael, and members of their immediate families) retained voting control over Adelphia, and also privately owned another set of companies, the Managed Entities,

---

[2]     The Amended Complaint states that the breach-of-fiduciary-duty claim is brought by Coudersport TV, Highland Preferred, Highland Prestige, Highland Video, and Hilton Head, identified as "the Managed Entities."  (Am. Compl. 37).  As these entities are not parties to this suit, however, the Court construes this as a claim — like all the others — brought by Zito and Zito Media.

that were managed by Adelphia pursuant to management agreements: Highland Preferred, Highland Prestige, Highland Video, Hilton Head, and Coudersport TV.  (*Id.* ¶¶ 10-13 & n.3, 27). In addition, the Rigas family held partnerships (together with the Managed Entities, the "Rigas Family Partnerships" or "RFPs") that owned interests in the Managed Entities and in Adelphia securities, one of which was known as Highland Holdings.  (*Id.* ¶¶ 30-31).

Over the next fifteen or so years, Deloitte provided advice to Adelphia and the RFPs with respect to the manner in which certain transactions between and among these entities (known as "related party transactions") were to be documented and disclosed to the public.  Specifically, Deloitte advised that any receivables and payables among the RFPs, on the one hand, and Adelphia, on the other, should be disclosed on a net basis, rather than showing each balance individually.  (*Id.* ¶ 61).  Deloitte also advised on the proper accounting treatment for transactions known as "co-borrowing agreements," transactions into which Adelphia entered to acquire capital necessary to purchase new cable systems, upgrade older systems, and provide new services.  (*Id.* ¶¶ 67-73).  These agreements turned previously existing RFP credit facilities into "co-borrowing" facilities, with both an RFP and an Adelphia subsidiary named as borrowers.  (*Id.* ¶ 75).  Deloitte advised that funds drawn on these agreements did not need to be reflected on the Adelphia balance sheet so long as the RFP had the ability to repay the debt.  (*Id.* ¶¶  82, 91).

Deloitte also oversaw the use of funds borrowed under these co-borrowing agreements — specifically, to purchase additional Adelphia securities — and did not advise that the use of the funds in this manner raised any accounting or disclosure issues.  (*Id.* ¶¶ 100-03).  Finally, Deloitte approved of Adelphia's "marketing support" arrangements with its cable box vendors, agreements under which the vendors would provide funds to Adelphia and, in exchange,

Adelphia would advertise for the vendors.  (*Id.* ¶¶ 106-09).  At one point during its engagement, Deloitte apparently became concerned with certain unspecified accounting practices of James Brown, Adelphia's chief financial officer, but it did not communicate its concerns to the Rigases or to the Adelphia audit committee.  (*Id.* ¶ 152).

**B.  Adelphia's Failure and Subsequent Government Investigations**

In early 2002, the Securities and Exchange Commission ("SEC") announced new guidance as to how public companies should disclose off-balance sheet debt.  (*Id.* ¶ 112). Deloitte interpreted this guidance to mean that Adelphia had to disclose the co-borrowing facilities going forward, but it did not determine that Adelphia's prior disclosures had been deficient.  (*Id.* ¶¶ 112, 117).  In March 2002, after Deloitte had verbally approved a draft of Adelphia's 2001 10-K, but before the firm issued a formal audit opinion, Adelphia issued an earnings report that revealed the co-borrowing agreements, and held a conference call with analysts to discuss its earnings results.  (*Id.* ¶¶ 125-26).

Shortly thereafter, the SEC began to investigate Adelphia's accounting treatment and disclosure of the co-borrowing agreements.  (*Id.* ¶ 129).  Eventually, Deloitte refused to sign the audit opinion, and Adelphia could not issue its 2001 10-K.  (*Id.* ¶ 138).  Adelphia consequently defaulted under various agreements, its stock declined in value, and NASDAQ ultimately delisted the stock in June 2002.  (*Id.* ¶ 138).  The RFPs, whose value was tied to Adelphia's in various ways, lost value as well.  (*Id.* ¶¶ 139-40).

Following Adelphia's failure, the federal government brought civil and criminal charges against Adelphia and members of the Rigas family.  The SEC filed an action against Adelphia and John, James, Timothy, and Michael, and the federal government indicted John and Timothy on criminal charges relating to the practices discussed above, including Adelphia's treatment of

netting, co-borrowing arrangements, purchases of Adelphia securities, and marketing support agreements. (*Id.* ¶¶ 145-47). John and Timothy were eventually convicted of conspiracy, securities fraud, and bank fraud. (*Id.* ¶ 157). Following their convictions, the Rigas family entered into a global settlement with the government, pursuant to which the family members forfeited all of their interests in Adelphia and the RFPs to the federal government. (*Id.* ¶¶ 158-60). Prior to the forfeiture, however, Highland Holdings, Highland Preferred, Highland Prestige, Highland Video, and Hilton Head transferred all assets not retained in order to comply with the settlement agreement to Zito, including their litigation rights against Deloitte. (*Id.* ¶¶ 157-63). Coudersport TV was not forfeited to the government, and subsequently became Zito Media. (*Id.* ¶ 164).

## C.  Procedural History

Plaintiffs initially brought this suit against Deloitte in 2004 in the Court of Common Pleas of Philadelphia County. (Hoeffner Decl. (Docket No. 25), Ex. D). In their original Complaint, Plaintiffs asserted only three claims: breach of professional duty, contribution, and indemnity. (*Id.* ¶¶ 36-49). In 2005, the case was designated as related to an existing multidistrict litigation in the Southern District of New York and was transferred to this Court. (Docket No. 1). In October 2012, the matter was reassigned to the undersigned. Thereafter, Plaintiffs were granted leave to file an Amended Complaint, and did so on June 7, 2013. (Docket Nos. 19, 22). Deloitte now moves to dismiss the Amended Complaint.

## DISCUSSION

Deloitte raises three sets of arguments in support of its motion. First, Deloitte argues that one Plaintiff, Zito, lacks standing. (Def.'s Mem. (Docket No. 24) 6-7). Second, Deloitte advances several arguments for dismissal of most or all claims: (1) that they are derivative

claims brought on Adelphia's behalf and thus covered by Adelphia's prior release of all claims against Deloitte (*id.* 7-8); (2) that they are time barred (*id.* 8-12); and (3) that they are barred by the doctrine of *in pari delicto* (*id.* 12-13).  Finally, Deloitte contends that each claim should be dismissed for failure to state a claim.  (*Id.* 14-24).  The Court will address each set of arguments in turn.

## A.  Applicable Legal Standards

To survive a Rule 12(b)(6) motion, a plaintiff must generally plead sufficient facts "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id.* at 570.

## B.  Deloitte's Motion to Dismiss Zito's Claims

Deloitte first argues that Zito is "not a proper plaintiff" because it never acquired the litigation rights of its putative predecessors-in-interest.  (Def.'s Mem. 6).  Reformulated, the argument is that Zito has no legally protected interest in this suit, and thus lacks standing under Article III of the Constitution.  *See Port Wash. Teachers Ass'n v. Bd. of Educ. of Port Wash. Union Free Sch. Dist.*, 478 F.3d 494, 498 (2d Cir. 2007) (outlining the requirements for constitutional standing, including an "invasion of a legally protected interest").  More

specifically, Deloitte challenges the validity of the transfers of litigation rights from the RFPs to Zito, arguing that the RFPs actually forfeited their assets to the government before the transfers of litigation rights took place. (Def.'s Mem. 6). Deloitte further contends that Plaintiffs have already litigated and lost this issue before the Second Circuit in *Zito I, L.P. v. Century/MLV Cable Venture*, 311 F. App'x 455 (2d Cir. 2009) ("*Zito I*"), and are therefore precluded from arguing otherwise.

Deloitte's preclusion argument is misplaced, however, as *Zito I* held only that the transfer of litigation rights from Highland Holdings to Zito was invalid. *Id.* at 456-57. In this case, Zito asserts rights as the successor-in-interest not only to Highland Holdings, but also to Highland Preferred, Highland Prestige, Highland Video, and Hilton Head. (Am. Compl. ¶ 3). Thus, the issues in the two suits are not identical, and collateral estoppel does not apply. *See, e.g.*, *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (noting that collateral estoppel applies only if "the identical issue was raised in a previous proceeding" (internal quotation marks omitted)). Moreover, there is reason to believe that the effect of the government forfeiture on the transfer from Highland Holdings to Zito may have differed from the effect of the forfeiture on the transfer from Highland Preferred to Zito, as Plaintiffs assert that only some of Highland Preferred's assets — not including litigation rights — were forfeited to the government. (Pls.' Mem. (Docket No. 27) 4-5). At a minimum, there is no basis in the present record to question the Amended Complaint's claim that Zito acquired litigation rights from Highland Preferred. Accordingly, the Court declines to dismiss Zito as a Plaintiff at this stage of the case.

**C.  Deloitte's Motion to Dismiss All or Most Claims**

As noted, Deloitte next raises several arguments for dismissal of most or all claims: (1) that they are derivative claims improperly brought on Adelphia's behalf; (2) that they are time barred; and (3) that they are barred by the doctrine of *in pari delicto*.

**1.   Whether Plaintiffs' Claims Are Derivative**

Deloitte's first argument as to all claims — that they are derivative rather than direct — is relatively easily rejected.  A derivative suit is one in which a "shareholder sues on behalf of the corporation for *harm done to it*," whereas a direct action is one in which shareholders sue "for *injuries done to them* in their individual capacities by corporate fiduciaries."  *Kramer v. W. Pac. Indus. Inc.*, 546 A.2d 348, 351 (Del. 1998) (quoting R. CLARK, CORPORATE LAW 639-40 (1986)) (internal quotation marks omitted); *see also Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (explaining that a direct claim is one where "the duty breached was owed to the stockholder and [where] he or she can prevail without showing an injury to the corporation").[3]  Here, Plaintiffs are not seeking to recover for harms done to Adelphia; instead, they are seeking to recover for breaches of duties allegedly owed to them and that allegedly existed independent of their status as Adelphia shareholders.  In particular, Plaintiffs claim that Deloitte breached contractual agreements to which the Managed Entities and Deloitte were parties (Am. Compl. ¶¶ 169-79), that Deloitte breached professional and fiduciary duties arising out of the particular relationship between the Managed Entities and Deloitte (*id.* ¶¶ 193-98, 202-

---

[3]       As the parties agree (Def.'s Mem. 7 n.8; Pls.' Mem. 8), because the classification of claims as direct or derivative relates to the internal affairs of a corporation, the law of the state of incorporation — here, Delaware — applies.  *See* 15 Pa. C.S.A. § 4145(a) (providing that in "any action or proceeding brought by a shareholder . . . of a foreign domiciliary corporation . . . against the corporation . . . . the court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which the foreign domiciliary corporation was incorporated").

03, 254-60), that Deloitte negligently misrepresented to Plaintiffs that it would advise them of risks associated with related party transactions (*id.* ¶ 218), and that Deloitte knowingly interfered with Plaintiffs' contractual relationships by refusing to sign the 2001 audit (*id.* ¶¶ 240-43). Plaintiffs allege numerous ways in which Deloitte's actions harmed them directly, including causing them to default under certain agreements (*id.* ¶¶ 138, 185, 209, 233, 247, 263; Pls.' Mem. 8 n.3), incur millions of dollars in defense costs (Am. Compl. ¶¶ 187, 211, 235, 249, 265), and forfeit assets to the government (*id.* ¶¶ 188, 212, 236, 250). These alleged harms do not depend on proof of any harms to Adelphia itself and, as such, are properly classified as direct claims. The Court therefore declines to dismiss Plaintiffs' claims on these grounds.

### 2. Whether Plaintiffs' Claims Are Timely

Deloitte's next argument is that most of Plaintiffs' claims — in particular, their claims for breach of professional duty, tortious interference, breach of fiduciary duty, and breach of contract — are time barred. (Def.'s Mem. 9-11). As the parties agree (*id.*; Pls.' Mem. 9-10), whether Plaintiffs' claims are time barred is a function of Pennsylvania law, as Plaintiffs filed suit in Pennsylvania state court and their claims are brought under Pennsylvania law. *See In re Zyprexa Prods. Liab. Litig.*, 688 F. Supp. 2d 130, 146 (E.D.N.Y. 2009) ("A multidistrict litigation transferee court applies the . . . statute of limitations rules of the state in which the action was filed."). Under Pennsylvania law, an action may be commenced by filing with the prothonotary (that is, the clerk of court) either a complaint or a praecipe to issue a writ of summons (effectively, a summons). *See* Pa. R. Civ. P. 1007. Original process must then be served within thirty days within Pennsylvania, *see* Pa. R. Civ. P. 401, and within ninety days outside of Pennsylvania, *see* Pa. R. Civ. P. 404. If a plaintiff fails to serve a praecipe to issue a writ of summons in a timely fashion and "demonstrate[s] an intent to stall the judicial

9

machinery" — for example, by failing to make a good faith effort to provide notice to the defendant — the praecipe to issue a writ of summons will not toll the statute of limitations. *McCreesh v. City of Philadelphia*, 888 A.2d 664, 674 (Pa. 2005); *see also, e.g.*, *Denochick v. Demag*, 155 F. Supp. 2d 386, 388 (E.D. Pa. 2001).

In light of these rules, the question of whether Plaintiffs' breach-of-professional-duty claim is timely is not easily answered. As Deloitte concedes (Def.'s Mem. 10), Plaintiffs filed a praecipe to issue a writ of summons within the relevant statute of limitations. Complicating matters, however, although the writ listed Deloitte's Pennsylvania address, Plaintiffs did not serve the writ on Deloitte within Pennsylvania, let alone within the thirty days allowed by Rule 401; instead, they concede that they served the writ (or, more precisely, a substitute writ, as Plaintiffs purportedly lost the original writ) on Deloitte in New York, within the ninety days allegedly allowed by Rule 404. (Pls.' Mem. 9). Deloitte argues that this conduct demonstrated an "intent to stall the judicial machinery" and that filing of the original writ therefore did not toll the statute of limitations, which lapsed before the substitute writ was filed or served. (Def.'s Mem. 9-10). Plaintiffs, by contrast, contend that they acted in good faith by serving Deloitte at the "most logical place for service," its national office in New York. (Pls.' Mem. 10).

As this summary makes plain, the parties' dispute turns principally on the issue of Plaintiffs' intent. *See, e.g.*, *Reyes v. City of Reading*, 10 Civ. No. 702 (JRS), 2010 WL 2996959, at *2 (E.D. Pa. July 28, 2010) ("Whether a plaintiff made a good-faith effort to comply with the rules regarding service is a fact-specific inquiry, not an 'objective bright line' test." (quoting *McCreesh*, 888 A.2d at 674)). As such, it is not a matter that should be resolved at this stage of the litigation. *See, e.g.*, *FTA Mkt. Inc. v. Vevi, Inc.*, No. 11 Civ. 4789 (VB), 2012 WL 383945, at *3 (S.D.N.Y. Feb. 1, 2012) ("On a Rule 12(b)(6) motion, the Court may only dismiss an action

based on the statute of limitations if, on the face of the complaint, it is clear that the claim is untimely."); *cf., e.g.*, *Gold v. State Farm Fire & Cas. Co.*, 880 F. Supp. 2d 587, 595 (E.D. Pa. 2012) (finding, on summary judgment, insufficient evidence to dismiss plaintiff's claims based on an alleged "inten[t] to stall the judicial machinery"); *Washington v. Peavy*, No. 05 Civ. 6386, 2006 WL 1117857, at *4 (E.D. Pa. Apr. 25, 2006) (similar).  Thus, Deloitte's motion to dismiss the breach-of-professional-duty claim as untimely is denied.

As noted, Deloitte also moves to dismiss as untimely Plaintiffs' claims for tortious interference, breach of fiduciary duty, and breach of contract, which were brought for the first time in the Amended Complaint filed on June 7, 2013.  The Court need not address whether these claims "relate back" to the original Complaint, however, because they are all dismissed for failure to state a claim, as discussed below.

### 3.   Whether Plaintiffs' Claims Are Barred by *In Pari Delicto*

Deloitte's final broad-based argument is that Plaintiffs' claims are barred by the doctrine of *in pari delicto*, which is "an application of the principle that no court will lend its aid to a man who grounds his actions upon an immoral or illegal act."  *Joyce v. Erie Ins. Exchange*, 74 A.3d 157, 162 (Pa. Super. Ct. 2013) (quoting *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 458 A.2d 545, 548 (Pa. Super. Ct. 1983) (internal quotation marks omitted)).  Under that doctrine, a court must consider whether plaintiffs engaged in immoral or illegal conduct and, if so, whether the plaintiffs' "action is grounded upon their immoral or illegal conduct."  *Feld*, 458 A.2d at 552; *see also Joyce*, 74 A.3d at 165-66 (applying *Feld* by first asking "whether [plaintiff] engaged in illegal activity" and then evaluating whether "the civil action [was] grounded in [plaintiff's] illegal conduct.").  If those requirements are met, the plaintiffs' claims are barred.

Significantly, the inquiry does not, as Plaintiffs contend, require an "identity of the issues between the criminal case and the instant case." (Pls.' Mem. 14). Although an identity of issues is required for application of collateral estoppel, collateral estoppel is a distinct doctrine, and of no relevance here. Collateral estoppel is a far narrower doctrine, precluding only the "relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding," *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 728 (2d Cir. 1981), and the underlying rationales of the two doctrines are entirely different. *Compare Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) ("Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue . . . and of promoting judicial economy by preventing needless litigation."), *with Feld*, 458 A.2d at 552 ("The reason no court will lend its aid to an action grounded upon immoral or illegal conduct is that 'the law will not suffer itself to be prostituted.'" (quoting *Fowler v. Scully*, 72 Pa. 456, 468 (Pa. 1872))).

Indeed, *Feld* makes clear that *in pari delicto* does not require an identity of issues to apply. There, officers of a men's clothing business engaged, on the advice of counsel, in an illegal scheme to prevent the unionization of its warehouse employees. *Feld*, 458 A.2d at 547. The officers testified about this scheme at a hearing before the National Labor Relations Board ("NLRB") and were subsequently convicted of interfering with agents of the NLRB. *See Feld & Sons, Inc. v. Pechner, Dorfman, Wolffe, Rounick & Cabot*, 5 Phila. Co. Rptr. 582 (C.C.P. Phila. Co. July 2, 1981). The officers then brought suit against their law firm — which had counseled them on the anti-unionization scheme — for professional malpractice, infliction of emotional distress, deceit, and breach of contract. *Feld*, 458 A.2d at 548. Notwithstanding the fact that the officers' criminal convictions did not involve any fraud against their lawyers, the Court barred the subsequent civil suit, simply explaining that

12

> [w]ere we to aid [plaintiffs] — confessed perjurers — in their attempt to recover
> compensatory and punitive damages . . . we should indeed "suffer [the law] to be
> prostituted."  For we should reward [plaintiffs], with a great deal of money, for their
> criminal conduct; we should soften the blow of the fines and sentences imposed upon
> them; and we should encourage others to believe that if they committed crimes on their
> lawyers' advice, and were caught, they too might sue their lawyers and be similarly
> rewarded.

*Id.* at 552 (quoting *Fowler*, 72 Pa. at 468) (third alteration in original).  *Feld* thus makes clear

that application of the doctrine of *in pari delicto* in this case, or at least the principle that "no

court will lend its aid to a man who grounds his action upon an immoral or illegal act," does not

require an identity of issues between the Rigas convictions and the issues before the Court today;

nor does it require John Rigas to have been convicted of defrauding Deloitte.  Instead, the

doctrine applies if (1) a Plaintiff or Plaintiffs engaged in illegal conduct; and (2) that Plaintiff's

or those Plaintiffs' claims are "grounded upon [his or their] illegal conduct." *Feld*, 458 A.2d at

552.

     Given those principles, John Rigas's claims are indeed barred by *in pari delicto*. First,

John Rigas was convicted of conspiracy to commit securities fraud, conspiracy to make and

cause to be made false statements in filings with the SEC, conspiracy to commit bank fraud,

securities fraud, and bank fraud.  *United States v. Rigas*, 490 F.3d 208, 219 (2d Cir. 2007).[4]

These convictions conclusively establish that John Rigas did, indeed, commit these crimes.  *See*

*Harter v. Reliance Ins. Co.*, 562 A.2d 330, 333 (Pa. Super. Ct. 1989) (noting that Pennsylvania

courts "have consistently held that prior criminal convictions are admissible and conclusive

---

[4]    The Court is permitted to consider the Second Circuit's decision on this motion to
dismiss because it is a matter of public record.  *See, e.g.*, *Bd. of Managers of 195 Hudson St.
Condo. v. Jeffrey M. Brown Assocs.*, 652 F. Supp. 2d 463, 471, 474-78 (S.D.N.Y. 2009) ("The
Court may properly rely on matters of public record in deciding a motion to dismiss under Rule
12(b)(6), including the public record of prior judicial decisions." (internal quotation marks
omitted)).

evidence in subsequent civil actions arising out of the same incidents and concerning the same activity which was criminally prosecuted in the prior action," and collecting cases); *see also Hurtt v. Stirone*, 206 A.2d 624, 626 (Pa. 1965) ("The defendant should not now be heard to deny that which was established by his prior criminal conviction, without proof that his conviction was procured by fraud, perjury or some manner of error now sufficient to upset the conviction itself.").

Second, John Rigas's claims are grounded upon the conduct for which he was convicted. At bottom, the factual allegations upon which the Amended Complaint is premised can be divided into three sets of conduct. First, Plaintiffs allege that Deloitte failed to advise them that the method by which related party transactions were documented could be viewed as inappropriate — which Plaintiffs claim represented a breach of contract (Am. Compl. ¶ 176), breach of professional duty (*id.* ¶ 198), and negligent misrepresentation (*id.* ¶ 219). Second, Plaintiffs point to Deloitte's refusal to sign the 2001 audit (*id.* ¶ 133), and argue that this failure constituted a breach of contract (*id.* ¶ 184), breach of professional duty (*id.* ¶ 208), negligent misrepresentation (*id.* ¶ 232), tortious interference (*id.* ¶ 243), and breach of fiduciary duty (*id.* ¶ 262). And third, Plaintiffs allege that Deloitte failed to share with Plaintiffs its concerns that James Brown should not be functioning as a chief financial officer of a public company (*id.* ¶ 152), a failure that allegedly also constituted a breach of contract (*id.* ¶ 178), breach of professional duty (*id.* ¶ 202) and negligent misrepresentation (*id.* ¶ 227).

John Rigas has already been held criminally responsible for each of these alleged misdeeds. For example, the Second Circuit specifically discussed the improper documentation of related party transactions when outlining the conduct of which John Rigas was convicted. *See Rigas*, 490 F.3d at 214-15 (discussing how defendants, contrary to their representations in public

filings, paid for Adelphia securities by moving debt Adelphia owed under the co-borrowing agreements to the financial statements of the Managed Entities, and how the defendants masked debts that the Managed Entities owed to Adelphia by reporting these amounts on a net basis and memorializing them in ledger journal entries). Similarly, John Rigas was held criminally liable for improper treatment of the co-borrowing agreements, *see id.* at 215, so he is barred from recovering against Deloitte for its decision not to sign the 2001 audit, the basis of which was the SEC's concern with "Adelphia's accounting treatment and disclosure of the co-borrowing agreements." (Am. Compl. ¶ 129). And finally, John Rigas cannot hold Deloitte liable for its failure to alert Plaintiffs to James Brown's "misunderstand[ing] [of] financial reporting issues" (*id.* ¶ 151), because the improper disclosure of accounting issues was previously attributed to John Rigas's intentional conduct. *See Rigas*, 490 F.3d at 221. As in *Feld*, were this Court to permit John Rigas to recover against Deloitte, the Court would "reward [him] with a great deal of money, for [his] criminal conduct; [would] soften the blow of the fines and sentences imposed upon [him]; and [would] encourage others to believe that if they committed crimes on their [accountants'] advice, and were caught, they too might sue their [accountants] and be similarly rewarded." *Feld*, 458 A.2d at 552.

Whether *in pari delicto* prevents Plaintiffs other than John Rigas from bringing claims against Deloitte, however, is a separate question. None of the other Plaintiffs was prosecuted, let alone convicted. Nevertheless, Deloitte argues that their claims should be barred pursuant to the doctrine of imputation, which "recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP (AHERF)*, 989 A.2d 313, 333 (Pa. 2010). That is, Deloitte contends that the other Plaintiffs should be held

accountable for John and Timothy Rigas's crimes because the two committed those crimes "in the course of their employment as . . . the owners and operators of the entity plaintiffs" and because the wrongdoing "was for the benefit of . . . the entity plaintiffs."  (Def.'s Mem. 13).

At this stage of the proceedings, however, the Court cannot dismiss the claims of these other Plaintiffs based on the doctrine of *in pari delicto* via imputation.  To begin with, Deloitte does not advance any theory as to how John Rigas's behavior could be imputed to James Rigas. As for the entity Plaintiffs, although the Supreme Court of Pennsylvania recently affirmed the applicability of imputation in this type of case, *see AHERF*, 989 A.2d at 339 ("[I]mputation . . . may extend to scenarios involving auditor negligence . . . ."), its applicability turns in part on whether the defendant dealt with the principal in good faith; if the defendant did not do so, imputation does not apply, *see id.*  In addition, the doctrine of imputation is subject to an adverse interest exception, which negates imputation where the "agent acts in his own interest, and to the corporation's detriment."  *Id.* at 333.  Here, Plaintiffs have alleged that Deloitte acted in bad faith towards the Managed Entities and the Rigases by "plac[ing its] self-interests above the best interests of its clients."  (Am. Compl. ¶ 137).  In addition, the Amended Complaint alleges facts that could support application of the adverse interest exception, as John Rigas's actions ultimately led to the downfall of the RFPs.  Assuming the truth of these allegations, as the Court must here, there is no basis to apply *in pari delicto* to any Plaintiff other than John Rigas.

**D.  Specific Claims**

Finally, the Court turns to Deloitte's arguments with respect to Plaintiffs' individual claims.  As noted, Plaintiffs allege breach of contract, breach of professional duty, negligent misrepresentation, tortious interference, breach of fiduciary duty, contribution, and indemnity.

Deloitte argues that on each of these counts, Plaintiffs fail to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The Court addresses each claim in turn.

### 1.   The Amended Complaint Fails To State a Claim for Breach of Contract

Plaintiffs' breach-of-contract claim is based on Deloitte's alleged failure to advise Plaintiffs that the method by which certain related party transactions were recorded, structured, accounted for, and disclosed could be viewed as inappropriate, and "by failing to cooperate with [Plaintiffs] with respect to the defense of such transactions."  (Pls.' Mem. 17; Am. Compl. ¶ 176).  These failures, Plaintiffs argue, constituted a breach of the agreement between the Managed Entities and Deloitte, under which Deloitte undertook to audit the Managed Entities' financial statements (Am. Compl. ¶ 41), provide accounting advice (*id.* ¶ 29), and review, analyze, and ensure that all related party transactions were "appropriately accounted for and . . . . identify deficiencies and  risks associated with such transactions," (*id.* ¶ 169; *see also* Pls.' Mem. 16).

This claim fails, however, because Plaintiffs do not allege breach of a specific duty imposed by the contract.  To survive a motion to dismiss on a breach-of-contract claim, a plaintiff must plead "(1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages."  *Chanel, Inc. v. Jupiter Grp.*, No. 04 Civ. 1540 (ARC), 2006 WL 1793223, at *6 (M.D. Pa. June 27, 2006); *see also J.F. Walker Co. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002).  A plaintiff need not attach the contract to the complaint or plead its terms verbatim, *see, e.g., Jones v. Select Portfolio Servicing, Inc.*, No. 08 Civ. 972, 2008 WL 1820935, at *4 (E.D. Pa. Apr. 22, 2008), but he or she must "identify the breach of a specific contract provision," *Hart v. Univ. of Scranton*, No. 11

Civ. 1576 (ARC), 2012 WL 1057383, at *3 (M.D. Pa. Mar. 28, 2012) (citing *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 404 (Pa. Super. Ct. 1992)).

Plaintiffs have not done so here.  At most, they allege that Deloitte was obligated to "ensure that [related party transactions] were appropriately accounted for and disclosed," (Am. Compl. ¶ 169), and "identify deficiencies and risks associated with such transactions" (*id.*). Plaintiffs do not, however, indicate what, exactly, Deloitte was required to do to ensure the appropriate accounting of related party transactions, what was meant by "appropriate" accounting and disclosure, or the manner in which Deloitte was required to identify these risks — and they do not even identify the source of these obligations, including whether the agreement was made orally or in writing.  *See, e.g.*, *Deron v. SG Printing, Inc.*, No. 11 Civ. 1934 (JMM), 2012 WL 1902577, at *4 (M.D. Pa. May 25, 2012) (noting that "[a] complaint alleging a breach of contract should clearly identify whether the alleged contract is written or oral," and dismissing the claim because plaintiff failed to provide the content of the allegedly breached terms of an employment contract); *Domiano v. Old Forge Bank* (*In re Domiano*), 422 B.R. 497, 504 (Bankr. M.D. Pa. 2009) (dismissing a breach-of-contract claim where the complaint "fail[ed] to recite the essential terms of the contract which was allegedly breached," noting that the court "should not be asked to speculate as to the terms of the alleged contract").  Accordingly, the breach-of-contract claim is dismissed.

## 2.  The Amended Complaint States a Claim for Breach of Professional Duty

Next, Plaintiffs assert a breach-of-professional-duty claim — also known as professional negligence — based on Deloitte's allegedly faulty accounting advice.  (Am. Compl. ¶ 198). Deloitte makes two arguments as to why this claim fails.  First, Deloitte contends that Plaintiffs fail to sufficiently allege that Deloitte owed them a duty of professional care because, "[a]s is the

case with respect to their breach of contract claim, plaintiffs fail to allege a sufficiently contractual relationship with Deloitte." (Def.'s Mem. 16).  Second, Deloitte asserts Plaintiffs fail to sufficiently allege a breach of the duty of care, because the complaint contains "no allegations regarding the applicable standard of care for members of the accounting community."  (*Id.*).

These arguments are unpersuasive.  First the ultimate defect in Plaintiffs' contract claim was not a failure to allege a contractual relationship, but rather a failure to specify the terms of the purported contract that were allegedly breached.  Plaintiffs do allege privity of contract between the Managed Entities and Deloitte (*see* Am. Compl. ¶¶ 38-43, 169-71), which gives rise to a duty of professional care.  *See, e.g.*, *Guy v. Liederbach*, 459 A.2d 744, 746 (Pa. 1983). Deloitte's references to *Red Rose Motors, Inc. v. Boyer & Ritter*, 66 Pa. D. & C.4th 73 (Pa. Com. Pl. 2004), and *Brandow Chrysler Jeep Company v. Datascan Technologies*, 511 F. Supp. 2d 529 (E.D. Pa. 2007), are thus unavailing.  The question of duty arose in *Red Rose* at the summary judgment stage, where the court could engage in a review of the contractual agreement to determine the scope of duties imposed on the defendants, *see* 66 Pa. D. & C. 4th at 79-81; here, on a motion to dismiss, the Court must accept Plaintiffs' allegations as true — which, as discussed above, include an allegation of privity of contract.  And *Brandow Chrysler* is distinguishable because plaintiffs' theory of duty there did not rest on privity of contract, but rather on the premise that the parties maintained a "bond so close as to approach that of privity." 511 F. Supp. 2d at 538 (internal quotation marks omitted).  Thus, the argument that "plaintiffs [cannot] establish [a] bond *approaching* privity . . . where [they are] not the 'end aim' of [the] transaction between [the] auditor and client" is of no relevance here.  (Def.'s Mem. 15 (emphasis added)).

Deloitte's second argument is also unavailing. Deloitte's primary contention is that the Amended Complaint does not allege a failure to comply with the "applicable standard of care for members of the accounting community," such as the Generally Accepted Auditing Standards ("GAAS") or Generally Accepted Accounting Principles ("GAAP"). (Def.'s Mem. 16). But Deloitte provides no support for the proposition that Plaintiffs must do so in order to survive a motion to dismiss. Although failure to comply with GAAS or GAAP may constitute a breach of the duty of professional care, *see, e.g.*, *Official Comm. of Unsecured Creditors of Corell Steel v. Fishbein & Co.*, No. 91 Civ. 4919 (LHP), 1992 WL 196768, at *6 (E.D. Pa. Aug. 10, 1992), it does not follow that Plaintiffs are required to plead such a failure. Instead, to state a claim for a breach of the duty of professional care, Plaintiffs must simply allege that Deloitte failed to exercise skill "as reasonably prudent, skillful accountants would use under the circumstances." *Robert Wooler Co. v. Fid. Bank*, 479 A.2d 1027, 1031 (Pa. Super. Ct. 1984) (emphasis omitted) (internal quotation marks omitted); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, No. 10 Civ. 704 (WLS), 2012 WL 2150744, at *6 (W.D. Pa. June 12, 2012) ("[T]he accountant can breach his or her professional duties to the client if he or she encounters suspicious circumstances, *i.e.*, "red flags," and fails to disclose them to the client."). They do so. (Am. Compl. ¶ 198 ("Deloitte failed to exercise an appropriate standard of care, *inter alia*, by failing to disclose to Plaintiffs that related party transactions should be formally documented by contract, and by failing to advise Plaintiffs of the risk that Deloitte's accounting determinations with respect to related party transactions . . . could be subject to challenge.")). Deloitte's motion to dismiss the breach-of-professional-duty claim is thus denied.

### 3.   The Amended Complaint Fails To State a Claim for Breach of Fiduciary Duty

Third, Plaintiffs bring a breach-of-fiduciary-duty claim.  Deloitte moves to dismiss the claim on the ground that Plaintiffs have failed to allege a fiduciary relationship.  In particular, Deloitte points to the professional nature of the relationship between the parties, and argues that a relationship of that sort does not, as a matter of law, give rise to fiduciary obligations.  (Def.'s Mem. 18-19).  Plaintiffs counter that the facts as alleged do generate fiduciary obligations, given Plaintiffs' "reli[ance] on Deloitte's expertise in every aspect of their financial processes."  (Pls.' Mem. 21).  Deloitte has the better of this argument.

"A fiduciary relationship exists where there is a relationship involving trust and confidence, and . . . confidence reposed by one side and domination and influence exercised by the other."  *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 401 (E.D. Pa. 2009) (internal quotation marks omitted).  The critical question in determining whether a fiduciary relationship exists is "whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side."  *EToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 23 (Pa. Super. Ct. 2002) (emphasis omitted) (quoting *Basile v. H & R Block, Inc.*, 777 A.2d 95, 101 (Pa. Super. Ct. 2001)).  Such a relationship "is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power."  *Id.* at 23 (citing *Basile*, 777 A.2d at 102).  "Most commercial contracts for professional services involve one party relying on the other party's superior skill or expertise," but "[t]his does not mean . . . that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party."  *Id.*  Indeed, such

a rule would inappropriately generate a fiduciary relationship "whenever one party had any marginally greater level of skill and expertise in a particular area than another party." *Id.*

Plaintiffs fail to plausibly allege the existence of a fiduciary relationship. It is true, as Plaintiffs point out, that courts may impose fiduciary responsibilities in business contexts where clients, "by virtue of their own weakness or inability, the advisor's pretense of expertise, or a combination of both, invest such a level of trust that they seek no other counsel." (Pls.' Mem. 20-21 (citing *Basile*, 777 A.2d at 102)). But the level of "weakness or inability" required is far greater than is alleged here. Plaintiffs rely heavily on *Basile*, where the Pennsylvania Superior Court held that a fiduciary relationship could exist where evidence suggested the "pronounced intellectual and economic weaknesses" of the clients, individual taxpayers allegedly defrauded by H & R Block, Inc. The Court noted that "a significant segment of the company's customers were those of $10,000 to $15,000 annual income, unemployed or employed in service occupations, and possessed of less than a high school education." *Basile*, 777 A.2d at 104-06. That is a far cry from the Plaintiffs here, who include: John Rigas, a "pioneer of the cable television industry" who graduated from Rensselaer Polytechnic Institute (Am. Compl. ¶¶ 9-10); James Rigas, a graduate of Harvard College and Stanford University (*id.* ¶ 11); and a set of entities controlled by a family including John and James, as well as Timothy Rigas, who attended the Wharton School of the University of Pennsylvania (*id.* ¶ 12), and Michael Rigas, a graduate of Harvard College and Harvard Law School (*id.* ¶ 13). The mere fact that Plaintiffs "relied on Deloitte's expertise in every aspect of their financial processes, and . . . were justified" in doing so (Pls.' Mem. 21) does not give rise to a fiduciary relationship. Instead, Plaintiffs must allege "overmastering influence" on one side or "weakness, dependence, or trust, justifiably

reposed" on the other, which they have failed to do in a plausible manner.  *Basile*, 777 A.2d at

101.  Accordingly, Deloitte's motion to dismiss the breach-of-fiduciary-duty claim is granted.

### 4.  The Amended Complaint States a Claim for Negligent Misrepresentation

Fourth, Plaintiffs bring claims for negligent misrepresentation.  Plaintiffs raise a number

of allegedly material omissions and misrepresentations in the Amended Complaint, including

Deloitte's promise that "the 2001 audit was essentially complete and that it would issue a clean

audit report within days."  (Am. Compl. ¶ 180).[5]  Deloitte argues that this statement was merely

a "statement[] of future intent," which is actionable only if false at the time of utterance, and that

Plaintiffs have failed to allege such falsity.  (Def.'s Mem. 21).  This argument, however, does not

support dismissal at this stage, because whether Deloitte's statement was "honestly made [with]

the intention in fact to perform in the future entails questions of fact."  *Rosen v. Comm'n Servs.*

*Grp., Inc.*, 155 F. Supp. 2d 310, 321 (E.D. Pa. 2001) (alteration in original) (internal quotation

marks omitted).  All Plaintiffs must allege to survive Deloitte's motion is: "(1) a

misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter

ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which

results in injury to a party acting in justifiable reliance on the misrepresentation."  *Bortz v. Noon*,

729 A.2d 555, 561 (Pa. 1999).  They have done so here: They claim that, based on Deloitte's

representation that it would issue a clean audit report, they issued a press release announcing

earnings, but then were unable to issue a 2001 10-K, ultimately resulting in a variety of injuries.

---

[5]      Although Plaintiffs state in their memorandum of law that this statement is "not the crux"
of their negligent misrepresentation claim (Pls.' Mem. 23), it is not clear that they have
abandoned this theory of negligent misrepresentation.  *See, e.g.*, *Nichols v. BAC Home Loans
Servicing LP*, No. 13 Civ. 224 (DNH), 2013 WL 5723072, at *5 n.6 (N.D.N.Y. Oct. 18, 2013)
(addressing a claim on the merits where it was unclear whether the plaintiff had abandoned it in
response papers).

(Am. Compl. ¶¶ 228-238).  As such, Deloitte's motion to dismiss the negligent misrepresentation claim is denied.

### 5.   The Amended Complaint Fails To State a Claim for Tortious Interference

Plaintiffs also bring a tortious interference claim.  This claim is based on Deloitte's refusal to sign the 2001 audit report, which Plaintiffs claim Deloitte knew would cause them to default on its co-borrowing agreements.  (Am. Compl. ¶¶ 74-76, 81-89, 242-44; *see also* Pls.' Mem. 19-20).  A claim of tortious interference with contract requires, among other things, allegations that the defendant possessed "the purpose or intent to harm the plaintiff."  *Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. Ct. 2008).  Plaintiffs claim that they have sufficiently alleged intent because intent includes consequences that are "certain, or substantially certain, to result from [a party's] acts," and Deloitte "knew its refusal to issue audited financials for the co-borrowing facilities would cause an event of default."  (Pls.' Mem. 19).

 Plaintiffs' claim fails, however, because they misstate the law.  Pennsylvania courts have made clear that to prevail on a claim for tortuous interference, a plaintiff must plead and prove that the defendant acted "'for the specific purpose of causing harm to the plaintiff.'"  *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 934 (Pa Super. Ct. 2013) (quoting *Phillips*, 959 A.2d at 429); *see also Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (Pa. 1971) ("The defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it." (internal quotation marks omitted)).  The only authority Plaintiff cites for the contrary proposition, *Weiley v. Albert Einstein Medical Center*, 51 A.3d 202 (Pa. Super. Ct. 2012), concerns the intent that is required for an entirely different tort, intentional interference with a dead body.  *Id.* at 209-11.  In the Amended Complaint, Plaintiffs merely allege that Deloitte's refusal to sign the 2001 audit report was intended to "elevate

protection of [its own] self-interests over the interests of Plaintiffs," and that Deloitte knew that

its failure to sign the report would result in Plaintiffs defaulting on their credit agreements.  (Am.

Compl. ¶ 243).  They do not allege any facts suggesting that, in refusing to sign the audit report,

Deloitte specifically intended these consequences.  Accordingly, the Amended Complaint fails to

state a claim for tortious interference, and Deloitte's motion to dismiss this claim is granted.

### 6.  **The Amended Complaint Fails To State Claims for Indemnity and Contribution**

Finally, Plaintiffs bring claims for indemnity and contribution, but these claims fail as a

matter of law as well.  First, Plaintiffs did not respond to Deloitte's arguments with respect to

their indemnity claim in their memorandum of law in opposition to the motion to dismiss.  Thus,

the indemnity claim is deemed abandoned and dismissed on that basis.  *See, e.g.*, *Garten v.

Hochman*, No. 08 Civ. 9425 (PGG), 2010 WL 2465479, at *6 (S.D.N.Y. June 16, 2010)

(dismissing certain claims because "[i]n response to Defendants' contention that he failed to

adequately plead this claim, [Plaintiff] presents no factual or legal argument" (citation omitted));

*Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08 Civ. 8786 (RMB), 2009 WL 856682, at

*9 (S.D.N.Y. Mar. 30, 2009) (similar); *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710,

723 (S.D.N.Y. 2005) (similar).

Second, Plaintiffs do not allege the elements of a contribution claim.  It is unclear

whether Plaintiffs' theory of contribution is based on Pennsylvania law or federal securities law,

but, in either case, their allegations are deficient.  Any contribution claim under Pennsylvania

law would be lacking, because Pennsylvania law permits a right of contribution only where "(1)

two or more persons are found jointly and severally liable in tort and (2) if one of the tortfeasors

has paid more than his or her pro rata share of the common liability."  *Penn. Nat'l Mut. Cas. Ins.

Co. v. Nicholson Constr. Co.*, 542 A.2d 123, 125 (Pa. Super. Ct. 1988).  Plaintiffs do not allege

any torts for which they are jointly and severally liable, or for which they paid more than their pro rata share and seek contribution.

To the extent that Plaintiffs claim contribution based on payments they made in the global settlement of their federal securities law claims — and to the extent that this theory does not impermissibly amend the Amended Complaint, *see K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss.") — this claim fails as well, because a claim for contribution based on federal securities fraud must allege that both parties violated the securities laws, *see Fromer v. Yogel*, 50 F. Supp. 2d 227, 235 (S.D.N.Y. 1999) ("Under the federal securities laws, such a claim must be based on allegations that all the parties violated securities laws, not based on allegations that the Defendants defrauded Plaintiffs.").[6]  Plaintiffs make no such allegations with respect to either themselves or Deloitte.  Accordingly, their contribution claim is also dismissed.

## CONCLUSION

For the reasons stated above, Deloitte's motion to dismiss is GRANTED in part and DENIED in part.  John Rigas's claims are barred by the doctrine of *in pari delicto*, so he is dismissed as a Plaintiff from this suit.  The other three Plaintiffs remain, but only with respect to the breach-of-professional-duty and negligent misrepresentation claims.  The breach-of-contract, breach-of-fiduciary-duty, tortious interference, indemnity, and contribution claims are dismissed.

---

[6]     Because this is an issue of federal law, the law of the Second Circuit controls.  *See Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *In re Korean Air Lines Disaster*, 829 F.2d 1171 (D.C. Cir. 1987)).

The Clerk of Court is directed to terminate both Docket No. 38 and John Rigas as a party in 05 Civ. 2770.

SO ORDERED.

Dated: December 27, 2013
       New York, New York

_____
JESSE M. FURMAN
United States District Judge